UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN CAPANNARI, JOHN A. ANDERSON
And KEVIN EICKMANN,

                          Plaintiffs,

vs.

GLEN GALEMMO, QUEEN CITY
INVESTMENT FUND II, LLC, QUEEN CITY
ADVISORS, LLC, GALEMMO INVESTMENT
GROUP, QUEEN CITY INVESTMENT
FUNDS, QUEEN CITY INVESTMENTS,
QUEEN CITY HEDGE FUND,
QC POWER STRATEGIES FUND SWEEP
ACCOUNT, LLC, QC POWER STRATEGIES
FUND, LLC, QUEEN CITY POWER
STRATEGIES FUND II, LLC, QUEEN CITY
HOLDINGS, LLC, SENTINEL PROPERTY
HOLDINGS, LLC, GLEN ROCK, LLC,
SENTINEL STRATEGY FUND, LLC,
SENTINEL BLACKBOX, LLC, QFC, LLC,
MIDWEST HOOPS AT SPORTSPLUS, LLC,
CINCINNATI ROYALS, INC., QUEEN CITY
HEDGE FUND LLC, BAMMB, LLC, W.
BERNARD KYLES & CO., INC., WILEY B.
KYLES, CHARLES G. SIMON, CPA, PSIF
LLC, RUGGED POWER INVESTMENTS
LLC, RUGGED POWER MANAGEMENT
LLC, KRISTINE GALEMMO, JOSHUA
LOGSDON, NICHOLAS ROSATI, RICHARD
ECKES, JAMES HULL, SEBASTIAN
LOGSDON, JAMES PERRY TRUST, ASL
PROPERTIES, INC., LUTHER LYNN
SHELBY, WILLIAM COX, IRWIN COHEN,
ALLISON BRISTOL, WILLIAM BRISTOL,
ROB MORRIS, LEONARD MORRIS,
RICHARD MORRIS, IRA STEIN, LESLIE
STEIN, ON-RAMP WIRELESS, INC.,
STEVEN SMITH, ANDREW MILLER,
LARRY RICHARDSON, LARRY WEIN, L.W.

Case No.: 1:13-cv-883
(Judge Michael R. Barrett)
(Mag. Judge Stephanie Bowman)

**FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS,
STATE LAWS, AND DAMAGES; AND**

**VERIFIED LIMITED LIABILITY
COMPANY MEMBER DERIVATIVE
COMPLAINT**

(JURY TRIAL DEMANDED)

CAPITAL CORPORATION, JOSEPH A.
GALEMMO, SR., CHERYL A. GALEMMO,
JOSEPH A. GALEMMO, JR., MARY ANN
GALEMMO and John Does 1-50

                    Defendants.

Plaintiffs John Capannari ("Capannari"), John Anderson ("Anderson") and Kevin

Eickmann ("Eickmann") (together "Plaintiffs"), file this First Amended Class Action Complaint

against Defendants Glen Galemmo ("Galemmo"), Queen City Investment Fund II, LLC, Queen

City Advisors, LLC, Galemmo Investment Group, Queen City Investment Funds, Queen City

Investments, Queen City Hedge Fund,  QC Power Strategies Fund Sweep Account, LLC, QC

Power Strategies Fund, LLC, QC Power Strategies Fund II, LLC, Queen City Holdings, LLC,

Sentinel Property Holdings, LLC, Glen Rock, LLC, Sentinel Strategy Fund, LLC, Sentinel

Blackbox, LLC, QFC, LLC, Midwest Hoops at SportsPlus, LLC, Cincinnati Royals, Inc., Queen

City Hedge Fund, LLC, BAMMB, LLC, (the "Galemmo Entities" or "Galemmo Defendants"),

W. Bernard Kyles & Co., Inc. and Wiley B. Kyles (the "Kyles Defendants"), and Charles G.

Simon, (collectively "Accountant Defendants"), PSIF LLC, Rugged Power Investments, LLC

("RPI"), Rugged Power Management, LLC ("RPM"),  Kristine Galemmo ("K. Galemmo"),

Joshua Logsdon, Nicholas Rosati, Richard Eckes, James Hull and Sebastian Logsdon ("Rugged

Power Defendants"), James Perry Trust and ASL Properties, Inc. (together "Perry Defendants"),

Luther Lynn Shelby ("Shelby"), William Cox ("Cox"), Irwin Cohen ("Cohen"), Allison Bristol

and William Bristol (the "Bristol Defendants"), Rob Morris ("Rob Morris"), Leonard Morris

("L. Morris"), Richard Morris ("Richard Morris"), Ira Stein and Leslie Stein (the "Stein

Defendants"), Steven Smith ("Smith"), Andrew Miller ("Miller"), Larry Richardson

("Richardson"), Joseph A. Galemmo, Sr. and Cheryl A. Galemmo (together "Joseph A.

2

Galemmo, Sr. Defendants"), Larry Wein and L.W. Capital Corp. (together "Wein Defendants") and John Does 1-50 (collectively the "Clawback Defendants).

Plaintiff John Capannari files this Verified Limited Liability Company Member Derivative Complaint on behalf of nominal Defendants QC Power Strategies Fund LLC ("QCP") and QFC, two Galemmo Entities engaged in the wholesale electricity trading market. All of Plaintiff's derivative claims are based on personal knowledge as to his own accounts, and information and belief as to all other allegations, formed after an investigation by counsel and analysis of available QCP and QFC documents and other available information.

The claims in this direct and derivative Complaint are as follows:

## INTRODUCTION TO SECURITIES AND STATE CLAIMS

1.     This class action is brought on behalf of approximately 200 investors who were fraudulently and unlawfully induced by Glen Galemmo and the Galemmo Entities to invest over $50,000,000 of their money from pension plans, IRAs, retirement accounts and other personal investment accounts in one of the largest Ponzi schemes in the history of Hamilton County, Ohio. Plaintiffs and Class members principally purchased membership interests in Queen City Investment Fund II, LLC ("Fund II"), an Ohio limited liability company purportedly formed by Defendant Galemmo as an investment fund to achieve capital appreciation by purportedly investing in stocks, bonds and other types of securities. In some cases, the Class members were induced to purchase "special deal" debt or equity securities that were fictional devices to get money into the Queen City funds and other affiliated Galemmo Entities and into the Defendants' pocket. Glen Galemmo and the Galemmo Entities repeatedly and falsely assured investors that their money was safely invested. Instead, however, Glen Galemmo and the Galemmo Entities, in violation of the securities laws of the United States and the laws of the State of Ohio, used the

money "invested" as their own personal "cookie jar," withdrawing whatever they personally needed without disclosure to the Class and forming and operating businesses for their own benefit. In fact, there is no accurate account of the use or whereabouts of the over $50,000,000 invested by Plaintiffs and Class members.

On July 17, 2013 at 7:31 a.m., Plaintiffs and Class members, without prior warning, received an e-mail from Defendant Glen Galemmo announcing that as of that date: "Queen City Investments will no longer be in operation." Glen Galemmo further advised that he had been instructed by counsel not to speak or interact with any "clients" and directed them to a Special Agent with the Internal Revenue Service ("IRS").

Plaintiffs and Class members have since learned that Glen Galemmo and the Galemmo Entities lied to investors and regulatory agencies about, among other things: (i) Fund II's investment strategies; (ii) Fund II's investment performance; (iii) Fund II's size and value; (iv) the value of each individual non-managing member's interest in Fund II; (v) the "fictional" special deals; and (vi) where and how investor monies were invested or held.

As a result of Glen Galemmo and the Galemmo Entities' violations of the federal securities laws designed to protect investors, as well as Ohio law, Fund II and all of the affiliated Galemmo Entities are shut down. Offices of the Galemmo Entities have gone dark and investor money remains unaccounted for. It is now clear that Defendant Glen Galemmo was operating a Ponzi scheme whereby he used money raised from new investors to pay back other investors and sustain the fraud. It is also clear that he received assistance in perpetuating his scheme from the Accountant Defendants. Those investors who received sums of money from Glen Galemmo and the Galemmo Entities that exceeded the amount of principal they invested are Clawback

4

Defendants.  Other investors such as the Plaintiffs and their families have suffered financial ruin due to the massive fraud perpetuated by Defendants.   This case seeks to right those wrongs.

## INTRODUCTION TO DERIVATIVE CLAIMS

2.     Plaintiff Capannari seeks to hold Galemmo, PSIF, K. Galemmo, and QFC Employees Joshua Logsdon ("J. Logsdon"), Nicholas Rosati ("Rosati"), Richard Eckes ("Eckes"), James Hull ("Hull"), and Sebastian Logsdon ("S. Logsdon") (collectively "the Power Traders") RPI, and RPM accountable for (1) their usurpation of corporate opportunities that belonged to QCP and QFC and therefore directly or indirectly to the Plaintiff and Class members; (2) their theft of QCP's and the Galemmo Entities' trade secrets; (3) their breaches of fiduciary duty owed to QCP and QFC; and (4) their other applicable violations of law that caused material monetary losses to Plaintiffs and Class members because the property of QCP and QFC either directly or indirectly belonged to them and not to QCP and  QFC.

3.     Plaintiff Capannari seeks to recoup for QCP and QFC (and indirectly for the Class members whose money was used to start and maintain the Galemmo Entities) all funds and the value of the assets that were usurped by Galemmo, PSIF, K. Galemmo, the Power Traders, RPI and RPM.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, Section 22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v, and Section 27 of the Securities Exchange Act ("Exchange Act") and supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims related to claims in this action that form part of the same case or controversy.

5.      The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as State and common law.

6.      In connection with the acts, conduct, and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), (c) and (d) because the Galemmo Defendants maintained executive offices in this district during the relevant time period, and many of the alleged acts, transactions, and conduct constituting violations of law occurred in this district.

## **PARTIES**

8.      Plaintiff John Capannari is a resident of Hamilton County, Ohio and was, at all times relevant, an investor in Fund II.

9.      Plaintiff John A. Anderson is a resident of Hamilton County, Ohio and was, at all times relevant, an investor in Fund II.

10.      Plaintiff Kevin Eickmann is a resident of Hamilton County, Ohio and was, at all times relevant, an investor in Fund II and special deals.

11.      Upon information and belief, Defendant Glen Galemmo ("Galemmo") currently resides in South Carolina, but at all times relevant, resided in Ohio and was the managing member of Fund II, as well as other Galemmo Entities.

12.     Defendant Fund II is an Ohio limited liability company formed on or about August 14, 2000, and had its principal place of business in Hamilton County, Ohio.

13.     Defendant Queen City Advisors, LLC, is an Ohio limited liability company formed on or about December 26, 2006 by K. Galemmo and had its principal place of business in Hamilton County, Ohio.   Upon information and belief, Glen Galemmo was the managing member of Queen City Advisors, LLC, which was the managing member of Fund II.

14.     Defendant Queen City Investment Funds, upon information and belief, is an unincorporated organization under which Defendant Galemmo transacted business in Hamilton County, Ohio.

15.     Defendant Queen City Hedge Fund LLC, upon information and belief, is an unincorporated organization under which Defendant Galemmo transacted business in Hamilton County, Ohio.  Queen City Hedge Fund LLC distributed information about Fund II.

16.     Defendant QC Power Strategies Fund II, LLC, is an Ohio limited liability company formed on or about May 1, 2013, and which transacted business in Hamilton County, Ohio.

17.     Defendant QC Power Strategies Fund Sweep Account, LLC, is an Ohio limited liability company formed on or about February 13, 2013, and which transacted business in Hamilton County, Ohio.

18.     Defendant QC Power Strategies Fund, LLC, is an Ohio limited liability company formed on or about September 21, 2012, and which transacted business in Hamilton County, Ohio.

19.     Defendant Queen City Holdings, LLC is an Ohio limited liability company formed on or about April 28, 1999 and which transacted business in Hamilton County, Ohio.

7

20.     Defendant Sentinel Property Holdings, LLC, is an Ohio limited liability company formed on or about August 13, 2012, and which transacted business in Hamilton County, Ohio.

21.     Defendant Sentinel Blackbox, LLC is a Delaware limited liability company formed on or about June 1, 2012, and which transacted business in Hamilton County, Ohio.

22.     Defendant BAMMB, LLC is an Ohio limited liability company, by information and belief, formed on or about August 28, 2007, and which transacted business in Hamilton County, Ohio.

23.     Defendant Glen Rock, LLC, is an Ohio limited liability company formed on or about July 6, 2012, and which transacted business in Hamilton County, Ohio.

24.     Defendant Sentinel Strategy Fund, LLC, is an Ohio limited liability company formed on or about June 25, 2012, and which transacted business in Hamilton County, Ohio.

25.     Defendant QFC, LLC, is an Ohio limited liability company formed on or about February 18, 2010, and which transacted business in Hamilton County, Ohio

26.     Defendant Midwest Hoops at SportsPlus, LLC, is an Ohio limited liability company formed on or about October 8, 2008, and which transacted business in Hamilton County, Ohio.

27.     Defendant Cincinnati Royals, Inc. is an Ohio for-profit corporation incorporated on October 3, 2008, and which transacted business in Hamilton County, Ohio.

28.     Defendant W. Bernard Kyles & Co., Inc. ("Kyles Inc.") is an Ohio corporation which has its principal place of business in Hamilton County, Ohio. Defendant Wiley B. Kyles is the statutory agent of Kyles Inc., which provided accounting services to Fund II and the Galemmo Defendants.

29.     Defendant Wiley B. Kyles ("Kyles") is a natural person and resident of Hamilton County, Ohio.  Kyles, upon information and belief, is the authorized agent and owner/operator of Kyles Inc.  (together Kyles and Kyles Inc are referred to as "the Kyles Defendants").

30.     Defendant Charles G. Simon ("Simon") is a certified public accountant and is a resident of North Carolina.  Simon prepared the fictitious Fund II IRS Schedule K-1s distributed to each investor of Fund II.

31.     Rugged Power Management, LLC (RPM") is a Delaware LLC, incorporated on May 7, 2013 and registered in Ohio as a for-profit corporation on May 13, 2013, and which transacts business in Hamilton County, Ohio.  Its managing member is J. Logsdon.

32.     Rugged Power Investments, LLC ("RPI") is a Delaware limited liability company incorporated on April 6, 2010 and again on May 7, 2013, and registered as an Ohio for-profit limited liability company on May 9, 2013, and which transacts business in Hamilton County, Ohio.  Its managing member is J. Logsdon.

33.     PSIF, LLC is a Delaware LLC incorporated on May 7, 2013, through which Defendant Galemmo transacted business in Hamilton County, Ohio.

34.     Kristine Galemmo, is currently a resident of South Carolina, who at all times relevant, was the wife of Glen Galemmo.

35.     Joshua Logsdon ("J. Logsdon") was employed by QFC, LLC as a Power Trader effective December 21, 2012 to trade energy investments.  J. Logsdon resigned from QFC on July 17, 2013.  He is the Managing Member of RPM and the Managing Member of RPI.

36.     Nicholas Rosati ("Rosati") was employed by QFC as a Power Trader effective January 28, 2013 to trade energy investments.  Rosati resigned from QFC on July 17, 2013 and,

on information and belief, is now working with Defendant J. Logsdon doing exactly the same job he did for QFC.

37. Richard Eckes ("Eckes") was employed by QFC as a Power Trader effective April 1, 2013 to trade energy investments. Eckes resigned from QFC on July 17, 2013 and, on information and belief, is now working with Defendant J. Logsdon doing exactly the same job he did for QFC.

38. James Hull ("Hull") was employed by QFC as a Power Trader effective March 21, 2013. Hull resigned from QFC on July 17, 2013 and, on information and belief, is now working with Defendant J. Logsdon doing exactly the same job he did for QFC.

39. Sebastian Logsdon ("S. Logsdon") was employed by QFC as a Power Trader effective June 17, 2013. S. Logsdon resigned from QFC on July 17, 2013 and, on information and belief, is now working with Defendant J. Logsdon doing exactly the same job he did for QFC.

40. Defendant James Perry Trust is a resident of Cincinnati, Ohio which, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

41. Defendant ASL Properties, Inc. is incorporated in the State of Ohio which, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

42. Defendant Luther Lynn Shelby is a resident of Coldwater, Mississippi, who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

43. Defendant William Cox is a resident of Cincinnati Ohio who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants and is, upon information and belief, a founder and member of Defendant RPI.

44.     Defendant Irwin Cohen is a resident of Gansevoort, New York who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

45.     Defendant Allison Bristol is a resident of Cincinnati, Ohio who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

46.     Defendant William Bristol is a resident of Cincinnati, Ohio who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

47.     Defendant Rob Morris is a resident of Newport Beach, California who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

48.      Defendant Leonard Morris is a resident of Carrabelle, Florida who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

49.     Defendant Richard Morris is a resident of Raleigh, South Carolina who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants, and also held himself out as Vice President of Sales of Queen City Investments.

50.     Defendant Ira Stein is a resident of Nashville, Tennessee who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

51.     Defendant Leslie Stein is a resident of Nashville, Tennessee who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

52.     Defendant On-Ramp Wireless is a corporation doing business in San Diego, California, which at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

53.     Defendant Steven Smith is a resident of Cincinnati Ohio, who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

54.    Defendant Andrew Miller is a resident of Irvine, California who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

55.    Defendant Larry Richardson is a resident of Cedar Falls, North Carolina who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

56.    Defendant Larry Wein is a resident of Newport Beach, California who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

57.    L W Capital Corp. is incorporated in the State of California which, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

58.    Defendant Joseph A. Galemmo, Sr. is a resident of Lebanon, Ohio who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

59.    Defendant Cheryl A. Galemmo is a resident of Lebanon, Ohio who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

60.    Defendant Joseph A. Galemmo, Jr., is a resident of Cape Girardeau, Missouri who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

61.    Defendant Mary Ann Galemmo is a resident of Cape Girardeau, Missouri who, at all times relevant, was an investor of Galemmo and the Galemmo Defendants.

62.    Defendants John Doe 1 – 50 are, at all times relevant, investors of Galemmo and the Galemmo Defendants.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff's incorporate by reference the allegations contained in paragraphs 1 – 62 as if fully restated herein.

64.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure on behalf of a Class of all persons and entities who purchased non-

12

managing membership interests either directly or through a "special deal" investment in Fund II or an affiliated Galemmo Entity between January 1, 2002 and July 17, 2013, inclusive (the "Class Period"), did not receive lawful distributions in excess of the amount of principal invested in Fund II or in related Galemmo Entities, and were damaged thereby. Excluded from the Class are all Defendants, members of the immediate family of each of the Defendants, any entity in which any Defendant has a controlling interest, and the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any Defendant.

65.     The Class is so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown it is estimated that there are approximately 150 to 200 putative Class members throughout the United States.

66.     Plaintiffs' claims are typical of the claims of the members of the Class, since all members of the Class purchased securities directly or indirectly or through special deals of Fund II or an affiliated Galemmo Entity during the Class Period, and sustained damages arising out of the Defendants' wrongful conduct in violation of the federal securities laws and Ohio law as alleged herein.

67.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in federal class action securities fraud litigation and Plaintiffs have no interests antagonistic to or in conflict with the other members of the Class.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. The likelihood of individual Class members prosecuting separate claims is remote. Since the damages suffered by individual Class members may be relatively small, the expense and burden of litigation makes

13

it impossible for Class members individually to seek redress for the wrongs done to them. It is desirable for all concerned to concentrate this litigation in this forum. No unusual difficulties are likely to be encountered in the management of this Class action.

69.    Questions of law and fact common to the members of the Class predominate over questions affecting any individual Class member. These common questions of law and fact include, among others, the following:

a.    Whether the Defendants' misrepresentations and omissions, as alleged herein, violated federal securities laws or Ohio law;

b.    Whether the Defendants' misrepresentations and omissions, as alleged herein, misrepresented material facts about the quality of Fund II membership interests and "special deals" during the Class period;

c.    Whether the Defendants' misrepresentations and omissions, as alleged herein, caused Class members to suffer a compensable loss;

d.    Whether Class members have sustained damages and, if so, the proper measure thereof.

e.    Whether the Defendants made materially false and misleading statements with knowledge of their falsity;

f.    Whether Class members' reliance on such statements and representations was justifiable;

g.    Whether Class members were damaged as result; and

h.    Whether Defendants were unjustly enriched at the expense of Class members.

## FACTS RELEVANT TO ALL CLASS CLAIMS

### *Setting The Stage For The Ponzi Scheme*

70.    Plaintiff's incorporate by reference the allegations contained in paragraphs 1 – 69 as if fully restated herein.

14

71.     On or about August 14, 2001, a business associate of Galemmo formed Power Hedge I, LLC, pursuant to Section 1705.04 of the Ohio Revised Code.

72.     On or about November 13, 2001, Galemmo Investment Group caused the name of Power Hedge I, LLC to be changed to Queen City Hedge Fund II, LLC.

73.     On or about March 1, 2002, Queen City Hedge Fund II, LLC changed its name to Queen City Investment Fund II, LLC ("Fund II").

### *Hooking Investors*

74.     On or about January 1, 2002, Galemmo, Fund II, and Queen City Advisors, LLC, published a confidential private offering memorandum by which they intended to, and did, sell purported non-managing membership interests in Fund II ("2002 Offering Memorandum") to Plaintiffs and Class members.  The 2002 Offering Memorandum was distributed to potential investors continuously until early 2012.

75.     The stated purpose of Fund II was to operate as an investment company, raising capital through the sale of non-managing membership interests, and thereafter "to seek substantial capital appreciation" through investing and trading equities, options and other securities and instruments, while minimizing risks.

76.     The 2002 Offering Memorandum represented that Queen City Advisors, LLC was the managing member of Fund II, and that it was "a Delaware Limited Liability Company organized in August 2000."  This was not true.  According to the Delaware Secretary of State, Queen City Advisors, LLC was incorporated in Delaware in 2012 – not 2000.  And, according to the Ohio Secretary of State, the Ohio entity formed by Galemmo named "Queen City Advisors, LLC" was not organized until 2006.  There is no doubt, however, that Galemmo controlled

15

Queen City Advisors, LLC and received all benefits from Queen City Advisors, LLC acting as the managing member of Fund II.

77.     The 2002 Offering Memorandum described specific restrictions and limitations on the nature and scope of permitted investments by Fund II.  These statements were false and misrepresented the true nature of the investments actually being made.  These restrictions and limitations falsely stated, among other things, the following:

a.     "The Company will not invest directly in real estate . . . ." In fact, without disclosure to Plaintiff and Class members, Defendants used Fund II assets, "special deal" funds and funds collected by affiliated Galemmo Entities for direct investments in real estate.  In a letter to the "Friends of the Fund" in early 2013, Defendants finally admitted that Fund II assets were used to purchase a building to house a "growing investment and operations team and ...to upgrade the working space, technology and client interaction space in Cincinnati."  On information and belief, Fund II has received no rental or other payment for use of the offices;

b.     The 2002 Offering Memorandum falsely states that selection of equity investments is based primarily on using techniques and charting tools to assess supply-demand relationships in the context of the general market and that the Managing Member uses a series of proprietary models and a broad cross-section of investment styles to identify investment opportunities.  In fact, none of this is true as Fund II had no proprietary models;

c.     The 2002 Offering Memorandum falsely states that Fund II was exempt from registration under the Securities Act of 1933 because it met the requirements of Regulation D and Rule 506.  A Regulation D exemption requires that the offering be limited to "accredited investors."  In fact, Fund II was open to any and all investors, including Plaintiff Capannari who invested his family's entire retirement account and life savings in Fund II.

d.     "It [Fund II] is not intended as a complete investment program and is designed only for investors who have adequate means of providing for their needs and contingencies without relying on distributions or withdrawals from their accounts, who are financially able to maintain their investment and who can afford the loss of their investment."  In fact, Defendants ignored this admission that the investment was totally unsuitable to certain members of the Class and Defendants

16

eagerly solicited all of the money and investments that many members of the Class owned, contradicting the written unsuitability warning with oral assurances that the investments were safe and suitable for everyone;

e. The 2002 Offering Memorandum falsely stated Galemmo's relevant employment history, describing only Galemmo's positions with R.H. York Investment Brokers and Olde Discount Corp, two registered broker-dealers. The 2002 Offering Memorandum failed to disclose the inexplicable and rapid movement of Galemmo's broker license from broker to broker to broker. In fact, Galemmo moved his license 9 times in 12 years from 1995 to 2007. Nor did the 2002 Offering Memorandum disclose that from January 1997 to March 2002, Galemmo's length of employment with broker dealers was 8 months, 2 months, 4 months, 2 months, and 10 months respectively;

f. The 2002 Offering Memorandum falsely stated that Defendant Galemmo was employed as a registered representative with Queen City Investment Funds, Inc., an "affiliated registered broker-dealer". In fact, Defendant Galemmo was not so registered and had never been employed by such company, according to Galemmo's own filings with FINRA (successor to the National Association of Securities Dealers and the regulator of brokers and dealers);

g. The 2002 Offering Memorandum falsely stated that at the end of each fiscal year, investors would receive "an audited financial report of the Company, certified by the Company's independent auditor." In fact, investors never received any audited financial reports; and

h. The 2002 Offering Memoranda omitted the fact that Fund II did not and would not comply with the tax laws of the United States.

78. To be eligible for an exemption from registration under the Securities Act of 1933, non-managing membership interests in Fund II were required to be limited to "accredited investors" as defined by Rule 501 of SEC Regulation D.

79. Fund II's initial and only Form D filing with the SEC, dated July 29, 2002, specifically states that Fund II had not sold and did not intend to sell interests to non-accredited investors. That representation was false.

17

80.     Fund II and Queen City Advisors, LLC sold membership interests in Fund II to investors that were not "accredited investors," as defined and used in Rule 501 of SEC Regulation D and invited and incentivized investors to solicit their friends and families to invest.

81.     The 2002 Offering Memorandum attached a copy of the Operating Agreement for Fund II ("Operating Agreement"), which was then incorporated as part of the Offering Memorandum. The Operating Agreement falsely stated that "[p]roper books of account shall be kept under the accrual method of accounting, and there shall be entered therein all transactions, matters and things relating to the Company's business as are required, and in accordance with generally accepted accounting principles." No such books of account exist.

82.     The Operating Agreement falsely stated that Fund II had books of account and accounting policies that would accurately account for the financial position of Fund II, the amount and location of Fund II funds, the size and characteristic of each individual investor's accounts, and the allocation of gains, losses, dividends and interest among the individual investors in accordance with Generally Accepted Accounting Principles;

83.     In or about January 2003, Galemmo, Fund II, and Queen City Advisors, LLC published a "Confidential Business Overview" for Fund II, which was provided to many Class members together with the 2002 Confidential Offering Memorandum to induce more investments. The stated purpose of the Confidential Business Overview was to familiarize the investment community with the fictional business strategy and operations of Fund II.

84.     The Confidential Business Overview falsely stated that the "Number 1 priority" of Fund II was the preservation of capital, further falsely stating that Fund II was "risk averse" with an emphasis on consistent, moderate returns.

85. The Confidential Business Overview falsely listed as "Audit Firm" for Fund II Spicer Jeffries LLP. This was an untrue statement. Spicer Jeffries LLP never performed an audit of Fund II financial records.

86. On or about January 1, 2012, Galemmo, Fund II, and Queen City Advisors, LLC published another confidential private offering memorandum for Fund II ("2012 Offering Memorandum"). The 2012 Offering Memorandum and the 2002 Offering Memorandum are identical in all material respects and the 2012 Offering Memorandum contained the same material misrepresentations as the 2002 Offering Memorandum. Included was a false statement that Galemmo managed a fund that averaged 26% annual returns over an eight year period, including the 2000 and 2008 major market decline.

87. It also included the following false statements.

a. The company would not invest directly in real estate. In fact, Galemmo used investor funds to purchase new offices.

b. Galemmo founded and manages Galemmo Investment Group, a private investment fund which has grown from $2 million in assets to in excess $20 million in assets, averaging a 60% annualized return for the last two fiscal years. In fact, Galemmo Investment Group has no assets.

88. Galemmo's 2012 letter to "Friends of the Fund" invited and incentivized investors to recommend Fund II to friends, family and colleagues. The letter informed "Friends" that the management team would be opening a new fund and urged investment in it. Some investors were paid commissions if a "friend" invested.

89. In connection with the fraudulent scheme, Fund II also distributed a "Queen City Investment Fund II Return Analysis" to nonmanaging members, comparing its returns between 2003 and 2012 with the S&P 500 returns. The Analysis falsely showed an average annual rate of return of 22% for Fund II during that ten year period.

19

90.     In addition, Galemmo prepared and distributed false portfolio statements purportedly from Goldman Sachs (a national investment banking and securities firm), showing a portfolio owned by the Galemmo Defendants with a market value in excess of $33,000,000 in cash and cash equivalents, a fixed income value in excess of $24,000,000 and a total portfolio value in excess of $100,000,000.  In fact, the Galemmo Defendants never had an account with Goldman Sachs.

### *Harm To Investors From Ponzi Scheme*

91.     Galemmo used Queen City Hedge Fund LLC to accept deposits from Class members for purported Fund II and "special deal" investments.

92.     Between January 1, 2002 and January 1, 2012, Galemmo represented to prospective investors of Fund II that he had sold over $300,000,000 of these securities as interests in Fund II.

93.     Galemmo used all or some of funds he received from investor moneys for his personal benefit, and not for the purposes for which Galemmo, Fund II or Queen City Advisors, LLC had represented in the 2002 and 2012 Offering Memoranda or any of the "special deals."

94.     Galemmo used the affiliated Galemmo Entities to siphon investor moneys from Fund II.  For example, in May 2013, Galemmo signed a check for more than $100,000 from Fund II to PSIF LLC, an organization under Galemmo's control.

95.     As part of the fraudulent scheme, Galemmo offered a series of special short-term investments yielding extraordinary interest rates, "special opportunities for investing in software companies," in debt instruments by national brokerage firms and other investments in LLC memberships that could make investments in stocks, bonds and other types of securities.  These

were known as "specials deals." In reality, they were merely another component of the Defendants' fraudulent scheme.

96. Instead of refunding these special deals funds, Defendants urged that those "proceeds" be invested in Fund II.

97. Galemmo used funds invested by Plaintiffs and Class members in Fund II to form, support and create a financial interest equivalent to an ownership interest in all of the Galemmo Entities.

## *Participation By Accountant Defendants*

98. As accountant to Fund II, the Kyles Defendants were not merely outside independent accountants, they were responsible for keeping and reporting on the books of account reflecting the financial position of Fund II, the amount and location of Fund II funds, the size and character of each individual investor's account, and the allocation of gains, losses and dividends among individual investors in accordance with Generally Accepted Accounting Principles. These books of account were used to prepare monthly statements which would be distributed to Class members. The Kyles Defendants knew that no accurate books and records existed, and nevertheless proceeded to take actions intended to perpetuate the fraud.

99. The Kyles Defendants corresponded directly with investors, providing them with purported year-end balances and withdrawals, as well as private placement investment direction forms. The Kyles Defendants knew that such statements were false.

100. Additionally, the Kyles Defendants prepared and/or reviewed and filed tax documents, building and construction expenses, calculated payroll and moneys owed to independent contractors. The Kyles Defendants entered investor checks into the journals and

ledgers, received and reconciled Fund II bank statements, and prepared and maintained the general ledger, knowing that all or substantially all of the entries were false.

101. The Kyles Defendants also prepared false financial documents at the direction of Galemmo and prepared knowingly false federal tax returns for the Galemmo Defendants.

102. The Kyles Defendants researched offshore, foreign Cayman Island investments and shelters on behalf of Galemmo, and the Galemmo Defendants, knowing that the purpose was to place Galemmo assets outside of the United States.

103. The Kyles Defendants also prepared several monthly statements for Class members from "Queen City Investment Funds", an entity that did not exist, with knowledge that Galemmo mailed these monthly statements to Class members to create the appearance of an active investment fund.

104. The monthly statements prepared by the Kyles Defendants failed to disclose where each Investor's money was invested, how it was invested, the interest held by each investor, or any detail as to any trading activity undertaken by the Galemmo Defendants during the period for which the statement related.

105. In an effort to hide investors' assets and just one day before informing investors of the shutdown of his offices, Defendant Galemmo transferred to Defendant Kyles signatory authority on a Key Bank account of QC Power Strategies Fund II LLC as "authorized officer." Kyles accepted signatory authority.

106. Galemmo engaged Defendant Simon each year to prepare and participate in the distribution of false U.S. tax return Exhibit D known as Schedule K-1's to investors. Defendant Simon had no credible or reliable financial information to rely on in preparing the K-1's and took no steps to obtain such information. Rather, Defendant Simon prepared these false K-1's based

on self-serving, vague information prepared and relayed to him by Gallemmo and his employees. Fund II then distributed these false Schedule K-1's to Plaintiffs and Class members, who paid incorrect personal income taxes based on these ficticious K-1's. Defendant Simon knew these false forms would be distributed to investors and used by investors in their United States tax return filings.

107. The Accountant Defendants knowingly, willingly, and intentionally participated in the fraud by preparing and supplying materially false information to Plaintiffs and Class members.

108. Plaintiffs and Class members have been damaged by the Accountant Defendants' violations of federal securities laws.

### *The Boom Falls*

109. On or about June 3, 2013, the Internal Revenue Service ("IRS") raided Galemmo's offices. Glen Galemmo was indicted for wire fraud pursuant to 18 USC § 1343, and money laundering, pursuant to 18 USC §1956, and the IRS issued a Notice of Forfeiture for all property, real and personal, which constituted or was derived from proceeds traceable to the offenses. Among other things, Galemmo forfeited the premises of his offices, contents of various bank accounts, his residence, a Florida condominium and various motor vehicles, as well as cash in various bank accounts.

110. Galemmo executed a plea agreement with the United States Attorney for the Southern District of Ohio and admitted his guilt to the following, among other things:

A. Wire Fraud

    1. That Galemmo devised a scheme to defraud investors to obtain money and property by means of false and fraudulent representations;

2.    That Galemmo's scheme included material misrepresentations and/or concealment of material facts; and

3.    That Galemmo had the intent to defraud.

B.    Money Laundering

1.    That Galemmo conducted financial transactions involving the proceeds of the fraud;

2.    That Galemmo knew that the property involved in the financial transactions represented the proceeds of unlawful activities; and

3.    That Galemmo knew that the transactions were designed to conceal the nature, location, source, ownership and control of such proceeds.

*United States of America v. Glen Galemmo,* United States District Court, Southern District of Ohio, Case No.: 13-141.

111.    In his Plea Agreement, Galemmo has admitted that he began operating the Galemmo Defendants as a Ponzi scheme "at some point prior to 2005" and continued to operate them until July 17, 2013.  Consequently, from 2005 through July 17, 2013, Galemmo and the Galemmo Defendants were insolvent, as that term is defined in R.C. § 1336.02.

## *The Investor Money Payments To K. Galemmo And The Clawback Defendants*

112.    During this time, Galemmo caused one or more of the Galemmo Defendants to make payments and money transfers to or on behalf of certain individuals and entities that exceeded any principal investment or equivalent value given in consideration thereof.

113.    Between at least 2005 and through July 17, 2013, Defendant K. Galemmo maintained a joint bank account, Key Bank account No. "X5922," with Glen Galemmo.

114.    Defendant K. Galemmo never worked for any of the Galemmo Defendants, could not support her family's lifestyle on her salary (if any), and needed money from Glen Galemmo

to pay bills. Joint account X5922 was the only personal bank account Defendants K. Galemmo and Glen Galemmo jointly maintained between 2005 and July 2013.

115. Between August 11, 2006 and July 16, 2013, Defendant K. Galemmo received investor money of at least $286,000 in the form of direct payments and transfers from one, or more, of the Galemmo Defendants. These payments include the following:

| Date | Galemmo Defendants | Amount |
|------|--------------------|--------|

| Date | Galemmo Defendants | Amount |
|------|--------------------|--------|
| 8/11/2006 | Queen City Holdings | 3,000 |
| 8/25/2006 | Queen City Holdings | 10,000 |
| 9/28/2006 | Queen City Holdings | 2,000 |
| 10/16/2006 | Queen City Holdings | 5,000 |
| 10/23/2006 | Queen City Holdings | 3,000 |
| 11/15/2006 | Queen City Holdings | 4,000 |
| 12/11/2006 | Queen City Holdings | 7,000 |
| 12/26/2006 | Queen City Holdings | 2,000 |
| 1/7/2007 | Queen City Holdings | 15,000 |
| 2/2/2007 | Queen City Holdings | 5,000 |
| 2/12/2007 | Queen City Holdings | 10,000 |
| 2/16/2007 | Queen City Holdings | 3,500 |
| 3/6/2007 | Queen City Holdings | 5,000 |
| 3/13/2007 | Queen City Holdings | 12,000 |
| 4/12/2007 | Queen City Holdings | 1,200 |
| 6/1/2007 | Queen City Holdings | 10,000 |
| 10/5/2007 | Queen City Holdings | 6,000 |
| 11/16/2007 | Queen City Holdings | 2,000 |
| 12/12/2007 | Queen City Holdings | 14,500 |
| 12/28/2007 | Queen City Holdings | 1,500 |
| 1/4/2008 | Queen City Holdings | 5,000 |
| 2/15/2008 | Queen City Holdings | 3,000 |

| 4/1/2008 | Queen City Holdings | 5,000 |
|---|---|---|
| 5/11/2009 | Midwest Hoops at SportsPlus, LLC | 3,000 |
| 8/31/2009 | Queen City Holdings | 3,000 |
| 9/2/2010 | QFC LLC | 1,000 |
| 7/19/2011 | QFC LLC | 4,000 |
| 9/8/2011 | QFC LLC | 3,500 |
| 11/30/2011 | QFC LLC | 3,000 |
| 6/6/2012 | QFC LLC | 4,000 |
| 6/18/2013 | QC Power Strategies Fund | 25,000 |
| 7/10/2013 | QC Power Strategies Fund | 30,000 |
| 7/16/2013 | QC Power Strategies Fund | 75,000 |
| | | |
| **TOTAL** | | $286,200 |

116.    In addition to the direct payments received by Defendant K. Galemmo between September 18, 2006 through June 7, 2013, Glen Galemmo caused the Galemmo Defendants to transfer approximately $1,213,000 into account X5922 for Defendant K. Galemmo's use.

117.    In addition, Defendant K. Galemmo used an American Express Platinum Business Card issued to Queen City Holdings to make personal purchases and pay personal bills. These charges were paid for by QFC or one of the other Galemmo Defendants. From 2008 through July 2013, QFC or another Galemmo Defendant paid over $1,000,000 for charges on that business account. These charges included hundreds of thousands of dollars which personally benefitted K. Galemmo and the Galemmo children, including their vacations and payments for school tuition.

118.    In summary, direct payments to Defendant K. Galemmo and indirect payments for the benefit of Defendant K. Galemmo total approximately $2,500,000, all of which are Class member's funds.

26

119.    Between August 28, 2008 and July 17, 2013, Defendant Perry received approximately $400,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Perry provided reasonably equivalent value.  This excess belongs to the Class

120.    Between April 25, 2007 and July 17, 2013, Defendant Shelby received approximately $6,500,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Shelby provided reasonably equivalent value.  This excess belongs to the Class.

121.    Between March 12, 2009 and July 17, 2013, Defendant Cox received an amount to be determined but in excess of $100,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Cox provided reasonably equivalent value. This excess belongs to the Class.

122.    Between April 13, 2009 and July 17, 2013, Defendant Cohen received approximately $525,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Cohen provided reasonably equivalent value.  This excess belongs to the Class.

123.    Between May 24, 2008 and July 17, 2013, the Bristol Defendants received approximately $198,000 more from Glen Galemmo and/or the Galemmo Defendants than they invested or for which the Bristol Defendants provided reasonably equivalent value.  This excess belongs to the Class.

124.    Between August 31, 2006 and July 17, 2013, Defendant Rob Morris received approximately $1,000,000 more from Glen Galemmo and/or the Galemmo Defendants than he

invested or for which Defendant Rob Morris provided reasonably equivalent value. This excess belongs to the Class.

125. Between March 20, 2012 and July 17, 2013, Defendant Richard Morris received approximately $125,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Richard Morris provided reasonably equivalent value. This excess belongs to the Class.

126. Between October 11, 2007 and July 17, 2013, the Stein Defendants received approximately $1,140,000 more from Glen Galemmo and/or the Galemmo Defendants than they invested or for which the Stein Defendants provided reasonably equivalent value. This excess belongs to the Class.

127. Between November 2006 and July 17, 2013, Defendant Smith received approximately $314,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Smith provided reasonably equivalent value. This excess belongs to the Class.

128. Between August 2006 and July 17, 2013, Defendant Richardson received approximately $250,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Richardson provided reasonably equivalent value. This excess belongs to the Class.

129. Between April 2012 and July 17, 2013, Defendant Miller received approximately $410,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Miller provided reasonably equivalent value. This excess belongs to the Class.

130. Between February 2000 and July 17, 2013, Defendant Joe Galemmo, Jr. received approximately $267,000 more from Glen Galemmo and/or the Galemmo Defendants than he

invested or for which Defendant Joe Galemmo, Jr. provided to in reasonably equivalent value. This excess belongs to the Class.

131.  Between December 2005 and July 17, 2013, Defendant Joseph A. Galemmo, Sr. received approximately $227,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Joseph A. Galemmo, Sr. provided reasonably equivalent value. This excess belongs to the Class.

132.  Between February 2011 and July 17, 2013, Defendant Larry Wein received approximately $420,000 more from Glen Galemmo and/or the Galemmo Defendants than he invested or for which Defendant Larry Wein provided to in reasonably equivalent value. This excess belongs to the Class.

133.  Between January 2009 and July 17, 2013, Defendant On-Ramp received approximately $700,000 more of investor funds from Glen Galemmo and/or the Galemmo Defendants than it invested or for which it provided reasonably equivalent value. This excess belongs to the Class.

## *The RPI Scheme*

134.  As noted above, on or about February 18, 2010, Defendant Galemmo formed QFC, LLC through which he purportedly conducted an investment business using Class members' money. Class members' capital formed the basis of a highly profitable energy trading business.

135.  On or about September 21, 2012, Galemmo formed QC Power Strategies Fund, LLC ("QCP") to get into, or continue in another entity, the energy commodities trading business. In December 2012, QFC hired Defendants J. Logsdon, and in 2013 hired Defendants Rosati, Eckes, Hull and S. Logsdon as energy traders (together "Power Traders").

136.    QCP joined, as a trading member, the energy trading platform operated by PJM Settlement Inc., a subsidiary of PJM Interconnection.  The PJM entities facilitated trading among their members in energy related commodities and were regulated by the Federal Energy Regulatory Commission.

137.    QCP began trading in the energy market in January 2013 through QFC's Power Traders.  These energy trades were made with the Class members' money, taken without the knowledge or consent of Class members, but no portion of the profits were ever paid to the Class members.  The Power Traders, Galemmo and Cox received all the financial benefit.

138.    On May 7, 2013, Defendant Galemmo, while the IRS was intensifying its ongoing investigation, incorporated PSIF, LLC for the specific purpose of diverting to his pockets - and his new "partners" pockets - profits that rightfully belonged to Class members.  On the same date, May 7, 2013, RPI and RPM were organized, with J. Logsdon their managing member.  RPI was organized soley for the self-interest of Defendant Galemmo, Defendant Cox and Defendant J. Logsdon to engage in energy market trading and keep the profits for themselves, ignoring their duties and obligations to the entities capitalized with the Class members' money.

139.    Pursuant to the plan to take away the corporate opportunity indirectly owned by Class members, on May 22, 2013, Defendant Galemmo individually, through PSIF, LLC, became a member of RPI.  Defendant Galemmo purchased his 30% membership interest in RPI with a check for $90,000 dated May 22, 2013 from PSIF.   This check was funded by money belonging directly or indirectly to the Class members.

140.    On May 20, 2013, QFC issued a check in the amount of $101,000 to PSIF, LLC. These funds belonged directly or indirectly to Class members.

141. Defendant Cox had previously profited handsomely from special deals and received class member money instead of true investment returns. Through Skibo, LLC, a Delaware limited liability company organized in 2003, Defendant Cox paid $89,000 for a 30% interest in RPI.

142. On May 22, 2013, RPM, an entity owned and controlled by Defendant J. Logsdon, transferred $120,000 to RPI to purchase a 40% interest in RPI.

143. On July 7, 2013, after an IRS raid and ten days prior to Defendant Glen Galemmo notifying investors he was closing down the Galemmo Entities, Defendant Galemmo transferred PSIF's membership interest in RPI to Defendant K. Galemmo. Nine days after she became a purported owner - on July 16, 2013 – Defendant K. Galemmo received a payment of $135,000 from RPI. This payment was made on the day before Defendant Galemmo's email to investors shutting down his operations.

144. Since July 2013, RPI has made distributions to its purported members, including Defendant K. Galemmo, and it is reasonably anticipated that RPI will make further membership distributions in the future. On information and belief, the profit distributions from RPI total approximately $83.15 million from August 2013 through the filing of Plaintiffs' First Amended Complaint.

145. RPI was organized by using assets that rightfully belong to Class members; operates by using trade secrets that rightfully belong to Class members; and distributes profits to RPI members that rightfully belong to Class members.

146. By way of example only, RPI continued energy trading through QCP and its PJM Settlement platform. These activities were undertaken by the Power Traders, whose salaries were being paid by QFC from funds belonging to Class members. QCP continued to transfer

funds to QFC resulting from the energy trades, and QFC, in turn, made improper payments and fraudulent transfers in June and July 2013. Defendant Shelby received at least $823,000 of these transfers.

147.    On October 3, 2013, RPI notified K. Galemmo that she had a right to purchase fifteen additional units of RPI for a total purchase price of $45,000. This right is the property of Class members.

148.    On October 17, 2013, The Locust Street Irrevocable 2013 Trust u/a/d July 31, 2013, Benjamin G. Dusing Trustee, borrowed $45,000 from Defendant Joseph Galemmo, Sr. (father of Glen Galemmo). The Trust paid $45,000 to RPI on November 6, 2013 to purchase fifteen shares. Neither the Trust, nor Defendant K.Galemmo nor Defendant Galemmo nor Defendant PSIF had the right to do so. The funds provided by Defendant Joseph Galemmo, Sr. are rightfully the property of Class members, as are the fifteen units.

149.    As noted above, between 2005 and July 17, 2013, Defendant Joseph Galemmo, Sr. received approximately $227,000 more than he invested or for which he provided any reasonably equivalent value. By information and belief, the $45,000 loan to Defendant K. Galemmo is part of these funds and the additional units of RPI purchased with these funds belong to QCP and QFC, Both are the property of the Class members.

## DERIVATIVE CLAIMS

150.    Defendant Galemmo, by acquiring a 30% ownership interest in RPI for himself – instead of allowing QCP and QFC to have the opportunity, breached his fiduciary duties to QCP and QFC. Defendant Galemmo seized the opportunity to realize profits of hundreds of millions of dollars annually by investing in energy securities, including futures, puts, calls and commodity positions for RPI.

151.    Defendant J. Logsdon breached his fiduciary duties to QFC by seizing the opportunity to profit and established a mirror image of the Galemmo trading operations and investment entities, naming them RPM and RPI. RPM then purchased a 40% interest in RPI, allowing Defendant J. Logsdon to reap the profits from a business venture that rightfully belonged to QCP.

152.    Power Trader Defendants breached their fiduciary duties to their employer QFC and stole trade secrets from QFC in violation of their employment contracts and Ohio law.

153.    Defendant Galemmo and the Power Trader Defendants breached Ohio law, which protects an employer's right to keep trade secrets from appropriation and disclosure.

154.    Plaintiff has not made a demand on QCP or QFC to institute this action as it would be futile to do so. Accordingly, the making of a demand is excused under the facts and circumstances herein.

155.    RPI continues to trade in the energy market.

## FIRST CLAIM FOR RELIEF
**(For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Against The Galemmo Defendants And The Accountant Defendants)**

156.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 – 155 as if fully restated herein.

157.    During the class period, the Galemmo Defendants and the Accountant Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a scheme and a continuous course of conduct to make materially false and misleading statements about the Galemmo phantom investment dealings, financial condition and operations and to conceal adverse material information about these investments.

33

158. The Galemmo Defendants and the Accountant Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and courses of conduct, as alleged herein, including the following: (1) making or participating in the making of untrue statements of material facts; (2) omitting to state the material facts necessary to make the statements about the investments not misleading; (3) engaging in transactions, practices, and a course of business which operated as a fraud and deceit upon investors during the Class Period; and (4) preparing and presenting false financial statements and K-1s with the knowledge that such statements and K-1s were false.

159. The Galemmo Defendants and Accountant Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Their misrepresentations and/or omissions were committed knowingly or recklessly for the purpose and effect of concealing the true information about the investments, including their actual financial condition and operations.

160. The Galemmo Defendants and Accountant Defendants received information reflecting the true facts regarding the investment and Galemmo's business practices, exercised control over and/or receipt of the materially misleading misstatements and/or their association with the investment and made them privy to confidential proprietary information concerning these investments. Because of their control and/or association with the investment, Defendants were active and culpable participants in the fraudulent scheme.

161. The Galemmo Defendants and Accountant Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be

34

disseminated to Investors.

162. The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, without the knowledge and complicity of the Accountant Defendants.

163. As a result of the dissemination of materially false and misleading information and the failure to disclose material facts, as set forth above, Investors paid artificially inflated prices for worthless membership interests in the investment during the Class Period.

164. In ignorance of the materially false and misleading nature of the reports and statements described above, Plaintiffs and the other Class members relied, to their detriment, on Defendants for complete and accurate information about these investments.

165. By virtue of the foregoing, Galemmo, Fund II and the Accountant Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and Plaintiffs and the Class have been damaged thereby, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (For Violations Of Section 20(a) Of The Exchange Act Against Defendant Galemmo)

166. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 – 165 as if fully restated herein.

167. At the time of the wrongs alleged herein, Defendant Galemmo was a controlling person of the Galemmo Entities within the meaning of Section 20(a) of the Exchange Act. Because of his position of authority, Galemmo had the power and authority to influence and control, and did influence and control, the decision-making and activities of Fund II, and the affiliated Galemmo Entities and caused them to engage in the wrongful conduct described herein. Defendant Galemmo exercised control to cause the dissemination of false and

misleading statements and omissions of material facts.

168. By virtue of his position as a controlling person, and as a result of the aforementioned conduct, Galemmo is liable under Section 20(a) of the Exchange Act.

### THIRD CLAIM FOR RELIEF
**(Violations Of Sections 5 And 12(a)(1) Of The 1933 Securities Act Against Galemmo And Fund II)**

169. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 – 168 as if fully restated.

170. The Securities Act prohibits sale or delivery after sale of an unregistered security.

171. Galemmo and Fund II failed to file a true Registration Statement for Fund II under the 1933 Act and for other investments.

172. A Registration Statement must include the following: (1) the entity's properties and business, (2) a full description of the offered security, (3) information about the management of the entity, and (4) a financial statement certified by an independent auditor. None of these were provided by Glen Galemmo for Fund II.

173. By omitting this information, Galemmo and Fund II filed a false Form D.

174. Galemmo and Fund II also failed to meet requirements for an exemption under Regulation D because they did not filed an appropriate Form D notice for Fund II.

175. Galemmo and Fund II certified that they would not sell to non-accredited investors. Plaintiffs and other investors did not qualify as "accredited" investors able to evaluate the risks and merits of the investment and the investment's economic risk. Plaintiffs and other investors who purchased membership units in Fund II were non-accredited investors.

176. Galemmo and Fund II failed to provide to these Plaintiffs access to the

information that Galemmo and Fund II were required to provide, including audited financial statements.

177.    Galemmo and Fund II failed to file annual amendments to Form D, as required under Regulation D.

178.    Plaintiffs purchased these securities without knowledge of the failure of Galemmo and Fund II to file a Registration Statement that met the requirements for an exemption from registration.

179.    Plaintiffs would not have purchased the securities if Galemmo and Fund II had provided the information required in a Registration Statement.

180.    By virtue of the foregoing actions and omissions, Plaintiffs have been damaged and are entitled to damages, including rescission, and other relief for violations by Galemmo and Fund II of Sections 12 of the 1933 Act alleged herein.

**FOURTH CLAIM FOR RELIEF**
**(Violations Of Section 12(a)(2) Of The Securities Act Of 1933**
**Against Galemmo, Fund II And The Kyles Defendants)**

181.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 – 180 as if fully restated herein.

182.    Galemmo, Fund II and the Kyles Defendants participated in the sale of securities to Plaintiffs that were unregistered and not exempt from registration.

183.    At the time of their investments, Plaintiffs had no knowledge that the investments offered by Galemmo, Fund II and the Kyles Defendants were subject to registration requirements.    In fact, Galemmo, Fund II and the Kyles Defendants affirmed in the Subscription Agreement that the securities were not subject to the registration requirement of the Securities Act.

184. Both the Offering Memorandum distributed to Plaintiffs and the oral communications with Plaintiffs contained material omissions and misstatements.

185. Plaintiffs had no knowledge of the falsity of these statements or the material omissions in the written materials provided to investors including, but not limited to, Monthly Accounting Statements prepared by the Kyles Defendants and other misrepresentations made by Galemmo and Fund II, as described above. Plaintiffs reasonably believed such statements were true.

186. Galemmo, Fund II and the Kyles Defendants knew, or in the exercise of reasonable diligence, should have known, of the untruths and omissions.

187. Plaintiffs would not have purchased the securities if they had this knowledge.

188. As a result of these investments, Plaintiffs have been damaged.

189. Plaintiffs are entitled to rescind their purchases and recover the value of their interest in Fund II. Plaintiffs seek rescission of their purchase of non-managing membership interests in Fund II.

## FIFTH CLAIM FOR RELIEF
### (Against Galemmo And Accountant Defendants For Ohio Securities Laws Violations)

190. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 189 as if fully restated herein.

191. The non-managing member interests in Fund II sold by Galemmo, Fund II and Queen City Advisors, LLC and the Accountant Defendants constituted securities under R.C. § 1707.01 *et seq.* ("Ohio Securities Laws").

192. The non-managing member interests in Fund II sold by Galemmo, Fund II and Queen City Advisors, LLC and the Accountant Defendants were securities that were not registered or exempt from registration in violation of R.C. § 1707.44(C)(1).

193. Galemmo, Fund II and Queen City Advisors, LLC, and the Accountant Defendants provided Plaintiffs and members of the Class with written material that contained or omitted materially false information in violation of R.C. § 1707.41, and which Plaintiffs and members of the Class relied upon to purchase non-managing memberships in Fund II.

194. The non-managing member interests in Fund II sold by Galemmo, Queen Fund II and Queen City Advisors, LLC and the Accountant Defendants constituted the illegal sale of unregistered securities under Ohio Securities Laws.

195. As a direct and proximate result of the aforementioned violations of Ohio Securities Laws, Plaintiffs and members of the Class have suffered damages in connection with their purchase of unregistered securities.

196. As a direct and proximate result of the aforementioned violations of Ohio Securities Laws, Plaintiffs and members of the Class have suffered damages due to the materially false information contained in or omitted from the written material provided by Galemmo, Fund II and Queen City Advisors, LLC and the Accountant Defendants.

197. As a direct and proximate result of the aforementioned violations of Ohio Securities Laws, Plaintiffs and members of the Class have suffered damages as a result of the omission of material information from the written material provided by Galemmo, Fund II and Queen City Advisors, LLC and the Accountant Defendants.

198.     As a direct and proximate result of the aforementioned violations of Ohio Securities Laws, Plaintiffs and members of the Class suffered damages and are entitled to rescind their securities purchases and recover their full purchase price, plus interest.

## SIXTH CLAIM FOR RELIEF
### (Against Galemmo, Galemmo Defendants And Accountant Defendants For Fraud)

199.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-198 as if fully restated herein.

200.     Plaintiffs and members of the Class, without knowledge of the falsity of Galemmo Defendants' statements and of the material omissions described above, and believing such statements to be true and complete, and in reasonable and justifiable reliance upon the statements and representations made by the Galemmo Defendants and the Accountant Defendants, as previously set forth herein, purchased interests in Fund II.

201.     Plaintiffs and the Class would not have purchased their investments except for the reliance upon the representations made by the Galemmo Defendants in offering such investments for sale and the Accountant Defendants in the accounting statements and K-1s.

202.     At the time the statements and representations were made by the Galemmo Defendants and the Accountant Defendants, they were false, the Galemmo Defendants and the Accountant Defendants knew them to be false and they intended to deceive Plaintiffs and the Class by make such statements.

203.     At the time of the false statements, misrepresentations and omissions, set forth above, each of the Galemmo Defendants and Accountant Defendants intended that Class members, including Plaintiffs, act on the basis of the misrepresentations and omissions contained in the materials and the false representations in deciding whether to purchase the investments and

Plaintiffs and the Class members reasonably relied thereon to their detriment in making such decisions.

204.    All the wrongful acts of the Galemmo Defendants and Accountant Defendants set forth herein are incorporated by reference.  Each wrongful act alleged constitutes a separate injury suffered by Plaintiffs and the Class.

205.    Had Plaintiffs and the Class known of the material facts which the Galemmo Defendants and Accountant Defendants wrongfully concealed and misrepresented, and the falsity of the Galemmo Defendants' representations, Plaintiffs and the Class would not have made any such purchases.

206.    Plaintiffs and the Class, as a result of their purchases and by reason of the Galemmo Defendants' and Accountant Defendants' wrongful concealments and misrepresentations, have sustained damages, suffered mental and emotional distress, and have lost a substantial part of their respective investments, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

207.    By reason of the foregoing, the Galemmo Defendants and Accountant Defendants are jointly and severally liable to Plaintiffs and the Class members.

## SEVENTH CLAIM FOR RELIEF
### (Against Galemmo, Galemmo Defendants And Accountant Defendants For Negligent Misrepresentation)

208.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-207 as if fully restated herein.

209.    The Galemmo Defendants and Accountant Defendants owed Plaintiffs and members of the Class a duty to:  (a) act with reasonable care in preparing and disseminating the information set forth in written materials, including Offering Memoranda, and Monthly Account

41

Statements and K-1s and (b) use reasonable diligence in determining the accuracy of and preparing the information contained therein.

210.    The Galemmo Defendants and Accountant Defendants breached their duty to Plaintiffs and members of the Class by failing to investigate, confirm, prepare and review with reasonable care the information contained in the written materials and other representations and by failing to disclose to Plaintiffs and members of the Class, among other things, the facts alleged above, and failing to correct the misstatements, omissions and inaccuracies contained therein.

211.    Plaintiffs and members of the Class justifiably relied upon the Galemmo Defendants' and Accountant Defendants' materially false and misleading statements, acts, and/or omissions of fact to purchase non-managing membership interests in Fund II.

212.    As a direct, foreseeable and proximate result of this negligence, Plaintiffs and Class members have sustained damages, suffered mental and emotional distress, and lost a substantial part of their respective investments, together with lost interest, general and incidental damages in an amount yet to be proven at trial.

### EIGHTH CLAIM FOR RELIEF
#### (Against Galemmo, Galemmo Defendants For Conversion)

213.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-212 as if fully restated herein.

214.    Plaintiffs own and/or have rights to the possession of the money paid to Galemmo and or any of the Galemmo Entities as a result of Defendants' deceptive and illegal practices.

215.    Galemmo's and the Galemmo Entities' exercise of dominion over the money paid to Galemmo or any of the Galemmo Entities by Plaintiffs or members of the Class was wrongful.

The payment of money by Plaintiffs or members of the Class to Galemmo or any Galemmo Entities was based upon false, deceptive and misleading representations concerning the nature of the purpose of the investments made and the use of funds paid to Galemmo or any Galemmo Entity.

216.    Galemmo has converted Plaintiffs' and Class members' property by retaining possession and dominion over the money, which was wrongfully and improperly obtained from Plaintiffs and members of the Class.

217.    Galemmo and the Galemmo Entities conversion of Plaintiffs' and Class members' property are without privilege.

218.    Plaintiffs and Class members have been damaged as a direct and proximate result of such wrongful conversion of their property.

219.    Galemmo's conduct was intentional, willful, wanton, and malicious, entitling Plaintiffs to punitive damages and attorney's fees in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
### (Against Galemmo and the Galemmo Defendants For Unjust Enrichment)

220.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-219 as if fully restated herein.

221.    Plaintiffs and Class members have conferred a substantial benefit upon Galemmo and the Galemmo Entities in the form of substantial cash investments.  Plaintiffs and Class members conferred this benefit upon Galemmo and the Galemmo Entities in reliance upon representations concerning the nature of the investment services and use of the funds raised by Galemmo and the Galemmo Entities.

222.    Plaintiffs and Class members were induced to invest in Fund II through deceptive and misleading representations and promises of Galemmo and the Galemmo Entities.

223.    Galemmo and the Galemmo Defendants have been unjustly enriched at the expense of the Plaintiffs and Class members.

224.    As a result, Plaintiffs and Class members are entitled to compensatory damages, plus interest, attorney's fees and costs.

## TENTH CLAIM FOR RELIEF
### (Against K. Galemmo And The Clawback Defendants
### For Fraudulent Transfer Violations Of R.C. § 1336.01 *et seq.*)

225.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 – 224 as if fully restated herein.

226.    Defendant Galemmo is "Debtor" as that term is defined in R.C. § 1336.01(F).

227.    Each of the Galemmo Entities are a "Debtor as that term is defined in R.C. § 1336.01(F).

228.    Plaintiffs, and members of the Class are "Creditors" as the term is defined in R.C. § 1336.01(D).

229.    Defendant K. Galemmo is an "Insider" as that term is defined in R.C. § 1336.01(G)(1)(a).

230.    At all times relevant hereto, Defendant Galemmo and the Galemmo Entities were insolvent as that term is defined in R.C. § 1336.02.

231.    While insolvent, Defendant Galemmo, directly or indirectly, made a transfer of cash and/or other property to the Clawback Defendants without receiving reasonably equivalent value in exchange for the transfer.

232.    The transfers to the Clawback Defendants were made with actual intent to hinder, delay or defraud Plaintiffs and the Class as creditors of Defendant Galemmo.

233.    At the time of the transfer, Defendant Galemmo had a business relationship with the Clawback Defendants.

234.    These transfers to the Clawback Defendants by Defendant Galemmo were fraudulent transfers under R.C. § 1336.04(A)(1) and 1336(A)(2).

235.    As a result of these fraudulent transfers, Plaintiffs and the Class have been damaged.

236.    Plaintiffs are entitled to have these fraudulent transfers to the Clawback Defendants rescinded and the funds used to pay the damages suffered by Plaintiffs and the Class.

## ELEVENTH CLAIM FOR RELIEF
### (Against All Defendants For Claim For Receivership/Accounting)

237.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-236 as if fully restated herein.

238.    Galemmo, Plaintiffs and Class members were all members of Fund II, an Ohio limited liability company.  Defendant Galemmo used money invested by Plaintiffs and Class members, without their knowledge or consent, to form, support and create a financial interest equivalent to an ownership interest in all of the Galemmo Entities.

239.    Pursuant to R.C. § 2735.01(A), the Court may appoint a receiver in an action between partners or others jointly owning an interest in property or a fund.

240.    Upon information and belief the assets of the Galemmo Entities are in danger of being lost, removed or materially injured.

241.     Pursuant to R.C. § 2735.01, *et seq.* Plaintiffs and Class members are entitled to an accounting of the affairs of all of the Galemmo Entities and RPI into which their money, property and trade secrets have been moved.

242.     Also, as a result, Plaintiffs and Class members are entitled to the appointment of a receiver and an accounting.

## TWELFTH CLAIM FOR RELIEF
### (Against All Defendants For Restitution or Rescission)

243.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-242 as if fully restated herein.

244.     The Galemmo Defendants conducted a special kind of fraud – a "Ponzi Scheme" – by which they paid out new monies received from investors to other investors who, led to believe their own monies were making profits, withdrew monies from their Galemmo investments.

245.     Some investors (Clawback Defendants) withdrew greater amounts of monies, which they believed were profits, that were greater than the Principal that they had invested.

246.     Any withdrawals by Clawback Defendants over and above the amount of Principal invested – i.e., "fictitious profits" – are subject to restitution and rescission, regardless of the good faith of Clawback Defendants.

## LIMITED LIABILITY MEMBER DERIVATIVE CLAIMS

### FIRST CLAIM
**Derivative Claim Against Defendants Galemmo, PSIF, K. Galemmo, The Power Traders, RPI and RPM For Usurpation Of Business Opportunities**

247.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-246 as if fully restated herein.

46

248.    Defendant Galemmo was a managing member of QCP and QFC. Defendant J. Logsdon and the Power Trader Defendants were employees of QFC. Under each of their Employment Contracts, the Power Trader Defendants owed a fiduciary duty to act at all times in the best interests of the company's business.

249.    Through QCP and QFC, Defendant Galemmo and the Power Trader Defendants acquired knowledge of the investment or business opportunity to invest in RPI.

250.    The investment in RPI – trading in energy stocks – was in the line of QFC and QCP's business.

251.    The opportunity was advantageous to QFC and QCP and those companies were financially able to accept the opportunity.

252.    Defendants Galemmo and the Power Trader Defendants acquired proprietary information about the energy trading opportunity while acting on behalf of QCP and QFC.

253.    Defendants Galemmo, PSIF, K. Galemmo, the Power Trader Defendants, RPI and RPM directly or indirectly usurped the opportunity to invest in RPI from QFC and QCP and reaped the benefits of knowledge and opportunity acquired through QFC and QCP.

254.    These Defendants directly and indirectly benefited by the usurpation of the business opportunity.

## SECOND CLAIM
### Derivative Claim Against G. Galemmo, PSIF, K. Galemmo, The Power Trader Defendants, RPI And RPM For Misappropriation Of Trade Secrets In Violation of R.C. § 1333.61 *et seq.*

255.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-254 as if fully restated herein.

256.    Galemmo, PSIF and the Power Trader Defendants became familiar with

proprietary and confidential energy trading information that was of specific and peculiar value to QFC and QCP, as well as unique skills, concepts, designs, client lists and inside knowledge of clients' energy trading preferences and policies, marketing strategy, business practices, hiring and training methods, financial and other confidential and proprietary information concerning operations.

257.    Each Power Trader Defendant agreed not to use for their own benefit or the benefit of another or to discuss, disseminate or distribute any trade secret or proprietary information to an employer or other with whom the employer had a business relationship.

258.    Each Power Trader Defendant also agreed not to directly or indirectly engage or participate in any business defined as the trading of short term electricity contracts – without prior written consent of their employer.

259.    Here, any prior written consent executed on behalf of QFC is null and void because its managing member – Defendant Galemmo – combined with the Power Trader Defendants to steal QFC trade secrets and proprietary information for their own benefit.

260.    Defendant Galemmo and the Power Trader Defendants took these trade secrets to RPI and used them for their own benefit and profit, at the expense of QCP and QFC.

261.    Defendants PSIF, K. Galemmo, RPI and RPM directly or indirectly facilitated, assisted, and abetted the misappropriation of trade secrets.

262.    These actions violate Ohio's Uniform Trade Secrets Act, R.C. §1333.61.

## THIRD CLAIM
### Derivative Claim Against The Power Trader Defendants And Defendant Galemmo For Breach Of Fiduciary Duty

263.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-262 as if fully restated herein.

48

264.    Defendant Galemmo and the Power Trader Defendants owe QFC and its members the highest fiduciary duties of loyalty, good faith, due care and fair dealing.

265.    Each Defendant breached and violated these fiduciary duties which caused injury to QFC and its members.

266.    Each Defendant seized the opportunity to profit for himself at the expense of investors and misappropriated trade secrets from QFC to take advantage of that opportunity.

## FOURTH CLAIM
### Derivative Claim Against The Power Trader Defendants, K. Galemmo, Galemmo, RPI And RPM For Unjust Enrichment

267.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-266 as if fully restated herein.

268.    By their wrongful actions, Defendant Galemmo, Defendant K. Galemmo, the Power Trader Defendants, Defendant RPI and Defendant RPM unjustly and knowingly used a benefit conferred on them, which they retained under circumstances where it would be unjust to do so without payment to QFC and its members.

269.    Plaintiff, as a member of QFC, seeks restitution from each of these Defendants and an Order of this Court to disgorge profits, benefits and compensation obtained as a result of their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Declaring this action to be a Class Action properly maintained pursuant to the Federal Rules of Civil Procedure and certifying Plaintiffs as the class representatives;

B.      Awarding Plaintiffs and Class members rescission and/or compensatory damages against Defendants for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, including interest;

C.      Awarding Plaintiffs and Class members the reasonable costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements;

D.      The appointment of a receiver and an accounting for the following entities:

Glen Allan Galemmo
Kristine Galemmo
Queen City Investment Fund II, LLC
Queen City Advisors, LLC
Galemmo Investment Group
Queen City Investment Funds
Queen City Investments
Queen City Hedge Fund
QC Power Strategies Fund II, LLC
QC Power Strategies Funds Sweep Account, LLC
QC Power Strategies Fund, LLC
Sentinel Property Holdings, LLC
Glen Rock, LLC
Queen City Holdings, LLC
Sentinel Strategy Fund, LLC
Sentinel Blackbox, LLC
QFC, LLC
Midwest Hoops at Sportsplus, LLC
Cincinnati Royals, Inc.
Queen City Hedge Fund, LLC
PSIF LLC
Rugged Power Investments, LLC
Rugged Power Management, LLC
Midwest Hoops Sports Complex, LLC
BAMMB, LLC

E.      Awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

WHEREFORE, Plaintiff Member, derivatively on behalf of Limited Liability Company, prays for judgment as follows:

A.      Declaration that Derivative Defendants have breached their fiduciary duties to Plaintiff;

B.      Declaration that Derivative Defendants have usurped business opportunities from Plaintiff;

C.      Declaration that Derivative Defendants have misappropriated trade secrets from Plaintiff;

D.      Declaration that Derivative Defendants have unjustly enriched themselves at Plaintiff's expense;

E.      Awarding QFC damages to be distributed to the Class for Defendants' usurpation of business opportunities;

F.      Awarding QFC damages to be distributed to the Class for Defendants' misappropriation of trade secrets;

G.      Awarding QFC damages to be distributed to the Class for Defendants' breach of fiduciary duties;

H.      Awarding QFC damages to be distributed to the Class for Defendants' unjust enrichment;

I.      Awarding Derivative Plaintiff's counsel the reasonable costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

J.      Awarding QFC further relief as may be just and proper under the circumstances.

51

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  May 13, 2014

Respectfully submitted,

s/ James R. Cummins
James R. Cummins (0000861)
Phyllis E. Brown (0037334)
Adam S. Brown (0078803)
Lauren M. Solimine (0091311)
CUMMINS & BROWN LLC
312 Walnut Street, Suite 1000
Cincinnati, OH 45202
(513) 241-6400 – Telephone
(513) 241-6464 – Facsimile
*jcummins@cumminsbrownlaw.com*
*pbrown@cumminsbrownlaw.com*
*abrown@cumminsbrownlaw.com*
*lsolimine@cumminsbrownlaw.com*

s/ Richard S. Wayne
Richard S. Wayne (0022390)
Brett M. Renzenbrink (0086723)
STRAUSS TROY CO., LPA
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio  45202-4018
(513) 621-2120 – Telephone
(513) 629-9426 – Facsimile
*rswayne@strausstroy.com*
*bmrezenbrink@strausstroy.com*

37984