# Lawrence P. Wein

November 12, 2015

JOHN CAPANNARI, et al.

v.

GLEN GALEMMO, et al.

Case Number: 1:13-cv-00883



# REPORTING AGENCY

513-233-3000
877.233.4403
FAX: 513-233-2310
depo@elitereportingagency.com

*www.elitereportingagency.com*

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4

5    _____
                                   )
6    JOHN CAPANNARI, et al.,        )
                                   )
7            Plaintiffs,            )
                                   ) CASE NO.
8                    vs.            ) 1:13-cv-00883
                                   )
9    GLEN GALEMMO, et al.,          )
                                   )
10           Defendants.           )
     _____)

11

12

13

14

15

16   Videoconference
     Deposition of:  LAWRENCE P. WEIN

17   Pursuant to:    Notice

18   Date and Time:  Thursday, November 12, 2015
                     9:20 PST/12:20 p.m. EST
19   Place:          Elite Reporting Agency, LLC
                     7733 Beechmont Avenue
20                   Suite 100
                     Cincinnati, Ohio  45255-4237
21   Reporter:       Brenda Keyser, RDR, CRR,
                       CLR, CME
22                   Notary Public - State
                       of Ohio
23   Videographer:   Johnnie Johnson

24

25

```
 1    APPEARANCES OF COUNSEL:

 2

 3            For the plaintiffs:

 4                    Phyllis E. Brown, Esq.
                            of
 5                    Cummins & Brown, LLC
                      Scripps Center
 6                    312 Walnut Street
                      Suite 1000
 7                    Cincinnati, Ohio  45202
                      513.241.6400
 8                    pbrown@cumminsbrownlaw.com

 9

10            For the defendants LW Capital
              Corporation and Larry Wein:
11
                      Patrick B. Healy, Esq.
12                         of
                      Mannion & Gray Co., LPA
13                    909 Wright's Summit Parkway
                      Suite 230
14                    Fort Wright, Kentucky  41011
                      859.663.9830
15                    phealy@manniongray.com

16

17            For the intervening defendant Richard
              Thomas:
18
                      William E. Flax, Esq.
19                    Mercantile Library Building
                      414 Walnut Street
20                    Suite 514
                      Cincinnati, Ohio  45202
21                    513.381.6223
                      krtq73aa@prodigy.net
22

23

24                         -  -  -

25
```

1           I N D E X

2

3    LAWRENCE P. WEIN                              PAGE

4        EXAMINATION BY MS. BROWN                    5
         EXAMINATION BY MR. FLAX                   125
5

6

7    EXHIBITS                        MARKED    REFERENCED

8        DEPOSITION EXHIBIT  1          -            6
         DEPOSITION EXHIBIT  2          -           31
9        DEPOSITION EXHIBIT  3          --          33
         DEPOSITION EXHIBIT  4          -           39
10       DEPOSITION EXHIBIT  5          -           56
         DEPOSITION EXHIBIT  6          -           68
11       DEPOSITION EXHIBIT  7          --          79

12       DEPOSITION EXHIBIT  8          --         100
         DEPOSITION EXHIBIT  9          -          116
13       DEPOSITION EXHIBIT 10          --         118
         DEPOSITION EXHIBIT 11          -          118
14       DEPOSITION EXHIBIT 12          --         121
         DEPOSITION EXHIBIT 13          --         106
15

16

17                              -  -  -

18

19

20

21

22

23

24

25

1        THE VIDEOGRAPHER:  Good morning.  Here

2   begins media number one in the deposition of

3   Larry Wein in the matter of John Capannari,

4   et al., versus Glen Galemmo, et al.

5        The case is in the United States

6   District Court, Southern District of Ohio.

7   The case number is 1:13-cv-883.

8        Today's date is November 12th, 2015.

9   And the time on the monitor is 9:20 a.m.

10        This deposition is taking place at

11   Dokich Court Reporting at 19712 MacArthur

12   Boulevard, Irvine, California, and is being

13   taken on behalf of the plaintiff.

14        The videographer is Johnnie Johnson

15   appearing on behalf of Elite Reporting

16   located in Cincinnati, Ohio -- Ohio.

17        Would counsel please identify

18   yourselves and state whom you represent?

19        MS. BROWN:  I'm Phyllis Brown.  And I'm

20   one of the lead counsel representing the

21   plaintiff class in this matter.

22        MR. FLAX:  I'm William Flax.  I

23   represent Richard Thomas, who's an

24   intervening defendant --

25        MR. HEALY:  Pat --

5

```
1         MR. FLAX:  Patent informal.
2         MS. BROWN:  He's plaintiff, isn't he?
3         MR. FLAX:  Oh.  Well, it's -- you're
4    intervening as a defendant, but --
5         MR. HEALY:  Patrick Healy from Mannion
6    Gray.  That's Judd Uhl's office.  We
7    represent the defendant deponent.
8         THE REPORTER:  Does everyone agree that
9    it's okay for me to no -- to swear the
10   witness from here in Cincinnati?
11        MS. BROWN:  Yes.
12        MR. HEALY:  No objection.
13        MR. FLAX:  Yes.
14             LAWRENCE P. WEIN
15   an intervening defendant herein, having been duly
16   sworn, was examined and deposed as follows:
17        THE REPORTER:  Thank you, sir.  You may
18   proceed.
19        MS. BROWN:  Thank you.
20             EXAMINATION
21   BY MS. BROWN:
22   Q.   Mr. Wein, I'm Phyllis Brown.  I believe
23   we spoke on the phone once quite a while ago.
24        Could you please give me your full name
25   and address for the record?
```

A. Lawrence Wein, 7 Sawgrass -- that's one word -- Drive, Newport Beach, California, 92660.

Q. Mr. Wein, as you know, this is a videotape deposition.

I will be asking you a series of questions. If I ask you a question that is unclear or if you don't understand or hear my words, please let me know, and I will rephrase or re-ask the question.

I will assume, if you answer the question, that you understood the question.

Is that fair?

A. Yes, ma'am.

Q. Okay. Are you taking any medications that would preclude you a -- being able to answer the questions truthfully?

A. No, I am not.

MS. BROWN: Okay. Could -- could the witness be given Exhibit 1?

THE WITNESS: Is this the exhibit that she gave me?

BY MS. BROWN:

Q. Yes. Exhibit 1 is titled the Notice of Deposition.

```
 1        A.    Okay.

 2              THE WITNESS:  Can I have it?

 3              THE VIDEOGRAPHER:  Yeah.

 4   BY MS. BROWN:

 5        Q.    Yeah.  Have you seen this before,

 6   Mr. Wein?

 7        A.    Yes, I have.

 8        Q.    Okay.  Have you had your deposition

 9   taken before?

10        A.    Have I ever had my deposition taken

11   before?

12        Q.    Yes.

13        A.    Yes, ma'am.

14        Q.    Okay.  And what -- in what -- how many

15   times?

16        A.    Maybe once or twice.

17        Q.    And can you tell me in what kind of

18   case?

19        A.    In a lawsuit that I filed on a piece of

20   rental property that I owned where there was

21   perpetrated fraud on the property.  And so I had

22   to sue the person that -- that bought the house.

23        Q.    Okay.  And was that in California?

24        A.    Yes.

25        Q.    Any other times your deposition was
```

1  taken?

2      A.    Not that I -- not that I can recollect,

3  no.

4      Q.    Okay.  And was that the case -- did

5  that case go to trial?

6      A.    No.

7            It -- it got arbitrated, and I ended up

8  getting payment from the appraiser.

9      Q.    Okay.  Mr. Wein, I'm just going to ask

10  you a couple of questions about your background.

11            Can you tell me where you went to

12  college?

13      A.    My first two years I went to the United

14  States Military Academy at West Point.

15            My junior and senior year, I went to

16  Boston College.

17            And I went to UC Irvine for graduate

18  school for my MBA.

19      Q.    Okay.  You spent two years at West

20  Point.

21            Were you dismissed from West Point?

22      A.    I'm sorry.  What was the question?

23      Q.    The question was, were you dismissed

24  from West Point?  Were you asked to leave West

25  Point?

1          A.     Yes.

2          Q.     Under what circumstances?

3          A.     Too many demerits and got in just basic

4     cadet trouble.  So I had to -- I was asked to

5     leave.

6          Q.     And did you go directly to Boston

7     College the following semester after you were

8     asked to leave?

9          A.     Yes.

10          Q.     Okay.  What degree did you receive from

11     Boston College?

12          A.     BA in economics.

13          Q.     And can you tell me what year?

14          A.     I was at West Point 1980 to 1982 and

15     Boston College '82 to '84.

16          Q.     And when did you receive your MBA from

17     UC Irvine?

18          A.     I want to say 1992, but that's just

19     from memory.

20          Q.     Okay.  Approximately 1992; is that

21     fair?

22          A.     Yes, ma'am.

23          Q.     Okay.  And after you graduated from

24     Boston College, did you begin your career

25     working?

1      A.   Yes.

2      Q.   And where -- where were you working?

3      A.   I immediately started to work for Fleet

4  National Bank.

5      Q.   In what position?

6      A.   In the e -- it was a group called Fleet

7  Capital Corporation.  And it was in the equipment

8  finance group as a salesperson.

9      Q.   Okay.  And how long did you remain in

10  that position?

11      A.   From July of 1984 until approximately

12  December of 1998.

13      Q.   And did you receive promotions during

14  this period?

15      A.   Yes, numerous promotions.

16      Q.   And what was your position at the time

17  you left in 1998?

18      A.   Vice president.

19      Q.   Of Fleet bank?

20      A.   Of Fleet Capital Corporation --

21      Q.   Oh, Fleet.

22      A.   -- which was a subsidiary of Fleet

23  National Bank.

24      Q.   Okay.  Got it.

25           Was your departure from Fleet Capital

1     Corporation voluntary?

2              THE WITNESS:  Hold on.  Let me shut

3       this off.

4       A.    I'm sorry.  Can you re -- repeat the

5     question, please?

6     BY MS. BROWN:

7       Q.    Sure.  Was your departure from Fleet

8     Capital Corporation voluntary?

9       A.    No.

10      Q.    What -- what was the cause of -- of --

11    were you terminated?

12      A.    Yes.

13      Q.    And what was the cause of your

14    termination?

15      A.    I had started up LW Capital

16    Corporation.  And it was determined there was a

17    conflict of interest between what I was doing at

18    LW Capital and what I was doing at Fleet

19    Capital.

20      Q.    And when did you start up LW Capital

21    Corporation?

22      A.    Again, it's -- it's from memory, but I

23    want to say 1993.

24      Q.    And I take it you never informed the

25    bank or you -- I'm sorry -- you never informed

1    Fleet Capital Corporation or your supervisors

2    that you had started up LW Capital Corporation?

3        A.    No.   I -- my -- my direct immediate

4    supervisor knew very well about LW Capital.

5        Q.    And did he approve of it?

6        A.    Yeah.   He never had any issue with it

7    or never said anything to me about it.

8        Q.    Okay.   And then how did an issue arise

9    in 1998?

10       A.    Well, Fleet was acquiring a -- numerous

11   other banks.

12             And in doing their due diligence, they

13   noticed documents for transactions that were part

14   of the portfolio they were acquiring that had my

15   name on the documents which were transactions

16   that I funded and sold to various banks during

17   that course of time.

18       Q.    Through LW Capital Corporation,

19   correct?

20       A.    Yes, ma'am.

21       Q.    Okay.   And then where did you go in

22   19 -- 1998, after you were terminated?

23       A.    I went to work for a company called

24   Rapidigm, which was an IT services company.

25       Q.    And how long did you stay there?

1     A.    From 1998 until 2009.

2     Q.    And what was your position with them?

3     A.    I was a director of the southwest

4  region.

5     Q.    What does that mean?

6     A.    So I started up and built and ran the

7  operation for Rapidigm in the southwestern United

8  States.

9     Q.    Okay.  And then in 2009, you left

10  Rapidigm?

11     A.    Yes, ma'am.

12     Q.    And where did you go from there?

13     A.    In 2000 -- so in 2009, I left Rapidigm,

14  and I moved over to MW Partners.

15     Q.    Okay.  Was your departure from Rapidigm

16  voluntary?

17     A.    Yes.

18     Q.    Okay.  And during this entire period,

19  you were also running LW Capital Corporation?

20     A.    Yes, ma'am.

21     Q.    Okay.  Let's talk about MW Partners.

22           Is this in -- what kind of company,

23  corporation, is this structurally?  Is it an

24  LLC?

25     A.    I'm not actually sure, to be honest

1    with you.  I -- I don't know the structure of MW

2    Partners.

3        Q.    Okay.  Let's start with this:  How many

4    partners are there?

5        A.    Well, now I believe there's three.

6            But at the time -- you know, again, I'm

7    not -- I'm not sure, because -- I don't know.  I

8    don't know how many partners there -- there were

9    or are currently.

10        Q.    Well, can you name the partners you

11    currently are -- know are partners?

12        A.    So right now the two -- the two

13    partners that I was aware of when I came over to

14    MW Partners are Rob Morris and Mike Willner.

15        Q.    Uh-huh.  So you joined the two of them

16    when you -- in -- in 2009, correct?

17        A.    I'm sorry.  You -- you broke up.

18        Q.    Sorry.  You joined Mr. Morris and

19    Mr. Willner as a partner in 2009 in MW Partners;

20    is that correct?

21        A.    No.

22            I'm not a partner with ownership in the

23    company.

24            I am a contractor to MW Partners.

25            I never joined MW Partners as an

1    employee.

2        Q.    You're neither an employee nor a

3    partner; is that correct?

4        A.    That's correct.

5        Q.    You're a independent contractor?

6        A.    Yes, ma'am.

7        Q.    Okay.  Do -- do you receive a salary?

8        A.    No, I do not.

9        Q.    Is your work there project-based?

10       A.    No, it is not.

11       Q.    Then how are you paid?

12       A.    Basically, whatever business I bring in

13   to MW Partners, I'm paid based on the

14   profitability of the -- each transaction, and

15   they pay me as a corp-to-corp entity.

16             They pay LW Capital for -- you know, as

17   a percentage of the profit of any transactional

18   business that I bring in there.

19       Q.    Okay.  So you actually work for

20   MW Partners through LW Capital Corporation?

21       A.    Yes, ma'am.

22       Q.    So the contract, then, would be between

23   LW Capital Corporation and -- and MW Partners; is

24   that right?

25       A.    That's correct.

1       Q.    And do you know currently if there are

2    additional partners beyond the two we just talked

3    about?

4       A.    I believe there is another partner.

5    And it's a recent transaction.  So if you'll give

6    me a second, I might be able to get his name.

7             His first name is Raj.  I don't know

8    his last name.

9       Q.    Okay.

10      A.    Raj is his first name.

11            And that -- that -- him becoming a

12   partner in the business just recently occurred

13   over the last couple of months.

14      Q.    How did you become involved with MW

15   Partners?

16      A.    I met MW Partners through my

17   association with them working at Rapidigm.

18      Q.    Was Mike Willner an employee of

19   Rapidigm?

20      A.    No, ma'am.

21      Q.    Was Rob Morris an employee of

22   Rapidigm?

23      A.    No, ma'am.

24      Q.    So you did work for Rapidigm on

25   behalf -- in a contractual relationship that

1    Rapidigm had with MW Partners; is that right?

2         A.    Yes, ma'am.

3         Q.    Okay.  What kind of work?

4         A.    What kind of work is -- what -- what

5    kind of work are you asking me?

6         Q.    What kind of work were you doing with

7    MW Partners?  What kind of work was Rapidigm,

8    through you, doing with MW Partners?

9         A.    So MW Partners and Rapidigm are in very

10   similar businesses.

11             And the -- the MW Partners -- if I can

12   back up for a second.  MW Partners -- there's a

13   few entities that are associated with MW

14   Partners, one of which is called Elevated

15   Resources.

16             And Elevated Resources is the entity

17   that Rapidigm actually worked with.

18             And then in 2006 Rapidigm was acquired

19   by Fujitsu.  And so I don't remember if MW

20   Partners -- I mean -- I'm sorry.

21             It's really not an MW Partners/Rapidigm

22   relationship; it's an Elevated Resources/Rapidigm

23   relationship.

24             And I'm not sure if Elevated Resources

25   came in existence to work with us before we were

1    acquired or after.  I don't recall it was

2    pre-2006 or post-2006.

3            But Elevated Resources provided

4    pass-through business for subcontracted resources

5    that we were using.  They payrolled those

6    resources.

7            So Elevated Resources would payroll

8    contractors that were not on our W-2 that we

9    subcontracted.  And then they would be

10    responsible for the payrolling and handling of

11    those resources and -- and -- at -- Rapidigm

12    and/or Fujitsu would pay them a fee for that

13    service.

14        Q.   Okay.

15        A.   Does that make sense?

16        Q.   I think I understand what you're

17    saying.

18            So does Mike Willner, to your

19    knowledge, have an ownership interest in Elevated

20    Resources?

21        A.   Again, I don't -- I'm not sure.  And I

22    don't know if it's changed, you know, from when I

23    went -- when I joined those guys originally to

24    now.

25            So I honestly don't know if he was

1    involved in Elevated as well as MW.  I'm not

2    sure.

3         Q.    Okay.  Do you know if he currently has

4    an ownership interest in Elevated Resources?

5         A.    No, I do not know that.

6         Q.    Okay.  Rob Morris?

7         A.    I do not know whether Rob Morris is --

8    has an ownership interest in Elevated Resources

9    either.

10        Q.    Okay.  Let's talk briefly about

11   LW Capital Corporation.

12              What kind of corporate entity is it

13   structurally?

14        A.    Subchapter S.

15        Q.    Okay.  So are you the only owner?

16        A.    Yes, ma'am.

17        Q.    Okay.  So you have a hundred percent

18   ownership in it?

19        A.    Yes, ma'am.

20        Q.    Are there other officers of the

21   corporation?

22        A.    No, ma'am.

23        Q.    You're the president, correct?

24        A.    Yes.

25        Q.    And there are no other off --

1    officers?

2         A.    Correct.

3         Q.    And what is the business of LW Capital

4    Corporation currently?

5         A.    LW Capital Corp is really an investment

6    company.  So it invests in stocks and bonds and

7    mutual funds.  It provides equipment leasing and

8    financing services to corporations.  It invests

9    in real estate.

10        Q.    So would it be correct to say it's the

11   entity through which you do your investments?

12        A.    Yes, ma'am.

13        Q.    Does it have any employees besides

14   you?

15        A.    No, ma'am.

16        Q.    Okay.  How did you come to invest with

17   Glen Galemmo?

18        A.    So, like I said, I joined MW Partners

19   in 2009.

20        Q.    Uh-huh.

21        A.    And I want to say towards the --

22   towards the end of 2010 I was introduced to Glen

23   by way of Andy Miller, Mike Willner, Rob Morris,

24   and Richard Low, all of whom at that time worked

25   either for or with MW Partners.

1    Q.    Okay.  Did you personally -- did you

2    meet him at -- personally at that time in 2010?

3    A.    No, I did not.

4    Q.    You were just introduced to him as a

5    possible -- well, how were you introduced to him?

6    What did they say about him?

7    A.    They had all had a very successful

8    relationship.  By success, I mean profitable

9    relationship with Mr. Galemmo for a number of

10   years preceding the conversation I had with him.

11         And they -- I believe it was Mike and

12   Rob had told me that there were opportunities to

13   do -- if I -- if I had some liquid cash, that I

14   could do short-term transactional loans with Glen

15   and have an opportunity to make some money, as

16   well.

17   Q.    Okay.

18   A.    So that -- that's how I was originally

19   introduced to Glen.

20   Q.    Okay.  Did you ask what kind of

21   business he had?

22   A.    I mean, he -- as far as I understood,

23   he was a deal maker and a guy who was involved in

24   a number of different kinds of investments, and

25   that -- that was really it.

1      I mean, the -- the nature -- the -- the

2  primary interest that I had was that Rob Morris's

3  sister was married to Glen Galemmo.

4      Q.    Are you referring to Kristine

5  Galemmo?

6      A.    Yes.  And that's Rob's sister.

7      Q.    Correct.

8      A.    That -- so between Rob's -- Rob knowing

9  Glen by way of marrying -- married to his sister

10  and, again, the -- each one of those individuals

11  had a very successful track record, profitable

12  track record, of dealing with Glen for four or

13  five, six, seven years prior to even talking to

14  me about it, I felt very comfortable with

15  whatever opportunities they presented to me.

16      So that was what -- why I was

17  interested.

18      Q.    Are you aware that Mr. Willner was sued

19  by the plaintiff class --

20      A.    Yes.

21      Q.    -- and settled his lawsuit?

22      A.    Yes, ma'am.

23      Q.    Are you aware that Mr. Miller was sued

24  by the plaintiff class --

25      A.    Yes, ma'am.

```
1        Q.    -- and settled his lawsuit?

2        A.    Yes, ma'am.

3        Q.    Are you aware that Mr. Morris was sued

4   by the plaintiff class --

5        A.    Yes, ma'am.

6        Q.    -- and settled his lawsuit?

7        A.    Yes, ma'am.

8        Q.    And who is the last name, Robert Love,

9   did you say?

10       A.    I'm sorry.  Richard Low, L-o-w.

11       Q.    Ah.

12       A.    Richard is part of the plaintiff

13  class.

14       Q.    Yeah.  I was going to say, I don't

15  recognize the -- the other name.

16             What did you believe that Mr. Galemmo

17  used the funds that you invested with him for?

18       A.    I really didn't know.  I didn't know.

19             He had talked and -- texted me and

20  talked to me over the phone about a number of

21  different transactions he was doing, primarily

22  with Goldman Sachs.

23             And I -- I didn't really -- and, again,

24  I didn't know what he was specifically doing with

25  my money.
```

1    Q.    Did you ever ask him?

2    A.    The time that I asked him was more

3    towards the end of the relationship.  And that's

4    when he told me about the Goldman Sachs

5    situation.

6    Q.    You say the time you asked him was

7    toward the end of your relationship.

8          Were you getting suspicious of him at

9    that time?

10    A.    Well, at -- at the time -- I mean, what

11    happened is, what started out as a four, five,

12    six, seven, eight-week transactional loan

13    arrangement, as -- as I continued to do deals --

14    loan deals with him, his time to pay me back was

15    longer and longer and longer.

16          And -- and -- and so I definitely,

17    towards the end of our relationship, began to get

18    suspicious and just, you know, wanted to ask some

19    more questions, because he was not being honest

20    and forthright with me in his communication

21    regarding paying me back my principal and

22    interest.

23    Q.    Yet you continued to invest with him,

24    correct?

25    A.    Well, this is -- this is really -- I

1   might have done one or two deals, max, maybe even

2   one deal at the end.

3           And then I stopped after my last deal,

4   which I believe was sometime in January 2013.

5   December -- actually, December 2012 was the last

6   time I lent him money.

7           And then after I got paid back in 2013,

8   I stopped doing business with him.

9           He had talked to me about other

10  transactions that he wanted me to look at.  And I

11  didn't partake in any other transactions after I

12  got paid back in -- in 2000 -- early 2013.

13      Q.   Did you ever invest money through

14  LW Capital Corporation with Mr. Galemmo?

15      A.   The funds -- I'm not sure -- again, I

16  am LW Capital.

17      Q.   Right.

18      A.   So I'm not -- so I'm not sure if LW

19  Capital provided some of the funds or I

20  personally provided the funds.

21           I don't have a recollection as to

22  exactly where the funds came from.

23           But -- but I never invested one dime in

24  Glen Galemmo or any Galemmo entity.  So

25  everything that I did with Galemmo was to him

1    personally, to the best of my knowledge.  And it

2    was lending him money, not investing money with

3    him.

4         Q.    Well, we'll get to that a little later.

5              Did you ever make any investments

6    through Mike Willner with Mr. Galemmo?

7              MR. HEALY:  Let me just object,

8         Phyllis.

9         A.    I never invested one dime with anything

10   related to Glen Galemmo.

11             Again, the nature of my business with

12   anything related to Glen Galemmo was purely loan,

13   principal, interest, transactional, pay me back.

14             The initial deal -- so my very first

15   deal with Galemmo, because I didn't know him,

16   even though I heard all the good things about him

17   and what a great guy he was, I wanted -- I

18   believe Willner might have been involved in that

19   deal.

20             And either -- I'm not sure if I paid --

21   if Mike -- I gave Mike the money or I wire -- I

22   believe I -- the money was wired from me to

23   Galemmo, but Mike might have paid me back.

24   Because it was only a $50,000 loan.

25             So that's how I started my

1    relationship.

2              But I believe Willner was involved in

3    that original transaction.

4    BY MS. BROWN:

5         Q.    Okay.  When you sent money, was it

6    always by wire transfer?

7         A.    Yes, ma'am.

8         Q.    And how did you get the wire transfer

9    instructions?

10        A.    Once the -- once the dollar amount,

11   duration, and rate were agreed upon, I asked Glen

12   to give me wiring instructions for who, where,

13   when, why, how he wanted me to send the money.

14        Q.    Isn't it correct, Mr. Wein, that every

15   amount, every -- all the money you sent was sent

16   into an account of Queen City Investment Fund

17   II?

18        A.    That is not correct.

19        Q.    Where did you send the money?

20        A.    There was another -- there was another

21   account that he --

22        Q.    What are you looking at, sir?  You're

23   not to look --

24        A.    I'm looking -- I'm sorry.

25        Q.    You're not to look at documents until I

1    ask you to.

2          A.    Okay.  Well, you just -- okay.

3          Q.    No.  I'm not asking -- I'm asking you a

4    question under oath.  I'm not asking you to check

5    documents.

6          A.    Okay.  Please repeat the question.

7          Q.    Did you ever -- are you saying that you

8    sent money to any account other than Queen City

9    Investment Fund II?  Yes or no.

10         A.    Yes, ma'am.  Yes, ma'am.

11         Q.    And what was the name of the account,

12   if you recall?

13         A.    QFC, comma, LLC.

14         Q.    And what did that stand for?

15         A.    I have no idea.

16         Q.    Okay.

17         A.    It was a different -- it's a different

18   account number than the other QFC, L -- QFC II or

19   whatever the other one was.

20               But to be honest with you, I didn't pay

21   any -- I'm actually just realizing that over the

22   last week, as I looked over my wires, because I

23   never paid any attention to who I wired the money

24   to.

25               Had I been in Ohio, I would have handed

1    him a personal check for the money.  The wire was

2    just a conduit for me to get him his funds.

3         Q.    Isn't it correct that none of your wire

4    transfers were to Mr. Galemmo personally?

5         A.    That is correct.

6         Q.    So why is it you say you lent money to

7    him personally?

8         A.    Because I would have sent the wire to

9    any city, state, country, planet, entity, House

10   of Pancakes -- I would have sent the money, once

11   we agreed on the arrangement personally, to

12   anybody or anywhere that he wanted me to send the

13   money.

14        Q.    What is it --

15        A.    I didn't -- it was just a conduit for

16   me.

17        Q.    What is it -- what is it that makes you

18   say that you lent money to him personally?

19        A.    Because that's the arrangement we had.

20   Him and I agreed I would lend him money and he

21   would pay me back in a certain amount of time, at

22   a certain interest rate.

23             My -- my -- my dealings were just to

24   him personally.

25             I had nothing -- I had never -- I never

1    talked to anybody else about the specific

2    transactions, other than to get wiring

3    instructions.

4         Every communication I ever had was with

5    Glen Galemmo personally.

6         Q.   Isn't it correct that none of your wire

7    transfers went into any account that was labeled

8    the personal account of Glen Galemmo?

9         A.   Well, I'm not sure.

10         Q.   Just a yes or no.

11         A.   Say that again, please.

12         Q.   Just a yes or no.

13         Do you want me to repeat the whole

14    question?

15         A.   Okay.  Yeah.  That would be great.  I'd

16    appreciate it.

17         Q.   Sure.

18         Isn't it correct that not one of your

19    wire transfers went into an account with the name

20    Glen Galemmo?

21         A.   That is -- that is correct and

22    accurate, yes.

23         Q.   Isn't it correct that not one of the

24    wire transfer -- transfers made to you was made

25    from an account of Glen Galemmo personally?

1        A.    That is correct.

2        Q.    Okay.  Let's look at what I've marked

3    as Exhibit 2, sir.

4              Do you recognize the name Adrienne

5    Bowling?

6        A.    Yes, ma'am.

7        Q.    And who is Adrienne Bowling?

8        A.    To the best of my knowledge, she was an

9    assistant to Glen.  She worked with Glen.

10       Q.    Oh.  That's correct.

11             MS. BROWN:  Mr. Flax, hold on one sec.

12             I'm sorry.  I -- I should have been

13             giving you copies of the exhibits.  Here's

14             Exhibit 2.

15             I'm just providing one of the attorneys

16             here with copies of the exhibits.

17             MR. FLAX:  Thank you.

18             MS. BROWN:  I inadvertently didn't do

19             it before.

20    BY MS. BROWN:

21       Q.    And you're asking her about where you

22    should send your money, correct?

23       A.    Yes, ma'am.

24       Q.    And she gives you the information,

25    correct?

1     A.    Yes.

2     Q.    And what is the name of the account?

3     A.    This particular one is QCIF II.

4     Q.    Look at the bottom of the first page.

5 It's Queen City Investment Fund II, correct?

6     A.    Correct.

7     Q.    And that's what she tells you,

8 correct?

9     A.    Correct.

10    Q.    Okay.  Did you ever ask any questions;

11 what is Queen City Investment Fund II?

12    A.    No.

13    Q.    Did you ever ask --

14    A.    Didn't really care.

15    Q.    -- what Mr. Galemmo's relationship was

16 with Queen City Investment Fund II?

17    A.    Nope; didn't care; didn't pay any

18 attention to it.

19        They could have told me to wire the

20 money to Mexico or his aunt or uncle or

21 grandmother.

22        Again, I would have personally

23 hand-delivered my check to him and not wired it

24 to anybody, had I lived in Ohio.

25        So he could have told me anywhere to

1   send the money that we agreed to loan and that

2   he'd pay me back -- I would have sent it

3   anywhere.

4          It had no significance.  It had no

5   relevance, importance.  It didn't matter to me.

6   I paid no attention to it.

7          And his name Queen City didn't mean

8   anything to me.  I had no idea what it was, nor

9   did I care.

10      Q.   Can you look at Exhibit 3, sir?

11        MS. BROWN:  Bill.

12      A.   Yeah.  This exhibit is pretty hard for

13   me to see.  It looks like it's highlighted or --

14   BY MS. BROWN:

15      Q.   Well --

16      A.   It's hard for me to read this

17   exhibit.

18      Q.   Okay.  Well, let's just look at the

19   name of the account on the exhibit, if you would.

20   What is the name of the account?

21      A.   Queen City Investment Fund II.

22      Q.   And that's where you were depositing

23   money, correct?

24      A.   Negative.

25      Q.   Well, let's look at the date,

1    December 3rd, the first deposit.

2              This is -- this is for the period --

3    the statement period December 1, 2010 through

4    December 31st, 2010.

5              And let's look at the wire credit from

6    Lawrence P. Wein, 7 -- Lawrence P. Wein, 7

7    Sawgrass Drive.

8              Is that you, sir?

9        A.    That's me.

10       Q.    And it's in the amount of $50,000,

11   correct?

12       A.    Correct.

13       Q.    And that's what you said you believe

14   was your first ex -- your first pri -- dealing

15   with Mr. Galemmo, correct?

16       A.    Yes, ma'am.  Yes, ma'am.

17       Q.    So isn't it correct that, whether you

18   call it a loan or investment, you were directly

19   depositing to the account of Queen City

20   Investment Fund II, not Mr. Galemmo personally?

21       A.    That is correct.

22       Q.    Okay.  Thank you.

23       A.    Although I had no idea what Queen City

24   Investment Fund II is.

25             I had no clue if -- what it was.  It

1    could have been a real estate holding company.

2    It could have been -- it could have been a -- one

3    of fifty partners in the company.  I had no idea

4    what Queen City Investment Fund II was.

5             I was -- it could have been Queen City

6    Investment Fund 80.  It could have been any one

7    of these 30 companies he has on his list here,

8    including QFC, LLC.

9        Q.   Please, sir --

10       A.   Which I -- it could have been Midwest

11   Hoops & Sports Plus, LLC; Cincinnati Royals, Inc.

12   He could have given me any entity.  I had no idea

13   who, what, where, when, how, or why.

14           And I did not deposit the money; I put

15   the money in as a loan to -- for Mr. Galemmo.

16       Q.   Sir, first off, if you would please

17   cooperate.  That is a video deposition.  And

18   you've had your deposition taken before.  The

19   only documents that you are to look at are

20   documents when I instruct you.

21           As a courtesy, you got a copy of all

22   the exhibits ahead of time through your attorney.

23           But, generally speaking, they would not

24   be available to you until I've introduced them.

25           So if you would please cooperate and

1    not pick up exhibits that have not yet been

2    introduced, I would appreciate it.

3              Can we agree on that?

4    A.    Yes, ma'am.

5    Q.    Okay.  So we're looking at Exhibit 2.

6              MR. HEALY:  3, I think you're on.

7              MS. BROWN:  I'm sorry.  Exhibit 3.  My

8    error.

9              THE WITNESS:  Okay.  All right.

10   BY MS. BROWN:

11   Q.    Exhibit 2 was the e-mail which gave you

12   the direction to Queen City Investment Fund II.

13             So you were given the name of where to

14   wire transfer your funds, and you chose not to

15   ask anything about what Queen City Investment

16   Fund II was, correct?

17   A.    Yes, ma'am.

18   Q.    Okay.  We'll be coming back to

19   Exhibit 3.

20             If you -- if you were to look through

21   Exhibit 3, what you would see, I believe -- and

22   feel free to look through -- that every deposit

23   you made was made by Lawrence P. Wein personally

24   and every payout was to LW Capital Corporation.

25             Did you request that?

1     A.   Yes, ma'am.

2     Q.   And why was that?

3     A.   Because, again, I am LW Capital.  And

4 just based on movement of funds, I chose to have

5 the money wired to LW Capital because, again, it

6 captures all of the business transactional --

7 or deals that I do.  So I just try to capture

8 everything in that account.

9     Q.   Well, why wouldn't you then wire the

10 money to him from that account?

11    A.   Because I -- I used funds from various

12 other sources of me -- of mine as loans to myself

13 from equity lines that I had to be able to fund

14 these deals for Glen.

15        And I -- I moved -- it was my own

16 personal preference, based on available funds

17 that I had, that I chose to do it this way in

18 terms of how I can move my own money around to

19 enable me to have the liquidity to do it.

20    Q.   Let me be clear, sir.  I'm not

21 suggesting that there's anything wrong with it.

22 I'm just asking the question.

23    A.   Okay.

24        So, basically, it was just a liquidity

25 thing, available funds, access to me being able

1   to fund these transactions for Glen.

2       Q.   So would it be correct to say that a

3   portion of the money that you deposited in Queen

4   City Investment Fund II was money that you

5   actually borrowed at a lower rate of interest

6   than you were receiving back from Glen?

7       A.   Okay.  So I would appreciate it if you

8   stopped using the word deposited as -- as

9   invested deposited funds and call the funds and

10   my transaction what it was, which was loan funds,

11   number one.

12       Number two, that is fair -- I guess

13   safe -- actually, why -- why don't you repeat the

14   question again?  --

15       Q.   Sir --

16       A.   -- so I can answer quickly?

17       Q.   Sir, I can choose whatever words I want

18   to use in this deposition.  You deposited funds,

19   whether you want to call them a loan or

20   investment, they were funds that were deposited

21   in Queen City Investment Fund II.

22       And my question is, when you were

23   depositing these funds, were you borrowing funds

24   at a lower rate of interest than the rate you

25   received back from Queen City Investment Fund II

1    when you were paid back?

2            MR. HEALY:  Larry, hang on one second.

3            Just for the record, I want to object

4        to any cl -- classification as investment in

5        the fund or depositing into the fund.

6            I just want a continuing objection to

7        phrasing it that way.

8            You can continue asking it however you

9        want, but I just want to object for the

10       record.

11           Larry, you can go ahead and answer

12       that.

13           THE WITNESS:  Fair enough.

14       A.   I did -- I don't know how many

15   different transactions I did.

16           But I feel it's safe to assume that,

17   yes, I used borrowed funds of my own at a lower

18   rate to go ahead and lend to Glen and then got

19   paid back by Glen at a higher rate.

20   BY MS. BROWN:

21       Q.   So your answer is, yes, you did that?

22       A.   Yes, I did that.

23       Q.   Okay.  Can you turn to Exhibit 4, sir?

24       A.   Sure.

25       Q.   I can represent to you that Exhibit 4

1    is a summary sheet that our office and --

2    produced, showing the transactions, all of the

3    deposits and all of the withdrawals.

4         If you could look at it, if you could

5    tell me if there's anything, to your knowledge,

6    inaccurate on it.

7    A.    I believe there -- there may be some

8    inaccuracy here.  But if I -- if I don't have the

9    ability to look at my original sheet, then I

10   can't tell you kind of where the inaccuracy is.

11        But I recall looking last night over my

12   notes and comparing it to your notes.  And there

13   is something that's off.

14   Q.    I have your original sheets as a later

15   exhibit.  We can go through that at that time, if

16   that's okay with you.

17   A.    Sure.  I mean --

18   Q.    So --

19   A.    I mean, basically, we're -- we're 40 or

20   $50,000 off.  I think the 5/7/12 transaction is

21   in a different place.

22        But for the most part, this -- this

23   describes financially what happened between Glen

24   Galemmo and myself.

25   Q.    Okay.  The 5/7/12 transaction, the way

1    I have it is a payout of $40,000.

2              Are you saying you believe there was no

3    payout, there was a higher payout?

4       A.    No.  No.  I -- I -- the -- the payment

5    back, I believe that really goes to the above

6    $500,000 deal, because 640,000 on 500 wouldn't

7    have happened.

8              So I just believe that -- that the --

9    the allocated payouts are -- are just in the

10   wrong spot allocated to the wrong loan.  That's

11   all.

12      Q.    Well, the way we prepared this sheet,

13   sir, was, we weren't tagging them to loans.  We

14   were just putting down the dates that there were

15   deposits and the dates that there were

16   withdrawals, not necessarily --

17      A.    Okay.

18      Q.    -- that they were tagged to a specific

19   loan.  We just followed the transactions.

20      A.    Okay.  So -- go -- I'm just -- I'm

21   sorry.  The only reason I would -- the only

22   reason that -- that they -- they should each be

23   tagged to a loan is because no new loan money

24   ever went out from me until every penny of

25   principal and interest was paid back on the

1    preceding loan.

2          So nothing was rolled, nothing was

3    added on top.  Every single transaction was paid

4    in full prior to the next separate and distinct

5    transaction to be funded.

6          Q.   Okay.

7          A.   So that's -- that's how I arranged --

8    that's how everything happened between Glen and

9    I.

10         Q.   When you -- is it correct that your

11    first transaction was the loan of December 3rd,

12    2010?

13         A.   Yes, ma'am.

14         Q.   Okay.  Did you have a written agreement

15    as to when you were to be paid back the

16    $50,000?

17         A.   No, ma'am.

18         Q.   Did you have a written agreement at how

19    much you were to be paid back?

20         A.   I had nothing in writing from Glen.

21         Q.   Did you have any agreement as to when

22    you would be paid back?

23         A.   No, ma'am.

24         Q.   So Mr. Galemmo -- who contacted you

25    about the $50,000 loan, the first loan?

1      A.    Mike Willner and Rob Morris.

2      Q.    And can you -- can you describe what

3   happened, the circumstances?

4      A.    Mike -- I believe it was Mike

5   originally brought it up to me and said that he

6   had been doing -- him and Rob had been doing a

7   few of these loans of recent with Glen.

8           And, apparently, Glen had asked him if

9   he had any other friends that were on a liquid

10   situation that could partake in the loans and

11   earn a reasonable rate of return.

12           And so Mike approached me and asked me

13   if I would -- you know, had any interest in doing

14   the loans.

15      Q.    Okay.  So you just said, sure, I'll

16   give you $50,000, and you didn't agree on what

17   the rate of return would be?

18      A.    Oh, we -- we -- the -- on every deal,

19   either by phone or by text, Glen and I would

20   agree on the amount, the rate, and the -- the

21   date by which he was supposed to pay me back.

22      Q.    And you were comfortable with that

23   arrangement?

24      A.    Again, yes, I was comfortable, because

25   of the relationship with the people in my office,

1    the longevity and duration of relationships with

2    Glen and the profits that they made in dealing

3    with Glen, in not just paper profits, but actual

4    fund withdrawal profits in the millions of

5    dollars that they made and that I had seen --

6    that I was aware of, and, again, the relationship

7    with my -- with Rob Morris's wife, his -- his

8    sister's husband.

9            So, yes, I was very comfortable based

10   on the experiences that these guys that I trusted

11   had with Glen prior to me getting involved.

12       Q.   Okay.  So let's look at this first

13   transaction.  You made the loan December 3rd.

14   You're paid back about two months later,

15   February 10th, correct?

16       A.   Yes, ma'am.

17       Q.   And you get 57 -- $57,100, correct?

18       A.   Yes, ma'am.

19       Q.   That's about 7 percent a month

20   interest?

21       A.   I'm not sure exactly what that works

22   out to.  10 percent -- it's probably a 7-percent

23   deal.

24            All my deals with Glen were supposed to

25   be between 6 and 10 percent on each transaction.

1    So that sounds about right.

2        Q.    Okay.  Annualized, that would be 84

3    percent interest, correct, if it's 7 percent?

4        A.    Correct.  None of these deals were

5    supposed to be 12-month deals.

6        Q.    Is that correct, if it were annualized,

7    it would be 84 percent?

8        A.    Yes, ma'am.

9        Q.    Okay.  So you're paid back

10   February 10th.

11           One week later, you decide to deposit

12   $300,000 with him, correct?

13       A.    I did -- again, we're just -- deposit

14   or loan, but, yes, that is correct.

15           So the first transaction went smooth

16   and clean.  He -- he delivered everything he said

17   he would deliver in the right time frame.  And so

18   once I got my 57,100 back, I entered into loan

19   transaction number two, for 300,000.

20       Q.    Okay.  And if you want to look at

21   Exhibit 3 at the same time, we can follow the

22   transactions on Exhibit 3.

23           If you'd turn to the third page of

24   Exhibit 3.

25       A.    (Witness complies.)

1      Q.    You'll see that on February 17th,

2    there's a wire transfer to the Queen City

3    Investment Fund II by you of $300,000.

4          Are you with me?

5      A.    So I'm -- I'm having a problem --

6    you -- in the way it's printed, I think there's

7    highlighted in the -- and the highlight's not

8    showing through the other side.

9          Does that make sense?

10      Q.    Yeah.  I can see what you're --

11      A.    It's hard for me to read this.

12      Q.    Well, if you look at the first

13    transaction on the third page, sir, do you see

14    the date February 17th?  There's no highlighting

15    on that date.

16      A.    Unless I'm looking at something, it's

17    just --

18      Q.    Exhibit 3.

19      A.    QFC -- yep.  QFC, LLC on the top.

20      Q.    It says, Queen City Investment Fund II,

21    at the top?

22      A.    Yeah.  I have --

23          MR. HEALY:  She's on page 3, Larry.

24    Page 2 says QFC, LLC.  Page 3 at the top

25    says, Queen City Investment Funds.

1      A.    2 of 4, page 2 of 3.  Okay.  Okay.  I

2  got -- these came out off the printer wrong.

3  That's why.  Okay.

4            February 17th.  Okay.  Yeah.  I'm good

5  now.  I see it.

6  BY MS. BROWN:

7      Q.    Okay.  We see the $300,000 deposit?

8      A.    Yes.

9      Q.    And then half of it was returned a

10  month later.  If you turn to page 4, you'll see a

11  withdrawal on March 18th of 150,000.

12            Are you with me?

13      A.    Yeah.  These came off the printer --

14  they gave -- whatever they gave me --

15      Q.    And, as I said, it goes into the LW

16  Capital Corporation account.

17      A.    Okay.  So -- so I'm -- I'm just -- they

18  printed these off wrong.  So I'm -- they're not

19  in order for me to --

20      Q.    Well, if you look at the March 18th --

21  do you see March 18th?

22      A.    Nope.

23            Okay.  Yeah.  This is --

24      Q.    Do you see wired to --

25      A.    Okay.  March 18th, yep.  150.

1      Q.    Yeah.  And then a week later you get

2    174,000, correct?

3      A.    So these -- these are not withdrawals.

4    These are payments.  But, yes, that is correct.

5      Q.    Well, what does it say at the top of

6    that column; Other Withdrawals, correct?

7      A.    That's out of their fund.  I have --

8    that's out of their bank statement.  This isn't

9    my statement.

10     Q.    Okay.  I --

11     A.    I don't know -- yeah, yeah.

12           This is not a withdrawal.  I don't -- I

13   didn't make this withdrawal.  They -- they chose

14   to pay me back out of this account.  And they --

15   it's payment to me.

16     Q.    Right.

17     A.    It's not a withdrawal by me.

18           On his statement, it shows as a deposit

19   and a withdrawal.

20     Q.    Correct.

21     A.    But that's not from me.  I didn't

22   withdraw anything.

23     Q.    I -- I never said you did.

24           I said, there was --

25     A.    You said I made a withdrawal.  I did

1    not make a withdrawal.

2        Q.    No.  I said there was a withdrawal of

3    $174,000.  It's clearly from his account --

4        A.    Right.

5        Q.    -- the account you deposited in, which

6    is Queen City Investment Fund II.

7        A.    Okay.

8        Q.    So that was $24,000 in interest,

9    correct?

10       A.    Correct.

11       Q.    In less than six weeks?

12       A.    Correct.

13       Q.    So that's about $4,000 a week?

14       A.    Correct.

15       Q.    Did that seem high to you?

16       A.    Unsecured, undocumented, hard money

17   loan, no personal guarantee, I -- if you go

18   borrow money from your credit card, what's the

19   rate?

20             What's the rate if you go to a pawn

21   shop and you give collateral where you did a hard

22   money loan and you do a trust deed?  Right?

23             So, no, that doesn't seem high to me

24   for doing undocumented, hard money loan with no

25   collateral.

1    Q.   Okay.  So how did you determine the

2  interest rate amount?

3    A.   Glen and I would talk on the phone and

4  agree up front.  And if -- and these first two

5  transactions went very smooth.  So there were no

6  issues.

7         But once -- once these deals, as you'll

8  see, as the deals -- as we go down each

9  transaction, the date slips.  There's a lot of

10  slippage, and some of these deals become four or

11  five, six-month deals.

12         So the interest rate would change based

13  on his inability to perform on paying me back.

14    Q.   Okay.  So when you talked on the phone,

15  would he make a proposal, I'll borrow this for

16  six weeks at 7 percent?  Is that how it worked?

17    A.   Yes, ma'am.  Yes, ma'am.

18    Q.   And then would you say, no, that's not

19  good enough?

20    A.   No.  He pretty much knew what I needed

21  to do these deals.  And he always stayed within

22  the parameters of -- of what the initial

23  agreement was.

24         Again, unless he really stretched it

25  out, he -- we always stayed, you know, relatively

1    in that -- in that band of rate that we agreed

2    would make sense for me to do short-term loans.

3         Q.   Okay.  So was there any bargaining

4    going on between you and Glen?

5         A.   No.

6         Q.   So whatever he suggested, you just

7    accepted?

8         A.   Again, yeah.  He knew -- he knew what

9    I -- he knew what it would take for me to give

10   him this kind of liquidity for what was supposed

11   to be a six, eight, ten-week transaction.

12         So it would -- doesn't make sense for

13   me to do a deal at 2 percent to give him $500,000

14   to make ten grand.

15         It doesn't make any sense for me at all

16   to do that deal, even though annualized it's 24

17   percent, it doesn't make sense for me to do a

18   two-month deal for 500,000 for ten grand.

19         Q.   So --

20         A.   He had to make it worth my while.

21         Q.   -- did you ever discuss with Mike

22   Willner what rates he was getting?

23         A.   Yes.  On that first deal, Mike's the

24   one who actually told me the rate.  And, again, I

25   believe it was somewhere around 7 percent, but I

1    can't remember exactly.

2              But Mike's the original one who

3    introduced me to doing these loans.  And I got

4    the rate that he was getting on the loans, he was

5    doing.

6         Q.    Did you ever discuss with him, how much

7    are you lending, or anything of that nature?

8         A.    I don't recall honestly, whether we had

9    the discussions about how much we were lending or

10   how long or how much you did.

11        Q.    What about with Rob Morris?

12        A.    Same thing.

13        Q.    Okay.

14        A.    I knew that Rob had done some loans.  I

15   knew that Rob had done some loans with Glen.  But

16   we -- we didn't really talk specifically about,

17   you know, the transactional nature of each deal.

18        Q.    So when things got a little out of

19   kilter and you weren't getting paid back as

20   quickly as -- as had been agreed upon, did you

21   discuss it with Mike Willner?

22        A.    I definitely discussed it with Mike.

23   And Mike told me that that -- that he was also

24   experiencing the same delay in payments, but that

25   Glen would make it right in terms of paying extra

1    money for the additional time that the funds

2    would be outstanding, but that he always got paid

3    back and not to worry.

4          And I had the same experience with

5    Glen, as well.  I always got paid back.  So I --

6    you know, I was comfortable doing what I was

7    doing.

8       Q.   So one week after the return of the

9    second $300,000 loan, you made a $500,000 loan,

10   correct?  If you look at marked --

11      A.   Yes, ma'am.

12      Q.   If you look at Exhibit 4, a $500,000

13   loan on March 31st.

14      A.   Yes, ma'am.

15          Again, that second transaction went

16   relatively smooth.  He did perform, he did what

17   he said he would do.

18          And so I went ahead and did another --

19   a third transaction with him.

20      Q.   Right.  And, again, the money was

21   deposited into Queen City Investment Fund II,

22   correct?

23      A.   Yes, ma'am.

24      Q.   Okay.  Then this money was paid back

25   over a period of -- of payments, I guess, through

1    June; is that correct?

2        A.   Yes, ma'am.

3        Q.   Okay.  You got the first 250,000

4    back on May 11th, which will be reflected in

5    Exhibit 3.

6             If you turn to the fifth page, you'll

7    see other withdrawals.  On May 11th, you'll see a

8    wire debit, again, to LW Capital Corporation, of

9    250,000.

10       A.   I don't think I have it.  Where's

11   Exhibit 3?  What page are we on, please?

12       Q.   It's the fifth page of Exhibit 3.  It's

13   May 2011.

14       A.   Yeah.  I'm just -- again, these are not

15   in order.  When they gave them to me -- they

16   printed them out and they gave them to me.

17   They're not in order, so it's -- it's really hard

18   for me to figure this out, to be honest with you.

19            I'm just going to assume that --

20       Q.   Well, we can -- we can --

21       A.   Is it okay if I look through your

22   schedule from Exhibit 4?

23       Q.   Yeah.  We can take a break, because

24   we're going to be using Exhibit 3, and you can

25   put it in order.

1     A.   Okay.  Let me -- I think that would

2  help, because this is not in order, too.

3     Q.   I think so, too.  I don't want you to

4  be agreeing to things that you haven't seen.

5     THE VIDEOGRAPHER:  Did you want to go

6     off the record, you said?

7     MS. BROWN:  Yes.

8     THE WITNESS:  Is there a way -- can --

9     is there a way you can maybe print this

10     again, so that it prints by itself, just

11     Exhibit 3?

12     MS. BROWN:  Can you do that, Brenda?

13     THE REPORTER:  Yes, we can do that when

14     we go off the record.

15     THE WITNESS:  Okay.  That will be

16     great.  Because I think that just something

17     got goofed up in the -- in the printing.

18     And I'll also try to make sense of it while

19     you're doing that.

20     MS. BROWN:  Okay.

21     THE VIDEOGRAPHER:  We are going off the

22     record.  The time on the monitor is 10:27

23     a.m.

24     (Off the record.)

25     THE VIDEOGRAPHER:  We are back on

```
1        the record.  The time on the monitor is
2        10:34 a.m.
3             MS. BROWN:  Thank you.
4   BY MS. BROWN:
5        Q.   So, Mr. Wein, we had just discussed
6   your loan of $500,000 on March 31st.  And you got
7   the first payback on May 11th of half of the
8   principal, correct?  If you could look --
9        A.   Yes, ma'am.
10       Q.   If you could look at the withdrawal
11  sheets.
12            And then on May 17th, you got a
13  payback; you got a wire transfer of 40,000,
14  right?
15       A.   Yes, ma'am.
16       Q.   Then if you turn the page, we have
17  another wire transfer of 20,000 on June 10th.
18       A.   Yes, ma'am.
19       Q.   And at this point you were worried
20  about the other 250,000 principal, correct?
21       A.   I don't know if I was worried or not.
22  I -- I don't remember.
23       Q.   Okay.  Well, let's look at Exhibit 5.
24            If you look at the back of it, starting
25  in the back, you e-mail Adrienne on June 15th.
```

1          You say, I spoke to Glen last week and

2    I expected a wire of 250,000 on Monday.  No sign

3    of it on Wednesday.

4          Do you recall?

5    A.    I don't recall.  But that's -- that

6    wouldn't surprise me.  It's definitely -- it's

7    from me.  So, yes, that -- that -- you know, I

8    definitely was asking where the rest of my money

9    was.

10   Q.    Then Adrienne responds two days later,

11   still waiting on wire.

12         Correct?

13   A.    I --

14   Q.    And then you respond again on

15   June 21st, no sign of the wire yesterday or

16   today.  What is the ETA?

17   A.    Yeah.  Yeah, no.  Definitely, that

18   sounds like it's right.  I mean it's --

19   Q.    And then --

20   A.    Yes.

21   Q.    -- finally, on June 22nd, she says, it

22   should be in your account now.

23         Now, did you have a definite time at

24   that point when you -- you were going to receive

25   the remaining payment?

1    A.    No.  I never had definite times with

2  Glen.

3    Q.    Well, did you have an agreement that --

4  of when you would get the 500,000 back and the

5  interest?

6    A.    It was all verbal -- and it more and

7  more became a moving target with Glen -- so

8  nothing in writing.

9          He always had investors that were doing

10  things and Goldman Sach -- he had all kinds of

11  stuff going on that, you know, a week delay, two

12  weeks, three weeks -- it just -- it just started.

13  This is when -- this is when the -- the issues

14  started with him stretching out payment.

15          So, no, we never had anything formally

16  agreed to, on this day you will pay me back.  It

17  was free -- it was more free-flowing.

18    Q.    So, in point of fact, you made the loan

19  on March 31st.  You were fully paid back three

20  months later, June 22nd, correct?

21    A.    Yes.

22    Q.    And you received $60,000 in interest,

23  correct?

24    A.    Correct.

25    Q.    So that's $20,000 a month, correct?

1      A.    Yes.  On $500,000, yes, that's correct.

2      Q.    And despite the delays, you -- you

3 continued to loan money to him, correct?

4      A.    Again, each deal stood on its own.  So

5 he'd have to pay me in full before I funded any

6 money to the next loan transaction.

7      So he continued to pay me a reasonable

8 rate of return for -- for this amount of money on

9 an unsecured, undocumented, uncollateralized

10 basis.

11      And so I was getting paid in full.  So

12 I continued to -- to do these transactions with

13 him, so long as I -- you know, again, that I was

14 paid in full on each deal before the next one

15 started.

16      Q.    So in September, September 15th, you

17 loaned him another $500,000, correct?

18      A.    Yes, ma'am.

19      Q.    And if we look at Exhibit 3, if we turn

20 to the month for September 2011, we see that you

21 personally wire transferred $500,000 into the

22 Queen City Investment Fund II account, correct?

23      A.    Yes, ma'am.

24      Q.    And, again, you were paid back over a

25 course of two months.

1          By November 9th, you were fully paid

2     back with $50,000 in interest, correct?

3          A.   Yes, ma'am.

4          Q.   And if we look at the next page, QFC

5     II -- or QFC, LLC, we see the first payment on

6     November 2nd to LW Capital of 50,000.

7          Are you with me?

8          A.   So this is one -- this is one that was

9     highlighted a little bit, looks like.

10         Q.   Yeah.

11         A.   Yeah.  Yes, ma'am.

12         Q.   And then on the next page we see two

13    payments on November 9th of $250,000 each

14    withdrawn from the QFC, LLC account.

15         A.   So I see the first two.  Oh, yeah,

16    okay.  I've got them.  Yes, ma'am.

17         Q.   Then you don't make another loan until

18    April of 2012, correct?

19         A.   Yes, that is correct.

20         Q.   And that's another loan for $500,000?

21         A.   That is correct.

22         Q.   Did you ever ask Mr. Galemmo why he

23    needed $500,000 every couple of months?

24         A.   I -- again, we never had specific

25    conversations about what he was doing with my

1    money.

2            He -- up to this point, he had

3    performed in agreement, basic agreement, with

4    what we had discussed.

5            I had been paid back.  I had a

6    reasonable rate of return for the risk I took.

7    He had paid me back all the money I'd ever -- I

8    ever lent him.

9            And so he -- he would talk about a lot

10   of different deals.  He was like a mover and a

11   shaker.

12           And he would talk about, I've got both

13   sides of a transaction.  He would talk about real

14   estate.  He would talk about investments that

15   he had.

16           He'd talk about Goldman Sachs and money

17   that he just needed to have in an account, so

18   that -- for Goldman, he needed to have liquidity.

19           He was -- I just -- it was hard for me

20   to ever get anything out of him of -- of meaning.

21           So we never really had very in,

22   at-length detailed discussions about what he was

23   doing with my money.

24           I -- this entire time, I had no reason

25   to doubt anything about the guy.  You know,

1    everything seemed like it was kosher.  And he

2    performed for me.  And everybody in my office

3    was, you know, doing well and -- and enjoying his

4    relationship.

5          So I never really -- never really dug

6    deeper into it.

7          Unfortunately, for some of these other

8    people, but -- yeah, I just -- I never did.  And

9    that's just the honest truth.

10       Q.  Isn't it accurate, you didn't really

11    care as long as you got your money?

12       MR. HEALY:  Objection.

13       Go ahead and answer.  You can answer.

14       A.  Yeah.  I mean -- I mean, it's not --

15    it's not that, you know, I didn't care in the

16    real sense of the word.

17          I just didn't worry about what he was

18    doing with my money, because, you know, I gave

19    him the money and I assumed he was doing

20    everything ethically and aboveboard and -- and

21    investing in the different things he was invested

22    in and the sports teams and the real -- whatever.

23          I didn't -- I don't want to say I

24    didn't care, meaning, you know, he was doing

25    criminal activity.  That's not -- that's not --

1    that's not a true statement at all.

2         I just had no reason to doubt that

3    anything was not right with this guy.

4         And so I never -- I never really pushed

5    him to explain in detail to me exactly what he

6    was doing with my money.

7    Q.   For all you knew, he could have been

8    doing criminal activity, correct?

9    A.   Yeah.  I mean, I -- I had no idea of

10   what he was doing.

11        I had no reason to believe, based on my

12   experience with him and the four other people in

13   my office, their experience with him over many

14   years of profitable relationships and no -- no

15   negative issues, nothing bad -- I had no reason

16   to believe that this guy could ever be doing

17   something illegal.  So it never even crossed my

18   mind.

19   Q.   And you never pursued what the money

20   was for, correct?

21   A.   Other than from 30,000 feet, meaning

22   basically -- you know, each transaction he

23   started to have different transactions, you know,

24   kind of give me a little bit of an understanding

25   of what we're doing.

1    And the last few deals that I did,

2    which were the higher dollars, were around an

3    account at Goldman Sachs that -- a relationship

4    that he had with Goldman Sachs where they needed

5    him to have a certain amount of liquidity in a

6    fund.  And it was securing something that Goldman

7    was doing.

8        And then at the end of that Goldman

9    deal, when they were done, they would pay him,

10   and he would pay me.

11       And to substantiate that, I had asked

12   him for a statement so I could see that my money

13   was basically just being used to sit in an

14   account and not go anywhere for a period of

15   time.

16       He did send -- I did get a statement

17   sent to me to show funds in an account that was

18   supposedly for Goldman Sachs and the transactions

19   we were doing towards the end.  But that's it.

20   Q.   Okay.  So this April 5th, 2012 loan was

21   repaid in full by August.

22       If we look -- if we turn and look at

23   the August statement from QFC, LLC, August of

24   2012, we'll see you got a wire transfer on

25   August 7 of 40,000.

1    Are you with me?

2  A. Is this Internet banking transfer to

3 account, 40,000?

4  Q. It says, August -- yeah, right below

5 that.  It says, wire debit, LW Capital

6 Corporation.

7  A. I see two --

8  Q. I'm sorry.  That's 250,000.

9  A. Yeah, yeah.  I see 250.

10  Q. Okay.

11  A. This is where I also think -- this is

12 the 40,000 that got misplaced.

13    So I think the 40,000 goes above.

14 But -- but we don't have to go over that now.

15 But this is -- this is the only conflict I had

16 with regard to payments and amounts.

17  Q. Well, if you turn to the prior page,

18 you'll see a wire debit to LW Capital Corporation

19 on May 7th of 40,000.

20    Do you see it?

21  A. Yes.  Yeah, the dates -- the dates cut

22 off on these.  I see --

23  Q. Well, you see a-y 7.  And up above it

24 says the month of May, May 1 to May 31.

25  A. Right.  Yeah, I see it.

1     Q.   Okay.  So we have the first payment on

2   this loan May 7th of 40,000.  We've got 250

3   August 3rd.

4          And if you look at August 10th, we've

5   got -- let's see -- we've got a hundred thousand

6   coming in.

7          We have 250 August 3rd.  We've got 40

8   August 7th -- or -- I'm sorry -- 250 August 7th,

9   another hundred August 10th.

10         So, basically, for this April loan,

11   you're getting 40,000 May 7th, 250 August 3rd,

12   250 August 7th, and another hundred August 10th.

13     A.   Yeah.  For -- again, for whatever

14   reason, I -- the -- I'm almost positive the

15   40,000 was supposed to be for the above loan,

16   but -- but let's just assume -- let's just say,

17   yes, correct.

18     Q.   Okay.  So that's an -- that's an

19   interest rate of 35,000 a month for a loan of

20   $500,000, correct?

21     A.   Yes.

22     Q.   You were again worried this time about

23   getting your money back, correct?

24     A.   Right.  So, yes.  This is really the

25   first transaction that -- that I started to have

1    some concerns, because the -- the payment --

2    repayment dates were getting stretched and

3    stretched and stretched.

4         Q.  Well, but you had no agreed dates,

5    you've testified.

6         A.  I know.  But -- but -- but the -- the

7    understanding up front was 5 -- or -- I'm

8    sorry -- 7 to 10 percent and to pay me back

9    within four to ten to 12 -- let's just say four

10   to 12 weeks.

11             So these were all supposed to be

12   short-term loans, and that was the understanding.

13             So the first few were within that --

14   within that eight, ten, 12-week span.

15             Now, all of a sudden, this one --

16   April, May, June, July -- so this one already

17   started to span out into August, so it started to

18   get into four months.

19             And then the next few we'll go through,

20   you'll see they start to stretch out even

21   further.

22             So the general understanding and

23   agreement we had was, these were all short-term

24   loans that would be paid back very quickly, and I

25   would be paid a reasonable rate of return for --

1    in interest for these loans.

2          And now is when they -- you really

3    started -- I mean, started to get stretched out

4    more and more and more.

5        Q.    Did you have a specific agreement as to

6    when the April loan would be paid back?

7        A.    No.

8        Q.    Okay.  When did you expect it to be

9    paid back?

10       A.    Every loan I did with him, I expected

11    to be paid back within two to three months,

12    max.

13       Q.    Okay.  Let's look at Exhibit 6, sir.

14    These are text messages between you and

15    Mr. Galemmo.

16         So if we look, we see on eight -- on

17    July 7th, you see -- you see, if you look at the

18    second message, Glen, haven't heard from you,

19    please call me.

20       A.    July 7th of what year?

21       Q.    20 -- 2012.

22       A.    July 7th.

23       Q.    I'm sorry.  July 2.

24       A.    Okay.

25       Q.    And then --

1    A.    July 2, right.

2    Q.    And then the next day you say, just

3    called you, please try me back.

4          And then, never heard back from you.

5          Then July 11th, you say, hi, Glen,

6    could really use money this week.

7    A.    Okay.   Yeah.   Okay.

8    Q.    So --

9    A.    Go ahead.

10   Q.    So when you were getting unresponsive

11   or no replies, did this make you suspicious?

12   A.    Yeah, clearly suspicious.   And -- and

13   clearly I was concerned about getting my money

14   back, because I was at risk:   substantial

15   unsecured, undocumented, uncollateralized amounts

16   of money.

17         So, for sure, any person in their right

18   mind would start to be upset at -- at this trail

19   of e-mails; definitely, yes.

20   Q.    And it goes on, never heard from you

21   yesterday, on July 17th.

22         And then later that -- that -- at

23   11:56 a.m., if you turn the page, you say, sounds

24   like we are scrambling, not what I wanted to

25   hear.

1      A.    Right.  Yes.  That's all -- that's all

2  accurate.

3      Q.    Yeah.  Then you --

4      A.    You have a question for me about it.

5      Q.    -- go on and you say, assuming you will

6  make it worth my while, higher interest payment.

7  The loan will be almost four months outstanding.

8            And then Glen responds, how does

9  20 percent sound for you?

10     A.    Okay.  I'm -- are you asking me a

11  question or -- I guess, I'm --

12     Q.    No.  Didn't that sound like an

13  exorbitant interest rate to you, 20 percent?

14     A.    Are you asking me for my opinion?

15     Q.    Yeah.

16     A.    No.

17     Q.    Okay.

18     A.    No.

19            When you go to a pawn -- when you go to

20  a pawn shop and give them your diamond ring,

21  what's the interest rate on the loan?

22            When you go and take your title for

23  your car to a title loan company, what's the

24  interest rate on the loan?

25            Call your credit company up and try to

1    borrow $500,000, see what the interest rate is.

2              Again, unsecured, undocumented,

3    uncollateralized -- I was at risk, substantial

4    amounts of money.

5              And so -- so the interest rate that I

6    was getting for these short-term loans is

7    absolutely reasonable and fair.

8         Q.   So let me ask you this:  Were you

9    questioning why he couldn't get the money back to

10   you at this point?

11        A.   I wasn't really questioning it, because

12   he kept -- like you can see here -- 4 million

13   firm commitment for next Tuesday, waiting -- you

14   know, he always had stories and reasons that he

15   would put out.

16             So I -- I never grilled him on

17   specifics as to what the delay was.

18             I mean, in these -- in dealing with

19   these sums of money, things happen.

20             You try and close a real estate

21   transaction, a commercial real estate

22   transaction, and it closes four months after it's

23   supposed to close.  So at this -- at this level

24   of finance, things happen.

25             But he always seemed to have a story

1  about what the problem was and what he was

2  waiting for.

3        And so -- so, no, I never really

4  grilled him on what the specific issue was.

5        Q.  And not only didn't you not grill him,

6  you never even asked him for documentation to

7  show that there was a deal out there, correct?

8        A.  I did ask him for that Goldman Sachs

9  statement showing me the fact that my money was

10  not anywhere other than sitting in an account

11  temporarily, short-term, to secure whatever

12  Goldman Sachs was doing with him.

13        Q.  Okay.  And so --

14        A.  And he did send me that statement.

15        Q.  So on this deal you say, 20 percent

16  makes it worth the pain, correct?

17        A.  Yes.

18        Q.  Total 600K in my account next week?

19        A.  Are you asking me, or are you just

20  reading?

21        Q.  Well, and then on August 3rd you got

22  the payment, correct --

23        A.  Yes, ma'am.

24        Q.  -- part of the payment?

25        A.  Yes.

1      Q.   But you're still worried -- if you turn

2   the page -- because you still didn't get the rest

3   of the principal?

4      A.   Correct.

5           Again, no -- every deal has to be

6   paid -- every loan has to be paid back in full

7   before I would do another deal.  And until I was

8   paid in full, I was concerned.  I wanted to make

9   sure.

10          I had a lot of money, understanding

11   that I -- I ran the risk of losing 100 percent

12   of.

13      Q.   And if you turned to page 4 of these

14   text messages, if you look towards the middle,

15   August 10th, a hundred per -- a hundred thousand

16   wire confirmed.

17          That deal was closed, correct?

18      A.   Yes, ma'am.  That was the final payment

19   for that deal.

20      Q.   Yeah.  Then just another month later,

21   you're ready to make another loan with him,

22   correct?

23      A.   Right.

24          Again, he -- he -- somehow, some way he

25   performed, and he made it worth my while to deal

1   with all the serous and aggravation and delays.

2   And he came through -- you know, again, he came

3   through for me and did what he said he would do.

4           It took him a little longer.  And he

5   paid me for waiting around.

6           And so, yes, I did another same kind of

7   deal for him.

8       Q.   Okay.  So let's look at your text

9   message of September 14th, 2012, the last

10  sentence.

11          You say, Also, please send me

12  documentation of the money market fund that my

13  money is invested in.

14          Correct?

15      A.   Okay.  Well, what page are you on now?

16  I'm sorry.

17      Q.   Page 4.

18      A.   Okay.  Page 4.

19      Q.   9/4 --

20      A.   Okay.  Yeah.  I got it.  I see it.

21      Q.   So, you say -- so, apparently, you

22  agreed somehow that your money would be invested

23  by him in a money market fund, correct?

24      A.   Right.  So this is -- this is what we

25  just actually just talked about.

1         So now, you know, we talked about the

2    amount, the rate, and the time to pay me back.

3    And that's pretty much all we always agreed on.

4         And this is when, because of the

5    delays, the lab -- the transaction prior was

6    actually the first one that started to get me,

7    you know, hey, what's going on.

8         So this is when we talked about -- and

9    I think it was on the phone, rather than by

10   text -- you know, what -- what kind of deal are

11   you doing?

12        And this is when the Goldman Sachs deal

13   came up.  And he told me that -- that it was just

14   sitting invested in a money market fund.

15        He needed to have this money for

16   Goldman in a deal that they were doing, and he

17   needed to back it up.  And as soon as they got

18   out of their deal, he would pay them money --

19   they would pay him his money back, and then he

20   would pay me my money back.

21        So he told me that my money would be in

22   a money market fund.

23        And I said, great, let me see it.  Show

24   me, you know, give me something that shows me,

25   because now I'm starting to get a little

1    concerned with the guy.

2           And -- and that's how that whole

3    deal -- that's how this Goldman Sachs deal came

4    up.

5        Q.    And if you turn to the next page, you

6    asked him again on September 18th, don't forget

7    to get me the money market fund documentation.

8           Correct?

9        A.    Yes.  Yes, ma'am.

10       Q.    And when did you actually receive it?

11       A.    I'm not sure.  I'm not sure what date I

12   received it.

13       Q.    But you're sure you received it?

14       A.    It wasn't -- it wasn't -- it -- maybe

15   it's even in one of the e-mails or in one of

16   these texts, but I did get it.  And I -- and it

17   was relatively close to that date.

18          And, then again, this is when I

19   reiterate to him that the last deal was really --

20   didn't make me happy.

21          And we had money plus 10 percent first

22   week of November, reiterated, is telling him I

23   didn't want the same thing to happen.

24          He told me, don't worry, it's in a

25   safe, liquid account, you know, blah, blah, blah.

1          So -- but he did send me the statement.

2     And I hope I -- I assume I sent you that

3     statement.

4          Q.   I can't remember.

5               I suspect if you turned it over to your

6     attorneys, I have no reason to believe you

7     didn't -- they didn't turn it over to us.

8          A.   All right.  So he sent me a statement.

9          Q.   But did you ever --

10         A.   I'm sorry.

11         Q.   Did you ever check with Goldman Sachs

12    as to whether it was accurate?

13         A.   No, I did not.

14         Q.   Okay.  And that loan was repaid,

15    correct, the loan of September?

16         A.   Yes, ma'am.

17         Q.   You got the first payment --

18         A.   Yes, ma'am.

19         Q.   -- back on October 31st.

20              If you go back to Exhibit 3 for the

21    month of October, you'll see wire debits to you

22    from QFC, LLC, two wire debits on October 31st of

23    $250,000 each.

24              That would be for the period October 1

25    through 31, 2012.

1    A.    Yeah.  I'm -- I'm just -- I don't see

2    the -- okay.  Yeah.  I've got them.  Okay.  Yeah.

3    Yes.  Correct.

4        Q.    You got two wire debits under

5    withdrawals, his withdrawals.

6             Then if you turn to the next page,

7    you've got two more of them, November 2nd and

8    November 5th, of $50,000 each, correct?

9        A.    Correct.

10            And so, again, this deal -- he promised

11   me it would go smoother.  He pretty much abided

12   by our -- our verbal agreement.

13            I got paid my money back within a

14   couple of months.  So we're back on track, and

15   I'm -- I'm feeling better.

16       Q.    So let me ask you this:  Did you know

17   Rick Morris?

18       A.    I didn't know Rick personally.  But I

19   believe that's Rob's brother.  He came into the

20   picture late in the game.  And I believe he

21   actually went to work for Glen.

22            And I met -- I met -- actually met him

23   and Glen at the end of the year, I want to say

24   maybe end of 2012.  I met -- they were -- were

25   coming through the West Coast doing a little

1     financial tour and meeting some clients.

2           And so they asked me to have lunch with

3     them, and I met Rick and Glen for lunch.

4        Q.   Okay.  If you look at Exhibit 7, sir,

5     if you turn to the second page, there's an e-mail

6     from Rick to you dated October 24th asking about

7     your availability.

8           Do you see it?

9           And then if you turn back to the first

10    page, it appears that you've made plans for lunch

11    with them?

12       A.   Yes.  That's the lunch I just

13    mentioned.

14       Q.   Right.  That's what I -- that's what I

15    assumed.

16          What was -- what was the topic

17    discussed at lunch?

18       A.   We talked about a lot of different

19    things, but mainly my relationship with -- the

20    loans that I had done with Glen.

21          And then they talked about --

22    apparently -- this is off the top of my head, but

23    I think they were trying to start another fund,

24    like a new fund.  And they were doing a West

25    Coast tour to get people to invest in the fund.

1     Q.    So when you say first you talked about

2     the relationship of the loans you've done with

3     Glen, what do you mean by that?

4     A.    So, obviously, we -- you know, we

5     started to have some issues on the timing.  And

6     so we just talked about the nature of what we had

7     been doing for the last couple of years.  And

8     that was it.

9           I mean, we talked about a lot of

10    things, sports and his relationship to some

11    basketball teams and kids.  And -- and that was

12    it.

13          It was really not -- it was not as much

14    a business lunch as it was, you know, you --

15    you've lent me over $2 million in the last couple

16    of years.  It would be nice to meet face-to-face

17    finally, because we had never met, and let me

18    take you out to lunch.

19          I mean, that's -- that's really what --

20    what it was.  It wasn't a meeting to discuss

21    anything personal.  It was just really to meet

22    finally face-to-face since he was in town.

23    Q.    Was there an explanation of the

24    concerns -- did you raise concerns about the

25    loans that you had made with him?

1      A.    Not other than what I had expressed in

2    my texts and the fact that I didn't want to have

3    a business relationship with anybody that wasn't

4    straight up and -- and honest and sincere and --

5    verbal, handwritten, handshake, documented,

6    whatever I wanted to make sure that -- that he

7    would honor whatever terms and conditions we

8    agreed to.

9            So other than just, you know, making

10   sure he understood where I was coming from and

11   the way I wanted to operate and the relationship

12   needed to work for me, that was it.

13     Q.    And what was his response?

14     A.    He agreed.  He -- he -- he agreed with

15   me and stated that that's how, you know, he

16   wanted it to work as well, but a lot of times

17   in -- in -- the nature of what his business was

18   that it wasn't always perfect and, you know, in a

19   nice little neat box, that a little bit of

20   flexibility would be needed, and that he would

21   compensate me if that was, in fact, the case.

22     Q.    And you said he -- he was -- he

23   discussed starting a new fund?

24     A.    Yeah.  I think they -- they -- he did

25   bring up the fact that they were either thinking

1    about or already did start -- I can't remember.

2            He mentioned -- again, I don't know if

3    he already did start it up or he -- it was

4    something they were trying to do.  But he brought

5    that up at the end about, if I would want to be

6    an investor in his fund.

7        Q.   And what did you say?

8        A.   No, absolutely not, no interest

9    whatsoever.

10       Q.   Did you ask him what his fund was

11   investing in?

12       A.   Didn't even care.  I wanted no part

13   of -- of investing in any fund.

14       Q.   Why is that?

15       A.   Because I had been involved in a number

16   of funds myself over the years of my investing,

17   sitting on your side of the table, having lost a

18   lot of my money in these Ponzi scheme deals.

19           So I had done also a couple of deals

20   before, as well.

21       Q.   So did it ever enter your head, since

22   you had such familiarity with Ponzi scheme deals,

23   that's -- that that's what Glen had?

24       A.   Nope.

25       Q.   Why -- you're a sophisticated investor,

1    Mr. Wein, correct?

2         A.   I don't know if I'm sophisticated.   I'm

3    a regular Joe investor guy who, you know --

4         Q.   Who loans $2 million --

5         A.   -- who loans dollars.

6         Q.   -- and has an MBA and had experience,

7    at least that you've described, with other

8    investment funds, correct?

9         A.   Yes.

10        Q.   Wouldn't that characterize you as a

11   sophisticated investor?

12        A.   I don't think so.   I never lent him

13   $2 million at once.   The maximum ever outstanding

14   was 5 or 600,000.

15             And because he had always paid me and

16   everyone I knew associated with him in full

17   profitably, I never -- I never -- it never

18   crossed my mind that -- that this guy was

19   involved in a Ponzi scheme.

20        Q.   Did you have any discussion about the

21   Goldman Sachs account that he claimed he put your

22   money in?

23        A.   Nothing other than him, at a high

24   level, explaining to me that that's what this

25   deal -- that this was a specific transaction with

1   Goldman, my money would be sitting in an account,

2   not to be touched by anyone, when he got paid by

3   Goldman for whatever it was they were doing, he

4   would pay me.  That was it.

5       Q.   So --

6       A.   Just going back for a second, if I --

7   if I may --

8       Q.   Sure.

9       A.   -- retract.

10      So you asked me if I ever had any

11  inclination of this being a Ponzi scheme.

12          And, you know, I don't know if I'm a

13  sophisticated investor, but I'm certainly not

14  a -- a rookie.

15          But had I had any idea, ever, that this

16  guy was involved in something illegal or a Ponzi

17  scheme, I never would have put out this kind of

18  money to him.

19          I did another deal after that deal for

20  600,000 after I had lunch with him.  So --

21  because at any point in time had -- has -- had

22  his downfall occurred six, seven, eight months

23  earlier than it did, I would have never seen one

24  penny of my $600,000.

25      Q.   And you would have been a member --

1      A.    So --

2      Q.    -- of the plaintiff class?

3      A.    Well, I don't know that you have people

4  in your plaintiff class -- that's a good

5  question.  I mean, I -- I did loans.  I was never

6  in the fund.  So I don't know that you would have

7  represented me.

8           I might have been out completely.

9  Everybody you're representing was in a fund,

10  invested in a fund.

11      Q.    Well, your money was -- sir, your money

12  was in the fund.  Your money was in the --

13  deposited --

14      A.    Yeah, but it was.

15      Q.    -- into the fund, the same way as the

16  plaintiffs' money was.

17      A.    No K-1, no contracts, no documents, no

18  nothing, no statements, no nothing to me.

19           So -- so, again, I -- my money was to

20  Glen.  But -- but, regardless, my -- my only

21  point is, I never would have given him the money,

22  because I could have -- I stood to lose a lot of

23  money.  I had no collateral, no PG, no documents,

24  nothing.

25           So -- so -- so that's a statement of my

1    trust in him and belief in him that the guy was
2    up-and-up.
3            And although moving parts were
4    occurring and he was stringing things out and --
5    and I started to have doubt about, you know, do I
6    want to continue to keep doing these deals, I
7    never would have put one penny with this guy if I
8    sensed anything even remotely close to Ponzi, you
9    know, or -- or illegal or anything.
10           Because I really -- I mean, I could
11   have lost a lot of money on my own had I have --
12   had I have known anything about it.
13           So I just wanted to -- just so you
14   understand where I'm coming from, the fact that I
15   knew nothing about it and didn't think it.
16       Q.   Thank you, sir.
17           Let's turn back to Exhibit 6, the
18   e-mail track.
19           MR. FLAX:   Can I get a copy?
20           MS. BROWN:   I'm sorry.   I'm sorry.
21   BY MS. BROWN:
22       Q.   I'm sorry.   The text messages.
23       A.   Okay.
24           MR. FLAX:   Thank you.
25   BY MS. BROWN:

1    Q.   If you turn to page 5, this is after

2    your lunch on November 5th.  If you look towards

3    the bottom of page 5, Glen texted you on

4    December 5th.

5         And he says, I have a very quick

6    turnaround deal, looking at three weeks.  I have

7    both sides of it.

8         What did that mean to you?

9    A.   Well, like -- like the other deals that

10   I was doing with him, he had all these

11   transactions.

12        There -- there was no talk about a fund

13   or roll my money into the fund or keep my money

14   in the fund.

15        Every deal he was borrowing money from

16   me for a very specific transaction that he was

17   doing.

18        So he called me, and now he has a new

19   transaction.  He's got both sides of it, meaning

20   he's got -- basically, he needs my money, again,

21   to sit somewhere.

22        He's got the -- the person borrowing --

23   using the money or doing something, because that

24   money is pledged, enabling them to do something,

25   and then reaping a reward, a financial reward and

1    then paying Glen and then Glen pays me.

2            So this was just another one of his, I

3    have another deal that I need to borrow money

4    from you for, quick, you know, pay you a good

5    rate of return, three weeks.

6            You know, and I'm not going to give him

7    $500,000 for 2500 bucks of money of re -- of

8    interest.

9            So these are high-interest rate,

10   supposed to be short-term deals.

11           And I -- you know, he got my interest.

12   And so we tried to talk about it on the phone,

13   you know.

14           Okay, you know, talk to me a little bit

15   about it, what are we doing, and -- and let's --

16   you know, I'm in.

17       Q.   So what did he tell you about it?

18       A.   I don't remember this particular one,

19   to be honest with you.

20           I think it might have been the same

21   deal as the -- the -- another Goldman deal,

22   because I don't remember anything -- the last

23   couple of deals were these Goldman deals with my

24   money in the -- in the account.

25           So I -- it was -- it -- there's no

1    other deal I remember him explaining to me except

2    at the end doing these Goldman transactions.

3         So that's -- that's what it was.

4         Q.   When there was a Goldman deal, you

5    didn't dep -- wire-transfer the money to Goldman;

6    isn't that correct?  You wire-transferred it to

7    Glen's fund?

8         A.   Right.  I wired it to where -- if Glen

9    had told me to wire it to Goldman, I would have.

10   If Glen had told me to wire it to Korea, I would

11   have.

12        I would have wired it anywhere he told

13   me to wire it, because I -- it really had no

14   significance to me in terms of where the money

15   was going.

16        It was for Glen to be repaid to me by

17   Glen.

18        He -- and, again, he -- he had money in

19   some account in the statement that showed a

20   considerable amount of money invested and in the

21   way -- and I don't remember how -- how -- the --

22   all the ins and outs of the deal.

23        But he had to have a certain amount of

24   money in the account.  For all I knew, it was at

25   Gold -- Goldman.  I didn't know anything about

1    the deal, you know, all the details.

2         But I would have wired that money

3    anywhere Glen told me to.  I would have been

4    happy to wire it to Goldman.  I didn't care.  I

5    didn't think twice about it.  I would have sent

6    the money anywhere on the planet he told me to

7    send it.

8         Q.   Isn't it a fact, sir, that every wire

9    transfer you made went into one of -- one or the

10   other of two of -- of the Queen City funds,

11   correct?

12        A.   Well, I didn't really know what QFC

13   was, or --

14        Q.   Well, it was LLC, so it wasn't

15   personally Glen, correct?

16        A.   Correct.  Yeah.  I mean, I -- again, I

17   would have -- I didn't pay any attention to where

18   I wired the money.

19        If I had lived in Ohio, I would have

20   personally handed him a check.  I would have sent

21   it to his mother, his sister, his aunt.

22        Q.   Yeah.

23        A.   I would have sent the money anywhere on

24   the planet to any company, any individual in any

25   location that he told me to send it.

1    Q.    Right.

2    A.    I didn't have any concern whatsoever

3    about where I was sending the money.

4          It was for Glen.  He could do with my

5    money whatever he wanted to do, as long as,

6    again, it was -- I assume to be legal and

7    aboveboard and ethical.

8          And -- and -- and as long as he paid me

9    back my money, I had no issues with who or where

10   I wired the money.

11         I never paid one minute of attention to

12   it, ever.

13         I didn't even know until -- until a

14   week ago there was QFC versus Queen City II.  And

15   nowhere in any -- it doesn't say Galemmo City

16   Fund.  It doesn't say Galemmo, LLC.  I have no

17   idea what QFC is, no idea at all.

18   Q.    Sir, you were never paid back one cent

19   by Mr. Galemmo, correct?

20   A.    Well, form over substance -- I -- in my

21   mind, I was paid back by Galemmo.

22         And just like I use my money at LW

23   Capital personally and company-wise, because I am

24   LW Capital, so I send it out of my personal, he

25   sends it back to LW Capital.  I have intercompany

1    transactions.

2            For all I know, QFC is his company.

3    Queen City -- I have no idea what it is.  For all

4    I know, Galemmo is the company.

5            I don't ask -- I don't -- I do it

6    myself.  I've done it on this transaction here,

7    sent money from Larry Wein personal, wire money

8    back to LW Capital.

9            So I don't know what he's doing with

10   it.  I have no clue.  I don't know what QFC is.

11   I don't know who owns it.  I don't know if he

12   owns it with you and the person next to you.  I

13   have no idea.

14       Q.   Sir, I'm --

15       A.   So -- so --

16       Q.   I'm just asking --

17       A.   So whatever he did with it and whoever

18   he paid me back from, it doesn't matter to me.  I

19   don't care.  It comes from Glen Galemmo for all

20   I'm concerned, as long as I get my money.

21       Q.   Sir, I'm not asking you how you feel

22   about the money.  We're talking about facts.

23            All of the wire transfers that you

24   received were either from QFC, LLC or Queen City

25   Investment Fund II; isn't that a fact?  Just a

1   yes or no.

2          A.   Yes, that is a fact.

3          Q.   All of the money that you deposited,

4   sent, whatever you want to call it, went into

5   either QFC, LLC or Queen City Investment Fund II;

6   isn't that a fact?

7          A.   Yes, ma'am.

8          Q.   Okay.  Thank you.

9               THE VIDEOGRAPHER:  This is the court --

10              this is the videographer.  We have five

11              minutes left on this DVD.

12              MS. BROWN:  Okay.

13  BY MS. BROWN:

14         Q.   So if we look -- continue looking at

15  Exhibit 6, if you look at December 6, you agree

16  to wire the money.  And you wire the money into

17  QFC, LLC, correct?

18              If you look at 12/6, 2012.

19         A.   I don't see that.

20              12/6.  Yes.

21         Q.   Okay.

22         A.   Yes.

23         Q.   And if you look below that --

24         A.   I don't have -- go ahead.  I'm sorry.

25         Q.   -- at his e-mails of December 5th.

1   He's very anxious to get the money.  He says, can

2   you do it at 9:00 a.m. your time and make sure

3   the bank does it at 9:15 your time.

4        A.    Are you asking me a question?

5        Q.    Yeah.  He was very anxious, correct?

6        A.    Yeah.  It looks like he was -- yeah, he

7   wanted me to make sure I took care of it pretty

8   quickly.

9        Q.    And did you ask him why it was so

10  important?

11       A.    No.

12            Three weeks, zero risk, Goldman Sachs

13  deal, money in the account, it was sitting there,

14  not going anywhere, I had no reason to ask him

15  what -- what the rush is.

16            I took care of it, as I said I would,

17  as fast as I could get it done.

18       Q.    And, sir, you never asked for

19  documentation that this was a Goldman Sachs deal,

20  correct?

21       A.    Remember, I stated that I asked him to

22  send me the statement of where the money was

23  invested.  I didn't ask him to send me anything

24  about his transaction with Goldman.

25       Q.    Well, you talked about --

1     A.    All my -- what?

2     Q.    You talked about an earlier deal we

3     looked at where you asked him for the statement

4     of where the money was invested.

5           In this deal, isn't it correct you

6     never asked him for a Goldman Sachs statement?

7     A.    Correct.

8           Basically, it was another Goldman deal.

9     And I -- I assumed -- I had given him the money.

10    He paid me back in a relatively fast time period.

11    And I have no reason to -- He said, I'm doing

12    another Goldman deal.  I need the money.

13          And on these deals there's always time

14    issues.  Money has to be certain places by

15    certain dates to close, whatever.  I didn't

16    assume anything was out of the ordinary.

17          So I didn't ask again for another

18    statement of -- you know, of -- of the money.  I

19    already saw it once, and I was good with it.  And

20    he paid me back.

21          THE VIDEOGRAPHER:  This is the

22          videographer.  There are two minutes left on

23          this DVD.

24          MS. BROWN:  Why don't we change it?

25          I -- I probably have less than an hour of

1    questions left.

2         THE VIDEOGRAPHER:  We are going off the

3    record.  The time on the monitor is 11:24

4    a.m.  This is the end of media number one in

5    the deposition of Larry Wein.

6         (Off the record.)

7         THE VIDEOGRAPHER:  We are back on the

8    record.  The time on the monitor is 11:33

9    a.m.  This is the beginning of media number

10   two in the deposition of Larry Wein.

11   BY MS. BROWN:

12        Q.   So, Mr. Wein, before the break we were

13   talking about the $600,000 loan.

14             And on December 7th of 2012, you

15   deposited by wire transfer $600,000 into the QFC,

16   LLC account, correct?

17        A.   Yes.

18        Q.   And you were expecting a three-week

19   turnaround, correct?

20        A.   Yes.

21        Q.   And you were not fully repaid until

22   January 23rd, 2013, correct?

23        A.   That is correct.

24        Q.   Okay.  So if we look at Exhibit 3, if

25   we look at the account statement from QFC, LLC

1    for January 2013, we'll see a payment -- tell me

2    when you're with me.

3         A.    Okay.  I'm with you.

4         Q.    So on January 2nd, we'll see a wire

5    transfer payment from QFC, LLC to LW Capital of

6    $300,000 in the middle of the page.

7         A.    January 2nd, right?

8         Q.    Correct.

9         A.    Yes, I see it.

10        Q.    And then towards the bottom we'll see

11   another payment, January 9th, of $42,000,

12   correct?

13        A.    Correct.

14        Q.    And if you turn the page, on

15   January 23rd, we'll see a final payment of

16   $300,000.  So that's $42,000 in interest,

17   correct?

18        A.    Correct.

19        Q.    And then if we go back to Exhibit 6,

20   the text messages, towards the end, if we look

21   at -- I guess it's the last page -- April of

22   2013, Mr. Galemmo asked you to call him,

23   correct?

24        A.    Correct.

25        Q.    And he tells you that he's got a good

1    deal that he got a call on.

2          And your response is your funds are

3    committed for the next two months.

4          Had you made a decision not to invest

5    with him?

6    A.   No.

7          I -- I had other transactions that I

8    was doing at the time.  So I wasn't able to get

9    involved with him.

10    Q.   Okay.  Then he contacts you again in

11    June, correct?

12    A.   Yes.

13    Q.   What happened?

14    A.   I don't remember.  I don't -- I don't

15    know.  I don't -- I don't remember what happened.

16    I don't even know if I ever talked to him again.

17          He called me, tried you back -- I don't

18    know.  I'm not sure.

19    Q.   Did you --

20    A.   I don't think I ever did talk to him --

21    I don't think I ever connected with him again.

22    Q.   Did you have any contact with him after

23    July 2nd, 2013?

24    A.   No.

25    Q.   Did you ever try to contact him?

```
1        A.    When -- when was he -- when was the
2   whole raid thing?  When did that go down?
3        Q.    The notice went out to investors
4   July 17th, 2013.
5              I think the raid was --
6        A.    That's prob --
7        Q.    -- about a week earlier.
8        A.    Right.  So, no.
9              And, obviously, the -- the guys in my
10  office -- I -- I -- I never tried to call him
11  until it was already a massive problem.  And then
12  that was it.  I never tried to get in touch with
13  him at all.  I was -- I was -- just washed my
14  hands of it.
15             Every penny that I lent him, he paid me
16  back.  He paid me my interest.  You know, it
17  was -- it was obviously something really, really
18  bad happened.
19             So I -- I never tried to call him again
20  or e-mail him or text him or anything.
21       Q.    Did you have any discussions about him
22  with Mr. Willner?
23       A.    No.
24             I had discussions about him with Low,
25  Willner, Miller, and Morris.  Yeah, I mean, it
```

1    was a big thing.

2         Q.    And what was the result of the

3    discussions?

4         A.    Absolute shock.  I mean, it was -- it

5    was horrible.

6              Willner -- Willner was in a real bad

7    situation, you know.  It -- I mean, it -- it was

8    terrible.  I mean, it was bad for all the

9    investors.  It was bad for the guys in my office.

10             It was -- Rob's sister was married to

11   this guy.  His family was in the fund.

12             I mean, it was terrible.  There is

13   nothing you can say.  It was absolutely horrific,

14   terrible, unconscionable.

15             And he really surprised a lot of

16   people.  A lot of people who had faith and trust

17   in him were, you know, unfortunately, incredibly

18   let down.

19             So it was just -- it was just bad;

20   nothing good.

21        Q.    Could you turn to Exhibit 8, please?

22        A.    Sure.  Exhibit 8.  Okay.

23        Q.    Can you identify Exhibit 8, sir?

24        A.    Yes.  I have Exhibit 8 in front of

25   me.

1       Q.    Yeah.  Have you ever seen this

2   before?

3       A.    Yes, ma'am.

4       Q.    Okay.  Did you provide the information

5   that's the basis for these answers?

6       A.    Yes, ma'am.

7       Q.    Okay.  Exhibit -- I'm looking at your

8   answer to admission number one.

9             Admit that Wein was an investor in the

10  Galemmo entities.

11            You deny.

12            What's the basis for your denial?

13      A.    Consistent with what we've discussed

14  all day today, all morning, I am not an investor

15  in anything Galemmo -- any entity, company,

16  nothing.  I didn't invest anything in anything

17  Galemmo.

18            I lent him money.  I was not an

19  investor, ever.

20            And I believe he also corroborated that

21  in his deposition when he was deposed.  He also

22  acknowledged the fact that Mr. Wein lent me money

23  and Mr. Wein -- he -- and in his depo, if you

24  read through his depo, he'll corroborate every

25  single thing I've been telling you all morning

1    about my business relationship with him.

2         Q.   You would agree --

3         A.   So I wasn't an investor -- go ahead.

4    I'm sorry.

5         Q.   You would agree that all of the funds

6    you deposited were deposited into either QFC, LLC

7    or Queen City Investment Fund II, correct?

8         A.   Correct.

9         Q.   Okay.  Let's look at admission number

10   two.

11             Admit that Wein made short-term loans

12   or investments to the Galemmo entities.

13             What is your basis for denying that in

14   part?

15        A.   Because I -- I guess that I admit in

16   part because, again, I -- unless Queen City

17   Investment II or QFC said Galemmo Investment II

18   or Galemmo QFC, I have no idea what they are.

19             I don't know whose it -- I don't know

20   if he's managing something.  I don't know if he's

21   an owner with multiple owners.  I have no idea.

22             I don't know anything about what it is,

23   who it is, what it means, nothing.

24             So that's why I'm admitting in part,

25   because I -- I don't -- I don't have any clue --

1    it didn't say Galemmo Investment Fund, LLC.

2              If it says Galemmo fund, I would have

3    had a better understanding of, this is a Galemmo

4    fund.  I have no idea.

5              He told me to wire the money somewhere.

6    I wired it.  That was it.

7         Q.   What's your basis --

8         A.   So I'm not admitting to it.

9              Go ahead.

10        Q.   What's your basis for calling these

11   personal loans directly to Glen Galemmo?

12        A.   Because my relationship --

13        Q.   Let me finish the question.

14        A.   Because my relationship -- yeah.

15   Because my relationship was with Glen Galemmo

16   directly.

17             Every communication I've had, other

18   than getting instructions where to wire the

19   money, was with Glen.

20             Every text, every phone call, every

21   agreement, every verbal agreement, every single

22   thing I ever had was with Glen Galemmo and -- and

23   the -- and it was all about the specific

24   transactional loans that we would do together.

25             So that was it.  And that was the

1    only -- I mean, my relationship was with Glen.

2    The money was lent to Glen.  Glen was supposed to

3    pay me back.

4             Whatever he did with the money or

5    ever -- I have no idea about anything else.  But

6    my deal was with Glen.

7             Form -- again, substance was my deals

8    with Glen.  Form of who wired me the money, what

9    he did with the money, how he got the money,

10   whether -- whether -- whether Phyllis lent money

11   to Glen and then he took that money and paid me

12   back at the end when the whole thing was

13   crumbling anyway and he was getting money --

14   borrowing money from Mike Willner to pay me so

15   the money -- even though it went into QFC, the

16   money was never a fund equity investor fund

17   person's money.

18            You lent them the money.  He gave it to

19   me.  So tracing the money from -- trying to

20   follow the money, figuring out who did what, I

21   have no clue, no idea.

22            My loan was with Glen Galemmo

23   personally, period.

24       Q.   Sir, in fact, you never made a personal

25   loan to Mr. Galemmo.  You never deposited money

1  in any account that was personally Mr. Galemmo's.

2  We agreed on that, correct?

3      A.   I have no idea who -- I didn't know who

4  the account was.  It could have been Glen

5  Galemmo.

6      Q.   But you -- you knew that --

7      A.   When you deposit money into LW Capital,

8  you're depositing -- that's my account.  I'm the

9  only owner.  It's -- you might as well -- you can

10  pay me personally or corporately; it doesn't make

11  a difference.

12          I don't know anything about the account

13  or the nature of it or his involvement in it;

14  nothing.

15          I put -- gave money to Glen Galemmo.  I

16  wired it where he told me to wire it.  He could

17  have told me to wire it to the House of Pancakes,

18  and I would have wired it to the House of

19  Pancakes.

20      Q.   Sir, we've gone through this before.

21  You had no basis --

22      A.   Right.  And we're going to keep going

23  over the same thing.  I'm going to say the same

24  thing time and time again.

25      Q.   Can we just agree that you wired the

1    money to two accounts?  One was Queen City

2    Investment Fund II, and one was QFC, LLC.  And

3    those were the two accounts that repaid LW

4    Capital Corporation any funds?

5        A.   In form, yes, that is a correct

6    statement.

7        Q.   Okay.  Fine.  Thank you.

8           Sir, I'm going to just change this a

9    bit.

10         Would you look at Exhibit 13?

11      A.   Sure.

12      Q.   Have you ever seen this document

13    before?

14      A.   Let me find it a second, please.

15      Q.   Sure.

16      A.   Hang on.

17      Q.   Sorry.

18      A.   That's all right.

19         Exhibit 13.

20      Q.   It's the last exhibit.

21      A.   Oh, shoot.  Hang on a second.  I'll get

22    that for you.

23        THE VIDEOGRAPHER:  Give me the pen, and

24      I'll reattach it.

25        THE WITNESS:  Okay.  Thank you.  I'm

1      sorry, Buddy.

2              THE VIDEOGRAPHER:  That's all right.

3              THE WITNESS:  I've got to find Exhibit

4      13.  Exhibit 3.

5              I don't see Exhibit 13 for some reason.

6              THE REPORTER:  Can we go off the

7      record, and I'll have them reprint it for

8      you?

9              THE WITNESS:  Yeah.  I don't see

10     Exhibit 13.

11             THE VIDEOGRAPHER:  Go off the record.

12             THE WITNESS:  Sorry about that.

13             THE VIDEOGRAPHER:  We are going off

14     the record.  The time on the monitor is

15     11:46 a.m.

16             (Off the record.)

17             THE VIDEOGRAPHER:  We are back on

18     the record.  The time on the monitor is

19     11:54 a.m.

20  BY MS. BROWN:

21      Q.    Mr. Wein, do you recognize

22  Exhibit 13?

23      A.    Yes, ma'am.

24      Q.    Okay.  You've seen it before,

25  correct?

1        A.    Yes, correct.

2        Q.    And before you provided your answers,

3    you reviewed the instructions and the

4    definitions, correct?

5        A.    To the best of my ability and

6    knowledge, that is correct.

7        Q.    What do you mean, to the best of your

8    ability?

9        A.    I mean, I'm a -- I'm not an attorney,

10    so I read it over and responded and did what I

11    was supposed to do, as I understood that I was

12    supposed to.

13        Q.    Okay.  Would you turn, under

14    definitions, to number 9?  I'm sorry.  The pages

15    for some reason are not numbered.

16        A.    Okay.

17        Q.    Okay.  It's a definition of Galemmo

18    entities, correct?

19        A.    Oh, under definitions.  Hang on.

20        Q.    Yeah, under definitions.

21        A.    Okay.  All right.

22        Q.    And do you see Queen City Invest --

23    Investment Fund II, L -- listed?

24        A.    Yes, I do.

25        Q.    And do you see QFC, LLC listed?

1       A.    I do.

2       Q.    So by the terms of this document, these

3   are Galemmo entities, correct?

4       A.    Correct.

5       Q.    And that's in plain English that a

6   layperson can understand, correct?

7       A.    Correct.

8       Q.    Okay.  So let's look at your answers

9   again.  If we go back to Exhibit 8 --

10      A.    Exhibit 8?

11      Q.    Yeah.  That's your answers to

12  admissions one.

13            Let's look -- go back to number two.

14      A.    Okay.  Okay.

15      Q.    First page.

16      A.    Right.

17      Q.    If you had followed the instructions

18  with the definitions, isn't it correct that the

19  answer would be that you made short-term loans of

20  investments to the Galemmo entities?

21      A.    Well, I say admit in part, again.

22            Now -- now that I know -- now that I

23  know all the entities and all the stuff that

24  happened, now I'm aware that they're Galemmo

25  entities.  But at the time I did the -- the loans

1   and the -- and the wires, I had no idea that they

2   were Galemmo entities.

3               So now that I know it, I'm answering

4   from the standpoint of not -- not being a Monday

5   morning quarterback, now that I know, I'm

6   answering it from the standpoint of what I did

7   when I did it.

8       Q.   Yeah.

9       A.   Does that make sense?

10      Q.   And isn't it correct that you had the

11  definition when you provided these answers, since

12  it's part of the requests for admissions?

13      A.   No.  I said I admit in part.

14      Q.   You deny --

15      A.   I admit in part that --

16      Q.   You -- let's read your answer, sir.

17               You admit in part -- you say you made

18  short-term personal loans directly to Glen

19  Galemmo.

20               You never made loans to the Galemmo

21  entities.

22               That's incorrect, right?

23      A.   That's not incorrect.

24      Q.   Why not?

25      A.   Because I -- I -- again, you've got

1    form over substance.

2        The money was wire -- the intent, the

3    acknowledged sworn testimony of myself and Glen

4    Galemmo, and anyone else you ask, is that I made

5    loans to Glen Galemmo.

6        He asked me -- he could have told me to

7    wire the money anywhere he wanted.

8        We're going back and forth.  You're

9    trying to get me to be an investor in a fund that

10   I had no idea existed and never was.

11       And I'm trying to tell you that I will

12   never agree to that, I will always deny that.

13   And I will tell you exactly what I did, the

14   nature of my business relationship with him.  And

15   I lent him money.

16       So you're going down one path, and I'm

17   not going down that path.

18       I was not an investor in the funds.  I

19   didn't have nothing to do with the funds.  I

20   didn't know anything about the funds.  I was

21   lending Glen Galemmo money.

22       The substance is that it was a loan to

23   Glen Galemmo.

24       The form is he told me to wire the

25   money to -- to an entity that now turns out to be

1    a Galemmo entity.

2          So now that I know that, yes, I did

3    wire the money to a Galemmo entity.

4          But the meeting and the structure and

5    the form and the intent was that this money was

6    meant for Glen Galemmo and to do whatever he

7    needed to do with it and pay me back on a

8    principal and interest basis on a loan.

9          Q.   Okay.

10         A.   Everything was transactional in any

11   fund at all.

12         Q.   Sir --

13         A.   And I don't know how we can beat a dead

14   horse.

15         Q.   Sir, the question --

16         A.   But that's it.

17         Q.   -- isn't asking you if you were an

18   investor.

19         It says, admit that Wein made

20   short-term loans or investments to the Galemmo

21   entities.

22         You were given at the time you answered

23   this a definition of the Galemmo entities.

24         We agreed it included the two entities

25   to which you deposited your money.

1      Would you agree with that?

2      A.   The first question here is admit that

3   Wein was an investor --

4      Q.   I'm not --

5      A.   -- in the Galemmo entities.

6      Q.   I asked -- sir --

7      A.   So it starts off by saying that I'm an

8   investor in the Galemmo entities.

9           I am not an investor in the Galemmo

10  entities, and that -- that -- that point is

11  carried throughout every single one of my answers

12  in this deposition.

13     Q.   Sir, I was asking you about admission

14  two, not admission one.

15     A.   Okay.  Well, I'm just telling you

16  that -- that it started off as an investor, and

17  then you -- then you try to put me in some fund

18  that I am not a part of and never was, never will

19  be.

20          And -- and so my answer is my answer.

21  I admit in part.  At the time I had no idea.

22          In substance, in form, yes -- I

23  answered this already -- I wired the money to

24  Galem -- Galemmo entities, now that I know

25  Galemmo entities.

1          But that's not what it was meant --
2   that is not what I thought I was doing and not
3   what I meant to do and not what I intended to do
4   when I did it.
5          Q.   Well, by the --
6          A.   Does that make sense?
7          Q.   Well, by the definition of Galemmo
8   entities that you were provided to use to answer
9   these requests for admission, isn't it correct
10  that you were -- you made loans to what were
11  defined as Galemmo entities?
12          Correct?
13          Just a yes or a no.
14          MR. HEALY:  Objection.
15  A.   No.
16          MR. HEALY:  Asked and answered.
17          Go ahead.
18  A.   No.  No.
19  BY MS. BROWN:
20          Q.   Okay.  You're still denying it.
21          Isn't it correct that --
22          A.   If -- if -- if -- hang on.  Let me ask
23  you a question.
24          Q.   Sir, you don't ask me questions in this
25  deposition.  I ask you questions.

1    A.    Okay.  All right.  All right.

2    Q.    Isn't it --

3    A.    Look, the Queen -- go ahead.

4          Go ahead.

5    Q.    The third question is admit that Wein

6    was repaid with interest by the Galemmo entities

7    for the loans Wein made to the Galemmo entities.

8          Given the definition of Galemmo

9    entities that you were provided, shouldn't the

10   correct answer be yes, admitting it?

11   A.    In form, yes, 100 percent.

12   Q.    Thank you.  Thank you.

13         And the next one is admit that Wein

14   made a profit in the business dealings in the

15   Galemmo entities.

16         Again, given the definition that you

17   were provided with these request for admissions,

18   isn't it correct that the correct answer should

19   have been admit, you made a profit from your

20   loans to the Galemmo -- from your business

21   dealings to the Galemmo entities?

22   A.    And, again, I'm not going to answer

23   your question yes or no, because it's not a yes

24   or no answer.

25         I don't know where that profit came

1    from.  I have no idea if Galemmo entities paid

2    me.  All I know is the money came from that

3    account.

4          He could have had someone else wire the

5    money into that account, like I did two months

6    before, and then immediately turn around and wire

7    it back out to me.

8          So -- so, yes, the wire -- bottom line,

9    the wires went to what is now known to be a

10   Galemmo entity, from me to the Galemmo entity,

11   not known at the time.  And I know now.

12         And it turns out now, that I also did

13   not know at the time, money was paid back to me

14   from the Galemmo entity.  And now that I know

15   that.

16         But at the time I had no idea of any

17   relationship with Galemmo entities at all about

18   who I was wiring the money to or who was wiring

19   me the money.

20   Q.    Let's look at Exhibit 9.

21   A.    Okay.

22         MR. FLAX:  Exhibit 9, Phyllis?  Do you

23   have 9?

24         MS. BROWN:  Here.  Just take one out.

25         MR. FLAX:  Okay.

1          MS. BROWN:  Oh, here.  I'm sorry.

2      That's the wrong one.

3          MR. FLAX:  Getting scrambled here.

4          MS. BROWN:  Sure.

5  BY MS. BROWN:

6      Q.   Again, if you look at request number

7  two, admit that Wein made short-term loans or

8  investments to the Galemmo entities, you're

9  standing by your answer, sir?

10     A.   At the time, the answer's no, I did not

11  know; now that I know, the answer's yes.

12     Q.   Okay.  And would the same be true for

13  admission number three, that you were repaid with

14  interest by the Galemmo entities for the loans?

15     A.   At the time, I had no idea and did not

16  know; and now, after the fact, that I know the

17  relationship and I have more knowledge about the

18  transaction, my answer is, yes, I was repaid by a

19  Galemmo entity.

20     Q.   And for number four, admit that Wein

21  made a profit in the business dealings with the

22  Galemmo entities, would your answer be admit now?

23     A.   Other than the fact that the wire --

24  that the wire came from the Gal -- Galemmo

25  entity, I have no idea where the source of those

1    funds was.

2              I have no idea where that money came

3    from.

4              Obviously, Glen was moving money in and

5    out and all around his entities, so I cannot -- I

6    do not have no idea whether the profit that I was

7    paid came from any Galemmo entity whatsoever; no

8    clue, no idea.

9              And unless you can trace every dollar

10   that was paid to me back to this fund, I think

11   it's pretty -- I think it's going to be pretty

12   hard for anybody to determine actually that --

13   who -- where the profit came from.

14             So, no, I don't -- I don't -- I don't

15   admit that, I don't understand that, and I don't

16   know that.

17        Q.   Fine.

18             Let's look at Exhibits 10 and 11.

19        A.   10 and 11.  I've got to be careful

20   about that, huh?  Okay.

21        Q.   Do you recognize these, sir?

22        A.   Yes, ma'am.

23        Q.   And can you tell me what they are?

24        A.   These are personal checking accounts of

25   my -- of mine.

1     Q.   And isn't it correct that you provided

2  these to the plaintiffs through discovery?

3     A.   Yes, ma'am.

4     Q.   Okay.  If we look at the first page of

5  Exhibit 10, we see on December 3rd a wire

6  transfer to Queen City Investment Fund II,

7  correct?

8     A.   Correct.

9     Q.   Is there anyplace in here in Exhibit --

10  Exhibit 10 or 11 where you either wired or

11  received money, wired money into or out of any

12  Galemmo account, any personal account of Glen

13  Galemmo?

14     A.   Now, I don't know -- I don't know if

15  these are his personal accounts, not his personal

16  accounts; I have no idea.

17       So, again, you're asking me then, no

18  idea; now, yes.  The answer's yes, they went to a

19  Galemmo entity.  But then, no clue, no idea

20  who -- what the account was or who owned the

21  account or anything.

22     Q.   Is -- you stated you felt there was

23  some discrepancy between your statements and the

24  statements I provided you.

25       Can you show me any discrepancy?

1          A.    No.

2                You know what?  I'm just going to --

3     for -- for -- for this depo, I'll assume -- I

4     need to look at the -- I really need to look at

5     the map out of the schedule that I sent in versus

6     the one you gave me to see if there are any

7     discrepancies.

8                I thought, in a quick overview last

9     night, that there was some numbers that -- again,

10    I -- I did it by loan.  You're doing it by

11    chronological date ordering.

12                So I don't know if there are any

13    discrepancies or not.  And I don't have -- I

14    don't -- I don't know right now.  I need to look

15    at that again, and I can -- I can verify that for

16    you.

17         Q.    Okay.

18         A.    But these are all accurate.  Everything

19    in these statements are all 100 percent accurate

20    in terms of wired and received funds.

21         Q.    Right.

22                And the way I read them, they totally

23    agree with the statements that I had, frankly.

24    That's why I'm asking you if there's a

25    discrepancy.

1  A. There -- there may not be.  Again, it

2 may be -- I -- I grouped them by loan, and you

3 grouped them just by kind of out and in.  And

4 so -- so there may not be a discrepancy.

5  Q. Okay.

6  A. The numbers may be accurate.

7  Q. Can you look at Exhibit 12?  Have you

8 ever seen this letter?

9  A. I need to find Exhibit 12.

10  Q. Okay.

11  MR. FLAX:  Do you have that exhibit?

12  A. I've got exhibits all over the place.

13 BY MS. BROWN:

14  Q. Yeah, I know the feeling.

15  A. 10, 11, 3, 7, 13.  I don't even know --

16 now, I don't know.  I don't see 12.  I could -- I

17 could have gotten it mixed up.  I don't -- I

18 don't see 12.

19  THE REPORTER:  If you'll go off the

20  record, I'll have it printed for you.

21  THE WITNESS:  Okay.  Thanks.

22  MR. HEALY:  Larry, maybe check --

23  THE VIDEOGRAPHER:  We're going off the

24  record.  The time is -- what, do you -- not

25  go off?

1          MR. HEALY:  No.  Off the record is

2     fine.

3          Larry, check at the back of Exhibit 11.

4     Maybe it got struck together.  It's just a

5     two-page letter.

6          THE WITNESS:  It did.  It did.  Thank

7     you.

8          MS. BROWN:  Good for you.

9          THE WITNESS:  Sorry about that.  It

10    did.  Okay.

11         MR. HEALY:  Glad I could contribute.

12         MS. BROWN:  Thank you.

13    A.   Okay.  I've reviewed it.

14    BY MS. BROWN:

15    Q.   Okay.  Have you ever seen it before?

16    A.   Yes, I have.

17    Q.   Okay.  Did you see it before you

18    responded to the request for admissions?

19    A.   You know, I can't honestly say time

20    stamp-wise when I saw it or didn't see it --

21    Q.   Oh, okay.

22    A.   -- versus my responses.

23    Q.   Did you --

24    A.   Can we -- I'm sorry.

25    Q.   Did you direct your counsel not to

1    respond to the letter?

2            MR. HEALY:  Objection.

3            You don't have to tell -- you don't

4        have to answer anything you told Judd or

5        vice versa.  So don't --

6            MS. BROWN:  I'm just asking a yes or

7        no.

8            MR. HEALY:  It's still going to the

9        substance.  If you want to rephrase it.

10           MS. BROWN:  Okay.

11           MR. HEALY:  But you don't have to tell

12       her anything that you told Judd.

13   BY MS. BROWN:

14       Q.   Do you have a response to the letter?

15       A.   Yeah.  The same response I had all

16   along.  I did not knowingly deposit funds into

17   Galemmo entity bank accounts.  I know now, but

18   then I had no idea.

19           I'm not understanding why we're having

20   these confusion about the fund.

21           I had no idea in 2010, '11, and '12,

22   that I was putting money in a Galemmo-related

23   entity or fund.

24           QFC doesn't say Galemmo FC.  Queen City

25   doesn't say Galemmo Queen City.  I had no clue.

1        Now I know, but then I did not know.

2     Q.  And why do you think it makes a

3  difference whether you knew or not?

4     A.  Because it didn't matter who I wired

5  the money to.  I didn't care.  I was lending him

6  money.

7        If -- if anybody that I lend money to,

8  I -- I agree on the rate, the term, the dollar

9  amount.

10       And -- and I ask them, you want me to

11  give you the money, you want me to write you a

12  check, do you want me to wire it, do you want me

13  to FedEx the funds, do you want me to pay you in

14  cash, do you want a check?

15       I don't really care how I give them the

16  money.  It doesn't make a difference to me.  I

17  will do whatever they ask me to do, send it

18  anywhere you want.  It doesn't matter to me.

19  It's doesn't -- it's not significant, material.

20  It doesn't change my transaction one iota.

21     Q.  Would you -- I agree with you; it

22  doesn't matter.

23       But would you agree that the net result

24  was you received $420,000 more than you put in?

25     A.  I earned $427,000 on my loans in

1   interest commensurate with the risk I took

2   lending unsecured, undocumented, unguaranteed,

3   and uncollateralized short-term -- short-term,

4   hard-money loans to an individual on a handshake.

5           I earned that interest. It compensated

6   me for the risk I took.

7           And now that I know that I could have

8   lost all of my money in any one transaction, I

9   should have earned more money.

10      Q.   Do we agree on the number?

11      A.   Roughly, yes.

12          MS. BROWN: Okay. That's all I have,

13   sir.

14          I have no further questions.

15          Bill?

16          MR. FLAX: I just have about four

17   questions.

18          MS. BROWN: Go ahead.

19                  EXAMINATION

20   BY MR. FLAX:

21      Q.   You indicated you'd been burned in a

22   Ponzi scheme yourself before this? Did you

23   indicate that?

24      A.   Sorry. You broke up.

25      Q.   Did you -- in answering one of the

1    questions you said that you would have been not

2    one to invest money because you had been burnt in

3    a Ponzi scheme previously.

4         Was that your testimony?

5    A.   I have done -- yeah.  I have done a

6    number of failed transactions in my 30-year

7    financial career, yes, sir.

8    Q.   Okay.  Do you have a brokerage account

9    yourself with anyone?

10   A.   Sorry?

11   Q.   A brokerage account.

12        THE WITNESS:  He's breaking up for some

13   reason.

14        MR. HEALY:  I think you need to speak

15   up.

16        MR. FLAX:  Oh.

17        MS. BROWN:  Do you want to switch

18   seats?

19        MR. HEALY:  What if we put this -- it's

20   coming out of there?

21        THE REPORTER:  It's fine, yeah.

22   BY MR. FLAX:

23   Q.   Do you have an investment account, a

24   investment brokerage account, with any dealer?

25   A.   I have invest -- personal investment

1    account and a company investment account with

2    Fidelity.

3         Q.    All right.  And how long have you had

4    those accounts?

5         A.    Twenty-six years.

6         Q.    All right.  Now, you testified that

7    Mr. Galemmo had told you that he needed your

8    money, that he was willing to pay usurious rates,

9    interest rates, for -- for money that he had

10   deposited with Goldman Sachs for a deal he was

11   waiting to close.

12              Is that your testimony?

13        A.    I testified that I'm not sure exactly

14   what the nature of his transaction was with

15   Goldman Sachs, but it -- it was consistent with

16   him telling me that it was pretty much risk-free.

17              He was depositing it into an account --

18   whether -- I don't know whether it was at Goldman

19   or not.  I think it was at light speed -- and

20   that he needed to have this money pledged to

21   Goldman for Goldman to do whatever they were

22   doing on the finance side and that they would

23   then pay him when that deal closed and then he

24   would pay me.

25              But I don't have any specifics about

1    knowing anything other than that -- that -- that.

2         Q.   Well, as a 26-year investor with a

3    major firm, weren't you at least a little bit

4    curious as to what kind of a deal he could be

5    doing with Goldman that would justify his

6    borrowing money at these usurious rates?

7         A.   Not at all.

8         Q.   You were -- just weren't interested,

9    weren't --

10        A.   No, not at all, no concern.  I have --

11   I had no idea what he was doing with the money.

12             He had a -- a successful track record

13   with me and four other people that I know very

14   well and trust and paid them millions of dollars

15   at the time.

16             And so I had no reason to assume that

17   anything -- any -- anything fraudulently would --

18   was happening with him.

19             So I didn't really have a reason to

20   question any deeper than I did.

21             MR. FLAX:  All right.  I have nothing

22        further.

23             MS. BROWN:  Nothing further.

24             MR. HEALY:  You -- you're done.

25             MS. BROWN:  You're done.

1          THE REPORTER:  What about signature?

2          MR. HEALY:  Yeah, if they order this,

3    Larry, you have the right to review it and

4    make any changes.

5          You can't substantively change it, but

6    you can change if they had a number wrong or

7    misspelled something, you can change it.

8          So I'd suggest we'll -- we would like

9    to reserve the right to read it, if that's

10   okay with you, Larry.

11         THE WITNESS:  Yes, please.

12         MR. HEALY:  Okay.  You guys going to

13   order it?

14         MS. BROWN:  Yeah, we are going to

15   order.

16         THE REPORTER:  Okay.

17         MR. HEALY:  Okay.  They are going to

18   order it, Larry.  So we'll get in touch with

19   you on reviewing it and making any changes

20   we need.  So we'll give you a call.  Okay?

21         THE WITNESS:  Okay.  All right.  Thank

22   you.

23         MR. HEALY:  You're done.  Thank you.

24         THE REPORTER:  We need to go off the

25   record.

1           THE VIDEOGRAPHER:   We are going -- we

2     are going off the record.   The time on the

3     monitor is 12:18 p.m.

4           This concludes the deposition of Larry

5     Wein for today.

6

7                        _____

                              LAWRENCE P. WEIN
8

9

                                - - -
10

      DEPOSITION ADJOURNED AT 12:18 PST/3:18 P.M. EST
11
                                - - -
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3    STATE OF OHIO        :
                          :  SS
4    COUNTY OF HAMILTON   :

5

6            I, Brenda Keyser, RDR, CRR, CLR, CME,

7    the undersigned, a duly qualified and

8    commissioned notary public within and for the

9    State of Ohio, do certify that before the giving

10   of his deposition, LAWRENCE P. WEIN was by me

11   first duly sworn to depose the truth, the whole

12   truth and nothing but the truth; that the

13   foregoing is the deposition given at said time

14   and place by LAWRENCE P. WEIN; that I am neither

15   a relative of nor employee of any of the parties

16   or their counsel, and have no interest whatever

17   in the result of the action.

18

19           IN WITNESS WHEREOF, I hereunto set my hand

20   and official seal of office at Cincinnati, Ohio,

21   this 18th day of November 2015.

22              *Brenda Keyser*

23   _____
             Brenda Keyser, RDR, CRR, CLR, CME
24           Notary Public - State of Ohio
             My commission expires September 21, 2017.
25

1        E R R A T A   S H E E T

2

3        DEPOSITION OF:  LAWRENCE P. WEIN
                  TAKEN:  NOVEMBER 12, 2015

4    Please make the following corrections to my
     transcript:

5

6    Page   Line Number              Correction Made

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

25   _____      _____
     Witness Signature              Date

1          THE VIDEOGRAPHER:  We are going -- we

2    are going off the record.  The time on the

3    monitor is 12:18 p.m.

4          This concludes the deposition of Larry

5    Wein for today.

6

7    _____

         LAWRENCE P. WEIN

8

9

                    - - -

10

     DEPOSITION ADJOURNED AT 12:18 PST/3:18 P.M. EST

11

                    - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              E R R A T A   S H E E T

 2
               DEPOSITION OF:  LAWRENCE P. WEIN
 3                    TAKEN:  NOVEMBER 12, 2015

 4   Please make the following corrections to my
     transcript:
 5

 6   Page  Line Number            Correction Made

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____         11/24/15

25   Witness Signature           Date
```

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOHN CAPANNARI, et al.,

                 Plaintiffs,

v.

GLEN GALEMMO, et al.,

                 Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:13-cv-883

Judge Michael Barrett
Mag. Stephanie Bowman

## NOTICE OF DEPOSITION OF LARRY WEIN

Pursuant to Rule 30, Federal Rules of Civil Procedure, notice is hereby given that

Plaintiffs have scheduled the video deposition of Larry Wein, at the date, time and location listed

below:

        Date:          November 12, 2015

        Time:         12:00 p.m. EST

        Location:    Elite Court Reporting Agency
                       7733 Beechmont Avenue, Suite 100
                       Cincinnati, OH 45255-4237

        Corresponding California location:   Dokich Court Reporters
                                        19712 MacArthur Boulevard
                                        Suite 100
                                        Irvine, CA 92612

Said video deposition will be before an officer authorized to administer oaths and will be

recorded by video and stenotype. Deposition will continue until completed.

<table>
<tr>
<td>

s/ Richard S. Wayne
Richard S. Wayne (0022390)
STRAUSS TROY CO., LPA
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio 45202-4018
(513) 621-2120 -- Telephone
(513) 629-9426 -- Facsimile
rswayne@strausstroy.com

</td>
<td>

s/ Phyllis E. Brown
James R. Cummins (0000861)
Phyllis E. Brown (0037334)
312 Walnut Street, Suite 1000
Cincinnati, OH 45202
Telephone: 513-241-6400
Facsimile: 513-241-6464
jcummins@cumminsbrownlaw.com
pbrown@cumminsbrownlaw.com
*Attorneys for Plaintiffs*

</td>
</tr>
</table>



**EXHIBIT**

PLAINTIFF
1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via electronic mail or by United States Postal Service on this 19th day of October 2015, upon the following:

Benjamin G. Dusing
Angela Hayden
Jason Kuhlman
The Law Offices of Benjamin G. Dusing, PLLC
50 East RiverCenter Blvd., Suite 820
Covington, KY 41011
bdusing@bgdlaw.com
ahayden@bgdlaw.com
jkuhlman@bgdlaw.com
> *Attorneys for:*
> WILEY B. KYLES
> W. BERNARD KYLES & CO., INC.
> KRISTINE GALEMMO

Bradley D. McPeek
Lindhorst & Dreidame
312 Walnut Street, Suite 3100
Cincinnati, OH 45202
bmcpeek@lindhorstlaw.com
> *Attorney for:*
> JAMES PERRY TRUST
> ASL PROPERTIES, INC.

Pamela K. Ginsburg
Richard T. Hamilton, Jr.
Donald J. Mooney
Brad A. Sobolewski
Ulmer & Berne LLP
2800 Cincinnati Commerce Center
600 Vine Street
Cincinnati, OH 45202
pginsburg@ulmer.com
rhamilton@ulmer.com
dmooney@ulmer.com
bsobolewski@ulmer.com
> *Attorneys for:*
> LUTHER LYNN SHELBY

Charles E. Reynolds
Brian P. O'Connor
Allison S. King
Santen & Hughes
600 Vine Street, Suite 2700
Cincinnati, OH 45202
cer@santen-hughes.com
bpo@santen-hughes.com
ask@santen-hughes.com
>   *Attorneys for:*
>   CYNTHIA KHOO-ROBINSON
>   JACK TENKMAN
>   CHARLES LYTLE

William Morris Bristol
Gary F. Franke Co., L.P.A.
120 East 4th Street, Suite 1040
Cincinnati, OH 45202
wmb@garyfrankelaw.com
>   *Attorney for:*
>   ALLISON BRISTOL
>   WILLIAM BRISTOL

Matthew J. Horwitz
United States Attorney's Office for the Southern District
201 East 4th Street, Suite 400
Cincinnati, OH 45202
Matthew.Horwitz@usdoj.gov
>   *Attorney for:*
>   UNITED STATES OF AMERICA

Judd R. Uhl
Katherine L. Kennedy
Mannion & Gray
909 Wright's Summit Parkway, Suite 230
Ft. Wright, KY 41011
kkennedy@manniongray.com
juhl@manniongray.com
>   *Attorneys for:*
>   L.W. CAPITAL CORPORATION
>   LARRY WEIN

Frank Tremper
Arnzen, Molloy, Storm & Turner, PSC
600 Greenup Street
Covington, KY 41011
FTremper@arnzenlaw.com

Katherine A. Clemons
Markesbery & Richardson Co., LPA
2368 Victory Parkway, Suite 200
P. O. Box 6491
Cincinnati, OH 45206
clemons@m-r-law.com
        *Attorneys for:*
        KIRK TENEYCK

William E. Flax
Mercantile Library Building
414 Walnut Street, Suite 514
Cincinnati, OH 45202
Krtq73aa@prodigy.net
        *Attorney for:*
        INTERVENOR DEFENDANT RICHARD THOMAS

William Schamp
8177 Stose Road
Celina, OH 45822-935
Wm.schamp@gmail.com

Steven Smith
6803 Salem Road
Cincinnati, OH 45230-2917
        *Pro Se*

Glen Galemmo, Register #: 72083-061
FCI Butner Low
Federal Correctional Institution
P. O. Box 999
Butner, NC 27509

                                    s/ Phyllis E. Brown
                                    Phyllis E. Brown

39601

| To: | 'Adrienne Bowling'[abowling@qcfunds.com] |
|---|---|
| Cc: | 'Mike Willner'[mwillner@gmail.com] |
| From: | Larry Wein |
| Sent: | Wed 2/16/2011 7:41:05 PM |
| Importance: | Normal |
| Subject: | RE: QCIFII Wiring Instructions |
| Categories: | multipart/alternative; boundary="----=_NextPart_000_0041_01CBCDCE.6823E110"; charset="us-ascii" |

Thanks,


I will wire over $300,000 tomorrow, Thursday 2/17


**From:** Adrienne Bowling [mailto:abowling@qcfunds.com]
**Sent:** Wednesday, February 16, 2011 12:35 PM
**To:** lwein@mwpartners.net
**Subject:** QCIFII Wiring Instructions


Larry,

Here are the wiring instructions you requested.

Please let me know if I can help you with anything else.


Bank Info:  US Bank

       3424 Edwards Rd.

       Cincinnati, Ohio 45208

       513-533-7400

ABA #:  ████████

Account Name:  Queen City Investment Fund II

Account #:  245085618



EXHIBIT
PLAINTIFF
2

--

Adrienne Harmeyer

Queen City Investments

1716 Madison Rd.

Cincinnati, OH 45206

513-924-0990 p

513-924-0991 f


**From:** mwillner@gmail.com [mailto:mwillner@gmail.com]
**Sent:** Wednesday, February 09, 2011 5:35 PM
**To:** Glen Galemmo; Adrienne Bowling
**Subject:** Fw: Larry _ I need your wiring instructions so I can send back your 57 and change. Thx


Sent from my Verizon Wireless BlackBerry

---

**From:** "Larry Wein" <lwein@mwpartners.net>

**Date:** Wed, 9 Feb 2011 15:00:50 -0800

**To:** 'Mike Willner'<mwillner@gmail.com>

**Subject:** RE: Larry _ I need your wiring instructions so I can send back your 57 and change. Thx


Mike,


Here you go......

Wells fargo bank


ABA – ███████


Acct # ███████


Account name - LW Capital Corp

**From:** Mike Willner [mailto:mwillner@gmail.com]
**Sent:** Wednesday, February 09, 2011 2:32 PM
**To:** Larry Wein
**Subject:** Larry_ I need your wiring instructions so I can send back your 57 and change. Thx

---

**Kind Regards**

**Mike**


**Managing Partner**

**MW Partners**

949-468-0829 p
949-637-2389 c
800-679-4615 f
mwillner@mwpartners.net
www.mwpartners.net

 **bank**

**Business Statement**
Account Number:
0 002 4508 5618
Statement Period:
Dec. 1, 2010
through
Dec. 31, 2010

Page 1 of 3

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

2761        TRN            Y   ST01

000031680 1 SP   104481893137156 S
QUEEN CITY INVESTMENT FUND II
1716 MADISON RD
CINCINNATI  OH 45206-1817



☎                        *To Contact U.S. Bank*

**24-Hour Business
Solutions:**                     *1-800-673-3555*

**Telecommunications Device
for the Deaf:**                  *1-800-685-5065*

**Internet:**                    *usbank.com*

## NEWS FOR YOU

The IRS is changing tax payment rules. Effective January 1, 2011, most businesses will be required to pay their taxes electronically. Due to this change, U.S. Bank will no longer be able to accept paper TT&L payment coupons after December 31, 2010. U.S. Bank offers easy and convenient tax payment alternatives for you including EasyTax, SinglePoint ® and SinglePoint Essentials. For information, contact Small Business Direct Sales at 877-743-5726 from 8 a.m. to 6:30 p.m, CT Monday - Friday.

## INFORMATION YOU SHOULD KNOW

At U.S. Bank, we place your privacy and the security of your accounts and personal information as a top priority. As permitted by the Internal Revenue Service, to further protect your personal information, we will provide only the last 4 digits of your personal tax identification number on any IRS Form 1099-INT you may receive for this account in the future.

## BASIC BUSINESS CHECKING                                Member FDIC
U.S. Bank National Association
### Account Summary                               Account Number 0-002-4508-5618

| | # Items | | |
|---|---|---|---|
| Beginning Balance on  Dec. 1 | | $ | 3,401.63 |
| Other Deposits | 10 | | 451,102.09 |
| Other Withdrawals | 14 | | 438,051.54 |
| **Ending Balance on  Dec. 31, 2010** | | $ | **16,452.18** |

### Other Deposits

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Dec.  3 | Wire Credit REF020378        WELLS SF | | | $ | 50,000.00 |
| | ORG=LAWRENCE P WEIN 7     SAWGRASS DR | | | |
| Dec. 10 | Wire Credit REF010787        WELLS SF | | | 250,000.00 |
| | ORG=SADIA ENTERPRISES   1112 7057 TROLLA DAWAY 7 | | | |
| Dec. 13 | Electronic Deposit          From CAPITAL1 VERIFY | | | 0.25 |
| | REF=10347006166752 N    1770527921TRIALCREDT266107815 | | | |
| Dec. 13 | Electronic Deposit          From CAPITAL1 VERIFY | | | 0.52 |
| | REF=10347006166752 N    1770527921TRIALCREDT266107815 | | | |
| Dec. 16 | Wire Credit REF001732        BK OF KY FLORENCE  101216020712 | | | 25,000.00 |
| | ORG=COCHRAN, RANDALL A    8830 RABBIT HASH HILL RD | | | |
| Dec. 17 | Electronic Deposit          From CAPITAL1 | | | 100,000.00 |
| | REF=10351006533740 N    108850000TRANSFER 266523631 | | | |
| Dec. 21 | Electronic Funds Transfer   From Account 130115324670 | | | 10,000.00 |
| | REF=10355009299992 N    FROM EVERBANK | | | |
| Dec. 27 | Electronic Deposit          From EVERBANK   F000000329332 | | | 16,000.00 |
| | REF=10360010749993 N    063092110TEST TRAN VE0000000329332 | | | |
| Dec. 28 | Electronic Deposit          From EVERBANK | | | 0.83 |
| | REF=10362010749993 N    063092110TEST TRAN VE0000000329332 | | | |
| Dec. 30 | Wire Credit REF000041        COLE TAYLOR CHGO 5012 6300044 7 | | | 100,000.00 |
| | ORG=MILLENIUM TRUST     COMPANY TRUST FUND 420 JOB1 | | | |
| | **Total Other Deposits** | | $ | **451,102.09** |

┌─────────────┐
│  **EXHIBIT** │
│  PLAINTIFF   │
│      3       │
└─────────────┘



QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**
Account Number:
1 301 1532 4670
Statement Period:
Feb. 1 , 2011
through
Feb. 28, 2011

Page 2 of 4



## FREE SMALL BUSINESS CHECKING (CONTINUED)
U.S. Bank National Association                    Account Number 1-301-1532-4670

### Other Deposits

| Date | | Description of Transaction | | Ref Number | | Amount |
|------|---|---------------------------|---|-----------|---|--------|
| Feb. | 1 | Electronic Funds Transfer | From Account 00245085618 | | $ | 163,000.00 |
| Feb. | 17 | Electronic Funds Transfer | From Account 00245085618 | | | 87,000.00 |
| Feb. | 17 | Electronic Funds Transfer | From Account 00245085618 | | | 100,000.00 |
| Feb. | 17 | Electronic Funds Transfer | From Account 00245085618 | | | 300,000.00 |

| | | Total Other Deposits | $ | 650,000.00 |
|---|---|---|---|---|

### Other Withdrawals

| Date | | Description of Transaction | | Ref Number | | Amount |
|------|---|---------------------------|---|-----------|---|--------|
| Feb. | 1 | Electronic Withdrawal | From Ocwen Loan Servi | | $ | 10.00- |
| | | REF=11032005350078 N | 3510035452MTG PMT 34359570 | | | |
| Feb. | 1 | Electronic Withdrawal | From Ocwen Loan Servi | | | 1,204.00- |
| | | REF=11032005350061N | 3510035452MTG PMT 34359570 | | | |
| Feb. | 1 | Electronic Withdrawal | From AMERICAN EXPRESS | | | 25,953.75- |
| | | REF=11031013254257 N | 0005000008ELEC REMIT110131062286949 | | | |
| Feb. | 1 | Wire Debit REF004703 | BK AMER SF 110201041430 | | | 35,000.00- |
| | | BNF=MICHAEL WILNER | | | | |
| Feb. | 3 | Internet Banking Transfer | To Account 145806766542 | | | 3,000.00- |
| Feb. | 3 | Wire Debit REF001817 | BK AMER SF 110203016375 | | | 6,000.00- |
| | | BNF=GARY HENSLEY | | | | |
| Feb. | 3 | Wire Debit REF001810 | BK AMER NYC 110203018308 | | | 12,000.00- |
| | | BNF=OCEAN ADVENTURE | PROGRAMS INC | | | |
| Feb. | 3 | Wire Debit REF001840 | FIFTH THIRD CINNATI 110204019406 | | | 5,000.00- |
| | | BNF=CHEVIOT SAVINGS BANK | | | | |
| Feb. | 7 | Wire Debit REF001106 | JPMCHASE NYC 110207012245 | | | 15,000.00- |
| | | BNF=IRWIN COHEN | | | | |
| Feb. | 7 | Wire Debit REF001360 | PNC BANK NA OFICE 110208015200 | | | 5,000.00- |
| | | BNF=BRANDON SMITH | | | | |
| Feb. | 9 | Internet Banking Transfer | To Account 145806766542 | | | 15,000.00- |
| Feb. | 9 | Wire Debit REF001388 | WELLS SF | | | 67,100.00- |
| | | BNF=W CAPITAL CORP | | | | |
| Feb. | 11 | Wire Debit INTERNAL | US BANK 110211009847 | | | 5,000.00- |
| | | BNF=MARY A GALEMMO 301 | TRILLIUM LN | | | |
| Feb. | 14 | Analysis Service Charge | | 1400000000 | | 966.96- |
| Feb. | 14 | Electronic Withdrawal | To TIMEWARNERKETTER | | | 1,337.00- |
| | | REF=11045010954851 N | 1133666692BANK DRAFT003417056201001 | | | |
| Feb. | 14 | Internet Banking Transfer | To Account 145806766542 | | | 40,000.00- |
| Feb. | 23 | Electronic Funds Transfer | To Account 00245085618 | | | 30,000.00- |
| Feb. | 23 | Wire Debit REF001023 | WESTERN FED ANAHIM 110223011364 | | | 50,000.00- |
| | | BNF=KEFAHA FEDERAL | CREDIT UNION | | | |
| Feb. | 23 | Wire Debit REF001051 | COLE TAYLOR CHGO 110223011607 | | | 100,060.00- |
| | | BNF=MILLENNIUM TRUST | COMPANY TRUST FUND | | | |
| Feb. | 23 | Wire Debit REF001144 | COLE TAYLOR CHGO 110223011622 | | | 100,060.00- |
| | | BNF=MILLENNIUM TRUST | COMPANY TRUST FUND | | | |
| Feb. | 28 | Wire Debit REF003166 | BK AMER NYC 110228038435 | | | 200,000.00- |
| | | BNF=LYNN SHELBY | | | | |

| | | Total Other Withdrawals | $ | 707,581.71- |
|---|---|---|---|---|

### Checks Presented Conventionally

| Check | Date | | Ref Number | Amount | Check | Date | | Ref Number | Amount |
|-------|------|---|-----------|--------|-------|------|---|-----------|--------|
| 1421 | Feb. | 23 | 9198748225 | 3,120.00 | 1463 | Feb. | 3 | 9195387941 | 79.76 |
| 1422 | Feb. | 23 | 8892573770 | 25,000.00 | 1464 | Feb. | 2 | 9195295169 | 110.00 |
| 1424* | Feb. | 28 | 9190585344 | 5,000.00 | 1465 | Feb. | 1 | 8896774680 | 14,000.00 |
| 1451* | Feb. | 4 | 4920664651 | 100.00 | 1466 | Feb. | 1 | 9195070905 | 7,500.00 |
| 1457* | Feb. | 3 | 9195416388 | 600,000.00 | 1467 | Feb. | 14 | 9197348676 | 67.50 |
| 1460* | Feb. | 4 | 8898507908 | 1,200.00 | 1468 | Feb. | 14 | 9197348675 | 72.50 |
| 1462* | Feb. | 1 | 8896812256 | 2,606.91 | 1469 | Feb. | 3 | 9195487917 | 4,000.00 |



QUEEN CITY INVESTMENT FUND II
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**
Account Number:
0 002 4508 5618
Statement Period:
Feb. 1, 2011
through
Feb. 28, 2011



Page 2 of 3

## BASIC BUSINESS CHECKING (CONTINUED)
U.S. Bank National Association     Account Number 0-002-4508-5618

### Other Deposits (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Feb. 17 | Wire Credit REF028067 | WELLS SF | | 300,000.00 |
| | ORG=LAWRENCE P WEIN 7 | SAWGRASS DR | | |
| Feb. 23 | Electronic Funds Transfer | From Account 130115324670 | | 30,000.00 |
| Feb. 28 | Wire Credit REF000207 | COLE TAYLOR CHGO 110228038403 | | 30,100.00 |
| | ORG=MILLENIUM TRUST | COMPANY TRUST FUND 820 JORI | | |

Total Other Deposits    $    547,900.00

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Feb. 1 | Electronic Funds Transfer | To Account 130115324670 | $ | 163,000.00- |
| Feb. 1 | Electronic Funds Transfer | To Account 130115324670 | | 127,000.00- |
| Feb. 14 | Analysis Service Charge | | 1400000000 | 67.95- |
| Feb. 16 | Electronic Funds Transfer | To Account 130115324670 | | 100,000.00- |
| Feb. 17 | Electronic Funds Transfer | To Account 130115324670 | | 300,000.00- |
| Feb. 23 | Wire Debit REF000845 | JPMORGAN CHASE BAN 110228019702 | | 30,000.00- |
| | BNF=EARL SHIMAOKA | | | |

Total Other Withdrawals    $    680,067.95-

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| Feb. 1 | 30,403.23 | Feb. 14 | 31,135.28 | Feb. 23 | 31,135.28 |
| Feb. 4 | 118,203.23 | Feb. 16 | 131,135.28 | Feb. 28 | 61,235.28 |
| Feb. 7 | 31,203.23 | Feb. 17 | 31,135.28 | | |

Balances only appear for days reflecting change.

## ANALYSIS SERVICE CHARGE DETAIL
Account Analysis Activity for: January 2011

| | | | |
|---|---|---|---|
| Account Number: | 0-002-4508-5618 | $ | 67.95 |
| Analysis Service Charge assessed to | 0-002-4508-5618 | $ | 67.95 |

### Service Activity Detail for Account Number 0-002-4508-5618

| Service | Volume | Avg Unit Price | Total Charge |
|---|---|---|---|
| **Depository Services** | | | |
| Combined Transactions/Items | 2 | | No Charge |
| Subtotal: Depository Services | | | 0.00 |
| **SinglePoint** | | | |
| Sp E Cday Sum Mo Maint | 1 | | No Charge |
| Sp E Cday Per Item Det | 2 | 1.50000 | 14.95 |
| Sp E Previous Day Per Item Det | 6 | | No Charge |
| Sp E ACH Mo Maintenance | 1 | | No Charge |
| Sp E Token Mo Maintenance | 1 | 3.00000 | 3.00 |
| Sp E Sum Payment Mo Maint | 1 | | No Charge |
| Sp E Wires Mo Maintenance | 1 | 10.00000 | 10.00 |
| Subtotal: SinglePoint | | | 27.95 |

 **bank.**

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

2781    TRN           Y    ST01

**Business Statement**
Account Number:
0 002 4508 5618
Statement Period:
Mar 1, 2011
through
Mar 31, 2011

Page 1 of 2



000033660 1 SP   106461020028465 S
QUEEN CITY INVESTMENT FUND II
1716 MADISON RD
CINCINNATI OH 45206-1817

☎                              _To Contact U.S. Bank_

**24-Hour Business**
**Solutions:**                           1-800-673-3555

**Telecommunications Device**
**for the Deaf:**                         1-800-685-5065

**Internet:**                                 usbank.com

## INFORMATION YOU SHOULD KNOW

Outgoing US dollar payment orders to selected countries may be converted to the local beneficiary's currency at any point in the processing chain unless you instruct the Bank not to convert the currency. Please contact Wire Transfer Operations at 888-799-4737 (888-79-WIRES), option 3 to waive the conversion during the payment processing chain and direct all payments to be received in US Dollar.

## BASIC BUSINESS CHECKING
U.S. Bank National Association                                          _Member FDIC_
                                                 **Account Number 0-002-4508-5618**

### Account Summary

| | # Items | | |
|---|---|---|---|
| Beginning Balance on Mar 1 | | $ | 61,235.28 |
| Other Deposits | 3 | | 824,000.00 |
| Other Withdrawals | 4 | | 354,123.45- |
| **Ending Balance on Mar 31, 2011** | | **$** | **531,111.83** |

### Other Deposits

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Mar 18 | Electronic Funds Transfer | From Account 130115324670 | | $ 150,000.00 |
| Mar 23 | Electronic Funds Transfer | From Account 130115324670 | | 174,000.00 |
| Mar 31 | Wire Credit REF039379 | WELLS SF ███████████ | | 500,000.00 |
| | ORG=LAWRENCE P WEIN 7 | SAWGRASS DR | | |
| | | **Total Other Deposits** | **$** | **824,000.00** |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Mar 2 | Electronic Funds Transfer | To Account 130115324670 | | $ 30,000.00- |
| Mar 14 | Analysis Service Charge | | 1400000000 | 123.45- |
| Mar 18 | Wire Debit REF001856 | WELLS SF ███████████ | | 150,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| Mar 23 | Wire Debit REF000805 | WELLS SF | | 174,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| | | **Total Other Withdrawals** | **$** | **354,123.45-** |

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| Mar 2 | 31,235.28 | Mar 18 | 31,111.83 | Mar 31 | 531,111.83 |
| Mar 14 | 31,111.83 | Mar 23 | 31,111.83 | | |

Balances only appear for days reflecting change.

## ANALYSIS SERVICE CHARGE DETAIL
Account Analysis Activity for: February 2011

| | | | | |
|---|---|---|---|---|
| | Account Number: | 0-002-4508-5618 | $ | 123.45 |
| | Analysis Service Charge assessed to | 0-002-4508-5618 | $ | 123.45 |

 **U.S. bank**

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

2781    TRN          Y    ST01

**Business Statement**
Account Number:
0 002 4508 5618
Statement Period:
Mar 1, 2011
through
Mar 31, 2011

Page 1 of 2



|||||||||||||||||||||||||||||||||||||||||||||||
000033660 1 SP    105481020028465 S
QUEEN CITY INVESTMENT FUND II
1716 MADISON RD
CINCINNATI OH 45206-1817

☎                   *To Contact U.S. Bank*

**24-Hour Business
Solutions:**             1-800-673-3555

**Telecommunications Device
for the Deaf:**        1-800-685-5065
**Internet:**              usbank.com

## INFORMATION YOU SHOULD KNOW

Outgoing US dollar payment orders to selected countries may be converted to the local beneficiary's currency at any point in the processing chain unless you instruct the Bank not to convert the currency. Please contact Wire Transfer Operations at 888-799-4737 (888-79-WIRES), option 3 to waive the conversion during the payment processing chain and direct all payments to be received in US Dollar.

## BASIC BUSINESS CHECKING                  *Member FDIC*
U.S. Bank National Association                  Account Number 0-002-4508-5618

### Account Summary

| | # Items | | |
|---|---|---|---|
| Beginning Balance on Mar 1 | | $ | 61,235.28 |
| Other Deposits | 3 | | 824,000.00 |
| Other Withdrawals | 4 | | 354,123.45- |
| **Ending Balance on Mar 31, 2011** | | **$** | **531,111.83** |

### Other Deposits

| Date | Description of Transaction | | Ref Number | | Amount |
|---|---|---|---|---|---|
| Mar 18 | Electronic Funds Transfer | From Account 130115324670 | | $ | 150,000.00 |
| Mar 23 | Electronic Funds Transfer | From Account 130115324670 | | | 174,000.00 |
| Mar 31 | Wire Credit REF039379 | WELLS SF | | | 500,000.00 |
| | ORG=LAWRENCE P WEIN 7 | SAWGRASS DR | | | |
| | | | **Total Other Deposits** | **$** | **824,000.00** |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | | Amount |
|---|---|---|---|---|---|
| Mar 2 | Electronic Funds Transfer | To Account 130115324670 | | $ | 30,000.00- |
| Mar 14 | Analysis Service Charge | | 1400000000 | | 123.45- |
| Mar 18 | Wire Debit REF001856 | WELLS SF | | | 160,000.00- |
| | BNF=LW CAPITAL CORP | | | | |
| Mar 23 | Wire Debit REF000805 | WELLS SF | | | 174,000.00- |
| | BNF=LW CAPITAL CORP | | | | |
| | | | **Total Other Withdrawals** | **$** | **354,123.45-** |

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| Mar 2 | 31,235.28 | Mar 18 | 31,111.83 | Mar 31 | 531,111.83 |
| Mar 14 | 31,111.83 | Mar 23 | 31,111.83 | | |

Balances only appear for days reflecting change.

## ANALYSIS SERVICE CHARGE DETAIL

Account Analysis Activity for: February 2011

| | | | |
|---|---|---|---|
| Account Number: | 0-002-4508-5618 | $ | 123.45 |
| Analysis Service Charge assessed to | 0-002-4508-5618 | $ | 123.45 |

 **US bank**

QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
1 301 1532 4670

Statement Period:
May 2, 2011
through
May 31, 2011

Page 2 of 4



**FREE SMALL BUSINESS CHECKING** **(CONTINUED)**

U.S. Bank National Association

Account Number 1-301-1532-4670

### Other Withdrawals (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|---|-----------|--------|
| May 6 | Wire Debit REF002429<br>BNF=GEORGE DAVID | FIFTH CINCINNATI 110506024879 | | 20,000.00- |
| May 9 | Wire Debit INTERNAL<br>BNF=MARY A SALEMMO 301 | US BANK 110509017677<br>TRILLIUM LN | | 9,000.00- |
| May 9 | Wire Debit REF001535<br>BNF=RENE COLLUM | GOLDEN ONE CU SACR 110509017602 | | 10,000.00- |
| May 10 | Electronic Withdrawal<br>REF=1130009800503 N | From Ocwen Loan Serv<br>3010035452MTG PMT 34359570 | | 10.00- |
| May 10 | Electronic Withdrawal<br>REF=1112900T298464 N | From FEDERAL EXPRESS<br>1710427007DEBIT MMA06608224 | | 519.07- |
| May 10 | Electronic Withdrawal<br>REF=1130009800597 N | From Ocwen Loan Serv<br>2010035452MTG PMT 34359570 | | 1,234.77- |
| May 10 | Wire Debit REF001875<br>BNF=LARRY HENSLEY | BK AMER SF 110510019399 | | 10,000.00- |
| May 10 | Wire Debit REF002208<br>BNF=LUTHER SHELBY | BK AMER NYC 110510022607 | | 50,000.00- |
| May 10 | Wire Debit REF000593<br>BNF=LARRY RICHARDSON | RANDOLPH ASHEBORO 110510006761 | | 218,937.00- |
| May 11 | Internet Banking Transfer | To Account 130111319518 | | 250.00- |
| May 11 | Wire Debit REF000512<br>BNF=MICHAEL WOEHLER | BBT BK HOPKINSVILL 110511006576 | | 13,500.00- |
| May 11 | Wire Debit REF000563<br>BNF=IRA STEIN | SUNTRUST ATL 110511006478 | | 100,000.00- |
| May 11 | Wire Debit REF000556<br>BNF=LW CAPITAL GROUP | WELLS SF ▇▇▇▇▇ | | 250,000.00- |
| May 13 | Analysis Service Charge | | 1300000000 | 530.46- |
| May 16 | Wire Debit REF000799<br>BNF=LUTHER L SHELBY | BK AMER NYC 110516009924 | | 1,600.00- |
| May 16 | Wire Debit REF001100<br>BNF=LUTHER L SHELBY | BK AMER NYC 110516012592 | | 14,400.00- |
| May 17 | Wire Debit REF000414<br>BNF=LW CAPITAL CORP | WELLS SF ▇▇▇▇▇ | | 40,000.00- |
| May 17 | Wire Debit REF000414<br>BNF=M W PARTNERS | WACHOVIA CHARLOTTE 110517015652 | | 50,000.00- |
| May 17 | Wire Debit REF001646<br>BNF=IRA STEIN | SUNTRUST ATL 110517015373 | | 100,000.00- |
| May 18 | Customer Withdrawal | | 4924281695 | 3,500.00- |
| May 20 | Wire Debit REF001110<br>BNF=IRA & LESLIE STEIN | SUNTRUST ATL 110520011699 | | 50,000.00- |
| May 20 | Wire Debit REF001188<br>BNF=INTERACTIVE BROKERS | CITIBANK OR NEW YO 110520011306<br>LLC FURTHER BENEFIT TO | | 300,000.00- |
| May 23 | Wire Debit REF000353<br>BNF=STEVE SCHUHOLZ | PNC BANK NA OF CLE 110523004864 | | 14,400.00- |
| May 27 | Wire Debit REF001654<br>BNF=ROBERT MORRIS | E TRADE ARLINGTON 110527017455 | | 3,500.00- |
| May 27 | Wire Debit INTERNAL<br>BNF=BIO MASS LLC 65 | US BANK 110527008454<br>AVENUE OF CHAMPIONS | | 10,000.00- |
| May 31 | Electronic Withdrawal<br>REF=1116100201451 N | From DUKE ENERGY OH<br>634690001WEB PAY 0181142110527 11 | | 601.26- |

| | | Total Other Withdrawals | $ | 1,407,643.84- |

### Checks Presented Conventionally

| Check | Date | Ref Number | Amount | Check | Date | Ref Number | Amount |
|-------|------|-----------|--------|-------|------|-----------|--------|
| 1374 | May 3 | 8994935515 | 607.76 | 1383* | May 4 | 9194883192 | 6,000.00 |
| 1378* | May 13 | 8893702559 | 183.71 | 1384 | May 10 | 9097391432 | 550.00 |



QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
1 301 1532 4670

Statement Period:
Jun 1, 2011
through
Jun 30, 2011

Page 2 of 4



FREE SMALL BUSINESS CHECKING (CONTINUED)

U.S. Bank National Association

Account Number 1-301-1532-4670

**Other Withdrawals**

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Jun 1 | Wire Debit REF002848 BNF=MICHAEL WILLNER | BK AMER SF 110601025401 | $ | 75,000.00- |
| Jun 2 | Internet Banking Transfer | To Account 145806766542 | | 5,000.00- |
| Jun 2 | Electronic Withdrawal REF=11152010126772 N | From AMERICAN EXPRESS 0005000008ELEC REMIT110601082499812 | | 21,590.19- |
| Jun 3 | Internet Banking Transfer | To Account 145806766542 | | 27,000.00- |
| Jun 6 | Wire Debit REF001261 BNF=RICHARD PURVIS | GOLDEN ONE CU SACR 110606013562 | | 3,000.00- |
| Jun 6 | Wire Debit REF001180 BNF=OCEAN ADVENTURE PROGRAMS INC | BK AMER NYC 110606019100 | | 20,000.00- |
| Jun 6 | Wire Debit REF001258 BNF=OCEAN ADVENTURE PROGRAMS INC | BK AMER NYC 110606013642 | | 20,000.00- |
| Jun 7 | Wire Debit REF001725 BNF=MOHAMMAD AMMAR AL-HARASH | TEXANS CU DALLAS 110607017610 | | 39,000.00- |
| Jun 8 | Internet Banking Transfer | To Account 145806766542 | | 2,000.00- |
| Jun 9 | Wire Debit REF000662 BNF=SHARON SAMPSON | GOLDEN ONE CU SACR 110609007030 | | 1,000.00- |
| Jun 10 | Wire Debit REF002433 BNF=LW CAPITAL CORP | WELLS SF ███████████ | | 20,000.00- |
| Jun 13 | Wire Debit REF002178 BNF=MICHAEL WILLNER | BK AMER SF 110613022965 | | 6,666.66- |
| Jun 13 | Wire Debit REF002186 BNF=ROB MORRIS | E TRADE ARLINGTON 110613023111 | | 6,666.66- |
| Jun 13 | Wire Debit REF002190 BNF=RICHARD LOW | CITIBANK OAKLAND 110613023195 | | 6,666.66- |
| Jun 13 | Wire Debit INTERNAL BNF=MARY A GALEMMO 301 TRILLIUM LN | US BANK 110613024213 | | 8,000.00- |
| Jun 14 | Analysis Service Charge | | 1400000300 | 616.99- |
| Jun 14 | Internet Banking Transfer | To Account 145806766542 | | 1,000.00- |
| Jun 14 | Electronic Withdrawal REF=11164009785979 N | To TIMEWARNERKETTER 1336660092BANK DRAF10034170050201001 | | 1,636.75- |
| Jun 14 | Wire Debit REF002167 BNF=RICHARD LOW | CITIBANK OAKLAND 110614023288 | | 54,000.00- |
| Jun 15 | Internet Banking Transfer | To Account 145806766542 | | 2,000.00- |
| Jun 16 | Internet Banking Transfer | To Account 145806766542 | | 4,000.00- |
| Jun 16 | Internet Banking Transfer | To Account 145806766542 | | 4,000.00- |
| Jun 16 | Wire Debit REF000516 BNF=FADIA DAVID | FIFTH CINCINNATI 110616006491 | | 20,000.00- |
| Jun 17 | Customer Withdrawal | | 5122311824 | 2,500.00- |
| Jun 17 | Wire Debit INTERNAL BNF=KEVIN L EICKMANN 8000 KROGER FARM RD | US BANK 110617022937 | | 250,000.00- |
| Jun 21 | Wire Debit REF001213 BNF=LYNN NELSEN | BK AMER NYC 110621012773 | | 3,500.00- |
| Jun 22 | Electronic Withdrawal REF=11172006641520 N | From Ocwen Loan Servi 3510035452MTG PMT 34359570 | | 10.00- |
| Jun 22 | Electronic Withdrawal REF=11172005095059 N | From FEDERAL EXPRESS 1710427007DEBIT MMA06836162 | | 34.30- |
| Jun 22 | Electronic Withdrawal REF=11172005095058 N | From FEDERAL EXPRESS 1710427007DEBIT MMA06836161 | | 53.42- |
| Jun 22 | Electronic Withdrawal REF=11172005095061 N | From FEDERAL EXPRESS 1710427007DEBIT MMA06836163 | | 60.36- |
| Jun 22 | Electronic Withdrawal REF=11172005095060 N | From FEDERAL EXPRESS 1710427007DEBIT MMA06836164 | | 80.98- |
| Jun 22 | Electronic Withdrawal REF=11172006755853 N | From DUKE ENERGY-OH 534690001 WEB PAY 0189326806211 | | 100.00- |

 **US bank.**  QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**
Account Number:
1 301 1532 4670

Statement Period:
Jun 1, 2011
through
Jun 30, 2011

Page 3 of 4

**FREE SMALL BUSINESS CHECKING** **(CONTINUED)**

U.S. Bank National Association

Account Number 1-301-1532-4670

## Other Withdrawals (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|------|------|------|------|------|
| Jun 22 | Electronic Withdrawal | From FEDERAL EXPRESS | | 157.91- |
| | REF=11172005095057 N | 1710427007DEBIT MMA06836156 | | |
| Jun 22 | Electronic Withdrawal | From Gewen Loan ServI | | 1,284.77- |
| | REF=11172006641616 N | 2610035452MTG PMT 32359670 | | |
| Jun 22 | Wire Debit REF000719 | WELLS SF | | 250,000.00- |
| | BNF=LW CAPITAL | | | |
| Jun 22 | Wire Debit REF000719 | WACHOVIA CHARLOTTE 110022006067 | | 252,645.66- |
| | BNF=MW PARTNERS | | | |
| Jun 23 | Electronic Withdrawal | From CINTI BELL TELE | | 34.86- |
| | REF=11173009669454 N | 1310241390INTBILLPMT5139240990956 | | |
| Jun 23 | Electronic Withdrawal | To SPRINT8006396111 | | 41.20- |
| | REF=11173011839225 N | 2521616695ACHBILLPAY721871590 | | |
| Jun 23 | Electronic Withdrawal | To TIMEWARNERKETTER | | 50.00- |
| | REF=11173011572885 N | 1133666692BANK DRAFT003417056201001 | | |
| Jun 23 | Electronic Withdrawal | From CINTI BELL TELE | | 100.00- |
| | REF=11173009669451 N | 1310241390INTBILLPMT5139240990956 | | |
| Jun 23 | Electronic Withdrawal | From CINTI BELL TELE | | 100.00- |
| | REF=11173009669452 N | 1310241390INTBILLPMT5139240990956 | | |
| Jun 23 | Electronic Withdrawal | From CINTI BELL TELE | | 100.00- |
| | REF=11173009669453 N | 1310241390INTBILLPMT5139240990956 | | |
| Jun 23 | Electronic Withdrawal | To SPRINT8006396111 | | 100.00- |
| | REF=11173011839221 N | 2521616695ACHBILLPAY721871590 | | |
| Jun 23 | Electronic Withdrawal | To SPRINT8006396111 | | 100.00- |
| | REF=11173011839224 N | 2521616695ACHBILLPAY721871590 | | |
| Jun 24 | Internet Banking Transfer | To Account 145806766542 | | 500.00- |
| Jun 24 | Internet Banking Transfer | To Account 145806766542 | | 1,000.00- |
| Jun 28 | Wire Debit REF002086 | FIFTH CINCINNATI 110628021256 | | 5,000.00- |
| | BNF=GEORGE DAVID | | | |
| Jun 30 | Wire Debit INTERNAL | US BANK 110630052360 | | 32,500.00- |
| | BNF=KEVIN L EICKMANN | 8000 KROGER FARM RD | | |

| | | **Total Other Withdrawals** | $ | 1,148,897.32- |
|---|---|---|---|---|

## Checks Presented Conventionally

| Check | Date | Ref Number | Amount | Check | Date | Ref Number | Amount |
|------|------|------|------|------|------|------|------|
| 1376 | Jun 15 | 9193992810 | 262.50 | 1525 | Jun 9 | 9192865256 | 19,000.00 |
| 1505* | Jun 1 | 9190931312 | 15,539.70 | 1526 | Jun 9 | 8894230077 | 587.37 |
| 1506 | Jun 2 | 8997446034 | 8,000.00 | 1527 | Jun 14 | 9193775846 | 5,000.00 |
| 1507 | Jun 2 | 8997446033 | 25,000.00 | 1528 | Jun 14 | 9193632459 | 15,000.00 |
| 1508 | Jun 2 | 8997446072 | 60,000.00 | 1529 | Jun 17 | 9092033497 | 538.00 |
| 1510* | Jun 8 | 9192570507 | 86.25 | 1531* | Jun 14 | 9193775126 | 3,500.00 |
| 1511 | Jun 3 | 9194438713 | 110,264.49 | 1532 | Jun 14 | 9193775125 | 50,000.00 |
| 1512 | Jun 7 | 9393483824 | 3,170.00 | 1533 | Jun 14 | 8897432181 | 103,000.00 |
| 1513 | Jun 6 | 9191901240 | 6,000.00 | 1534 | Jun 15 | 8898231242 | 2,729.65 |
| 1514 | Jun 7 | 8892682834 | 1,050.00 | 1535 | Jun 17 | 9194309357 | 12,000.00 |
| 1515 | Jun 8 | 8893471313 | 4,000.00 | 1536 | Jun 17 | 9194285741 | 4,000.00 |
| 1516 | Jun 13 | 9193161853 | 110.00 | 1537 | Jun 20 | 8991852906 | 2,572.43 |
| 1517 | Jun 8 | 8892930061 | 107,500.00 | 1538 | Jun 20 | 9194743744 | 840.00 |
| 1518 | Jun 13 | 9193162844 | 81.25 | 1539 | Jun 20 | 9194743743 | 15,000.00 |
| 1519 | Jun 14 | 8897614666 | 160.00 | 1540 | Jun 22 | 4722487865 | 168,000.00 |
| 1520 | Jun 10 | 8894538208 | 183.75 | 1571* | Jun 24 | 8995497052 | 60,000.00 |
| 1521 | Jun 10 | 4927026586 | 1,826.24 | 1572 | Jun 29 | 9196312844 | 3,000.00 |
| 1522 | Jun 10 | 9192983744 | 479.00 | 1573 | Jun 30 | 9196616033 | 5,225.00 |
| 1523 | Jun 8 | 9192657624 | 3,125.00 | 1577* | Jun 30 | 9790005617 | 175,000.00 |
| 1524 | Jun 9 | 9192865257 | 3,500.00 | 1579* | Jun 30 | 9390544885 | 24,000.00 |

 **bank.**

**Business Statement**
Account Number:
0 002 4508 5618
Statement Period:
Sep 1, 2011
through
Sep 30, 2011

Page 1 of 2

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

2761       TRN                    Sep 1          Y      ST01



000037005  1 SP      106481273895054 S
QUEEN CITY INVESTMENT FUND II
1716 MADISON RD
CINCINNATI OH 45206-1817

☎                           *To Contact U.S. Bank*

**24-Hour Business**
**Solutions:**                        1-800-673-3555

**Telecommunications Device**
**for the Deaf:**                      1-800-685-5065
**Internet:**                          usbank.com

---

## BASIC BUSINESS CHECKING                                      Member FDIC
U.S. Bank National Association                          Account Number 0-002-4508-5618

### Account Summary

|                              | # Items |    |            |
|------------------------------|---------|----|------------|
| Beginning Balance on Sep 1   |         | $  | 71,793.86  |
| Other Deposits               | 7       |    | 983,600.14 |
| Other Withdrawals            | 8       |    | 998,225.45- |
| **Ending Balance on Sep 30, 2011** |  | $ | 57,168.55 |

### Other Deposits

| Date | Description of Transaction | | Ref Number | Amount |
|------|----------------------------|---|-----------|--------|
| Sep 8 | Electronic Funds Transfer | From Account 130115324670 | | $ 139,000.00 |
| Sep 14 | Electronic Deposit | From DIRECT,ING | | 0.04 |
| | REF=11256007957600 N | 1510394779ING DIRECT000010000000059 | | |
| Sep 14 | Electronic Deposit | From DIRECT,ING | | 0.10 |
| | REF=11256007957659 N | 1510394779ING DIRECT000010000000059 | | |
| Sep 15 | Wire Credit REF023100 | WELLS SF | | 500,000.00 |
| | ORG=LAWRENCE P WEIN / | SAWGRASS DR | | |
| Sep 22 | Wire Credit REF000238 | COLE TAYLOR CHGO   110922023144 | | 12,200.00 |
| | ORG=MILLENIUM TRUST | COMPANY TRUST FUND 820 JORI | | |
| Sep 22 | Wire Credit REF000254 | COLE TAYLOR CHGO   110922023632 | | 164,400.00 |
| | ORG=MILLENIUM TRUST | COMPANY TRUST FUND 820 JORI | | |
| Sep 23 | Electronic Funds Transfer | From Account 130115324670 | | 169,000.00 |
| | | **Total Other Deposits** | $ | 983,600.14 |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|------|----------------------------|---|-----------|--------|
| Sep 1 | Electronic Funds Transfer | To Account 130115324670 | | $ 3,000.00- |
| Sep 1 | Electronic Funds Transfer | To Account 130115324670 | | 5,000.00- |
| Sep 1 | Electronic Funds Transfer | To Account 130115324670 | | 7,000.00- |
| Sep 6 | Wire Debit REF001903 | COLE TAYLOR CHGO   110906001780 | | 138,851.00- |
| | BNF=MILLENNIUM TRUST | COMPANY TRUST FUND | | |
| Sep 15 | Analysis Service Charge | | 1500000000 | 80.45- |
| Sep 16 | Electronic Funds Transfer | To Account 130115324670 | | 500,000.00- |
| Sep 23 | Wire Debit REF000769 | COLE TAYLOR CHGO   110923007223 | | 168,294.00- |
| | BNF=MILLENNIUM TRUST | COMPANY TRUST FUND | | |
| Sep 23 | Electronic Funds Transfer | To Account 130115324670 | | 176,000.00- |
| | | **Total Other Withdrawals** | $ | 998,225.45- |

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|------|----------------|------|----------------|------|----------------|
| Sep 1 | 66,793.86 | Sep 14 | 55,943.00 | Sep 22 | 232,462.55 |
| Sep 8 | 55,942.86 | Sep 15 | 55,862.55 | Sep 23 | 57,168.55 |

Balances only appear for days reflecting change.



**us bank.**

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

2781    IMG                    Y    ST01

**Business Statement**
Account Number:
1 301 1532 4670
Statement Period:
Nov 1, 2011
through
Nov 30, 2011

Page 1 of 8



000002839 2 AT 0.490 106481358998698 P
QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

☎                                              *To Contact U.S. Bank*

**24-Hour Business
Solutions:**                                        1-800-673-3555

**Telecommunications Device
for the Deaf:**                                     1-800-685-5065

**Internet:**                                          usbank.com

---

## FREE SMALL BUSINESS CHECKING                                    Member FDIC

U.S. Bank National Association                          Account Number 1-301-1532-4670

### Account Summary

|  | # Items | $ | |
|---|---|---|---|
| Beginning Balance on Nov 1 |  | $ | 49,531.15 |
| Customer Deposits | 8 |  | 1,474,472.00 |
| Other Deposits | 3 |  | 202,000.00 |
| Other Withdrawals | 29 |  | 926,209.68 - |
| Checks Paid | 33 |  | 784,228.84 - |
| **Ending Balance on Nov 30, 2011** |  | **$** | **15,564.63** |

### Customer Deposits

| Number | Date | Ref Number | Amount | Number | Date | Ref Number | Amount |
|---|---|---|---|---|---|---|---|
|  | Nov 1 | 9790920815 | 55,000.00 |  | Nov 8 | 9790748134 | 500,000.00 |
|  | Nov 2 | 9792366265 | 34,972.00 |  | Nov 16 | 9791262717 | 291,500.00 |
|  | Nov 3 | 9793617421 | 100,000.00 |  | Nov 21 | 9797085453 | 293,000.00 |
|  | Nov 4 | 9795120164 | 100,000.00 |  | Nov 28 | 9795221006 | 100,000.00 |
|  |  |  |  | **Total Customer Deposits** |  | **$** | **1,474,472.00** |

### Other Deposits

| Date | Description of Transaction |  | Ref Number |  | Amount |
|---|---|---|---|---|---|
| Nov 1 | Internet Banking Transfer | From Account 130112948448 |  | $ | 100,000.00 |
| Nov 18 | Internet Banking Transfer | From Account 130112948448 |  |  | 100,000.00 |
| Nov 22 | Internet Banking Transfer | From Account 145806766542 |  |  | 2,000.00 |
|  |  | **Total Other Deposits** |  | **$** | **202,000.00** |

### Other Withdrawals

| Date | Description of Transaction |  |  | Ref Number |  | Amount |
|---|---|---|---|---|---|---|
| Nov 1 | Wire Debit REF004233 | BK AMER SF | 111101034497 |  | $ | 42,000.00 - |
|  | BNF=MICHAEL WILLNER |  |  |  |  |  |
| Nov 1 | Wire Debit REF004221 | PNC BANK NA OF OH | 111101034438 |  |  | 80,000.00 - |
|  | BNF=STEVE SCHUHOLZ |  |  |  |  |  |
| Nov 2 | Wire Debit INTERNAL | US BANK | 111102008066 |  |  | 10,000.00 - |
|  | BNF=MARY A GALEMMO 301 | TRILLIUM LN |  |  |  |  |
| Nov 3 | Wire Debit REF001216 | WELLS SF |  |  |  | 50,000.00 - |
|  | BNF=LW CAPITAL CORP |  |  |  |  |  |
| Nov 4 | Internet Banking Transfer | To Account 145806766542 |  |  |  | 21,000.00 - |
| Nov 7 | Wire Debit REF000564 | BK AMER NYC | 111107006606 |  |  | 3,500.00 - |
|  | BNF=LYNN NELSEN |  |  |  |  |  |
| Nov 7 | Internet Banking Transfer | To Account 145806766542 |  |  |  | 5,000.00 - |
| Nov 7 | Wire Debit REF000602 | BK AMER NYC | 111107007212 |  |  | 5,000.00 - |
|  | BNF=OCEAN ADVENTURE | PROGRAMS INC |  |  |  |  |
| Nov 7 | Wire Debit REF000638 | FIFTH CINCINNATI | 111107007565 |  |  | 8,000.00 - |
|  | BNF=GEORGE DAVID |  |  |  |  |  |
| Nov 7 | Wire Debit REF000613 | HUNT GOL | 111107007821 |  |  | 25,000.00 - |
|  | BNF=STEVE SMITH |  |  |  |  |  |
| Nov 8 | Internet Banking Transfer | To Account 130111319518 |  |  |  | 12.00 - |

 **US bank.**

QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**
Account Number:
1 301 1532 4670

Statement Period:
Nov 1, 2011
through
Nov 30, 2011



Page 2 of 8

## FREE SMALL BUSINESS CHECKING (CONTINUED)

U.S. Bank National Association            Account Number 1-301-1532-4670

### Other Withdrawals (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Nov 8 | Electronic Withdrawal | To AT&T 99914400000PAYMENT 180935646360GLR | | 187.71- |
| | REF=11312004974418 N | | | |
| Nov 9 | Wire Debit REF000751 | WELLS SF | | 250,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| Nov 9 | Wire Debit REF000747 | WELLS SF | | 250,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| Nov 14 | Wire Debit REF000219 | BK AMER SF 111114006404 | | 6,100.00- |
| | BNF=MICHAEL WILLNER | | | |
| Nov 15 | Electronic Withdrawal | From DUKE ENERGY OH 534690001 WEB_PAY 02421700111411 | | 359.37- |
| | REF=11319004900025 N | | | |
| Nov 15 | Analysis Service Charge | | 1600000000 | 532.29- |
| Nov 16 | Wire Debit REF000757 | FIFTH CINCINNATI 111116006021 | | 1,250.00- |
| | BNF=DONALD ALLEY | | | |
| Nov 16 | Wire Debit INTERNAL | US BANK 111116008802 | | 2,000.00- |
| | BNF=BIO MASS LLC 65 | AVENUE OF CHAMPIONS | | |
| Nov 17 | Wire Debit REF000746 | BK AMER NYC 111117007043 | | 108,000.00- |
| | BNF=LUTHER SHELBY | | | |
| Nov 18 | Electronic Withdrawal | From FEDERAL EXPRESS 7710422007DEBIT MMA07620028 | | 220.71- |
| | REF=1321012117022 N | | | |
| Nov 18 | Electronic Withdrawal | To SPRINT800630011 2021816695ACHBILLPAY 221874890 | | 470.59- |
| | REF=11321012299897 N | | | |
| Nov 18 | Wire Debit REF002831 | FIFTH CINCINNATI 111118027735 | | 10,000.00- |
| | BNF=FADIA DAVID | | | |
| Nov 22 | Internet Banking Transfer | To Account 2601058461106 | | 840.00- |
| Nov 29 | Wire Debit REF000501 | GOLDEN ONE CU SACR 111129006107 | | 500.00- |
| | BNF=SHARON SAMPSON | | | |
| Nov 29 | Internet Banking Transfer | To Account 145806760542 | | 20,000.00- |
| Nov 30 | Electronic Withdrawal | From DUKE ENERGY OH 534690001 WEB_PAY 02472789112911 | | 216.88- |
| | REF=11334002263790 N | | | |
| Nov 30 | Wire Debit REF003376 | GOLDEN ONE CU SACR 111130042013 | | 5,000.00- |
| | BNF=RICHARD PURVIS | | | |
| Nov 30 | Electronic Withdrawal | From AMERICAN EXPRESS 0005000008ELEC REMIT11112906081518 | | 22,902.13- |
| | REF=11333010897054 N | | | |

| | | | Total Other Withdrawals | $ 926,209.68- |

### Checks Presented Conventionally

| Check | Date | Ref Number | Amount | Check | Date | Ref Number | Amount |
|---|---|---|---|---|---|---|---|
| 1712 | Nov 1 | 8990232684 | 252.00 | 1733 | Nov 18 | 9097834130 | 32,400.00 |
| 1714* | Nov 2 | 9191338797 | 86.25 | 1734 | Nov 21 | 9796006931 | 30,000.00 |
| 1715 | Nov 4 | 9191661306 | 6,000.00 | 1735 | Nov 22 | 9798774402 | 27,000.00 |
| 1716 | Nov 4 | 9191755601 | 51.23 | 1736 | Nov 22 | 9391760062 | 53,700.00 |
| 1717 | Nov 2 | 8991280181 | 9,000.00 | 1737 | Nov 21 | 9796220737 | 131,100.00 |
| 1718 | Nov 3 | 9191465411 | 2,831.72 | 1738 | Nov 21 | 8895475963 | 6,000.00 |
| 1719 | Nov 9 | 8996237291 | 4,000.00 | 1739 | Nov 22 | 8895688406 | 5,000.00 |
| 1721* | Nov 7 | 9192062556 | 800.00 | 1740 | Nov 23 | 8896702092 | 107,600.00 |
| 1722 | Nov 7 | 9192062557 | 2,600.00 | 1741 | Nov 23 | 9194839633 | 110.00 |
| 1724* | Nov 2 | 8991724277 | 25,000.00 | 1742 | Nov 22 | 9798900399 | 53,750.00 |
| 1726* | Nov 15 | 9193564239 | 2,831.72 | 1743 | Nov 28 | 8990253520 | 30,000.00 |
| 1727 | Nov 14 | 8998883662 | 100,000.00 | 1744 | Nov 22 | 9194803164 | 2,000.00 |
| 1728 | Nov 21 | 8895476729 | 615.92 | 1745 | Nov 28 | 9794393610 | 1,500.00 |
| 1729 | Nov 14 | 9796192678 | 1,480.00 | 1746 | Nov 28 | 9794393611 | 85.00 |
| 1730 | Nov 14 | 9193052272 | 7,000.00 | 1747 | Nov 30 | 9195938000 | 5,410.00 |
| 1731 | Nov 15 | 9193202966 | 6,125.00 | 1748 | Nov 30 | 9195814605 | 3,000.00 |
| 1732 | Nov 18 | 8893343393 | 127,000.00 | | | | |

 **bank**

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

2781    TRN                              Y    ST01

000040760 1 SP    10648158074034 S
QUEEN CITY INVESTMENT FUND II
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
0 002 4508 5618
Statement Period:
Apr 2, 2012
through
Apr 30, 2012

Page 1 of 2



☎                            **To Contact U.S. Bank**

*24-Hour Business
Solutions:*                                1-800-673-3555

*Telecommunications Device
for the Deaf:*                             1-800-685-5065
*Internet:*                                usbank.com

---

## NEWS FOR YOU

You can now make purchases with any U.S. Bank Business Visa Check Card or ATM Card using your PIN at no charge

## BASIC BUSINESS CHECKING                                      Member FDIC
U.S. Bank National Association                          Account Number 0-002-4508-5618

### Account Summary

|                              | # Items |    |           |
|------------------------------|---------|----|-----------|
| Beginning Balance on Apr 2   |         | $  | 29,995.85 |
| Other Deposits               | 2       |    | 510,363.00 |
| Other Withdrawals            | 5       |    | 510,085.45- |
| Ending Balance on Apr 30, 2012 |       | $  | 30,273.40 |

### Other Deposits

| Date | Description of Transaction | | Ref Number | Amount |
|------|----------------------------|---|-----------|--------|
| Apr  5 | Wire Credit REF041588      | WELLS SF | | $ 500,000.00 |
|      | ORG=LAWRENCE P WEIN 7 | SAWGRASS DR | | |
| Apr 20 | Wire Credit REF000259 | COLE TAYLOR CHGO 120420027660 | | 10,363.00 |
|      | ORG=MILLENIUM TRUST | COMPANY TRUST FUND 020JON | | |
|      |                            |  | Total Other Deposits | $ 510,363.00 |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|------|----------------------------|---|-----------|--------|
| Apr  5 | Electronic Funds Transfer | To Account 130115324670 | | $ 250,000.00 |
| Apr  5 | Electronic Funds Transfer | To Account 130115324670 | | 250,000.00 |
| Apr  9 | Electronic Funds Transfer | To Account 130115324670 | | 5,000.00 |
| Apr 10 | Electronic Funds Transfer | To Account 130115324670 | | 5,000.00 |
| Apr 13 | Analysis Service Charge |  | 1300000000 | 85.45- |
|      |                            |  | Total Other Withdrawals | $ 510,085.45- |

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|------|---------------|------|---------------|------|---------------|
| Apr  5 | 29,995.85 | Apr 10 | 19,995.85 | Apr 20 | 30,273.40 |
| Apr  9 | 24,995.85 | Apr 13 | 19,910.40 |  | |

Balances only appear for days reflecting change.

## ANALYSIS SERVICE CHARGE DETAIL
Account Analysis Activity for: March 2012

| | | | |
|---|---|---|---|
| Account Number: | 0-002-4508-5618 | $ | 85.45 |
| Analysis Service Charge assessed to | 0-002-4508-5618 | $ | 85.45 |

### Service Activity Detail for Account Number 0-002-4508-5618

| Service | Volume | Avg Unit Price | Total Charge |
|---------|--------|----------------|--------------|
| **Depository Services** | | | |
| Combined Transactions/Items | 3 | | No Charge |



QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**
Account Number:
1 301 1532 4670

Statement Period:
May 1, 2012
through
May 31, 2012

Page 2 of 11



## SMALL BUSINESS CHECKING (CONTINUED)

k National Association                                             Account Number 1-301-1532-4670

### Deposits (continued)

| Description of Transaction | | Ref Number | Amount |
|---|---|---|---|
| Internet Banking Transfer | From Account 130111901927 | | 1,500.00 |
| Internet Banking Transfer | From Account 130112948448 | | 3,000.00 |
| Electronic Funds Transfer | From Account 00245085618 | | 8,000.00 |
| Internet Banking Transfer | From Account 130112948448 | | 150,000.00 |
| Internet Banking Transfer | From Account 130112948448 | | 50,000.00 |
| Electronic Funds Transfer | From Account 00245085618 | | 179,000.00 |
| Electronic Deposit | From ZACHARY WILLNER | | 30,000.00 |
| HRTG 121380010047951 N | 0341667665BENDEN | | |
| Internet Banking Transfer | From Account 130112948448 | | 50,000.00 |
| Internet Banking Transfer | From Account 130112948448 | | 30,000.00 |
| Electronic Funds Transfer | From Account 00245085618 | | 215,000.00 |
| Wire Credit REF001690 | USAA FED SAN ANTON 120525034018 | | 50,000.00 |
| ORG=WILLIAM Q CLODFELTER | 7070 HOWARD ST | | |
| Wire Credit REF001699 | PNC BANK NA OF CLE 120525034248 | | 200,000.00 |
| ORG=IAN J GUTTMAN 8480 | FOX CUB LN | | |
| Electronic Funds Transfer | From Account 00245085618 | | 20,000.00 |
| Internet Banking Transfer | From Account 145806766542 | | 1,000.00 |
| Internet Banking Transfer | From Account 130111901927 | | 1,500.00 |
| Internet Banking Transfer | From Account 145806766542 | | 3,000.00 |
| Internet Banking Transfer | From Account 130112948448 | | 3,000.00 |
| | | **Total Other Deposits** $ | **1,717,003.00** |

### Withdrawals

| Description of Transaction | | Ref Number | Amount |
|---|---|---|---|
| Internet Banking Transfer | To Account 230105849106 | $ | 900.00- |
| Wire Debit REF002290 | BK AMER SF 120601020856 | | 40,000.00- |
| BNF=MIKE WILLNER | | | |
| Wire Debit REF004328 | BANKERS FRANKFORT 120501035386 | | 1,300,000.00- |
| BNF=HERITAGE BANK 1818 | FLORENCE PIKE | | |
| Wire Debit REF002266 | BANKERS FRANKFORT 120502020140 | | 200,000.00- |
| BNF=HERITAGE BANK 1818 | FLORENCE PIKE | | |
| Wire Debit REF001958 | BK AMER SF 120603018955 | | 30,000.00- |
| BNF=MIKE WILLNER | | | |
| Wire Debit REF000924 | SARATOGA BK SARATO 120604010774 | | 5,000.00- |
| BNF=IRWIN COHEN | | | |
| Wire Debit REF000954 | FIFTH CINCINNATI 120504010835 | | 20,000.00- |
| BNF=FADIA DAVID | | | |
| Wire Debit REF001804 | E TRADE ARLINGTON 120504018760 | | 150,000.00- |
| BNF=ROD MORRIS | | | |
| Wire Debit REF002463 | BK AMER NYC 120507024837 | | 8,000.00- |
| BNF=OCEAN ADVENTURE | PROGRAMS INC | | |
| Wire Debit REF000696 | WFBTSF ████████████ | | 40,000.00- |
| BNF=LW CAPITAL CORP | | | |
| Internet Banking Payment | To Reserve Line | | 1,501.79- |
| Internet Banking Payment | To Reserve Line | | 3,003.59- |
| Wire Debit REF001760 | BK AMER NYC 120510018266 | | 3,500.00- |
| BNF=LYNN NELSEN | | | |
| Wire Debit REF001759 | EVERBANK JACKSONVI 120510018064 | | 6,000.00- |
| BNF=YUKI FUKUYAMA | | | |
| Wire Debit REF001805 | BK AMER SF 120510018632 | | 8,000.00- |
| BNF=LARRY HENSLEY | | | |
| Internet Banking Transfer | To Account 145806766542 | | 1,000.00- |
| Internet Banking Transfer | To Account 145806766542 | | 6,000.00- |
| Wire Debit REF001491 | FIFTH CINCINNATI 120511015106 | | 20,000.00- |
| BNF=ELIZABETH MURRAY | | | |

 QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
1 301 1532 4670

Statement Period:
Aug 1, 2012
through
Aug 31, 2012

Page 2 of 11



## REE SMALL BUSINESS CHECKING (CONTINUED)

Bank National Association
Account Number 1-301-1532-4670

### her Deposits (continued)

| te | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| g 30 | Wire Credit REF002075 | BANKERS FRANKFORT 120830027531 | | 200,000.00 |
| | ORG=KEVIN HICKMANN 8000 | KROGER FARM ROAD | | |
| g 31 | Wire Credit REF001612 | KEYBANK CLEVELAND 120831045572 | | 65,000.00 |
| | ORG=PENSCOS TRUST 1849 | MADISON RD | | |
| | | Total Other Deposits | $ | 1,331,776.50 |

### her Withdrawals

| te | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| g 1 | Electronic Withdrawal | From CINTI BELL TELE | $ | 345.60- |
| | REF=12213012478896 N | 1310241390INTBILLPMT5139240990956 | | |
| g 1 | Electronic Withdrawal | TO TIME WARNER KETTER | | 636.92- |
| | REF=12214006495581 N | 1113066092BANK DRAFT0934 17058201991 | | |
| g 1 | Wire Debit REF003746 | BK AMER SF 120801032374 | | 125,000.00- |
| | BNF=MICHAEL WILLNER | | | |
| g 3 | Wire Debit REF002233 | GLENS FALLS NATL 120803025851 | | 7,500.00- |
| | BNF=IRWIN COHEN | | | |
| g 3 | Wire Debit REF000553 | GOLDEN ONE CU SACR 120803006654 | | 9,000.00- |
| | BNF=RICHARD PURVIS | | | |
| g 3 | Wire Debit REF000525 | CITIBANK OAKLAND 120803006877 | | 14,240.00- |
| | BNF=RICHARD LOW | | | |
| g 3 | Wire Debit REF000542 | SUNTRUST ATL 120803006522 | | 150,000.00- |
| | BNF=IRA STEIN | | | |
| g 3 | Wire Debit REF000532 | WELLS S SF ████████ | | 250,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| g 6 | Internet Banking Transfer | To Account 130111901927 | | 2,000.00- |
| g 7 | Wire Debit REF003595 | GLENS FALLS NATL 120807014768 | | 5,000.00- |
| | BNF=IRWIN COHEN | | | |
| g 7 | Wire Debit REF001410 | GOLDEN ONE CU SACR 120807014911 | | 8,500.00- |
| | BNF=RICHARD PURVIS | | | |
| g 7 | Internet Banking Transfer | To Account 145806766542 | | 40,000.00- |
| g 7 | Wire Debit REF001427 | WELLS SF ████████ | | 250,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| g 9 | Wire Debit REF000708 | CITIBANK OAKLAND 120809005951 | | 20,000.00- |
| | BNF=RICHARD LOW | | | |
| g 9 | Electronic Withdrawal | From FEDERAL EXPRESS | | 289.61- |
| | REF=12221006618168 N | 1710427007DEBIT MMA09212435 | | |
| g 9 | Wire Debit REF002303 | BK AMER NYC 120809024305 | | 3,500.00- |
| | BNF=LYNN NELSEN | | | |
| g 9 | Wire Debit REF002287 | EVERBANK JACKSONVI 120809024228 | | 9,000.00- |
| | BNF=YUKI FUKUYAMA | | | |
| g 9 | Wire Debit REF002473 | FIFTH CINCINNATI 120809025150 | | 100,000.00- |
| | BNF=RAYMOND M STACY | | | |
| g 9 | Wire Debit REF000602 | WELLS SF 120809007184 | | 225,000.00- |
| | BNF=MW PARTNERS | | | |
| g 10 | Customer Withdrawal | 9790982068 | | 500.00- |
| g 10 | Wire Debit REF002798 | WELLS SF ████████ | | 100,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| g 14 | Analysis Service Charge | 400000000 | | 624.16- |
| g 14 | Internet Banking Transfer | To Account 145806766542 | | 4,000.00- |
| g 14 | Internet Banking Transfer | To Account 145806766542 | | 5,000.00- |
| g 14 | Internet Banking Transfer | To Account 145806766542 | | 21,000.00- |
| g 15 | Electronic Withdrawal | From Ocwen Loan Servi | | 1.00- |
| | REF=12228002256523 N | 2510035452MTG PMT 34359570 | | |
| g 15 | Electronic Withdrawal | From Ocwen Loan Servi | | 1,270.28- |
| | REF=12228002256515 N | 2510035452MTG PMT 34359570 | | |

 **US bank.**

QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
1 301 1532 4670

Statement Period:
Sep 4, 2012
through
Sep 30, 2012

Page 2 of 13





## FREE SMALL BUSINESS CHECKING (CONTINUED)

.S. Bank National Association                               Account Number 1-301-1532-4670

### Other Deposits (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|------|----------------------------|---|-----------|--------|
| Sep 14 | Wire Credit REF050250 | WELLS SF     120914037507 | | 30,000.00 |
| | ORG=WF WIRES | PTLD-REJECTED WIRE IN PROC MAC P61 | | |
| Sep 14 | Wire Credit REF045717 | WELLS SF | | 500,000.00 |
| | ORG=LAWRENCE H WEIN 7 | SAWGRASS DR | | |
| Sep 17 | Wire Credit REF034948 | WELLS SF     120917031105 | | 30,000.00 |
| | ORG=WF WIRES | PTLD-REJECTED WIRE IN PROC MAC P61 | | |
| Sep 17 | Wire Credit REF002121 | BANKING FRANKFORT   120913025606 | | 250,000.00 |
| | ORG=WILLIAM L WARREN 20 | GARDEN PLACE | | |
| Sep 25 | Internet Banking Transfer | From Account 130112948448 | | 50,000.00 |
| Sep 26 | Electronic Funds Transfer | From Account 00245065618 | | 20,686.64 |
| | Rick Morris IRA | | | |
| Sep 28 | Electronic Funds Transfer | From Account 00245085618 | | 422,234.57 |
| | | **Total Other Deposits** | **$** | **1,692,504.21** |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|------|----------------------------|---|-----------|--------|
| Sep 4 | Electronic Withdrawal | To AMEX EPayment | $ | 36,024.68- |
| | REF=12248002259444 N | 0005000008ACH PMT  W7790 | | |
| Sep 4 | Wire Debit REF001782 | BK AMER SF     120904018366 | | 55,000.00- |
| | BNF=MICHAEL WILLNER | | | |
| Sep 6 | Internet Banking Transfer | To Account 145806766542 | | 15,000.00- |
| Sep 6 | Wire Debit REF002383 | BK AMER NYC    120906024715 | | 100,000.00- |
| | BNF=LUTHER SHELBY | | | |
| Sep 7 | Wire Debit REF002554 | BK AMER NYC    120907023884 | | 100,000.00- |
| | BNF=LUTHER SHELBY | | | |
| Sep 10 | Returned Check(s) Charge | | 8990306802 | 35.00- |
| Sep 10 | Internet Banking Transfer | To Account 145806766542 | | 4,000.00- |
| Sep 11 | Internet Banking Transfer | To Account 130113729250 | | 400.00- |
| Sep 11 | Internet Banking Transfer | To Account 145806766542 | | 1,000.00- |
| Sep 11 | Internet Banking Transfer | To Account 145806766542 | | 5,000.00- |
| Sep 11 | Wire Debit REF000684 | BK AMER SF     120911008852 | | 18,560.00- |
| | BNF=MICHAEL WILLNER | | | |
| Sep 11 | Wire Debit REF000421 | FIFTH CINCINNATI  120911005941 | | 40,000.00- |
| | BNF=ALISON BRISTOL | | | |
| Sep 11 | Wire Debit REF000755 | HARRIS CHICAGO   120911008747 | | 225,000.00- |
| | BNF=DORMAN TRADING, LLC | | | |
| Sep 12 | Wire Debit REF002463 | SCHOOLS FIRST FCU 0 120912025069 | | 3,500.00- |
| | BNF=LYNN NELSEN | | | |
| Sep 12 | Wire Debit REF002368 | EVERBANK JACKSONVI 120912025783 | | 8,000.00- |
| | BNF=YUKI FUKUYAMA | | | |
| Sep 13 | Wire Debit REF002313 | JPMORGAN CHASE BAN 120913025576 | | 1,500.00- |
| | BNF=THOMAS HENSLEY | | | |
| Sep 13 | Customer Withdrawal | | 9795917592 | 7,130.00- |
| Sep 13 | Wire Debit REF002504 | JPMORGAN CHASE BAN 120913025509 | | 15,000.00- |
| | BNF=EARL SHIMAOKA | | | |
| Sep 13 | Wire Debit REF002505 | BK AMER NYC    120913025948 | | 200,000.00- |
| | BNF=LUTHER SHELBY | | | |
| Sep 13 | Wire Debit REF000832 | BK AMER SF     120913009105 | | 300,000.00- |
| | BNF=MICHAEL WILLNER | | | |
| Sep 14 | Electronic Withdrawal | From Ocwen Loan Servi | | 10.00- |
| | REF=12258001249969 N | 3510035452MTG PMT  34359570 | | |
| Sep 14 | Electronic Withdrawal | From Ocwen Loan Servi | | 1,270.26- |
| | REF=12258001249960 N | 2510035452MTG PMT  34359570 | | |
| Sep 14 | Wire Debit REF002636 | GLENS FALLS NATL   120914028236 | | 5,000.00- |
| | BNF=IRWIN COHEN | | | |

 **bank.**

QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**
Account Number:
1 301 1532 4670

Statement Period:
Oct 1, 2012
through
Oct 31, 2012

Page 4 of 12



**FREE SMALL BUSINESS CHECKING** **(CONTINUED)**

U.S. Bank National Association                                    Account Number 1-301-1532-4670

**Other Withdrawals (continued)**

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Oct 31 | Wire Debit REF003015 | BK AMER NYC    121031039414 | | 1,539.00- |
| | BNF=CHARLENE L SMITH | | | |
| Oct 31 | Internet Banking Transfer | To Account 145806746542 | | 15,000.00- |
| Oct 31 | Wire Debit REF001635 | BBT BK HOPKINSVILL 121031024092 | | 17,495.15- |
| | BNF=MICHAEL WOEHLER | | | |
| Oct 31 | Electronic Withdrawal | TR AMEX EPayment | | 31,610.44- |
| | REF=12304006396436 N | 0005000006ACH PMT  W0206 | | |
| Oct 31 | Wire Debit REF001699 | SUNTRUST ATL    121031022896 | | 100,000.00- |
| | BNF=IRA STEIN | | | |
| Oct 31 | Wire Debit REF001740 | WELLS SF | | 250,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| Oct 31 | Wire Debit REF001714 | WELLS SF | | 250,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| Oct 31 | Wire Debit REF001680 | HARRIS CHICAGO  121031023162 | | 275,000.00- |
| | BNF=DORMAN TRADING, LLC | | | |

Total Other Withdrawals  $  **3,784,264.38-**

**Checks Presented Conventionally**

| Check | Date | Ref Number | Amount | Check | Date | Ref Number | Amount |
|---|---|---|---|---|---|---|---|
| 2262 | Oct  2 | 8995776946 | 500,000.00 | 2318* | Oct 29 | 9192484979 | 75.00 |
| 2263 | Oct  3 | 9197904331 | 300,000.00 | 2382* | Oct 16 | 9190844407 | 107,000.00 |
| 2264 | Oct  4 | 8950192193 | 10,000.00 | 2383 | Oct 23 | 8991732842 | 1,000.00 |
| 2265 | Oct  4 | 8950192192 | 800.00 | 2384 | Oct 16 | 9792838480 | 18,500.00 |
| 2266 | Oct  4 | 8950192191 | 1,000.00 | 2385 | Oct 18 | 8897720486 | 774.61 |
| 2268* | Oct  4 | 8950192190 | 1,298.00 | 2386 | Oct 22 | 9191726950 | 519.00 |
| 2269 | Oct  4 | 8997524250 | 18,800.00 | 2387 | Oct 19 | 8898552936 | 40,000.00 |
| 2270 | Oct  4 | 9792675409 | 18,800.00 | 2388 | Oct 23 | 9191853970 | 220.00 |
| 2271 | Oct  5 | 8998304897 | 18,800.00 | 2389 | Oct 25 | 9192238057 | 10,000.00 |
| 2272 | Oct  9 | 9198647643 | 600,000.00 | 2391* | Oct 30 | 8350055838 | 971.19 |
| 2273 | Oct  4 | 8997530138 | 12,000.00 | 2392 | Oct 29 | 9192653988 | 65.00 |
| 2274 | Oct 15 | 8894788613 | 872.90 | 2394* | Oct 26 | 8993650029 | 836.95 |
| 2275 | Oct 12 | 8893768225 | 113,000.00 | 2395 | Oct 29 | 8993949711 | 23,000.00 |
| 2276 | Oct 10 | 8892414703 | 4,000.00 | 2396 | Oct 26 | 9798188111 | 7,000.00 |
| 2277 | Oct 11 | 9096731083 | 1,000.00 | 2397 | Oct 29 | 9091718239 | 7,000.00 |
| 2278 | Oct  5 | 9198419776 | 7,500.00 | 2401* | Oct 29 | 9192700444 | 2,000.00 |
| 2279 | Oct 12 | 8893758194 | 40,000.00 | 2407* | Oct 31 | 8996370297 | 204,250.00 |
| 2280 | Oct 10 | 8892423670 | 5,000.00 | 2411* | Oct 10 | 8892663878 | 24,000.00 |
| 2281 | Oct 10 | 8892423669 | 15,000.00 | 2412 | Oct 12 | 8893758190 | 200,000.00 |
| 2282 | Oct 10 | 9093971903 | 10,000.00 | 2413 | Oct 11 | 9190240352 | 5,000.00 |
| 2283 | Oct 10 | 8892664330 | 1,200.00 | 2414 | Oct 11 | 9190240353 | 3,000.00 |
| 2284 | Oct 10 | 8892423668 | 6,000.00 | 2415 | Oct 12 | 8894071062 | 2,452.20 |
| 2285 | Oct  5 | 8998308407 | 20,000.00 | 2416 | Oct 11 | 9190308449 | 15,000.00 |
| 2286 | Oct 12 | 9190468973 | 412.50 | 2417 | Oct 16 | 8895966830 | 20,000.00 |
| 2289* | Oct 10 | 9190094629 | 10,000.00 | 2418 | Oct 17 | 9096201319 | 500.00 |
| 2290 | Oct 11 | 8893420406 | 3,135.02 | | | | |

* Gap in check sequence         Conventional Checks Paid (51)  $  **2,411,781.37-**

**Balance Summary**

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| Oct  1 | 567,677.92 | Oct 10 | 18,326.14 | Oct 18 | 6,996.46 |
| Oct  2 | 355,890.50 | Oct 11 | 701,628.62 | Oct 19 | 161,070.47 |
| Oct  3 | 522,836.85 | Oct 12 | 367,037.30 | Oct 22 | 15,551.47 |
| Oct  4 | 436,138.85 | Oct 16 | 149,042.04 | Oct 23 | 15,906.38 |
| Oct  5 | 638,540.43 | Oct 16 | 73,542.04 | Oct 24 | 69,906.38 |
| Oct  9 | 33,526.14 | Oct 17 | 65,771.07 | Oct 25 | 53,512.39 |

 **bank.**

QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
1 301 1532 4670

Statement Period:
Nov 1, 2012
through
Nov 30, 2012

Page 2 of 12



## FREE SMALL BUSINESS CHECKING (CONTINUED)

U.S. Bank National Association

Account Number 1-301-1532-4670

### Other Deposits (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|---|-----------|--------|
| Nov 29 | Electronic Funds Transfer | From Account 0024508561B | | 74,000.00 |
| | | **Total Other Deposits** | **$** | **1,969,000.00** |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|---|-----------|--------|
| Nov 1 | Wire Debit REF002143 | SCHOOLSFIRST FCU O 121101023577 | | $ 3,500.00- |
| | BNF=LYNN NELSEN | | | |
| Nov 1 | Wire Debit REF002078 | BK AMER SF 121101028245 | | 50,000.00- |
| | BNF=MICHAEL WILLNER | | | |
| Nov 1 | Wire Debit REF002837 | WELLS SF 121101029355 | | 250,000.00- |
| | BNF=SABIA ENTERPRISES LLC | | | |
| Nov 1 | Wire Debit REF002187 | WELLS SF 121101023141 | | 250,000.00- |
| | BNF=SABIA ENTERPRISES LLC | | | |
| Nov 2 | Wire Debit REF001185 | WELLS SF | | 50,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| Nov 5 | Wire Debit REF000479 | WELLS SF | | 50,000.00- |
| | BNF=LW CAPITAL CORP | | | |
| Nov 6 | Internet Banking Transfer | To Account 130116278297 | | 100.00- |
| Nov 6 | Internet Banking Transfer | To Account 1458067365542 | | 5,000.00- |
| Nov 6 | Wire Debit REF002021 | GLENS FALLS NATL 121106020952 | | 10,000.00- |
| | BNF=IRWIN COHEN | | | |
| Nov 7 | Wire Debit REF002220 | JPMCHASE DALLAS 121107022860 | | 475,000.00- |
| | BNF=ATLAS COMMODITIES LLC | | | |
| Nov 8 | Internet Banking Transfer | To Account 146806766542 | | 2,000.00- |
| Nov 8 | Internet Banking Transfer | To Account 1458067365542 | | 5,000.00- |
| Nov 9 | Wire Debit REF002945 | E TRADE ARLINGTON 121109029457 | | 3,500.00- |
| | BNF=ROB MORRIS | | | |
| Nov 9 | Wire Debit REF002906 | EVERBANK JACKSONVI 121109028630 | | 5,000.00- |
| | BNF=YUKI FUKUYAMA | | | |
| Nov 9 | Wire Debit REF002952 | CITIBANK OAKLAND 121109029499 | | 10,500.00- |
| | BNF=RICHARD LOW | | | |
| Nov 9 | Wire Debit INTERNAL | US BANK 121109029170 | | 15,000.00- |
| | BNF=MARY A GALEMMO 301 | TRILLIUM LN | | |
| Nov 13 | Electronic Withdrawal | From CINTI BELL TELE | | 243.36- |
| | REF=12314007900310 N | 1310241390INTBILLPMT5132212861159 | | |
| Nov 13 | Electronic Withdrawal | From CINTI BELL TELE | | 560.31- |
| | REF=12314007900090 N | 1310241390INTBILLPMT5132240090956 | | |
| Nov 13 | Electronic Withdrawal | To TIMEWARNERKETTER | | 621.45- |
| | REF=12318010252521 N | 1133666692BANK DRAFT003417056201001 | | |
| Nov 13 | Internet Banking Transfer | To Account 1458067365542 | | 3,000.00- |
| Nov 14 | Wire Debit REF001221 | WESBANCO WHEELING 121114011852 | | 100,000.00- |
| | BNF=DENNIS GABRIEL | | | |
| Nov 14 | Wire Debit REF000963 | JPMCHASE DALLAS 121114006785 | | 265,000.00- |
| | BNF=ATLAS COMMODITIES LLC | | | |
| Nov 15 | Analysis Service Charge | | 1500000000 | 1,227.90- |
| Nov 15 | Internet Banking Payment | To Reserve Line | | 14,730.00- |
| Nov 15 | Wire Debit REF002436 | FIFTH CINCINNATI 121115025376 | | 20,000.00- |
| | BNF=ELIZABETH MURRAY | | | |
| Nov 15 | Wire Debit REF002781 | PNC BANK NA OF CLE 121115009162 | | 55,000.00- |
| | BNF=SILVER BULLET | | | |
| Nov 15 | Wire Debit REF002516 | BK AMER NYC 121115025103 | | 100,000.00- |
| | BNF=LUTHER L. SHELBY | | | |
| Nov 15 | Wire Debit REF000922 | CITIBANK OF NEW YO 121115010126 | | 100,000.00- |
| | BNF=INTERACTIVE BROKERS LLC | | | |



**U.S. bank**

QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**
Account Number:
1 301 1532 4670

Statement Period:
Dec 3, 2012
through
Dec 31, 2012

Page 2 of 13



## FREE SMALL BUSINESS CHECKING (CONTINUED)

U.S. Bank National Association      Account Number 1-301-1532-4670

### Other Deposits (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Dec 7 | Wire Credit REF041676 | WELLS SF ▓▓▓▓▓ | | 600,000.00 |
| | ORG=LAWRENCE P WEIN 7 | SAWGRASS DR | | |
| Dec 11 | Electronic Funds Transfer | From Account 00245085618 | | 180,000.00 |
| Dec 12 | Internet Banking Transfer | From Account 130111901927 | | 1,500.00 |
| Dec 12 | Electronic Funds Transfer | From Account 145806766542 | | 3,000.00 |
| Dec 12 | Internet Banking Transfer | From Account 130112946448 | | 3,000.00 |
| Dec 12 | Internet Banking Transfer | From Account 130112948448 | | 100,000.00 |
| Dec 17 | Wire Credit REF002927 | BANKERS FRANKFORT 121217039302 | | 250,000.00 |
| | ORG=KEVIN EICKMANN 8000 | KROGER FARM ROAD | | |
| Dec 17 | Electronic Funds Transfer | From Account 00245085618 | | 854,000.00 |
| Dec 19 | Electronic Funds Transfer | From Account 00245085618 | | 70,000.00 |
| Dec 26 | Internet Banking Transfer | From Account 130112948448 | | 225,000.00 |
| Dec 26 | Internet Banking Transfer | From Account 130112948448 | | 375,000.00 |
| Dec 26 | Electronic Funds Transfer | From Account 00245085618 | | 45,000.00 |
| Dec 28 | Electronic Funds Transfer | From Account 00245085618 | | 100,000.00 |
| Dec 28 | Electronic Funds Transfer | From Account 00245085618 | | 149,900.00 |
| Dec 31 | Electronic Funds Transfer | From Account 00245085618 | | 482,932.00 |
| Dec 31 | Electronic Funds Transfer | From Account 00245085618 | | 192,923.05 |
| | | **Total Other Deposits** | **$** | **4,171,255.05** |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Dec 3 | Electronic Withdrawal | From CINTI BELL TELE | $ | 134.32- |
| | REF=1233501217463 0 N | 1310241390INTBILLPMT5132212861159 | | |
| Dec 3 | Electronic Withdrawal | From FEDERAL EXPRESS | | 191.97- |
| | REF=1233800455575 7 N | 171042700PDEB1 MMA05946631 | | |
| Dec 3 | Electronic Withdrawal | From DUKE ENERGY OH | | 501.02- |
| | REF=1233800516706 0 N | 534690001 WEB_PAY 03883082112712 | | |
| Dec 3 | Electronic Withdrawal | From MEWARNERKETTER | | 679.43- |
| | REF=1233800598080 0 N | 1433668692BANK DRAFT0044706820100H | | |
| Dec 3 | Wire Debit REF004300 | SCHOOLSFIRST FCU O 121203040871 | | 3,500.00- |
| | BNF=LYNN NELSEN | | | |
| Dec 3 | Wire Debit REF004245 | BK AMER SF 121203041600 | | 50,000.00- |
| | BNF=MICHAEL WILLNER | | | |
| Dec 4 | Internet Banking Transfer | To Account 145806766542 | | 5,000.00- |
| Dec 4 | Wire Debit REF002446 | GLENS FALLS NATL 121204025324 | | 16,000.00- |
| | BNF=IRWIN COHEN | | | |
| Dec 6 | Returned Check(s) Charge | 9198317397 | | 35.00- |
| Dec 6 | Internet Banking Transfer | To Account 145806766542 | | 5,000.00- |
| Dec 7 | Wire Debit REF001169 | BK AMER NYC 121207012470 | | 100,000.00- |
| | BNF=LUTHER SHELBY | | | |
| Dec 11 | Returned Check(s) Charge | 8894878432 | | 35.00- |
| Dec 11 | Returned Check(s) Charge | 8894871790 | | 35.00- |
| Dec 11 | Returned Check(s) Charge | 8894879024 | | 35.00- |
| Dec 11 | Returned Check(s) Charge | 8894879025 | | 35.00- |
| Dec 11 | Overdraft Charge | 8894879023 | | 35.00- |
| Dec 11 | Wire Debit REF002472 | FIFTH CINCINNATI 121211023021 | | 132,500.00- |
| | BNF=JROUH AL AKKAWI | | | |
| Dec 12 | Wire Debit REF002629 | BK AMER SF 121212027175 | | 25,000.00- |
| | BNF=MICHAEL WILLNER | | | |
| Dec 13 | Wire Debit REF001716 | FIFTH CINCINNATI 121213018366 | | 65,030.00- |
| | BNF=TEDD BYER | | | |
| Dec 14 | Analysis Service Charge | 1400000000 | | 778.85- |
| Dec 14 | Internet Banking Payment | To Reserve Line | | 1,501.78- |



QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
1 301 1532 4670

Statement Period:
Jan 2, 2013
through
Jan 31, 2013

Page 2 of 15



## FREE SMALL BUSINESS CHECKING (CONTINUED)

U.S. Bank National Association

Account Number 1-301-1532-4670

### Other Deposits (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|---|-----------|--------|
| Jan 30 | Electronic Funds Transfer | From Account 00245085618 | | 40,000.00 |
| Jan 30 | Electronic Funds Transfer | From Account 00245085618 | | 173,420.00 |
| Jan 30 | Wire Credit REF004241 | HARRIS CHICAGO 130130028351 | | 400,000.00 |
| | ORG=DORMAN TRADING CUST SEG FUNDS ACCT 141 WJA | | | |
| Jan 30 | Electronic Funds Transfer | From Account 00245085618 | | 499,900.00 |

| | | Total Other Deposits | $ | 3,692,142.44 |
|--|--|--|--|--|

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|---|-----------|--------|
| Jan 2 | Wire Debit REF001802 | SCHOOLSFIRST FCU O. 130102019268 | $ | 3,500.00- |
| | BNF=LYNN NELSEN | | | |
| Jan 2 | Wire Debit INTERNAL | US BANK 130102018297 | | 7,500.00- |
| | BNF=RICHARD D MORRIS | 1716 MADISON RD | | |
| Jan 2 | Internet Banking Transfer | To Account 145806766542 | | 9,000.00- |
| Jan 2 | Internet Banking Transfer | To Account 145806766542 | | 15,000.00- |
| Jan 2 | Electronic Withdrawal | To AMEX EPayment | | 35,509.15- |
| | REF=1300200809705A N | 0005000008ACH PMT W2404 | | |
| Jan 2 | Wire Debit REF001705 | BK AMER SF 130102018585 | | 50,000.00- |
| | BNF=MICHAEL WILLNER | | | |
| Jan 2 | Wire Debit REF003085 | CITIBANK OF NEW YO 130102030920 | | 100,000.00- |
| | BNF=INTERACTIVE BROKERS | LLC | | |
| Jan 2 | Electronic Funds Transfer | To Account 00245085618 | | 257,689.02- |
| Jan 2 | Wire Debit REF002939 | WELLS SF | | 300,000.00- |
| | BNF=LW CAPITAL | | | |
| Jan 4 | Electronic Withdrawal | From FEDERAL EXPRESS | | 221.74- |
| | REF=13003014097171 N | 1710427007DEBIT MMA10104743 | | |
| Jan 4 | Wire Debit REF002484 | TOWNEBANK PORTSMOU 130104025309 | | 3,000.00- |
| | BNF=THE GARTMAN LETTER | | | |
| Jan 4 | Wire Debit REF002878 | GLENS FALLS NATL 130104031210 | | 10,000.00- |
| | BNF=IRWIN COHEN | | | |
| Jan 7 | Electronic Withdrawal | From CINTI BELL TELE | | 154.19- |
| | REF=13007005745658 N | 1310241390INTBILLPMT5132122861159 | | |
| Jan 7 | Wire Debit REF002478 | GOLDEN ONE CU SACR 130107025914 | | 12,000.00- |
| | BNF=SHARON SAMPSON | | | |
| Jan 9 | Electronic Withdrawal | From FEDERAL EXPRESS | | 302.21- |
| | REF=13008007131052 N | 1710427007DEBIT MMA10190468 | | |
| Jan 9 | Internet Banking Transfer | To Account 130109276297 | | 500.00- |
| Jan 9 | Electronic Withdrawal | From CINTI BELL TELE | | 1,184.06- |
| | REF=13008005057435 N | 1310241390INTBILLPMT5139240990956 | | |
| Jan 9 | Wire Debit REF001991 | GOLDEN ONE CU SACR 130109020610 | | 2,000.00- |
| | BNF=RENE COLLUM | | | |
| Jan 9 | Wire Debit REF002068 | EVERBANK JACKSONVI 130109022196 | | 5,000.00- |
| | BNF=YUKI FUKUYAMA | | | |
| Jan 9 | Internet Banking Transfer | To Account 145806766542 | | 6,000.00- |
| Jan 9 | Wire Debit REF000509 | FIFTH CINCINNATI 130109006921 | | 10,025.00- |
| | BNF=STEVEN WOLFSON | | | |
| Jan 9 | Wire Debit REF002807 | WELLS SF | | 42,000.00- |
| | BNF=LW CAPITAL | | | |
| Jan 9 | Wire Debit REF001991 | WELLS SF 130109020383 | | 150,000.00- |
| | BNF=SABIA ENTERPRISES, | LLC | | |
| Jan 10 | Wire Debit REF001744 | JPMCHASE NYC 130110018192 | | 5,866.97- |
| | BNF=PENSCO TRUST | | | |
| | COMPANY | | | |
| Jan 10 | Wire Debit REF001821 | BK AMER NYC 130110018526 | | 100,000.00- |
| | BNF=LUTHER SHELBY | | | |



QFC, LLC
1716 MADISON RD
CINCINNATI OH 45206-1817

**Business Statement**

Account Number:
1 301 1632 4670

Statement Period:
Jan 2, 2013
through
Jan 31, 2013

## FREE SMALL BUSINESS CHECKING (CONTINUED)

.S. Bank National Association

Account Number 1-301-1632-4670

### Other Withdrawals (continued)

| Date | Description of Transaction | | | Ref Number | Amount |
|------|---------------------------|---|---|-----------|--------|
| an 11 | Electronic Withdrawal | To TIME WARNER KETTER | | | 627.03- |
| | REF=13011009234185 N | 11396665092BANK DRA T0034170562010001 | | | |
| an 11 | Wire Debit REF001988 | JPMORGAN CHASE BAN | 130111020871 | | 8,000.00- |
| | BNF=TOM HENSLEY | | | | |
| an 11 | Wire Debit REF001985 | BK AMER SF | 130111020823 | | 10,000.00- |
| | BNF=LARRY HENSLEY | | | | |
| an 11 | Wire Debit REF002650 | E TRADE ARLINGTON | 130111021176 | | 100,000.00- |
| | BNF=ROB MORRIS | | | | |
| an 11 | Wire Debit REF001990 | HARRIS CHICAGO | 130111020630 | | 100,000.00- |
| | BNF=DORMAN TRADING, LLC | | | | |
| an 14 | Check Printing Charge | | | | 130.38- |
| an 15 | Analysis Service Charge | | | 1500000000 | 685.10- |
| an 15 | Customer Withdrawal | | | 9794024128 | 1,750.00- |
| an 15 | Wire Debit REF002274 | FIFTH CINCINNATI | 130115023343 | | 20,000.00- |
| | BNF=MIKE MURRAY | | | | |
| an 15 | Wire Debit REF003159 | HARRIS CHICAGO | 130115031334 | | 100,000.00- |
| | BNF=DORMAN TRADING, LLC | | | | |
| an 16 | Wire Debit REF002297 | CITIB CATTXXXX | 130116020063 | | 2,600.00- |
| | BNF=ADEBAMOLA AKINBENSON | | | | |
| an 16 | Wire Debit REF001870 | KEYBANK CLEVELAND | 130116019201 | | 100,000.00- |
| | BNF=SENTINEL PROPERTY | HOLDINGS | | | |
| an 17 | Wire Debit REF002508 | KEY BK CLEVELAND | 130117024619 | | 2,000.00- |
| | BNF=SENTINEL STRATEGY | FUND | | | |
| an 17 | Wire Debit REF002522 | HARRIS CHICAGO | 130117025328 | | 125,000.00- |
| | BNF=DORMAN TRADING, LLC | | | | |
| an 18 | Wire Debit REF000940 | KEYBANK CLEVELAND | 130118012507 | | 2,000.00- |
| | BNF=SENTINEL BLACKBOX | LLC | | | |
| an 18 | Wire Debit REF001159 | FIFTH CINCINNATI | 130118014584 | | 50,000.00- |
| | BNF=MARK WOEHLER | | | | |
| an 22 | Wire Debit REF001260 | BK AMER SF | 130122017547 | | 5,000.00- |
| | BNF=MICHAEL WILLNER | | | | |
| an 23 | Wire Debit REF000556 | FIFTH CINCINNATI | 130123007820 | | 50,000.00- |
| | BNF=MARK WOEHLER | | | | |
| an 23 | Wire Debit REF000605 | WELLS SF | 130123007764 | | 100,000.00- |
| | BNF=ELEVATED RESOURCES | | | | |
| an 23 | Wire Debit REF000614 | HARRIS CHICAGO | 130123008140 | | 300,000.00- |
| | BNF=DORMAN TRADING, LLC | | | | |
| an 23 | Wire Debit REF000643 | HARRIS CHICAGO | 130123008079 | | 300,000.00- |
| | BNF=DORMAN TRADING, LLC | | | | |
| an 23 | Wire Debit REF000665 | WELLS SF | | | 300,000.00- |
| | BNF=LW CAPITAL | | | | |
| an 24 | Wire Debit REF003690 | CITIBANK OF NEW YO | 130124008474 | | 75,000.00- |
| | BNF=INTERACTIVE BROKERS | LLC | | | |
| an 25 | Internet Banking Transfer | To Account 145806766542 | | | 5,000.00- |
| an 25 | Wire Debit REF002020 | WELLS SF | 130125019418 | | 50,000.00- |
| | BNF=ELEVATED RESOURCES | | | | |
| an 28 | Electronic Withdrawal | From FEDERAL EXPRESS | | | 91.60- |
| | REF=13028006896737 N | 1710427007DEBIT MMA10306235 | | | |
| an 28 | Electronic Withdrawal | From FEDERAL EXPRESS | | | 75.16- |
| | REF=13028006896735 N | 1710427007DEBIT MMA10306229 | | | |
| an 28 | Electronic Withdrawal | From FEDERAL EXPRESS | | | 267.93- |
| | REF=13028006896736 N | 1710427007DEBIT MMA10306231 | | | |
| an 28 | Electronic Withdrawal | From DUKE ENERGY OH | | | 287.77- |
| | REF=13028006896649 N | 844690001WEB PAY 0410727070124113 | | | |
| an 28 | Internet Banking Transfer | To Account 145806766542 | | | 5,000.00- |

## Lawrence Wein or LW Capital

| DATE | Deposit to Glen | Withdraw to Wein or LW Capital |
|---|---|---|
| 12/03/2010 | $50,000 | 0 |
| 02/10/2011 | 0 | $57,100 |
| 02/17/2011 | $300,000 | 0 |
| 03/18/2011 | 0 | $150,000 |
| 03/23/2011 | 0 | $174,000 |
| 03/31/2011 | $500,000 | 0 |
| 05/11/2011 | 0 | $250,000 |
| 05/17/2011 | 0 | $40,000 |
| 06/11/2011 | 0 | $20,000 |
| 06/22/2011 | 0 | $250,000 |
| 09/15/2011 | $500,000 | 0 |
| 11/02/2011 | 0 | $50,000 |
| 11/09/2011 | 0 | $250,000 |
| 11/09/2011 | 0 | $250,000 |
| 04/05/2012 | $500,000 | 0 |
| 05/07/2012 | 0 | $40,000 |
| 08/03/2012 | 0 | $250,000 |
| 08/07/2012 | 0 | $250,000 |
| 08/10/2012 | 0 | $100,000 |
| 09/14/2012 | $500,000 | 0 |
| 10/31/2012 | 0 | $250,000 |
| 10/31/2012 | 0 | $250,000 |
| 11/02/2012 | 0 | $50,000 |
| 11/02/2012 | 0 | $50,000 |
| 12/07/2012 | $600,000 | 0 |
| 01/02/2013 | 0 | $300,000 |
| 01/09/2013 | 0 | $42,000 |
| 01/23/2013 | 0 | $300,000 |
| | $2,950,000.00 | $3,373,100.00 |



**EXHIBIT**
PLAINTIFF
4

**To:** Adrienne Harmeyer[abowling@qcfunds.com]
**From:** LWein@lwcapitalcorp.com
**Sent:** Wed 6/22/2011 5:59:42 PM
**Importance:** Normal
**Subject:** RE: larry wein wire status?
**Categories:** multipart/alternative;
boundary="_000_9D2533F98E6F5D4A901C82051873D08D400ABEFB1EP3PW5EX
1MB01E_"; charset="us-ascii"

All good, thanks again.


Larry


**From:** Adrienne Harmeyer [mailto:abowling@qcfunds.com]
**Sent:** Wednesday, June 22, 2011 9:37 AM
**To:** LWein@lwcapitalcorp.com
**Subject:** RE: larry wein wire status?


Larry,

Wire should be in your account now. It was sent this morning.


--

Adrienne Harmeyer

Queen City Investments

1716 Madison Rd.

Cincinnati, OH 45206

513-924-0990 p

513-924-0991 f


**From:** LWein@lwcapitalcorp.com [mailto:LWein@lwcapitalcorp.com]

**EXHIBIT**
PLAINTIFF
5

**Sent:** Tuesday, June 21, 2011 4:52 PM
**To:** Adrienne Harmeyer
**Subject:** RE: larry wein wire status?


Adrienne,


no sign of the wire yesterday or today.  What is the ETA?


thanks



**Larry Wein | LW Capital Corp**

**Work:**  949-640-7783
**Cell:**   949-701-0456
**Fax:**    949-640-4448
**E-mail:** lwein@lwcapitalcorp.com
**Website:** http://www.lwcapitalcorp.com


**A PASSION FOR EXCELLENCE**



**From:** Adrienne Harmeyer [abowling@qcfunds.com]
**Sent:** Friday, June 17, 2011 12:48 PM
**To:** LWein@lwcapitalcorp.com
**Subject:** RE: larry wein wire status?

Larry,

Still waiting on wire. I'm sorry for the slight delay. I feel confident that it will be taken care of on Monday.


Have a great weekend.

Thanks.


....

Adrienne Harmeyer

Queen City Investments

1716 Madison Rd.

Cincinnati, OH 45206

513-924-0990 p

513-924-0991 f


**From:** LWein@lwcapitalcorp.com [mailto:LWein@lwcapitalcorp.com]
**Sent:** Wednesday, June 15, 2011 4:58 PM
**To:** abowling@qcfunds.com
**Subject:** larry wein wire status?


Hi Adrienne,


I spoke to Glen last week, and expected the wire ($250,000) on Monday. No sign of it on wednesday. Can you please follow up with him and let me know when I will have it.


thanks

Larry


Larry Wein | LW Capital Corp

Work: 949-640-7783
Cell: 949-701-0456
Fax: 949-640-4448
E-mail: lwein@lwcapitalcorp.com
Website: http://www.lwcapitalcorp.com


A PASSION FOR EXCELLENCE

**Text Messages Between Larry Wein and Glen Galemmo**

**7/2/2012 at 7:40 am**
Larry, will give you a call after 2:30 your time to discuss the loan.    Glen

**7/2/2012 at 4:01 pm**
Glen. Haven't heard from you yet. Pls call me

**7/2/2012 at 4:38 pm**
Once I'm done with these guys at dinner Will call you

**7/3/2012 at 8:25 am**
Just called you. Please try me back

**7/3/2012 at 8:35 am**
Will call at 12 my time

**7/3/2012 at 5:16 pm**
Never heard back from you

**7/3/2012 at 5:53 pm**
Spent the last 4 hrs in the emergency room.  Son 18 stitches in his leg.   Will call you tomm.

**7/3/2012 at 6:40 pm**
No problem. Hope he is okay.

**7/6/2012 at 12:04 pm**
Glen - spoke to mike yesterday. I need to get my money back for a RE deal I am doing. I came in your loan deal on april 5 and I have been in for 3 months.  Can't stay in any longer. Initially - it was a 4 to 6 week commitment. It's been 12 weeks.  Let me know when you can wire me my money. Thanks

**7/11/2012 at 7:03 am**
Hi glenn, could really use money this week.  Let me know when to expect it so I can coordinate with my refi. Thx

**7/12/2012 at 11:23 pm**
Glenn - appreciate an update on my wire.  Please let me know Friday where we are at. When will I receive my interest. I have a transaction that is in limbo, until I get the funds. Thx

**7/16/2012 at 4:27 pm**
I judged landed in Orlando.   Will call you in about 2 hrs

**7/17/2012 at 8:13am**
Never heard from you yesterday. Need to talk this morning.  My lender is waiting for me to tell them what I am doing

1



**EXHIBIT**
PLAINTIFF
6

7/17/2012 at 8:46 am
I will know in about 2 hrs. I asked both of my CPA if the fund can replace your 500k   Have a 4m firm commitment for Tuesday next week.   Also waiting to here back from a single investor that can do it by tomm.

7/17/2012 at 11:56 am
Sounds like we are scrambling. Not what I wanted to hear. At this point, rather than rush and stress out, let's just wait until next week when the 4mm comes in. I will sign all of my paperwork with bank before I leave. I will be back in the next week from Friday and will close on 7/30. As long as no other hiccups, this will work. Assuming you will make it worth my while with higher interest payment. The loan will be almost 4 months outstanding on 8/5.  Thanks for hustling to try to make it work.

7/17/2012 at 12:38 pm
Agree with you,   Have you received any interest?  How does 20 percent sound for you.

7/28/2012 at 1:10 am
Glen       :
I am in Europe. And expected to see the money back in my account this week per the agreement we had last week. I am on a ship at sea and do not have good phone or Internet access, so this is the last thing I want to be dealing with. Today is Friday already  no contact or update from you and no money  I need to know what is going on. I do not like having to continuously chase this down, especially when I am on vacation with my family and we agreed on everything before I left.

7/28/2012 at 11:56 am
Looks like we are pushing back another week. Going on 4 months on this deal. 20% makes it worth the pain. So that's 500 + 100k.  Total 600k in my account next week. Thx

7/28/2012 at 12:15 pm
It will get done this coming week.

8/3/2012 at 5:24 am
Glen it's Friday and no word from you and no money. I need to see the money today.  Can't deal with another delay or setback.  Please advise.

8/3/2012 at 6:30 am
Check your acct in 4 hrs money will be there

8/3/2012 at 6:37 am
Thanks - That would make my day. What amount did you send?

8/3/2012 at 6:39 am
You will get 2 250k wires today and 100 or more interest on Monday

8/3/2012 at 6:40 am
That's great.
Much appreciated. I like the 100k or more!

8/3/2012 at 10:02 am

The 1st 250 just came in

8/3/2012 at 12:29 pm
Haven't seen the other 250k yet

8/3/2012 at 1:30 pm
I will call and c what is up

8/3/2012 at 5:05 pm
Never got the 2nd wire or an update from you after you said you were checking on it. Why do we keep having all these issues? Be great to just have happen what I am told is going to happen. I am sure you can appreciate that. So where are we at now?

8/3/2012 at 7:30 pm
Im not in town, made 3 calls don't have any good reason why you don't have it??  Gave all the instructions on wed. Will let you know when I do.

8/4/2012 at 6:38 pm
Never heard back from you  . ..
So what did you find out? Where are we?

8/6/2012 at 4:24 am
Will know why the 250 didn't go by 9:30 eastern. Just think no third party wire???? Not sure I'm back in the office will get is straighten out this am.

8/6/2012 at 10:46 am
Okay. Let me know. As of 2pm est, no money.

8/6/2012 at 11:43 am
The 250 will be there tomm unless the bank let's me flip the wire today. But worst case tomm. The hold up is gs will not let us do a third party after telling me it would not be a problem.  Will update you at the end of the day

8/6/2012 at 6:45 pm
Never got an update. At this point, need firm date for payment. I Can't keep pushing this out. I have commitments for this money, that I have delayed for months now. I assume (based on your prior emails) that I will get the 250 wire tomorrow (Tuesday) and the interest payment (100k+) on wed or Thursday ·· definitely before end of week. I must have my loan paid off by end of week, so no room for any further changes or delays  Please confirm the dates. Thx

8/7/2012 at 7:09 am
Please provide an update this morning.

8/7/2012 at 9:56 am
Check your acct in an hr.  You will have 250 k in it.

3

8/7/2012 at 10:34 am
Lookin good. Received. Thank you  Almost home. When shall I expect my interest payment?  Assume before end of the week. Let me know

8/7/2012 at 10:38 am
Based on you prior commitments, I am expecting to get me interest payment before End of week. Please confirm as I have commitments for those funds. Thanks

8/7/2012 at 11:00 am
Correct

8/8/2012 at 11:32 am
I will be a happy man. Thanks

8/9/2012 at 7:51 pm
Tomorrow is Friday.  End of week. Expecting Interest payment tomorrow. Please don't let me down. I need the money

8/10/2012 at 9:40 am
Please provide an update. Important

8/10/2012 at 10:30 am
I'm not in the office.   Will be back in after 2:15 my time.   Should all be good.

8/10/2012 at 2:17 pm
100k wire confirmed. ☺

9/13/2012 at 9:52 am
What is a good time to give you a call.  Glen

9/13/2012 at 2:18 pm
For the next 2 hours

9/13/2012 at 2:46 pm
Called you

9/14/2012 at 8:38 am
Qfc llc
Account # 130115324670
us bank
Aba# 042000013

9/14/2012 at 12:00 pm
I will do 500k and wire today.  10% interest to me and guarantee that I am out (loan pd bck in full + int) NLT 1st week of November. Can't have what happened last time, happen again. Also please send me documentation of the money market fund that my money is invested in.

9/14/2012 at 12:15 pm

4

Will do.

9/14/2012 at 12:37 pm
Done. Wire sent today.

9/18/2012 at 12:03 pm
Please confirm you received wire. Please Don't forget to get me the money market fund
documentation. Also – this deal must go much better than the last one. Basically ..... Need you to follow
thru in your commitments as to what will happen and when it will happen. Money + 10% return NLT
first week of November. Thx

9/18/2012 at 12:30 pm
All good. Give me your email

9/18/2012 at 12:35 pm
lwein@lwcapitalcorp.com

11/4/2012 at 3:20 pm
Where we meeting tomorrow at 11:30am?

11/4/2012 at 3:30 pm
Let's meet at bistango's on Von Karmen. Please Check on my interest payment wire. Your girl told me it
was sent on Friday. No show for 50000 Amount.

11/4/2012 at 3:35 pm
Will do she told me it was done

11/5/2012 at 11:28 am
Running about 10 minutes late. Grab us a table. Thanks

11/5/2012 at 11:32 am
We are here. C you when you get here. Sitting in the bar talking with bartender

11/5/2012 at 11:51 am
A few minutes away

11/5/2012 at 11:55 am
We are at a table

12/5/2012 at 6:29 am
Give me a call. I have a very quick turn around deal. Looking at 3 weeks I have both sides of it. Glen

12/5/2012 at 9:48 am
Just called you back

12/5/2012 at 10:05 am
I just landed from New York Give me 20 mins to get in my car. Will call you

5

12/5/2012 at 5:38 pm
What did you come up with or what are you thinking

12/5/2012 at 6:51 pm
What is my yield,

12/5/2012 at 7:00 pm
5.5 I have to get it out Friday back on dec 28 Friday.   Can get you some back a little sooner but it is only three weeks zero risk.

12/5/2012 at 8:28 pm
I will put in 600k. Send me wire instructions

12/6/2012 at 6:50 am
QFC llc
Account # 130115324670
Us bank
Aba# 042000013

Us bank
3424 Edwards rd
Cincinnati Ohio 45208
513-533-7400

12/5/2012 at 11:42 am
Larry what time do you think the wire is going out

12/5/2012 at 11:50 am
Not until tomorrow as I am in LA most of the day.  Is that okay. Tomorrow for sure

Can you do it at 9am your time and make sure the bank does it at 9:15 your time.  I have to get all 5m out tomm.

I can try. Not sure how they operate the wire room.

I understand. Just tell them to get it out ASAP. Thanks

12/7/2012 at 12:10 pm
Larry has it gone out????

12/7/2012 at 1:08 pm
Should have. I will check

Please check

12/7/2012 at 2:02 pm
Did it go out.

12/7/2012 at 2:25 pm
Yes it did. I can get confirm # if u need it

K no need for the number

12/10/2012 at 11:52 am
All good?

Yes

Great. Did it based on you saying it comes back on Friday 12-28, so let's make sure that date is good.
Merry XMAS.  friendly reminder rerun my funds on or before Friday 12-28. Thanks

600k principal plus 5.5% interest. Thx

12/27/2012 at 12:18 am
Need update on my funding.  P&I due on Friday. It is Thursday already.  Please update ASAP.

12/27/2012 at 4:33 am
Larry I will never respond on Christmas Day.  I have a call today at 1:00 pm my time the funds are due
back on Friday.  Will updated you on it after the call.  Have bothsides so not concern.

12/27/2012 at 8:56 am
Sounds good thanks. Xmas day just another day for us Jews. Forgot

Lol. K

12/31/2012 at 5:00 pm
Just an FYI.... I never got a wire on Friday or today.  Adrienne said Monday was worst case. Happy new
year.

12/31/2012 at 6:31 pm
Im back in town tomm afternoon will check and text you.  Happy new year

1/2/2013 at 11:23 am
Please do that for me today. Thanks
Got an update from Adrienne.  I assume we will have all funds transferred before end of this week. Just
let me know.  Have a great day

The 300 has been wired.  Will update you tomm.  Thanks Glen

1/3/2013 at 11:45 am
Let me know please. Like to settle up before end of the week. Thx

1/4/2013 at 9:24 am

7

Waiting on second half if comes in you will get it today if not Monday for sure. Don't want to burn bridges ..... Free money.

That works. Appreciate the update.

1/8/2013 at 12:14 am
Glen -- what's the latest? You said Monday for sure. Haven't seen the wire.

1/17/2013 at 7:05 am
Please Let me know when the balance will be wired. Thanks

1/18/2013 at 12:08 pm
No word from you yet. Wondering when I will see the money.

4/10/2013 at 10:11 am
Call me when you can

4/10/2013 at 11:35 am
In meeting . Call this afternoon

Sounds goods

4/29/2013 at 11:53 am
Hey Larry, have a good deal that I jus got a call on.   If interested will call you.  Let me know.    Glen

4/30/2013 at 9:27 am
Funds committed right now for the next 2 months.  Really appreciate you thinking about me though. Thx

6/29/2013 at 10:43 pm
Am in San Fran all weekend. Will call Monday.

7/2/13 at 6:40am
Call me today in am

7/2/13 at 12:34 pm
Tried you back

| To: | Rick Morris[rmorris@qcfunds.com] |
| --- | --- |
| From: | LWein@lwcapitalcorp.com |
| Sent: | Thur 11/1/2012 8:56:58 PM |
| Importance: | Normal |
| Subject: | RE: Meeting Nov 5th |
| Categories: | multipart/alternative; boundary="_000_9D2533F98E6F5D4A901C82051873D08D4633D3631CP3PW5EX1MB01E_"; charset="iso-8859-1" |

I am good for Monday. before we meet though, please find out the status of my $50,000 interest payment. i received the $500,000 principal payment, but not the interest. Let me know when to expect the wiire (timing). If you prefer - feel free to bring my check with you when we get together.

thanks


**Larry Wein | LW Capital Corp**

Work:   949-640-7783
Cell:    949-701-0456
Fax:    949-640-4448
E-mail: lwein@lwcapitalcorp.com
Website: http://www.lwcapitalcorp.com


**A PASSION FOR EXCELLENCE**

---

**From:** Rick Morris [rmorris@qcfunds.com]
**Sent:** Thursday, November 01, 2012 10:30 AM
**To:** LWein@lwcapitalcorp.com
**Subject:** Re: Meeting Nov 5th


Larry,

Are you ok with Monday at 11:30am? I am looking forward to meeting with you.

Regards,

Rick Morris

Sent from my iPhone



EXHIBIT

PLAINTIFF

7

On Oct 26, 2012, at 2:52 AM, "LWein@lwcapitalcorp.com" <LWein@lwcapitalcorp.com> wrote:

Thanks Rick, what time are you thinking about getting together on 11/5? I am around that day, so should be fine.

**From:** Rick Morris [mailto:rmorris@qcfunds.com]
**Sent:** Wednesday, October 24, 2012 1:05 PM
**To:** LWein@lwcapitalcorp.com
**Subject:** Meeting Nov 5th

Larry,

Glen asked me to contact you and inquire your availability to meet with us the morning of Monday, November 5th. Glen and I will be doing a short west coast tour and would love to schedule some time to get together. Please let me know if your available.

Also, Glen wanted me to let you know that your recent investment is coming due this week and he will have your return to you Monday or Tuesday at the latest.

Best regards,

***Rick Morris***

VP Sales

Queen City Investments

1716 Madison Road

Cincinnati, OH  45206

513.924.0990 o

513.430.1281 c

rmorris@qcfunds.com

| | |
|---|---|
| **To:** | 'LWein@lwcapitalcorp.com'[LWein@lwcapitalcorp.com] |
| **From:** | Adrienne Harmeyer |
| **Sent:** | Wed 11/2/2011 6:00:10 PM |
| **Importance:** | Normal |
| **Sensitivity:** | None |
| **Subject:** | RE: wire confirmation |

He said he is being told tomorrow, so we will see.

---

Adrienne Harmeyer

Queen City Investments

1716 Madison Rd.

Cincinnati, OH 45206

513-924-0990 p

513-924-0991 f

**From:** LWein@lwcapitalcorp.com [mailto:LWein@lwcapitalcorp.com]
**Sent:** Wednesday, November 02, 2011 1:43 PM
**To:** Adrienne Harmeyer
**Subject:** RE: wire confirmation

Wire received, thank you.   what is ETA on the principal?

Larry

**From:** Adrienne Harmeyer [mailto:abowling@qcfunds.com]
**Sent:** Wednesday, November 02, 2011 9:47 AM
**To:** LWein@lwcapitalcorp.com
**Subject:** wire confirmation

Larry,

I sent you a wire for $50k, which you should have in your LW account.

It is interest due.

Glen said that is all we have received so far.


Thanks.


--

Adrienne Harmeyer

Queen City Investments

1716 Madison Rd.

Cincinnati, OH 45206

513-924-0990 p

513-924-0991 f


**From:** LWein@lwcapitalcorp.com [mailto:LWein@lwcapitalcorp.com]
**Sent:** Wednesday, June 22, 2011 2:00 PM
**To:** Adrienne Harmeyer
**Subject:** RE: larry wein wire status?


All good, thanks again.


Larry

**To:** Adrienne Harmeyer[abowling@qcfunds.com]
**From:** I.Wein@lwcapitalcorp.com
**Sent:** Wed 1/2/2013 7:26:08 PM
**Importance:** Normal
**Subject:** Re: wire status
**Categories:** multipart/alternative; boundary="_000_1C066C50EA1B4E129D64C73DBE6D7740lwcapitalcorpcom_"; charset="utf-8"

Great thanks for update.  Please confirm we will have all funds  wired to me by end of this week (to account for the extra couple of days).

Thank You,
Larry Wein
949.701.0456

On Jan 2, 2013, at 10:45 AM, "Adrienne Harmeyer" <abowling@qcfunds.com> wrote:


Larry,


We did not receive wire until after the wire cut off on Monday, so I was unable to get a wire out to you.  Glen said the funds are coming in are 2 days late because we got the funds to them 2 days late.


I have wired out $300k to your LW Capital account.

As soon as the second wire comes in I will wire out to you.


---

Adrienne Harmeyer

Queen City Investments

1716 Madison Rd.

Cincinnati, OH 45206

513-924-0990 p

513-924-0991 f

From: LWein@lwcapitalcorp.com [mailto:LWein@lwcapitalcorp.com]
Sent: Monday, December 31, 2012 7:59 PM
To: Adrienne Harmeyer
Subject: RE: wire status
Importance: High

Hi Adrienne,

No wire on Friday and no wire on Monday, which was the worst case scenario.
Appreciate an update.  thanks

From: Adrienne Harmeyer [mailto:abowling@qcfunds.com]
Sent: Friday, December 28, 2012 12:37 PM
To: LWein@lwcapitalcorp.com
Subject: wire status

Larry,

Just wanted to give you a quick update, as I am the only one in the office today!

I'm waiting on the wire to hit--I've been told the wire will come in 2 wires--expecting 1
today.

I'm hoping to turn some funds around to you this afternoon, but at the very latest I
will be able to get a wire out to you Monday.

Glen is on his way to MO for a family wedding so I'm trying to hold the fort down the
best I can!

Hope you have a wonderful new years if I do not speak to you before.

--

Adrienne Harmeyer

Queen City Investments

1716 Madison Rd.

Cincinnati, OH 45206

513-924-0990 p

513-924-0991 f

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| JOHN CAPANNARI, et al. | : | Case No 1:13–CV–883 |
| | : | |
| Plaintiffs, | : | Judge: Michael Barrett |
| | : | Magistrate: Judge Stephanie K. Bowman |
| v. | : | |
| | : | **DEFENDANTS LARRY WEIN AND** |
| GLEN GALEMMO, et al. | : | **L.W. CAPITAL CORPORATION'S** |
| | : | **RESPONSES TO PLAINTIFFS' FIRST** |
| Defendants. | : | **SET OF REQUESTS FOR** |
| | : | **ADMISSIONS** |

Defendants Larry Wein and L.W. Capital Corporation ("Defendants"), by and through counsel, and for its Responses to Plaintiffs' First Set of Requests for Admissions states as follows:

## ANSWERS TO FIRST SET OF REQUESTS FOR ADMISSIONS

**Request for Admission No. 1**

Admit that Wein was an investor in the Galemmo Entities.

**ANSWER:** Deny.

**Request for Admission No. 2**

Admit that Wein made short-term loans or investments to the Galemmo Entities.

**ANSWER:** Admit in part. Defendants did make short-term personal loans (not investments) directly to Glenn Galemmo. Defendants never made loans to the Galemmo entities. Defendants had no knowledge about the Galemmo entities. Wein made personal, unsecured, undocumented loans to Glen Galemmo. These loans were made to Glen Galemmo personally, and had nothing to do with any of his entities.

**EXHIBIT**

PLAINTIFF

8

### Request for Admission No. 3

Admit that Wein was repaid with interest by the Galemmo Entities for the loans Weins made to the Galemmo Entities.

**ANSWER:** Deny. Defendants never had any knowledge of any Galemmo Entities. Defendants' loans were made directly to Galemmo. Wein loans were never made to any Galemmo Entities. Defendants was repaid by Glenn Galemmo (the borrower) the principal amount of the loans (money borrowed) as well as the associated interest. The interest on the loans represented a fair market rate of return on the loans. Under the agreement between Defendants and Galemmo, Galemmo would borrow money from Defendants and pay Defendants back the Principal amount (loan amount) plus interest. Defendants had absolutely no knowledge, understanding or control of anything that Galemmo did with the money he borrowed from Defendants, nor did Defendants have any knowledge, understanding or control of how Galemmo paid Defendants back.

### Request for Admission No. 4

Admit that Wein made a profit in the business dealings with the Galemmo Entities.

**ANSWER:** Deny. Defendants did not have any business dealings with the Galemmo Entities.

### Request for Admission No. 5

Admit that the total amount of Wein's loans to the Galemmo Entities was $2,950,000. If you deny this request, please provide the information requested in Instruction No. 9.

**ANSWER:** Deny. The Defendants' loans were made directly to Glenn Galemmo (the individual) and not to any Galemmo Entities. These personal loans to Galemmo totalled $2,950,000 between 12/10 and 1/13. These loans were made to Glen Galemmo personally, and had nothing to do with any of his entities.

### Request for Admission No. 6

Admit that Wein withdrew or received $3,370,000 as return payment for the above-mentioned loans that Wein made to the Galemmo Entities. If you deny this request, please provide the information requested in Instruction No. 9.

**ANSWER:** Deny. Defendants never withdrew any money from any Galemmo related entity account. The total dollar amount received by Defendants, for principal loan repayment plus associated interest charges, during the time between 12/10 thru 1/13, was $3,323,100 and not $3,373,100.

<u>Request for Admission No. 7</u>

Admit that Wein provided no services to the Galemmo Entities of reasonably equivalent value.

**ANSWER:** Deny. Defendant Wein used his own personal cash to lend to Galemmo. These loans were made to Glenn Galemmo, the individual, on an unsecured (no collateral) and undocumented basis (no personal guarantee or any other documents that would typically accompany loans of this size).

Respectfully submitted,

/s/ Judd R. Uhl
Judd R. Uhl (0071370)
Katherine L. Kennedy (0079566)
Mannion & Gray Co., L.P.A.
909 Wrights Summit Parkway, Suite 230
Ft. Wright, KY 41011
(859) 663-9830/(859) 663-9829 (Fax)
juhl@manniongray.com
kkennedy@manniongray.com
*Attorneys for Defendants, Larry Wein and*
*L.W. Capital Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent this 16th day of April, 2015 to:

All Counsel and Parties of Record

Glen Galemmo, Register Number: 72083-061
FCI Butner Low
Federal Correction Institution
P.O. box 999
Butner, NC 27509

Irwin Cohen
10 Jessica Trace
Gravesvoort, NY 12831

Steve Smith
680 Nordyke Road
Cincinnati, OH 45255

William T Schamp
8177 Stose Road
Celina, OH 45822-9305

/s/ Judd R. Uhl
Judd R. Uhl (0071370)
Katherine L. Kennedy (0079566)

# VERIFICATION PAGE

STATE OF CALIFORNIA---        )
                              )SS
COUNTY OF ORANGE              )

    I, Larry Wein, individually and as a representative of L.W. Capital Corporation, after being first duly sworn, state that I have the authority and the requisite personal knowledge to answer Plaintiff's First and "Second" Set of Requests for Admissions that I have read the foregoing Answers to Plaintiff's First and Second Set of Requests for Admissions and that the same are true as I verily believe.

                                    Larry Wein, individually and as a
                                      representative of L.W. Capital Corporation

Sworn to before me and subscribed in my presence this 22 day of April, 2015.

                                      Notary Public

    SHANE THOMAS JOHNSON
    Commission # 1991314
    Notary Public – California        Commission Expires: 9/16/2016
    Orange County
    My Comm. Expires Sep 16, 2016

## CALIFORNIA JURAT WITH AFFIANT STATEMENT GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

_____ *Signature of Document Signer No. 1* _____ *Signature of Document Signer No. 2 (if any)*

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California
County of ORANGE

Subscribed and sworn to (or affirmed) before me

on this 22 day of APRIL, 2015,
by      *Date*      *Month*      *Year*

(1) LARRY WEIN

(and (2) _____ ),
            *Name(s) of Signer(s)*

proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

> SHANE THOMAS JOHNSON
> Commission # 1991314
> Notary Public - California
> Orange County
> My Comm. Expires Sep 16, 2016

Signature _____
*Signature of Notary Public*

*Seal*
*Place Notary Seal Above*

────────────── OPTIONAL ──────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: VERIFICATION PAGE _____ Document Date: 4/22/15

Number of Pages: 1 Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827) Item #5910

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOHN CAPANNARI, et al. | : | Case No 1:13-CV-883 |
| | : | |
| Plaintiffs, | : | Judge: Michael Barrett |
| | : | Magistrate: Judge Stephanie K. Bowman |
| v. | : | |
| | : | DEFENDANTS LARRY WEIN AND |
| GLEN GALEMMO, et al. | : | L.W. CAPITAL CORPORATION'S |
| | : | RESPONSES TO PLAINTIFFS' FIRST |
| Defendants. | : | SET OF REQUESTS FOR |
| | : | ADMISSIONS |

Defendants Larry Wein and L.W. Capital Corporation ("Defendants"), by and through

counsel, and for its Responses to Plaintiffs' First Set of Requests for Admissions states as follows:

### ANSWERS TO FIRST SET OF REQUESTS FOR ADMISSIONS

**Request for Admission No. 1**

Admit that Wein was an investor in the Galemmo Entities.

**ANSWER:** Deny.

**Request for Admission No. 2**

Admit that Wein made short-term loans or investments to the Galemmo Entities.

**ANSWER:** Admit in part. Defendants did make short-term personal loans (not
investments) directly to Glenn Galemmo. Defendants never made loans to the Galemmo
entities. Defendants had no knowledge about the Galemmo entities. Wein made personal,
unsecured, undocumented loans to Glen Galemmo. These loans were made to Glen
Galemmo personally, and had nothing to do with any of his entities.

EXHIBIT

PLAINTIFF
9

<u>Request for Admission No. 3</u>

Admit that Wein was repaid with interest by the Galemmo Entities for the loans Weins made to the Galemmo Entities.

ANSWER:   Deny.   Defendants never had any knowledge of any Galemmo Entities. Defendants' loans were made directly to Galemmo.   Wein loans were never made to any Galemmo Entities.  Defendants was repaid by Glenn Galemmo (the borrower) the principal amount of the loans (money borrowed) as well as the associated interest.  The interest on the loans represented a fair market rate of return on the loans.  Under the agreement between Defendants and Galemmo, Galemmo would borrow money from Defendants and pay Defendants back the Principal amount (loan amount) plus interest.  Defendants had absolutely no knowledge, understanding or control of anything that Galemmo did with the money he borrowed from Defendants, nor did Defendants have any knowledge, understanding or control of how Galemmo paid Defendants back.

<u>Request for Admission No. 4</u>

Admit that Wein made a profit in the business dealings with the Galemmo Entities.

ANSWER:   Deny.   Defendants did not have any business dealings with the Galemmo Entities.

<u>Request for Admission No. 5</u>

Admit that the total amount of Wein's loans to the Galemmo Entities was $2,950,000. If you deny this request, please provide the information requested in Instruction No. 9.

ANSWER:   Deny.   The Defendants' loans were made directly to Glenn Galemmo (the individual) and not to any Galemmo Entities.   These personal loans to Galemmo totalled $2,950,000 between 12/10 and 1/13.   These loans were made to Glen Galemmo personally, and had nothing to do with any of his entities.

<u>Request for Admission No. 6</u>

Admit that Wein withdrew or received $3,370,000 as return payment for the above-mentioned loans that Wein made to the Galemmo Entities. If you deny this request, please provide the information requested in Instruction No. 9.

ANSWER:   Deny.   Defendants never withdrew any money from any Galemmo related entity account.   The total dollar amount received by Defendants, for principal loan repayment plus associated interest charges, during the time between 12/10 thru 1/13, was $3,323,100 and not $3,373,100.

<u>Request for Admission No. 7</u>

Admit that Wein provided no services to the Galemmo Entities of reasonably equivalent value.

**ANSWER:** **Deny.  Defendant Wein used his own personal cash to lend to Galemmo.  These loans were made to Glenn Galemmo, the individual, on an unsecured (no collateral) and undocumented basis (no personal guarantee or any other documents that would typically accompany loans of this size).**

Respectfully submitted,

/s/ Judd R. Uhl
Judd R. Uhl (0071370)
Katherine L. Kennedy (0079566)
Mannion & Gray Co., L.P.A.
909 Wrights Summit Parkway, Suite 230
Ft. Wright, KY 41011
(859) 663-9830/(859) 663-9829 (Fax)
juhl@manniongray.com
kkennedy@manniongray.com
*Attorneys for Defendants, Larry Wein and*
*L.W. Capital Corporation*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent this 16th day of April, 2015 to:

All Counsel and Parties of Record

Glen Galemmo, Register Number: 72083-061
FCI Butner Low
Federal Correction Institution
P.O. box 999
Butner, NC 27509

Irwin Cohen
10 Jessica Trace
Gravesvoort, NY 12831

Steve Smith
680 Nordyke Road
Cincinnati, OH 45255

William T Schamp
8177 Stose Road
Celina, OH 45822-9305

/s/ Judd R. Uhl
Judd R. Uhl (0071370)
Katherine L. Kennedy (0079566)

# VERIFICATION PAGE

STATE OF CALIFORNIA···         )
                                   )SS

COUNTY OF ORANGE          )

    I, Larry Wein, individually and as a representative of L.W. Capital Corporation, after being first duly sworn, state that I have the authority and the requisite personal knowledge to answer Plaintiff's First and "Second" Set of Requests for Admissions that I have read the foregoing Answers to Plaintiff's First and Second Set of Requests for Admissions and that the same are true as I verily believe.

 

Larry Wein, individually and as a
representative of L.W. Capital Corporation

 

Sworn to before me and subscribed in my presence this _22_ day of April, 2015.

 

Notary Public

SHANE THOMAS JOHNSON
Commission # 1991314
Notary Public – California
Orange County
My Comm. Expires Sep 16, 2016

Commission Expires: 9/16/2016

## CALIFORNIA JURAT WITH AFFIANT STATEMENT          GOVERNMENT CODE § 8202

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–6 to be completed only by document signer[s], *not* Notary)

_____        _____
*Signature of Document Signer No. 1*      *Signature of Document Signer No. 2 (if any)*

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ORANGE

SHANE THOMAS JOHNSON
Commission # 1991314
Notary Public - California
Orange County
My Comm. Expires Sep 16, 2016

Seal
Place Notary Seal Above

Subscribed and sworn to (or affirmed) before me

on this  22  day of  APRIL , 20 15 .
         Date        Month        Year
by

(1) LARRY WEIN

(and (2) _____ ).
                Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____
           *Signature of Notary Public*

─────────────────────── OPTIONAL ───────────────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

Description of Attached Document

Title or Type of Document: VERIFICATION PAGE          Document Date: 4/22/15

Number of Pages: 1    Signer(s) Other Than Named Above: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5910

*Money wired into me — From Balance* 

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 2/1 | 1258 | Cashed Check | | 300.00 | |
| 2/1 | 1254 | Check | | 252.84 | 114,241.43 |
| 2/2 | 1259 | Check | | 320.00 | 113,921.43 |
| 2/3 | 1256 | Cashed Check | | 465.00 | |
| 2/3 | 1257 | Check | | 2,300.00 | |
| 2/3 | 1260 | Check | | 483.56 | 110,672.87 |
| 2/4 | 1261 | Check | | 160.00 | |
| 2/4 | | Accelpay ACH 110203 (800) 465-0995 Shayne Wein | | 20.00 | 110,492.87 |
| 2/7 | | Paysimple Funding 110204 800-466-0992 Lw Capital | 2,656.31 | | |
| 2/7 | 1253 | Check | | 222.00 | 112,927.18 |
| 2/8 | | Deposit Made In A Branch/Store | 8,351.64 | | 121,278.82 |
| 2/9 | 1262 | Check | | 1,500.00 | 119,778.82 |
| 2/10 | | Wt Fed#01388 U.S. Bank, N.A. /Org=Clic, Llc Srf# 1102I0014683 | 57,100.00 | | |
| 2/10 | | Deposit | 10,500.00 | | |
| 2/10 | | Paysimple Funding 110209 800-466-0992 Lw Capital | 4,864.07 | | |
| 2/10 | | Wire Trans Svc Charge - Sequence: 110210041429 Srf# 110210014583 Trn#110210014583 Rfb# 110210014583 | | 10.00 | |
| 2/10 | 1265 | Check | | 23,928.68 | |
| 2/10 | | Payx Small Biz Payroll 021011 xxxxx8528 Lw Capital Corp | | 60.00 | 168,247.33 |
| 2/16 | | Deposit Made In A Branch/Store | 7,064.41 | | |
| 2/16 | 1270 | Check | | 2,686.82 | |
| 2/16 | 1267 | Check | | 235.00 | |
| 2/16 | 1269 | Check | | 29.89 | |
| 2/16 | 1268 | Check | | 16.28 | 172,146.76 |
| 2/17 | | Paysimple Funding 110215 800-466-0992 Lw Capital | 2,940.54 | | 175,086.30 |
| 2/17 | | Deposit Made In A Branch/Store | 1,177.22 | | |
| 2/17 | 1246 | Cashed Check | | 935.00 | |
| 2/17 | 1271 | Check | | 160.00 | 175,168.51 |
| 2/22 | | Paysimple Funding 110216 800-466-0992 Lw Capital | 8,966.19 | | |
| 2/22 | | Payx Small Biz Payroll 022211 xxxxx8528 Lw Capital Corp | | 26,912.50 | |
| 2/22 | 1274 | Check | | 20,489.69 | |
| 2/22 | | Payx Small Biz Payroll 022211 xxxxx8528 Lw Capital Corp | | 4,100.23 | 132,612.22 |
| 2/23 | 1275 | Check | | 306.00 | |
| 2/23 | | Accelpay ACH 110221 (800) 465-0995 Shayne Wein | | 14.94 | 132,291.28 |
| 2/24 | 1263 | Cashed Check | | 604.60 | |
| 2/24 | 1272 | Check | | 1,730.00 | 129,956.76 |
| 2/25 | | Paysimple Funding 110224 800-466-0992 Lw Capital | 4,530.58 | | 134,487.36 |
| 2/28 | | Deposit Made In A Branch/Store | 9,728.27 | | |
| 2/28 | 1265 | Check | | 29,853.58 | |
| 2/28 | 1283 | Check | | 6,674.25 | |
| 2/28 | 1277 | Check | | 1,790.00 | 108,137.80 |
| Ending balance on 2/28 | | | | | 108,137.80 |
| Totals | | | $117,899.33 | $124,655.80 | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

## Summary of checks written  (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 1246 | 2/17 | 935.00 | 1258 | 2/1 | 300.00 | 1263 | 2/24 | 604.60 |
| 1253 * | 2/7 | 222.00 | 1259 | 2/2 | 320.00 | 1265 * | 2/10 | 23,928.68 |
| 1254 | 2/1 | 252.84 | 1260 | 2/3 | 483.56 | 1266 | 2/16 | 29.89 |
| 1256 * | 2/3 | 465.00 | 1261 | 2/4 | 160.00 | 1267 | 2/16 | 235.00 |
| 1257 | 2/3 | 2,300.00 | 1262 | 2/9 | 1,500.00 | 1268 | 2/16 | 16.28 |



**EXHIBIT**

PLAINTIFF

**11**



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 3/10 | | Payx Small Biz Payroll 031011 xxxxx6528 Lw Capital Corp | | 59.00 | 132,248.21 |
| 3/11 | | Deposit Made In A Branch/Store | 5,698.60 | | |
| 3/11 | 1295 | Check | | 68.36 | 137,868.43 |
| 3/14 | 1300 | Check | | 222.00 | |
| 3/14 | 1292 | Check | | 140.00 | 137,620.43 |
| 3/16 | 1291 | Check | | 25.00 | 137,601.43 |
| 3/16 | | Paysimple Funding 110315 800-466-0992 Lw Capital | 4,618.53 | | 142,119.96 |
| 3/17 | 1294 | Cashed Check | | 470.00 | 141,649.96 |
| 3/18 | | WT Fed#01850 U.S. Bank, N.A. /Org=Queen City Investment Fund U Srf# 110318020934 Trn#110318039802 Rfb# 110318020934 | 150,000.00 | | |
| 3/18 | | Wire Trans Svc Charge - Sequence: 110318059802 Srf# 110318020934 Trn#110318039802 Rfb# 110318020934 | | 10.00 | |
| 3/18 | 1302 | Check | | 160.00 | 291,479.96 |
| 3/21 | | Paysimple Funding 110318 800-466-0992 Lw Capital | 8,986.19 | | |
| 3/21 | 1299 | Check | | 1,576.00 | |
| 3/21 | 1298 | Check | | 339.46 | |
| 3/21 | | Accentcey ACH 110316 800-465-0995 Shayna Weln | | 14.65 | 298,475.04 |
| 3/22 | | Deposit Made In A Branch/Store | 5,428.78 | | 303,903.82 |
| 3/23 | | WT Fed#00805 U.S. Bank, N.A. /Org=Queen City Investment Fund U Srf# 110323008841 Trn#110323028916 Rfb# 110323008841 | 174,000.00 | | |
| 3/23 | | Wire Trans Svc Charge - Sequence: 110323028916 Srf# 110323008841 Trn#110323028916 Rfb# 110323008841 | | 10.00 | |
| 3/23 | 1284 | Check | | 8,778.98 | 469,113.84 |
| 3/24 | | Paysimple Funding 110323 800-466-0992 Lw Capital | 5,602.46 | | |
| 3/24 | 1303 | Cashed Check | | 476.00 | |
| 3/24 | | Payx Small Biz Payroll 032411 xxxxx6528 Lw Capital Corp | | 31,062.71 | |
| 3/24 | | Payx Small Biz Payroll 032411 xxxxx6528 Lw Capital Corp | | 4,140.22 | |
| 3/24 | 1305 | Check | | 1,176.18 | 437,653.20 |
| 3/25 | | Deposit Made In A Branch/Store | 11,115.33 | | |
| 3/25 | | Online Transfer Ref #Ibejx)863 to Business Performance Savings xxxxxx0571 on 03/25/11 | | 75,000.00 | |
| 3/25 | 1307 | Check | | 315,000.00 | 58,998.53 |
| 3/29 | 1301 | Cashed Check | | 485.00 | |
| 3/29 | 1309 | Check | | 2,498.82 | 65,994.71 |
| 3/30 | | Online Transfer Ref #Ibe2H0N6Fy From Business Performance Savings Willmar Loan | 85,000.00 | | |
| 3/30 | 1314 | Check | | 3,986.86 | |
| 3/30 | 1306 | Check | | 1,000.00 | |
| 3/30 | 1310 | Check | | 325.00 | 135,682.85 |
| 3/31 | | Paysimple Funding 110330 800-466-0992 Lw Capital | 946.49 | | |
| 3/31 | | Deposit Made In A Branch/Store | 624.68 | | |
| 3/31 | 1316 | Check | | 100,000.00 | |
| 3/31 | 1311 | Check | | 1,177.89 | |
| 3/31 | 1312 | Check | | 160.00 | |
| 3/31 | 1304 | Check | | 140.37 | 35,975.77 |
| **Ending balance on 3/31** | | | | | **35,975.77** |
| **Totals** | | | **$545,320.99** | **$617,392.02** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

## Summary of checks written   (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 1291 | 3/3 | 450.00 | 1276 * | 3/10 | 476.00 | 1291 | 3/16 | 25.00 |
| 1294 * | 3/3 | 700.00 | 1278 * | 3/3 | 114.00 | 1292 | 3/8 | 700.00 |
| 1269 * | 3/10 | 490.00 | 1279 | 3/2 | 56.00 | 1284 * | 3/25 | 8,778.98 |
| 1273 * | 3/1 | 2,376.00 | 1280 | 3/3 | 18.75 | 1285 * | 3/2 | 897.50 |



## Activity summary

| | |
|---|---|
| Beginning balance on 5/1 | $120,565.20 |
| Deposits/Credits | 353,924.73 |
| Withdrawals/Debits | - 153,194.94 |
| Ending balance on 5/31 | $321,394.99 |
| | |
| Average ledger balance this period | $259,477.50 |

Account number:

**LW CAPITAL CORP**

*California account terms and conditions apply*

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

### Overdraft Protection

This account is not currently covered by Overdraft Protection. If you
would like more information regarding Overdraft Protection and
eligibility requirements please call the number listed at the top of
your statement or visit your Wells Fargo branch.

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 5/2 | 1335 | Check | | 876.00 | |
| 5/2 | | Acceptpay ACH 110429 (800) 465-0995 Shayna Wein | | 21.67 | 119,767.33 |
| 5/3 | | Deposit Made In A Branch/Store | 8,357.94 | | |
| 5/3 | 1327 | Check | | 704.25 | |
| 5/3 | 1313 | Check | | 450.00 | |
| 5/3 | 1328 | Check | | 250.00 | 126,721.02 |
| 5/4 | 1337 | Check | | 1,381.64 | |
| 5/4 | 1329 | Check | | 400.00 | |
| 5/4 | | Acceptpay ACH 110503 (800) 465-0995 Shayna Wein | | 20.00 | 124,919.38 |
| 5/5 | | Payslmple Funding 110504 800-466-0092 Lw Capital | 4,459.29 | | |
| 5/5 | 1316 | Cashed Check | | 487.50 | |
| 5/5 | 1319 | Check | | 15,375.00 | |
| 5/5 | 1333 | Check | | 9,782.70 | 103,733.47 |
| 5/9 | 1343 | Check | | 29,869.00 | |
| 5/9 | 1340 | Check | | 1,576.00 | |
| 5/9 | 1342 | Check | | 693.00 | |
| 5/9 | 1341 | Check | | 222.00 | 72,371.47 |
| 5/10 | | Deposit Made In A Branch/Store | 14,266.00 | | |
| 5/10 | | Deposit Made In A Branch/Store | 2,761.20 | | |
| 5/10 | 1346 | Check | | 28,977.55 | |
| 5/10 | | Payx Small Biz Payroll 051011 xxxxx6523 Lw Capital Corp | | 69.00 | 60,352.14 |
| 5/11 | | WT Fed#00556 U.S. Bank, N.A. /Org-Cfc, LLC Srf# 110511006437 Trn#110511026494 Rfb# 110511006437 | 260,000.00 | | |
| 5/11 | | Paysimple Funding 110510 800-466-0092 Lw Capital | 4,664.07 | | |
| 5/11 | | Wire Trans Svc Charge - Sequence: 110511026494 Srf# 110511006437 Trn#110511026494 Rfb# 110511006437 | | 10.00 | |
| 5/11 | 1332 | Check | | 140.00 | 316,098.21 |
| 5/12 | 1347 | Check | | 160.00 | 314,936.21 |
| 5/16 | | Paysimple Funding 110513 800-466-0092 Lw Capital | 4,618.53 | | 319,554.74 |
| 5/17 | | WT Fed#00414 U.S. Bank, N.A. /Org-Cfc, LLC Srf# 110517005280 Trn#110517021046 Rfb# 110517005280 | 40,000.00 | | |
| 5/17 | | Wire Trans Svc Charge - Sequence: 110517021046 Srf# 110517005280 Trn#110517021046 Rfb# 110517005280 | | 10.00 | 359,544.74 |
| 5/19 | | Paysimple Funding 110518 800-466-0092 Lw Capital | 6,501.19 | | |
| 5/19 | 1331 | Cashed Check | | 1,047.50 | 366,998.43 |
| 5/20 | | Deposit | 225.33 | | |
| 5/20 | 1338 | Check | | 700.00 | 366,523.76 |
| 5/23 | | Deposit Made In A Branch/Store | 10,269.61 | | |
| 5/23 | 1354 | Check | | 55,305.17 | |
| 5/23 | 1336 | Check | | 40.00 | |



## Activity summary

| | |
|---|---|
| Beginning balance on 6/1 | $321,394.99 |
| Deposits/Credits | 487,467.34 |
| Withdrawals/Debits | – 934,610.65 |
| **Ending balance on 6/30** | **$474,251.68** |
| Average ledger balance this period | $268,240.98 |

Account number: ⸱
**LW CAPITAL CORP**

California account terms and conditions apply

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

### Overdraft Protection

This account is not currently covered by Overdraft Protection. If you
would like more information regarding Overdraft Protection and
eligibility requirements please call the number listed at the top of
your statement or visit your Wells Fargo branch.

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 6/1 | | Payalmpto Funding 110531 800-466-0992 Lw Capital | 1,766.77 | | 323,161.76 |
| 6/2 | | Deposit | 5,677.48 | | |
| 6/2 | 1349 | Cashed Check | | 465.00 | |
| 6/2 | 1361 | Check | | 797.15 | 327,577.09 |
| 6/3 | | Deposit | 1,640.18 | | |
| 6/3 | 1364 | Check | | 4,650.00 | |
| 6/3 | 1363 | Check | | 1,460.00 | 322,807.27 |
| 6/6 | | Payx Small Biz Payroll 060611 xxxxx5523 Lw Capital Corp | | 28,499.55 | |
| 6/6 | | Payx Small Biz Payroll 060611 xxxxx5523 Lw Capital Corp | | 16,680.65 | |
| 6/6 | 1363 | Check | | 225.00 | |
| 6/6 | | Anthem Bluecross Blue Cross 110802 Zc7N00xxxxx x | | 83.30 | |
| 6/6 | 1348 | Check | | 20.00 | |
| 6/6 | | Acceptpay ACH 110603 (800) 465-0998 Shayna Wein | | 20.00 | 276,428.61 |
| 6/7 | | Payalmpto Funding 110606 800-466-0992 Lw Capital | 4,469.20 | | 263,817.20 |
| 6/7 | 1367 | Check | | 70.54 | |
| 6/8 | | Deposit Made In A Branch/Store | 8,228.26 | | 290,043.51 |
| 6/8 | | Payalmpto Funding 110606 800-466-0992 Lw Capital | 7,027.11 | | |
| 6/9 | 1362 | Cashed Check | | 465.00 | |
| 6/9 | 1367 | Check | | 220.00 | |
| 6/9 | 1373 | Check | | 160.00 | |
| 6/9 | 1368 | Check | | 74.59 | |
| 6/9 | 1369 | Check | | 60.00 | 296,094.03 |
| 6/10 | | WT Fed/02483 U.S. Bank, N.A. /Org=Gfc, LLC Srf# 110610024903 Trn#110810072716 Rtb# 110410024903 | 20,000.00 | | |
| 6/10 | | Wire Trans Svc Charge - Sequence: 110610072716 Srf# 110610024903 Trn#1106100727 Rtb# 110610024903 | | 10.00 | |
| 6/10 | | Payx Small Biz Payroll 061011 xxxxx5523 Lw Capital Corp | | 69.00 | 316,015.03 |
| 6/13 | | Return Item Charge - Paper AZ 110613 | | 3,003.37 | 313,011.66 |
| 6/14 | 1365 | Check | | 800.00 | |
| 6/14 | 1366 | Check | | 800.00 | |
| 6/14 | 1369 | Check | | 40.00 | |
| 6/14 | 1370 | Check | | 37.00 | |
| 6/14 | 1371 | Check | | 8.00 | |
| 6/14 | 1372 | Check | | 6.80 | 311,319.86 |
| 6/16 | | Deposit Made In A Branch/Store | 6,326.96 | | |
| 6/16 | | Payalmpto Funding 110616 800-466-0992 Lw Capital | 4,618.53 | | |
| 6/16 | 1344 | Cashed Check | | 1,390.00 | 320,876.15 |
| 6/17 | 1375 | Cashed Check | | 440.00 | 319,435.15 |
| 6/21 | | Payalmpto Funding 110620 800-466-0992 Lw Capital | 8,501.19 | | 327,936.34 |



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 6/22 | | WT Fed#00719 U.S. Bank, N.A. /Org=Qls, LLC Srf# 110622008107 Trn#110622028639 Rfb# 110622008107 | 260,000.00 | | |
| 6/22 | | Deposit Made In A Branch/Store | 3,290.56 | | |
| 6/22 | | Online Transfer Ref #Ibemq4849K From Business High Yield Savings Pay Back Wilner Loan of 500000 | 160,000.00 | | |
| 6/22 | | Wire Trans Svc Charge - Sequence: 110622028639 Srf# 110622008107 Trn#110622028639 Rfb# 110622008107 | | 10.00 | |
| 6/22 | 1376 | Check | | 575,000.00 | 166,166.90 |
| 6/23 | 1374 | Cashed Check | | 930.00 | 165,226.90 |
| 6/24 | | Payaimple Funding 110623 800-466-0992 Lw Capital | 5,582.45 | | |
| 6/24 | | Acceptpay ACH 110623 (800) 465-0995 Shayna Wein | | 18.24 | 160,791.11 |
| 6/27 | | Deposit | 6,441.80 | | 167,232.91 |
| 6/30 | | Payaimple Funding 110629 800-466-0992 Lw Capital | 7,088.77 | | |
| 6/30 | | Withdrawal Made In A Branch/Store | | 60.00 | 174,251.68 |
| Ending balance on 6/30 | | | | | 174,251.68 |
| Totals | | | $487,467.34 | $634,610.63 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

## Summary of checks written  (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|------|------|------|------|------|------|------|------|------|
| 1344 | 6/16 | 1,890.00 | 1363 | 6/3 | 1,460.00 | 1370 | 6/14 | 37.00 |
| 1348 * | 6/6 | 20.00 | 1364 | 6/3 | 4,850.00 | 1371 | 6/14 | 9.00 |
| 1349 | 6/2 | 408.90 | 1365 | 6/14 | 800.00 | 1372 | 6/14 | 6.00 |
| 1353 * | 6/5 | 225.00 | 1366 | 6/14 | 800.00 | 1373 | 6/9 | 160.00 |
| 1357 * | 6/9 | 220.00 | 1367 | 6/7 | 70.84 | 1374 | 6/23 | 930.00 |
| 1359 * | 6/9 | 60.00 | 1368 | 6/9 | 71.59 | 1375 | 6/17 | 440.00 |
| 1361 * | 6/2 | 797.15 | 1369 | 6/14 | 40.00 | 1376 | 6/22 | 575,000.00 |
| 1362 | 6/9 | 465.00 | | | | | | |

* Gap in check sequence.

## Account transaction fees summary



| Service charge description | Units used | Units included | Excess units | Service charge per excess units ($) | Total service charge ($) |
|------|------|------|------|------|------|
| Paid and Deposited Items | 60 | 150 | 0 | 0.50 | 0.00 |
| Total service charges | | | | | $0.00 |

Looking for ways to cut costs? Direct Pay, through Wells Fargo Business Online, lets you make secure electronic payments. Paying employees and contractors by direct deposit helps save on labor - It's easy for you and convenient for them. You can also use Direct Pay to pay vendors as fast as the next business day. Learn more at wellsfargo.com/biz/directpay.

# IMPORTANT ACCOUNT INFORMATION





## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 11/1 | 1476 | Check | | 4,734.76 | |
| 11/1 | 1469 | Check | | 280.00 | |
| 11/1 | 1471 | Check | | 116.89 | 76,011.46 |
| 11/2 | | WT Fed/01216 U.S. Bank, N.A. /Org=Qfc, LLC Srf# 111102013036 Trn#111102053301 Rfb# 111102013036 | 60,000.00 | | |
| 11/2 | | Deposit Made In A Branch/Store | 8,700.93 | | |
| 11/2 | | Wire Trans Svc Charge - Sequence: 111102053301 Srf# 111102013036 Trn#111102053301 Rfb# 111102013036 | | 15.00 | |
| 11/2 | 1476 | Check | | 25,000.00 | |
| 11/2 | 1468 | Check | | 716.00 | |
| 11/2 | 1472 | Check | | 0.79 | 118,572.68 |
| 11/3 | | Paysimple Funding 111103 800-466-0902 Lw Capital | 376.97 | | 112,949.65 |
| 11/4 | | Deposit Made In A Branch/Store | 1,180.46 | | |
| 11/4 | 1470 | Check | | 42.41 | |
| 11/4 | | Acceptpay ACH 111103 800-466-0996 Shayna Wein | | 20.00 | 114,089.61 |
| 11/7 | | Paysimple Funding 111104 800-466-0902 Lw Capital | 5,340.74 | | |
| 11/7 | 1477 | Check | | 600.00 | 118,907.35 |
| 11/8 | | Deposit | 23,760.00 | | |
| 11/8 | 1478 | Check | | 28,440.00 | 114,217.35 |
| 11/9 | | WT Fed/00761 U.S. Bank, N.A. /Org=Qfc, LLC Srf# 111109007984 Trn#111109036746 Rfb# 111109007984 | 250,000.00 | | |
| 11/9 | | WT Fed/00747 U.S. Bank, N.A. /Org=Qfc, LLC Srf# 111109008033 Trn#111109036818 Rfb# 111109008033 | 250,000.00 | | |
| 11/9 | | Wire Trans Svc Charge - Sequence: 111109036746 Srf# 111109007984 Trn#111109036746 Rfb# 111109007984 | | 15.00 | |
| 11/9 | | Wire Trans Svc Charge - Sequence: 111109036818 Srf# 111109008033 Trn#111109036818 Rfb# 111109008033 | | 15.00 | |
| 11/9 | 1461 | Cashed Check | | 442.80 | |
| 11/9 | 1453 | Cashed Check | | 695.00 | |
| 11/9 | 1481 | Check | | 514.00 | 612,735.85 |
| 11/10 | | Paysimple Funding 111109 800-466-0902 Lw Capital | 12,868.42 | | |
| 11/10 | | Payx Small Biz Payroll 111011 xxxgd0623 Lw Capital Corp | | 60.00 | 625,616.27 |
| 11/14 | | Deposit Made In A Branch/Store | 684.86 | | |
| 11/14 | | Online Transfer Ref #Ibac7x0Jgd to Business High Yield Savings Transfer to Savings | | 100,000.00 | |
| 11/14 | 1485 | Check | | 500,000.00 | |
| 11/14 | 1484 | Check | | 920.00 | |
| 11/14 | 1483 | Check | | 90.00 | 25,192.13 |
| 11/15 | 1490 | Check | | 6,612.28 | |
| 11/15 | 1480 | Check | | 292.88 | |
| 11/15 | 1489 | Check | | 104.12 | 18,273.35 |
| 11/16 | | Deposit Made In A Branch/Store | 5,700.61 | | 23,973.96 |
| 11/17 | | Paysimple Funding 111116 800-466-0902 Lw Capital | 2,939.53 | | |
| 11/17 | 1495 | Check | | 1,496.64 | 25,416.85 |
| 11/18 | | Deposit | 10,679.76 | | 36,096.44 |
| 11/21 | | Paysimple Funding 111118 800-466-0902 Lw Capital | 11,690.63 | | |
| 11/21 | 1496 | Check | | 36,770.69 | |
| 11/21 | 1490 | Check | | 1,930.00 | |
| 11/21 | 1488 | Check | | 841.89 | |
| 11/21 | 1486 | Check | | 260.00 | 10,684.69 |
| 11/22 | 1491 | Check | | 123.45 | |
| 11/22 | 1492 | Check | | 77.13 | |
| 11/22 | | Acceptpay ACH 111121 800-466-0996 Shayna Wein | | 40.60 | 10,623.41 |
| 11/23 | | Paysimple Funding 111122 800-466-0902 Lw Capital | 380.00 | | |
| 11/23 | | Return Item Charge - Paper AZ 111123 | | 372.94 | |



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 5/1 | | ACH Direct Inc Funding 120430 (469) 676-9920 Lw Capital | 3,498.62 | | 181,408.56 |
| 5/2 | | Deposit Made In A Branch/Store | 13,660.71 | | |
| 5/2 | 1594 | Check | | 8,630.00 | 186,469.27 |
| 5/4 | 1596 | Check | | 6,962.25 | |
| 5/4 | | Acceptpay ACH 120503 800-465-0995 Shayna Wein | | 20.00 | 179,487.02 |
| 5/7 | | WT Fed#06686 US Bank, NA /Org=Qfc, LLC Srf# 120507008777 Trn#120507050731 Rfb# 120507008777 | 40,000.00 | | |
| 5/7 | | ACH Direct Inc Funding 120504 (469) 676-9920 Lw Capital | 3,697.76 | | |
| 5/7 | | Wire Trans Svc Charge - Sequence: 120507050731 Srf# 120507008777 Trn#120507050731 Rfb# 120507008777 | | 15.00 | |
| 5/7 | 1595 | Cashed Check | | 160.00 | 222,829.78 |
| 5/10 | | Payx Smsll Biz Payroll 051012 xxxxx6523 Lw Capital Corp | | 315.00 | 222,514.78 |
| 5/11 | | ACH Direct Inc Funding 120510 (469) 676-9920 Lw Capital | 6,748.83 | | |
| 5/11 | 1598 | Check | | 250.00 | |
| 5/11 | 1591 | Check | | 25.00 | 228,988.61 |
| 5/14 | | Deposit Made In A Branch/Store | 59,207.68 | | |
| 5/14 | 1605 | Cashed Check | | 42,400.27 | |
| 5/14 | 1604 | Cashed Check | | 49,896.22 | |
| 5/14 | 1599 | Check | | 4,963.15 | |
| 5/14 | 1597 | Check | | 3,695.30 | |
| 5/14 | 1600 | Check | | 2,644.84 | 184,596.39 |
| 5/15 | | Payx Smsll Biz Payroll 051512 xxxxx6523 Lw Capital Corp | | 24,841.31 | 159,815.08 |
| 5/16 | | ACH Direct Inc Funding 120515 (469) 676-9920 Lw Capital | 6,855.53 | | 166,670.61 |
| 5/17 | | Deposit | 11,618.16 | | |
| 5/17 | 1602 | Check | | 184.39 | 178,004.38 |
| 5/18 | | Deposit | 28,635.42 | | |
| 5/18 | 1610 | Check | | 1,738.00 | |
| 5/18 | 1603 | Check | | 257.00 | 204,902.80 |
| 5/21 | | Deposit | 11,298.43 | | |
| 5/21 | | ACH Direct Inc Funding 120518 (469) 676-9920 Lw Capital | 10,613.59 | | |
| 5/21 | 1609 | Check | | 17,297.42 | |
| 5/21 | 1607 | Check | | 1,080.00 | |
| 5/21 | 1608 | Check | | 614.00 | 206,913.37 |
| 5/22 | 1611 | Cashed Check | | 180.00 | |
| 5/22 | | Acceptpay ACH 120521 800-465-0995 Shayna Wein | | 39.75 | 206,693.62 |
| 5/23 | 1588 | Cashed Check | | 457.60 | |
| 5/23 | 1592 | Cashed Check | | 475.00 | 205,761.12 |
| 5/25 | | ACH Direct Inc Funding 120524 (469) 676-9920 Lw Capital | 10,451.06 | | 216,212.18 |
| 5/29 | | Deposit | 4,135.14 | | 220,347.32 |
| 5/30 | | Deposit | 17,226.42 | | |
| 5/30 | 1606 | Check | | 603.00 | 236,970.74 |
| 5/31 | 1619 | Cashed Check | | 504.00 | 236,466.74 |
| Ending balance on 5/31 | | | | | 236,466.74 |
| Totals | | | $227,505.10 | $168,848.40 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

## Summary of checks written    (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|------|------|------|------|------|------|------|------|------|
| 1588 | 5/23 | 457.60 | 1596 | 5/4 | 6,962.25 | 1602 * | 5/17 | 184.39 |
| 1591 * | 5/11 | 25.00 | 1597 | 5/14 | 3,695.30 | 1603 | 5/18 | 257.00 |
| 1592 | 5/23 | 475.00 | 1598 | 5/11 | 250.00 | 1604 | 5/14 | 49,896.22 |
| 1594 * | 5/2 | 8,630.00 | 1599 | 5/14 | 4,963.15 | 1605 | 5/14 | 42,400.27 |
| 1595 | 5/7 | 160.00 | 1600 | 5/14 | 2,644.84 | 1606 | 5/30 | 603.00 |



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 8/3 | | WT Fed#00032 US Bank, NA /Org=Qic, LLC Srf# 120803006756 Trn#120803036281 Rfb# 120803006758 | 250,000.00 | | |
| 8/3 | | Wire Trans Svc Charge - Sequence: 120803036281 Srf# 120803006756 Trn#120803036281 Rfb# 120803006756 | | 15.00 | 399,842.89 |
| 8/6 | | Deposit Made In A Branch/Store | 12,376.92 | | |
| 8/6 | | Acceptpay ACH 120803 800-465-0095 Shayna Weln | | 20.00 | 412,199.81 |
| 8/7 | | WT Fed#01427 US Bank, NA /Org=Qic, LLC Srf# 120807014693 Trn#120807065562 Rfb# 120807014693 | 250,000.00 | | |
| 8/7 | | ACH Direct Inc Funding 120806 (469) 676-9920 Lw Capital | 1,737.26 | | |
| 8/7 | | Wire Trans Svc Charge - Sequence: 120807065562 Srf# 120807014693 Trn#120807065562 Rfb# 120807014693 | | 15.00 | 663,521.05 |
| 8/8 | 1655 | Cashed Check | | 807.60 | 663,113.86 |
| 8/8 | | Deposit Made In A Branch/Store | 19.83 | | |
| 8/9 | 1677 | Check | | 500,000.00 | |
| 8/9 | 1676 | Check | | 4,165.00 | 158,968.39 |
| 8/10 | | WT Fed#01413027 US Bank, NA /Org=Qic, LLC Srf# 120810027912 Trn#120810113027 Rfb# 120810027912 | 100,000.00 | | |
| 8/10 | | Deposit Made In A Branch/Store | 50,000.00 | | |
| 8/10 | | ACH Direct Inc Funding 120809 (469) 676-9920 Lw Capital | 7,088.49 | | |
| 8/10 | | Wire Trans Svc Charge - Sequence: 120810113027 Srf# 120810027912 Trn#120810113027 Rfb# 120810027912 | | 15.00 | |
| 8/10 | 1678 | Check | | 300.00 | |
| 8/10 | | Payx Small Biz Payroll 081012 xxxxx5923 Lw Capital Corp | | 72.00 | 315,619.88 |
| 8/13 | | WT Fed#01078 Valley Bank /Org=Stratus Content Partners Srf# Trn#120813070346 Rfb# | 2,444.59 | | |
| 8/13 | | Deposit Made In A Branch/Store | 1,616.10 | | |
| 8/13 | | Wire Trans Svc Charge - Sequence: 120813070346 Srf# Trn#120813070346 Rfb# | | 15.00 | |
| 8/13 | 1660 | Check | | 60.00 | |
| 8/13 | | Acceptpay ACH 120810 800-465-0095 Shayna Weln | | 29.57 | 319,455.00 |
| 8/14 | 1670 | Check | | 28,803.34 | |
| 8/14 | 1671 | Check | | 14,376.41 | 276,300.31 |
| 8/16 | 1675 | Cashed Check | | 1,310.00 | |
| 8/16 | 1672 | Check | | 1,071.00 | 273,928.31 |
| 8/16 | | ACH Direct Inc Funding 120815 (469) 676-9920 Lw Capital | 9,381.83 | | 283,267.14 |
| 8/17 | 1685 | Check | | 22,000.00 | |
| 8/17 | 1686 | Check | | 380.00 | 260,897.14 |
| 8/20 | 1690 | Check | | 9,966.16 | |
| 8/20 | 1686 | Check | | 460.00 | |
| 8/20 | 1693 | Check | | 379.00 | |
| 8/20 | 1687 | Check | | 260.50 | |
| 8/20 | 1681 | Check | | 190.50 | 249,681.98 |
| 8/21 | | ACH Direct Inc Funding 120820 (469) 676-9920 Lw Capital | 9,465.81 | | 259,148.79 |
| 8/24 | | ACH Direct Inc Funding 120823 (469) 676-9920 Lw Capital | 9,235.02 | | |
| 8/24 | | Deposit Made In A Branch/Store | 3,594.30 | | |
| 8/24 | 1684 | Check | | 233.02 | 271,744.29 |
| 8/27 | | Payx Small Biz Payroll 082712 xxxxx5923 Lw Capital Corp | | 29,771.31 | 241,972.98 |
| 8/28 | 1694 | Check | | 28,586.01 | 213,386.97 |
| 8/30 | | Deposit Made In A Branch/Store | 2,033.17 | | |
| 8/30 | | ACH Direct Inc Funding 120829 (469) 676-9920 Lw Capital | 1,216.04 | | 216,676.18 |
| 8/31 | | ACH Direct Inc Funding 120830 (469) 676-9920 Lw Capital | 5,166.62 | | 221,742.70 |
| | | Ending balance on 8/31 | | | 221,742.70 |
| **Totals** | | | **$715,117.93** | **$643,233.12** | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.




## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 10/1 | | ACH Direct Inc Funding 120928 (469) 676-9920 Lw Capital | 6,664.20 | | |
| 10/1 | 1722 | Check | | 19,829.40 | |
| 10/1 | 1721 | Check | | 7,856.07 | |
| 10/1 | 1719 | Check | | 688.44 | |
| 10/1 | 1716 | Check | | 162.11 | |
| 10/1 | 1720 | Check | | 42.82 | 140,426.00 |
| 10/3 | | Deposit Made In A Branch/Store | 5,953.12 | | |
| 10/3 | 1715 | Cashed Check | | 492.60 | |
| 10/3 | 1713 | Cashed Check | | 522.00 | |
| 10/3 | 1718 | Check | | 16.50 | 144,986.02 |
| 10/4 | | Acceptpay ACH 121003 800-465-0995 Shayna Wein | | 20.00 | 144,966.02 |
| 10/5 | | ACH Direct Inc Funding 121004 (469) 676-9920 Lw Capital | 1,737.25 | | |
| 10/5 | 1723 | Check | | 469.00 | |
| 10/5 | 1724 | Check | | 100.00 | 146,134.27 |
| 10/9 | 1728 | Check | | 280.00 | |
| 10/9 | 1717 | Check | | 80.01 | |
| 10/9 | 1687 | Check | | 25.00 | 145,769.26 |
| 10/10 | | Payx Small Biz Payroll 101012 xxxxx5523 Lw Capital Corp | 72.00 | | 145,697.26 |
| 10/11 | 1726 | Check | | 235.00 | |
| 10/11 | 1711 | Check | | 150.00 | |
| 10/11 | | Acceptpay ACH 121010 800-465-0995 Shayna Wein | | 26.49 | 145,285.77 |
| 10/12 | | ACH Direct Inc Funding 121011 (469) 676-9920 Lw Capital | 8,150.79 | | |
| 10/12 | 1729 | Cashed Check | | 200.00 | |
| 10/12 | 1703 | Check | | 15.00 | 153,221.56 |
| 10/16 | | ACH Direct Inc Funding 121015 (469) 676-9920 Lw Capital | 7,764.24 | | |
| 10/16 | 1736 | Check | | 30,096.69 | 130,889.11 |
| 10/18 | 1734 | Check | | 10,136.63 | |
| 10/18 | 1732 | Check | | 550.00 | 120,202.48 |
| 10/19 | | ACH Direct Inc Funding 121018 (469) 676-9920 Lw Capital | 10,911.81 | | |
| 10/19 | | Deposit Made In A Branch/Store | 2,867.19 | | 133,981.48 |
| 10/22 | 1731 | Check | | 260.00 | |
| 10/22 | 1733 | Check | | 204.50 | 133,526.98 |
| 10/24 | 1730 | Cashed Check | | 492.50 | |
| 10/24 | 1727 | Cashed Check | | 847.60 | |
| 10/24 | 1738 | Check | | 2,694.00 | 129,672.88 |
| 10/26 | | ACH Direct Inc Funding 121025 (469) 676-9920 Lw Capital | 10,451.06 | | |
| 10/26 | | Deposit Made In A Branch/Store | 3,913.30 | | |
| 10/26 | 1738 | Cashed Check | | 200.00 | 144,037.34 |
| 10/30 | 1739 | Cashed Check | | 985.00 | 143,052.34 |
| 10/31 | | WT Fed#01710 US Bank, NA /Org=Qlc, LLC Srf# 121031023372 Trn#121031076905 Rfb# 121031023372 | 250,000.00 | | |
| 10/31 | | WT Fed#01714 US Bank, NA /Org=Qlc, LLC Srf# 121031023305 Trn#121031076847 Rfb# 121031023305 | 250,000.00 | | |
| 10/31 | | ACH Direct Inc Funding 121030 (469) 676-9920 Lw Capital | 6,664.20 | | |
| 10/31 | | Wire Trans Svc Charge - Sequence: 121031076905 Srf# 121031023372 Trn#121031076905 Rfb# 121031023372 | | 15.00 | |
| 10/31 | | Wire Trans Svc Charge - Sequence: 121031076847 Srf# 121031023305 Trn#121031076847 Rfb# 121031023305 | | 15.00 | 649,686.54 |
| Ending balance on 10/31 | | | | | 649,686.54 |
| Totals | | | $565,077.16 | $77,431.16 | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 11/2 | | Deposit Made In A Branch/Store | 710.00 | | |
| 11/2 | | Online Transfer Ref #Ibeqqymim From Business High Yield Savings for Payroll | 54,000.00 | | |
| 11/2 | 1740 | Check | | 600,000.00 | 104,395.64 |
| 11/5 | | WT Fed#00479 US Bank, NA/Org=Cie, LLC Srf# 121105007088 Trn#121105042489 Rfb# 121105007088 | 60,000.00 | | |
| 11/5 | | Wire Trans Svc Charge - Sequence: 121105042489 Srf# 121105007088 Trn# 121105042489 Rfb# 121105007088 | | 15.00 | |
| 11/5 | | Payx Small Biz Payroll 110512 xxxxx6523 Lw Capital Corp | | 39,409.28 | 114,972.26 |
| 11/6 | | Acceptpay ACH 121106 800-466-0695 Shayna Weln | | 20.00 | 114,952.26 |
| 11/7 | | ACH Direct Inc Funding 121108 (469) 675-9920 Lw Capital | 3,476.71 | | 116,428.99 |
| 11/9 | | ACH Direct Inc Funding 121108 (469) 675-9920 Lw Capital | 8,150.79 | | |
| 11/9 | | Deposit Made In A Branch/Store | 1,243.60 | | |
| 11/9 | | Anthem Bc RA-0201003 121108 000000349644962 Lw Capital Corp. | | 1,680.00 | |
| 11/9 | 1745 | Check | | 200.00 | 125,942.68 |
| 11/13 | 1743 | Check | | 5,846.69 | |
| 11/13 | | Payx Small Biz Payroll 111312 xxxxx6523 Lw Capital Corp | | 72.00 | 120,023.99 |
| 11/14 | 1742 | Check | | 195.00 | |
| 11/14 | | Acceptpay ACH 121111 800-466-0695 Shayna Weln | | 25.94 | 119,803.05 |
| 11/16 | | ACH Direct Inc Funding 121116 (469) 675-9920 Lw Capital | 8,122.24 | | |
| 11/16 | 1746 | Check | | 624.48 | |
| 11/19 | 1741 | Check | | 140.00 | 127,160.81 |
| 11/20 | | Deposit Made In A Branch/Store | 5,191.49 | | |
| 11/20 | 1744 | Cashed Check | | 1,025.00 | 131,317.30 |
| 11/21 | | ACH Direct Inc Funding 121120 (469) 675-9920 Lw Capital | 13,709.89 | | 144,613.19 |
| 11/21 | 1748 | Check | | 814.00 | |
| 11/23 | 1753 | Check | | 230.00 | |
| 11/23 | 1747 | Check | | 119.43 | 144,103.76 |
| 11/26 | | Deposit Made In A Branch/Store | 1,816.42 | | 145,982.18 |
| 11/27 | | ACH Direct Inc Funding 121126 (469) 675-9920 Lw Capital | 10,451.06 | | 156,433.24 |
| 11/28 | 1749 | Check | | 1,870.00 | |
| 11/28 | 1755 | Check | | 150.00 | 154,413.24 |
| 11/29 | 1758 | Check | | 47,765.76 | |
| 11/29 | 1769 | Check | | 33,810.98 | 72,849.51 |
| 11/30 | | ACH Direct Inc Funding 121129 (469) 675-9920 Lw Capital | 6,634.20 | | 82,365.01 |
| 11/30 | | Deposit Made In A Branch/Store | 2,854.30 | | 82,365.01 |
| Ending balance on 11/30 | | | | | 82,365.01 |
| Totals | | | $166,382.69 | $733,704.43 | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

## Summary of checks written   (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 1740 | 11/2 | 600,000.00 | 1745 | 11/9 | 200.00 | 1753 * | 11/23 | 230.00 |
| 1741 | 11/19 | 140.00 | 1746 | 11/19 | 624.48 | 1755 * | 11/28 | 150.00 |
| 1742 | 11/14 | 195.00 | 1747 | 11/23 | 119.43 | 1758 * | 11/29 | 47,765.76 |
| 1743 | 11/13 | 5,846.69 | 1748 | 11/21 | 814.00 | 1769 | 11/29 | 33,810.98 |
| 1744 | 11/20 | 1,025.00 | 1749 | 11/28 | 1,870.00 | | | |

* Gap in check sequence.



## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 1/2 | | WT Fed#02939 US Bank, NA./Org=Cfo, LLC Srf# 130102029387 | 300,000.00 | | |
| | | Trn#130102097802 Rfb# 130102029387 | | | |
| 1/2 | | Deposit Made In A Branch/Store | 9,020.42 | | |
| 1/2 | | ACH Direct Inc Funding 121231 (469) 676-9920 Lw Capital | 9,051.76 | | |
| 1/2 | | Wire Trans Svc Charge - Sequence: 130102097802 Srf# | | 15.00 | 358,107.06 |
| | | 130102029387 Trn#130102097802 Rfb# 130102029387 | | | |
| 1/4 | | Cashed Check | | 220.00 | |
| 1/4 | 1788 | Check | | 100.00 | |
| 1/4 | | Acceptpay ACH 130103 800-465-0995 Shayna Weln | | 20.00 | 357,867.06 |
| 1/7 | 1785 | Check | | 5,396.00 | 352,461.06 |
| 1/8 | | ACH Direct Inc Funding 130107 (469) 676-9920 Lw Capital | 3,476.71 | | 355,937.77 |
| 1/9 | | WT Fed#02807 US Bank, NA./Org=Cfo, LLC Srf# 130109023869 | 42,000.00 | | |
| | | Trn#130109096039 Rfb# 130109023869 | | | |
| 1/9 | | Wire Trans Svc Charge - Sequence: 130109096039 Srf# | | 15.00 | 407,922.77 |
| | | 130109023869 Trn#130109096039 Rfb# 130109023869 | | | |
| 1/10 | | Payx Small Biz Payroll 011013 xxxxx5523 Lw Capital Corp | | 72.00 | 407,850.77 |
| 1/11 | | ACH Direct Inc Funding 130110 (469) 676-9920 Lw Capital | 7,864.79 | | |
| 1/11 | | Acceptpay ACH 130110 800-465-0995 Shayna Weln | | 27.59 | 415,687.97 |
| 1/14 | | Paychex Inc. Payroll 4628920000650x Lw Capital Corp | | 7,640.76 | |
| 1/14 | 1767 | Check | | 318.00 | 407,723.21 |
| 1/15 | | Paychex Tps Taxes 010913 48269400017690x Lw Capital Corp | | 4,024.84 | |
| 1/15 | | Paychex Elb Invoice 130115 x48302220000137z Lw Capital Corp | | 49.80 | 403,649.57 |
| 1/16 | | ACH Direct Inc Funding 130115 (469) 676-9920 Lw Capital | 8,122.24 | | |
| 1/16 | 1769 | Check | | 330.00 | 411,440.81 |
| 1/17 | 1790 | Cashed Check | | 514.00 | 410,926.81 |
| 1/18 | 1786 | Check | | 360.00 | |
| 1/18 | 1794 | Check | | 2,206.00 | |
| 1/18 | 1768 | Check | | 763.57 | 407,597.24 |
| 1/22 | | ACH Direct Inc Funding 130118 (469) 676-9920 Lw Capital | 14,626.69 | | |
| 1/22 | 1791 | Check | | 1,870.00 | |
| 1/22 | 1789 | Check | | 200.00 | 420,153.93 |
| 1/23 | | WT Fed#00565 US Bank, NA./Org=Cfo, LLC Srf# 130123007839 | 300,000.00 | | |
| | | Trn#130123030104 Rfb# 130123007839 | | | |
| 1/23 | | Deposit Made In A Branch/Store | 4,877.44 | | |
| 1/23 | | Online Transfer Ref #Ibexkr029Z From Business High Yield | 100,000.00 | | |
| | | Savings New Loan for Sung Grow 200000 | | | |
| 1/23 | | Wire Trans Svc Charge - Sequence: 130123030104 Srf# | | 15.00 | |
| | | 130123007839 Trn#130123030104 Rfb# 130123007839 | | | |
| 1/23 | 1801 | Check | | 700,000.00 | |
| 1/23 | 1793 | Check | | 100.00 | 124,416.37 |
| 1/24 | 1788 | Check | | 400.00 | 124,016.37 |
| 1/25 | 1787 | Cashed Check | | 875.00 | 123,141.37 |
| 1/28 | | ACH Direct Inc Funding 130125 (469) 676-9920 Lw Capital | 3,238.02 | | |
| 1/28 | | Deposit Made In A Branch/Store | 5,292.63 | | |
| 1/28 | 1803 | Cashed Check | | 1,000.00 | |
| 1/28 | 1800 | Check | | 2,884.95 | 133,784.66 |
| 1/29 | 1805 | Check | | 300.00 | 133,484.66 |
| 1/31 | | ACH Direct Inc Funding 130130 (469) 676-9920 Lw Capital | 8,666.70 | | |
| 1/31 | | Deposit Made In A Branch/Store | 1,617.02 | | 143,867.38 |
| **Ending balance on 1/31** | | | | | **143,867.38** |
| **Totals** | | | **$822,450.44** | **$729,722.92** | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

**CUMMINS & BROWN, LLC**
ATTORNEYS AND COUNSELORS AT LAW
SCRIPPS CENTER
312 WALNUT STREET, SUITE 1000
CINCINNATI, OHIO 45202

TELEPHONE
513-241-6400

FACSIMILE
513-241-6464

April 21, 2015

**Via Electronic Mail**
Judd R. Uhl, Esq.
Katherine L. Kennedy, Esq.
Mannion & Gray
909 Wright's Summit Parkway, Suite 230
Ft. Wright, KY 41011

Re:     Capannari, et al. v. Galemmo, et al.

Dear Counsel:

We recently received Defendants Larry Wein and L.W. Capital Corporation's "Responses to Plaintiff's Second Set of Admissions." In response to Request for Admission No. 1, your client denied depositing funds in the bank accounts of any of the Galemmo Entities.

This response does not comport with records that we have obtained. For example, records of deposit and withdrawal from U.S. bank concerning Galemmo Entity Queen City Investment Fund II show a deposit in the amount of $50,000.00 from Lawrence P. Wein to the Queen City Investment Fund II account on December 3, 2010.

The deposit was not an isolated event. On March 31, 2011 a wire credit from Mr. Wein for $500,000.00 into the Queen City Investment Fund II account. On April 5, 2012, Mr. Wein wired another $500,000.00 into the same account.

Records show that despite the denial, Mr. Wein knowingly deposited funds into Galemmo Entity bank accounts. Prior to his deposit on March 31, 2011, Mr. Wein sought and received email instructions for how to wire funds into the Queen City Investment Fund II. This is shown by the email message from Adrienne Bowling to Mr. Wein on February 16, 2011 where Ms. Bowling states: "Here are the wiring instructions you requested" and provides the information needed for Mr. Wein to transmit funds into the Queen City Investment Fund II account.

This email directly contradicts the assertion made by Mr. Wein in response to Request for Admission No. 4: "Defendants never knowingly deposited money into any Galemmo entities."

The relevant records are enclosed herein. Please explain why your client has denied depositing funds into the Galemmo Entities when records show that he has knowingly done so.

Sincerely,

Adam S Brown

ASB:th
Enclosures
39205

MONEY WIRED OUT TO balem MO

**WELLS FARGO**

# Money Market Checking

**Account number:**

LAWRENCE P WEIN

Wells Fargo Bank, N.A., California

Questions about your account: **1-800-742-4932**

Worksheet to balance your account and General Statement Policies can be found towards the end of this statement.

| Activity summary | |
| --- | --- |
| Balance on 12/1 | 1,021,784.52 |
| Deposits/Additions | 21,466.41 |
| Withdrawals/Subtractions | - 414,586.54 |
| Balance on 12/31 | $628,667.39 |

## Checking account and WF Advantage CA Municipal MMF summary

| | |
| --- | --- |
| Money Market Fund balance on 12/31 | $628,667.39 |
| Checking balance | $0.00 |
| Dividends earned this period | *$7.33 |
| Dividends earned this year | $17.86 |
| Minimum balance | $762,747.39 |
| Average balance | $862,793.46 |
| 7-day current yield as of 12/31 | 0.0100010% |
| 30-day current yield as of 12/31 | 0.0100010% |

* The asked amount will post to your account on the first business day of the following month and appear on your next statement.

## Transaction history

| Date | Description | Check No. | Deposits/Additions | Withdrawals/Subtractions |
| --- | --- | --- | --- | --- |
| | | | 8.41 | 1,000.00 |
| 12/1 | Dividend Paid/Reinvested Prior Month WF Advantage CA Municipal MMF | | | 277.00 |
| 12/1 | Fld Bkg Svc LLC Moneyline 101201 1840051001M6A6R Lawrence P Wein | 1881 | | 20.00 |
| 12/1 | Check | | | 50,000.00 |
| 12/8 | Wire Trans Svc Charge - Sequence: 101203056426 Srf# 0000020337767642 | | | 4,382.54 |
| | Trn#101203056426 Rfb# | | | 2,696.00 |
| | WT Fed#00376 U.S.Bank, N.A./Ftr/Bnf=Queen City Investment Fund II Srf# 0000020337767642 Trn#101203056426 Rfb# | 1882 | 9,700.00 | |
| 12/8 | Online Transfer Ref #Ibejbxcycy to CAMuni MMC Wein Portion of Prop Tax Dec 10 | | | 15,000.00 |
| 12/8 | Check | | 11,700.00 | |
| 12/7 | Deposit | | | 200,000.00 |
| 12/8 | Fld Bkg Svc LLC Moneyline 101208 1840051001Mclu4 Lawrence P Wein | | | 6,000.00 |
| 12/14 | Deposit | | | |
| 12/14 | Online Transfer Ref #Ibebyvn8Rf to Home Equity Line of Credit Payback Loan For Vernon Rell | | | |
| 12/14 | Online Transfer Ref #Ibe29Q5Kf7 to CAMuni MMC Wein 6000 Deposit Dec 2010 | | | |

**Investment and Insurance Products:**
- Are NOT insured by the FDIC or any other federal government agency
- Are NOT deposits of or guaranteed by the Bank or any Bank affiliate
- MAY Lose Value

**Important Information**
This statement must be accompanied or preceded by a current prospectus for the funds in which you are invested. Consider the investment objectives, risks, charges, and expenses of the investment carefully before investing. This and other information about Wells Fargo Advantage Funds can be found in a current prospectus. Please read it carefully before investing.

An investment in a money market fund is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency.

Although the Fund seeks to preserve the value of your investment at $1 per share, it is possible to lose money by investing in a money market fund.

Wells Fargo Funds Management, LLC, a wholly-owned subsidiary of Wells Fargo & Company, provides investment advisory and administrative services for Wells Fargo Advantage Funds. Other affiliates of Wells Fargo & Company provide sub-advisory and other services for the Funds. The Funds are distributed by Wells Fargo Funds Distributor, LLC, member NASD/SIPC, an affiliate of Wells Fargo & Company.

EXHIBIT

283891



**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you
would like more information regarding Overdraft Protection and
eligibility requirements please call the number listed at the top of
your statement or visit your Wells Fargo branch.

## Checking and money market summary

Fund name: *WF Advantage CA Municipal MMF*

| | |
|---|---|
| Money market fund balance on 2/28 | $9,926.57 |
| Checking balance on   2/28 | $0.00 |
| Dividends earned this period | * $0.17 |
| Dividends earned year to date | $2.02 |
| Money market fund minimum balance | $9,926.57 |
| Money market fund average balance | $22,014.30 |
| 7-day current yield as of 2/28 | 0.01% |
| 30-day current yield as of 2/28 | 0.01% |

\* * The actual dividend amount will post to your account on the first
business day of the following month and appear on your next
statement.

## Transaction history

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 2/1 | | Dividend Paid/Reinvested Prior Month WF Advantage CA Municipal MMF | 1.85 | | |
| 2/1 | | Online Transfer Ref #Ibebz8391q to Checking Temp Transfer for 643 Vernon Refi | | 16,000.00 | |
| 2/1 | | Fid Bkg Svc LLC Moneyline 110201 164005100 INfqla Lawrence P Wein | | 1,000.00 | 11,289.57 |
| 2/3 | | Online Transfer From Thompson S Ref #Ibebz59P62 Checking Thank You Larry for Your Patience | 250.00 | | 11,609.57 |
| 2/4 | 1694 | Check | | 281.00 | 11,227.57 |
| 2/16 | | Fid Bkg Svc LLC Moneyline 110216 xxxxx8100 DuSA Lawrence P Wein | | 1,000.00 | 10,227.57 |
| 2/16 | | Online Transfer Ref #Ibempcvwrf From Home Equity Line of Credit Short Term Loan to Willner | 300,000.00 | | 310,227.57 |
| 2/17 | | Wire Trans Svc Charge – Sequence: 110217070898 Srf# 0000692048390287 Trn#110217070898 Rfb# | | 20.00 | |
| 2/17 | | WT Fed#06067 U.S. Bank, N.A. /Ftr/Bnf=Queen City Investment Fund II Srf# 0000692048390287 Trn#110217070898 Rfb# | | 300,000.00 | 10,207.57 |
| 2/22 | 1695 | Check | | 281.00 | 9,926.57 |
| **Ending balance on 2/28** | | | | | 9,926.57 |
| **Totals** | | | **$300,251.85** | **$317,582.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your
transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*



## Transaction history

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 3/1 | | Dividend Paid/Reinvested Prior Month WF Advantage CA Municipal MMF | 0.17 | | |
| 3/1 | | Fid Bkg Svc LLC Moneyline 110301 xxxxx6100 166Mp Lawrence P Wein | | 1,000.00 | 8,926.74 |
| 3/3 | | Deposit | 2,500.00 | | 11,426.74 |
| 3/8 | | Online Transfer Ref #Ibebzkd5Z to WF Home Equity Acct Pay Back Vernon Loan | | 6,000.00 | 5,426.74 |
| 3/10 | | Fid Bkg Svc LLC Moneyline 110316 xxxxx6100 1loyn Lawrence P Wein | | 1,000.00 | |
| 3/15 | ^ 1686 | Aetna Companies Bill Pymnt 110314 1886 | | 309.00 | 4,117.74 |
| 3/17 | | Online Transfer From Thompson S Ref #Ibeql0Los Checking Balance Owed to NOW 3300 | 150.00 | | 4,267.74 |
| 3/24 | | Online Transfer From Thompson S Ref #Ibexdq8xx4 Checking Balance Owed to NOW 3150 Thank You | 150.00 | | 4,417.74 |
| 3/25 | | Deposit | 315,000.00 | | 319,417.74 |
| 3/28 | | Online Transfer Ref #Ibexdqp97Z to Home Equity Line of Credit Pay Off Willner Loan | | 300,000.00 | |
| 3/28 | | Online Transfer Ref #Ibex57Bnz7G to WF Home Equity Acct Repay 543 Vernon Loan | | 15,000.00 | |
| 3/28 | | Online Transfer Ref #Ibexhnjp63 to Home Equity Line of Credit Willner Loan | | 826.08 | 3,589.66 |
| 3/30 | | Online Transfer Ref #Ibexdx6Lpk From Home Equity Line of Credit Willner Loan | 335,000.00 | | |
| 3/30 | | Online Transfer Ref #Ibejsk6Wd5 From WF Home Equity Acct Willner Loan | 75,000.00 | | 413,589.66 |
| 3/31 | | Deposit Made In A Branch/Store | 100,000.00 | | |
| 3/31 | | Wire Trans Svc Charge – Sequence: 110331106447 Srf# 0000692000342890 Trn#110331106447 Rtb# | | 20.00 | |
| 3/31 | | WT Fed#09379 U.S. Bank, N.A. /Ftr/Bnf=Queen City Investment Fund II Srf# 0000692000342890 Trn#110331106447 Rtb# | | 500,000.00 | |
| 3/31 | 1697 | Check | | 281.00 | 13,288.66 |
| Ending balance on 3/31 | | | | | 13,288.66 |
| Totals | | | $927,800.17 | $824,438.08 | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

^ *Converted check:Check converted to an electronic format by your payee or designated representative. Checks converted to electronic format cannot be returned, copied or imaged.*

## Summary of checks written  *(checks listed are also displayed in the preceding Transaction history)*

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 1686 | 3/15 | 309.00 | 1697 | 3/31 | 281.00 |

## Money market fund sweep transactions

| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|---|---|
| 3/1 | – 0.17 | 3/8 | + 6,000.00 | 3/24 | – 150.00 | 3/30 | – 410,000.00 |
| 3/4 | + 1,000.00 | 3/16 | + 1,809.00 | 3/25 | – 315,000.00 | 3/31 | + 400,301.00 |
| 3/4 | – 2,500.00 | 3/17 | – 150.00 | 3/28 | + 315,826.08 | | |

*Sweep transactions are settled in the Fund, and Fund shares are actually purchased and redeemed on the business day immediately following the day of the sweep shown above.*



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|------|-------|-------------|---------------------|---------------------------|----------------------|
| 6/2 | | Deposit | 2,426.36 | | 6,963.42 |
| 6/6 | 1692 | Check | | 281.00 | 6,682.42 |
| 6/15 | | Fid Bkg Svc LLC Moneyline 110615 xxxxx5100 3) BK Lawrence P Wein | | 1,000.00 | 5,682.42 |
| 6/22 | | Deposit | 575,000.00 | | 580,682.42 |
| 6/23 | | Online Transfer Ref #Ibejz2Xs4T to Home Equity Line of Credit Payback Wilner Loan | | 315,000.00 | |
| 6/23 | | Online Transfer Ref #Ibe57Txqlq to Wf Home Equity Acct Payback Wilner Loan | | 260,000.00 | 5,682.42 |
| 6/30 | 1693 | Check | | 281.00 | 5,401.42 |
| Ending balance on 6/30 | | | | | 5,401.42 |
| Totals | | | $577,426.41 | $577,582.00 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

## Summary of checks written   (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|
| 1692 | 6/6 | 281.00 | 1693 | 6/30 | 281.00 |

## Money market fund sweep transactions

| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|------|--------|
| 6/1 | + 0.05 | 6/3 | - 2,426.00 | 6/15 | +1,000.00 | 6/23 | +575,000.00 |
| 6/1 | +1,000.00 | 6/6 | +281.00 | 6/22 | - 575,000.00 | 6/30 | +281.00 |
| 6/2 | - 0.36 | | | | | | |

Sweep transactions are settled in the Fund, and Fund shares are actually purchased and redeemed on the business day immediately following the day of the sweep shown above.

 IMPORTANT ACCOUNT INFORMATION

Save time with Online Bill Pay

Save time, avoid late fees, and save on postage costs. Be at ease knowing your payments get there fast-with over 90% of our top payees able to receive payments in 2 days or less. You can even make same day payments to Wells Fargo credit accounts, and to other select merchants. Pay your bills efficiently with Wells Fargo Bill Pay-backed by our Payment Guarantee. We guarantee your payments will be paid as scheduled, on time, every time. Go to wellsfargo.com or wellsfargo.com/biz to sign up or sign on today.



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|------|------|------|------|------|------|
| 7/27 | | Deposit | 5,000.00 | | 10,771.63 |
| 7/28 | 1694 | Check | | 281.00 | 10,490.63 |
| Ending balance on 7/31 | | | | | 10,490.63 |
| Totals | | | $7,426.21 | $2,336.00 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

## Summary of checks written  (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount |
|------|------|------|
| 1694 | 7/28 | 281.00 |

## Money market fund sweep transactions

| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|------|------|------|------|------|------|------|------|
| 7/1 | -0.21 | 7/7 | -2,300.00 | 7/19 | -125.00 | 7/28 | +281.00 |
| 7/1 | +1,060.00 | 7/15 | +1,000.00 | 7/27 | -5,000.00 | | |

Sweep transactions are settled in the Fund, and Fund shares are actually purchased and redeemed on the business day immediately following the day of the sweep shown above.





## With you when *saving money becomes automatic*

Now you can save automatically with the Wells Fargo Way2Save® Savings account. $1 is automatically transferred from your checking account to your Way2Save Savings account when you make a debit card purchase, pay a bill with Wells Fargo Online® Bill Pay, or make an automatic payment. Speak with a banker, call us at 1-800-WFB-OPEN, or visit wellsfargo.com to learn more today.

## ✔ IMPORTANT ACCOUNT INFORMATION

Sign up for Online Banking and get free, 24/7 access to your Wells Fargo accounts.
With Online Banking, you can view detailed account information, manage your account profile and transfer funds at your fingertips. You can also choose to receive important notices and your account statements online – it's quicker and safer than receiving them in the mail and it's environmentally friendly. With this service, you can have time-sensitive information sent to your email - for example, you can receive an alert when a deposit is made, when your account balance falls below a pre-set balance in your account, or when overdraft protection was needed. Sign on and get started today by visiting wellsfargo.com.

Enjoy your summer!
Whether camping, beachcombing, bicycling, hiking, exploring museums, or visiting family or friends, enjoy summer and easily manage your money with free access to Mobile Banking*. Take the Wells Fargo Mobile service with you on your next weekend trip or vacation!



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|------|--------------|-------------|---------------------|---------------------------|----------------------|
| 9/6 | | Deposit | 2,205.00 | | 7,075.91 |
| 9/8 | 1695 | Check | | 401.00 | 6,674.91 |
| 9/13 | | Online Transfer Ref #be2CC3Wnt From Home Equity Line of Credit Wilner Short Term Loan 235000 | 235,000.00 | | |
| 9/13 | | Online Transfer Ref #belg2F6H From WF Home Eqlty Acct Short Term Loan Wilner 20000 | 20,000.00 | | 261,674.91 |
| 9/14 | | Deposit Made In A Branch/Store | 250,000.00 | | 511,674.91 |
| 9/16 | | Wire Trans Svc Charge - Sequence: 110916082214 Srf# 000069225770B464 Trn#110916082214 Rfb# | | 20.00 | |
| 9/16 | | WT Fed#03100 U.S. Bank, N.A. /Ftr/Bnf=Queen City Investment Fund II Srf# 000692257708464 Trn#110916082214 Rfb# Weln | | 500,000.00 | |
| 9/16 | | Fid Bkg Svc LLC Moneyline 110915 xxxxx5100 5A9Sz Lawrence P | | 1,000.00 | 10,654.91 |
| 9/19 | | Bank Originated Credit | 18,000.00 | | 28,654.91 |
| 9/20 | | Withdrawal Made In A Branch/Store | | 9,400.00 | 19,254.91 |
| 9/27 | | Online Transfer Ref #Bamqqvpyn to Home Equity Line of Credit Payback Loan for Wilner 10000 | | 10,000.00 | |
| 9/27 | | Withdrawal Made In A Branch/Store | | 5,000.00 | 4,254.91 |
| 9/30 | | Deposit | 6,000.00 | | 10,254.91 |
| Ending balance on 9/30 | | | | | 10,254.91 |
| Totals | | | $531,205.00 | $525,621.00 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

## Summary of checks written  (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount |
|--------|------|--------|
| 1695 | 9/8 | 401.00 |

## Money market fund sweep transactions

| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|------|--------|
| 9/1 | - 1.06 | 9/8 | +401.00 | 9/16 | +501,020.00 | 9/27 | +15,000.00 |
| 9/1 | +1,000.00 | 9/13 | - 255,000.00 | 9/19 | - 18,000.00 | 9/30 | - 6,000.00 |
| 9/7 | - 2,205.00 | 9/14 | - 250,000.00 | 9/20 | +9,400.00 | | |

Sweep transactions are settled in the Fund, and Fund shares are actually purchased and redeemed on the business day immediately following the day of the sweep shown above.

---

The Wells Fargo ExpressSend service is available online

With Wells Fargo Online, you can quickly send money back home using your existing ExpressSend service.
- To get started, sign on to wellsfargo.com, select the "Transfer" tab and click "To Another Country" tab.
- You'll obtain information about your transfer fees and the current foreign exchange rate before you submit a transfer.
- Online transaction history makes it easy to monitor all your ExpressSend transfers.

There's no more waiting in teller lines.* Send money home today!

*The first remittance transfer for each ExpressSend service agreement must be completed in person at a Wells Fargo store. Cash-based remittance transfers can only be initiated at a Wells Fargo store.



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|------|-------------|-------------|-----|------|------|
| 10/6 | | Deposit Made In A Branch/Store | 2,236.82 | | |
| 10/6 | | Online Transfer Ref #Ibe68Kfm2Sl, to OA Muni MMC 3000 Additional Total 6000 of 10000 | | 3,000.00 | 8,492.02 |
| 10/11 | | Deposit | 24,000.00 | | 32,492.02 |
| 10/12 | | Withdrawal Made In A Branch/Store | | 8,000.00 | 24,492.02 |
| 10/17 | | Bank Originated Credit | 8,000.00 | | |
| 10/17 | | Fid Bkg Svc LLC Moneyline 111017 xxxxx5100 5Tgy0 Lawrence P Wein | | 1,000.00 | 31,492.02 |
| 10/20 | | Withdrawal Made In A Branch/Store | | 8,000.00 | 23,492.02 |
| 10/24 | | Deposit | 10,000.00 | | 33,492.02 |
| 10/27 | 1696 | Cashed Check | | 350.00 | |
| 10/27 | | Withdrawal Made In A Branch/Store | | 6,000.00 | |
| 10/27 | 1697 | Check | | 25,000.00 | 3,142.02 |
| Ending balance on 10/31 | | | | | 3,142.02 |
| Totals | | | $44,237.41 | $61,350.00 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

## Summary of checks written   (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|
| 1696 | 10/27 | 350.00 | 1697 | 10/27 | 25,000.00 |

## Money market fund sweep transactions



| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|------|--------|
| 10/3 | - 0.25 | 10/7 | - 2,236.00 | 10/17 | - 7,000.00 | 10/24 | - 10,000.00 |
| 10/3 | + 1,000.00 | 10/11 | - 24,000.00 | 10/20 | + 8,000.00 | 10/27 | + 30,350.00 |
| 10/6 | + 2,999.18 | 10/12 | + 8,000.00 | | | | |

Sweep transactions are settled in the Fund, and Fund shares are actually purchased and redeemed on the business day immediately following the day of the sweep shown above.

# ☑ IMPORTANT ACCOUNT INFORMATION

Enjoy safe and secure savings with a Wells Fargo Time Account (CD). You will get a guaranteed rate of return and have the peace of mind of knowing your money is FDIC insured up to applicable limits. Talk with your Wells Fargo Banker today.

Turn off the paper clutter . . . If you bank online, get your statement online. It's easy to switch to Online Only Statements. Sign on at wellsfargo.com/turnoffpaper, select Online Only, or check the box Switch All to Online Only Delivery and click Submit at the bottom of the page. Online statements reduce paper clutter, help protect against identity theft, and they're gentle on the environment.



## Activity summary

| | |
|---|---|
| Beginning balance on 11/1 | $3,142.02 |
| Deposits/Additions | 698,460.15 |
| Withdrawals/Subtractions | – 677,843.00 |
| Ending balance on 11/30 | $23,779.17 |

Account number: ⸰⸰

**LAWRENCE P WEIN**

California account terms and conditions apply

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 121042882

### Overdraft Protection

This account is not currently covered by Overdraft Protection. If you
would like more information regarding Overdraft Protection and
eligibility requirements please call the number listed at the top of
your statement or visit your Wells Fargo branch.

## Checking and money market summary

Fund name:  *WF Advantage CA Municipal MMF*

| | |
|---|---|
| Money market fund balance on 11/30 | $23,779.17 |
| Checking balance on  11/30 | $0.00 |
| Dividends earned this period | * $0.31 |
| Dividends earned year to date | $4.50 |
| Money market fund minimum balance | $2,142.17 |
| Money market fund average balance | $37,144.84 |
| 7-day current yield as of 11/30 | 0.01% |
| 30-day current yield as of 11/30 | 0.01% |

\*  *The actual dividend amount will post to your account on the first
business day of the following month end appear on your next
statement.*

## Transaction history

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 11/1 | | Dividend Paid/Reinvested Prior Month WF Advantage CA Municipal MMF | 0.15 | | |
| 11/1 | | Fid Bkg Svc LLC Moneyline 111101 xxxxx6100 65C1E Lawrence P Wein | | 1,000.00 | 2,142.17 |
| 11/4 | | Deposit Made In A Branch/Store | 2,300.00 | | 4,442.17 |
| 11/8 | | Deposit | 6,000.00 | | 10,442.17 |
| 11/9 | | Deposit | 15,000.00 | | |
| 11/9 | 1698 | Check | | 582.00 | 24,860.17 |
| 11/14 | | Deposit | 600,000.00 | | |
| 11/14 | | Online Transfer Ref #Ibejv2886G to Home Equity Line of Credit Repay Loan 10000 | | 10,000.00 | |
| 11/14 | | Withdrawal Made In A Branch/Store | | 8,000.00 | 606,880.17 |
| 11/16 | | Online Transfer From Thompson S Ref #Ibe58V28Bx Checking New Balance to 2500 | 250.00 | | |
| 11/16 | | Online Transfer Ref #Ibe35Wnm9G to Home Equity Line of Credit Repay Wittner Loan 316861 | | 316,351.00 | |



## Transaction history (continued)

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 11/16 | | Online Transfer Ref #Ibe2Cspf2S to WF Home Equity Acct Repay Willner Loan 180000 | | 180,000.00 | |
| 11/16 | | Fid Bkg Svc LLC Moneyline 111116 xxxxx8100 6Cwkd Lawrence P Web | | 1,000.00 | |
| 11/16 | 1699 | Check | | 900.00 | 6,879.17 |
| 11/16 | | Deposit | 9,900.00 | | 16,779.17 |
| 11/23 | | Deposit | 35,000.00 | | |
| 11/23 | | Withdrawal Made In A Branch/Store | | 10,000.00 | 43,779.17 |
| 11/25 | | Bank Originated Credit | 10,000.00 | | 53,779.17 |
| 11/28 | | Deposit | 20,000.00 | | 73,779.17 |
| 11/30 | | Online Transfer Ref #Iba56Y6Ypfr to WF Home Equity Acct Repay Loan for Dir 5000D | | 50,000.00 | 23,779.17 |
| Ending balance on 11/30 | | | | | 23,779.17 |
| **Totals** | | | **$599,460.15** | **$577,913.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Summary of checks written   (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 1698 | 11/9 | 562.00 | 1699 | 11/16 | 900.00 |

## Money market fund sweep transactions

| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|---|---|
| 11/1 | - 0.15 | 11/9 | - 6,000.00 | 11/16 | +498,001.00 | 11/25 | -10,000.00 |
| 11/1 | +1,000.00 | 11/9 | - 14,438.00 | 11/16 | - 8,900.00 | 11/28 | - 20,000.00 |
| 11/7 | - 2,300.00 | 11/14 | - 482,000.00 | 11/23 | - 25,000.00 | 11/30 | +50,000.00 |

*Sweep transactions are settled in the Fund, and Fund shares are actually purchased and redeemed on the business day immediately following the day of the sweep shown above.*

## ⓨ IMPORTANT ACCOUNT INFORMATION

Create a budget, track spending, and receive alerts to monitor your account activity. Experience financial freedom when you use Wells Fargo's account alerts and other online money management tools. Use Wells Fargo Mobile so you can access your accounts on-the-go*. Go to wellsfargo.com to sign up or sign on today. *Service provider and applicable account activity fees may apply.

A Wells Fargo Way2Save Retirement account can be a great way to start your retirement savings. This account gives you the ease and convenience of automatic transfers and the security of FDIC insurance, up to applicable limits. Talk to your Wells Fargo banker, call 1-800-BEST-IRA (1-800-237-8472) or visit us online at wellsfargo.com.



## Checking and money market summary

Fund name: *WF Advantage CA Municipal MMF*

| | |
|---|---|
| Money market fund balance on 4/30 | $3,534.29 |
| Checking balance on 4/30 | $0.00 |
| Dividends earned this period | * $0.70 |
| Dividends earned year to date | $1.01 |
| Money market fund minimum balance | $3,534.29 |
| Money market fund average balance | $85,405.72 |
| 7-day current yield as of 4/30 | 0.01% |
| 30-day current yield as of 4/30 | 0.01% |

\* *The actual dividend amount will post to your account on the first business day of the following month and appear on your next statement.*

## Transaction history

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 4/2 | | Dividend Paid/Reinvested Prior Month WF Advantage CA Municipal MMF | 0.09 | | |
| 4/2 | | Online Transfer Ref #Ibems74R5W From WF Home Equity Acct 2011 Property Tax Payment for Drr | 15,146.00 | | |
| 4/2 | | Fid Bkg Svc LLC Moneyline 120402 xxxxx6100 920Ns Lawrence P Wein | | 1,000.00 | 20,204.29 |
| 4/3 | 1708 | Check | | 15,146.00 | 5,058.29 |
| 4/4 | | Online Transfer Ref #Ibeilbrie2Q From Home Equity Line of Credit Short Term Loan and Payoff Drr Everett | 335,000.00 | | |
| 4/4 | | Online Transfer Ref #Ibeqp86Y36 From WF Home Equity Acct Short Term Loan to Larry | 220,000.00 | | 560,058.29 |
| 4/6 | | Wire Trans Svc Charge - Sequence: 120405124945 Srf# 0000692096385623 Trn#120405124945 Rfb# | | 30.00 | |
| 4/6 | | WT Fed#01698 U.S. Bank, N.A. /Ftr/Bnf=Queen City Investment Fund II Srf# 0000692096385623 Trn#120405124945 Rfb# | | 500,000.00 | |
| 4/6 | 1707 | Check | | 55,000.00 | |
| 4/6 | 1705 | Check | | 284.00 | 4,744.29 |
| 4/6 | | Deposit | 20,000.00 | | 24,744.29 |
| 4/13 | | Deposit | 1,665.00 | | |
| 4/13 | | Transfer From Thompson Shane Ref # Ppe2Dym636 Balance Is NOW 2000 Thank You | 125.00 | | |
| 4/13 | | Withdrawal Made In A Branch/Store | | 8,000.00 | 17,534.29 |
| 4/16 | | Bank Originated Credit | 10,000.00 | | |
| 4/16 | | Fid Bkg Svc LLC Moneyline 120416 xxxxx6100 8D4Ti Lawrence P Wein | | 1,000.00 | 26,534.29 |
| 4/18 | | Withdrawal Made In A Branch/Store | | 8,000.00 | |
| 4/18 | | Fid Bkg Svc LLC Moneyline 120418 xxxxx6100 9lhJP Lawrence P Wein | | 15,000.00 | 3,534.29 |
| **Ending balance on 4/30** | | | | | 3,534.29 |
| **Totals** | | | **$601,936.09** | **$604,460.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*



## Interest summary

| | |
|---|---|
| Interest paid this statement | $0.63 |
| Average collected balance | $9,349.49 |
| Annual percentage yield earned | 0.08% |
| Interest earned this statement period | $0.63 |
| Interest paid this year | $0.63 |

## Transaction history

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 9/4 | | Transfer From Thompson Shane Ref #Ppcc58Smyr New Balance Is 1500. Thank You | 100.00 | | |
| 9/4 | | Sweep Dividend Deposit ACH Dividend Tra | 0.60 | | |
| 9/4 | | Fid Bkg Svc LLC Moneyline 120904 xxxxx5100 By/Uz Lawrence P Wein | | 1,000.00 | 2,699.62 |
| 9/6 | | Deposit Made In A Branch/Store | 100,000.00 | | 102,699.62 |
| 9/7 | | Online Transfer Ref #Ibeg2D47Zx to WF Home Equity Acct Pay Down Loan for Dro 100000 | | 100,000.00 | 2,699.62 |
| 9/12 | | Deposit Made In A Branch/Store | 2,300.00 | | 4,999.62 |
| 9/14 | | Online Transfer Ref #Ibeg5D94Fiq From WF Home Equity Acct Short Term Loan for Lw Capital Total 300000 | 300,000.00 | | |
| 9/14 | | Online Transfer Ref #Ibexhr8Rh3 From Home Equity Line of Credit Short Term Loan Lw Capital Total 500000 | 200,000.00 | | |
| 9/14 | | Wire Trans Svc Charge - Sequence: 120914126046 Srf# 000069225B946697 Trn#120914126046 Rfb# | | 30.00 | |
| 9/14 | | WT Fed#05717 US Bank, NA /Ftr/Bnf-Qfc, LLC Srf# 000069225B946697 Trn#120914126046 Rfb# | | 500,000.00 | 4,969.62 |
| 9/17 | | Fid Bkg Svc LLC Moneyline 120917 xxxxx5100 G6Fmk Lawrence P Wein | | 1,000.00 | 3,969.62 |
| 9/21 | | Deposit Made In A Branch/Store | 698.85 | | 4,668.47 |
| 9/27 | | Deposit Made In A Branch/Store | 12,000.00 | | 16,668.47 |
| 9/28 | | Interest Payment | 0.63 | | 16,669.00 |
| Ending balance on 9/30 | | | | | 16,669.00 |
| Totals | | | $615,099.88 | $602,030.00 | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

# ☑ IMPORTANT ACCOUNT INFORMATION

Effective November 7, 2012, debit or ATM card cash withdrawals made in person at non-Wells Fargo locations or in person using the cash advance feature at Wells Fargo banking locations will be subject to your daily ATM withdrawal limit.

In addition, in the Terms & Conditions for Wells Fargo Consumer Debit Cards, the section titled "Authorization Holds for Card transactions" and Consumer Account Agreement section titled "Authorization holds for          card transactions" are changing to clarify that the Bank is permitted to place authorization holds for up to 30 days on certain debit card transactions.

Remember, an "authorization hold" is a "pending" transaction that will reduce the current available balance that you can withdraw or use to pay transactions from your account. If you do not have sufficient available funds in your account, transactions may be paid with an overdraft protection advance, paid into overdraft or returned unpaid as applicable.



## Interest summary

| | |
|---|---|
| Interest paid this statement | $2.10 |
| Average collected balance | $30,400.00 |
| Annual percentage yield earned | 0.08% |
| Interest earned this statement period | $2.10 |
| Interest paid this year | $7.98 |

## Transaction history

| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|---|---|---|---|---|---|
| 12/3 | | Fid Bkg Svc LLC Moneyline 121203 xxxxx5100 Dllys Lawrence P Wein | | 1,000.00 | 9,875.60 |
| 12/4 | | Withdrawal Made In A Branch/Store | | 6,600.00 | |
| 12/4 | 1716 | Check | | 284.00 | 3,091.80 |
| 12/6 | | Online Transfer Ref #Ibee9288W4 From WP Home Equity Acct Short Term Loan Wilner 400000 | 400,000.00 | | |
| 12/6 | | Online Transfer Ref #Ibee9Gqqx From Home Equity Line of Credit Short Term Loan Wilner 200000 | 200,000.00 | | 603,091.80 |
| 12/7 | | Wire Trans Svc Charge - Sequence: 121207126912 Srl# 0000892342702445 Trn#121207126912 Rfb# | | 30.00 | |
| 12/7 | | WT Fed#04976 US Bank, NA /Ftr/Bnf=Glo LLC. Srl# 0000892342702445 Trn#121207126912 Rfb# | | 600,000.00 | 3,061.80 |
| 12/10 | | Deposit | 18,000.00 | | 21,061.80 |
| 12/12 | 1716 | Check | | 2,712.38 | 18,349.42 |
| 12/13 | | Deposit Made In A Branch/Store | 2,300.00 | | 20,649.42 |
| 12/17 | | Withdrawal Made In A Branch/Store | | 9,000.00 | |
| 12/17 | | Fid Bkg Svc LLC Moneyline 121217 xxxxx5100 Duo1M Lawrence P Wein | | 1,000.00 | 10,649.42 |
| 12/19 | | Withdrawal Made In A Branch/Store | | 8,000.00 | 2,649.42 |
| 12/20 | | Deposit Made In A Branch/Store | 15,000.00 | | |
| 12/20 | | Transfer From Thompson Shane Ref #Ppsmvbd6Yp | 150.00 | | 17,799.42 |
| 12/24 | | Deposit Made In A Branch/Store | 10,000.00 | | |
| 12/24 | | Online Transfer Ref #Ibee3G3Qgd to Premier Checking xxxxx0194 on 12/22/12 | | 13,000.00 | 14,799.42 |
| 12/28 | | Withdrawal Made In A Branch/Store | | 9,000.00 | 5,799.42 |
| 12/31 | | Interest Payment | 2.10 | | 5,801.52 |
| Ending balance on 12/31 | | | | | 5,801.52 |
| Totals | | | $645,452.10 | $650,526.38 | |

The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.

## Summary of checks written   (checks listed are also displayed in the preceding Transaction history)

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 1716 | 12/4 | 284.00 | 1716 | 12/12 | 2,712.38 |

 # IMPORTANT ACCOUNT INFORMATION

We want to let you know of important upcoming changes.